## Harold Derschowitz (x263)

| | |
|---|---|
| **From:** | numoh@umohlaw.com |
| **Sent:** | Thursday, February 07, 2008 12:18 AM |
| **To:** | Deborah MartinNorcross |
| **Cc:** | Harold Derschowitz (x263) |
| **Subject:** | RE: Mann v. Plus One, etc. |
| **Attachments:** | Mann-Bates Stamped 113-184 (4).pdf |

These are additional bates stamped documents
Uwem I. Umoh
255 Livingston Street,
4th Floor
Brooklyn, NY 11217
718.360.0527
718.360.1916 (Fax)

This electronic message transmission is sent by the Umoh Law Office. This message contains
information that is confidential, privileged and exempt from disclosure under applicable law. The
information is intended only for the use of the individual(s) or entity(ies) to which it is addressed. Any
unauthorized use or dissemination of this communication is strictly prohibited. If you are not the
intended recipient or agent responsible for delivering this message to the intended recipient, be aware
that any disclosure, copying, distribution or use of the contents of this message is prohibited.

If you have received this electronic transmission in error, please notify us immediately by telephone at
(718) 360-0527 or notify the sender by return e-mail message and delete this message and all its
attachments. Thank you.

-------- Original Message --------
Subject: Mann v. Plus One, etc.
From: "Deborah MartinNorcross" <dmnorcross@martinnorcross.com>
Date: Fri, January 04, 2008 2:14 pm
To: "Harold Derschowitz (x263)" <HDERSCHOWITZ@lskdnylaw.com>
Cc: "numoh@umohlaw.com" <numoh@umohlaw.com>

Dear Harold,

Attached are our: (1) First Request for Production of Documents; (2) First Set of
Interrogatories to Board of Managers of Trump World Tower Condominiums; and (3) First Set
of Interrogatories to John Henriques. Please respond to these discovery requests within the time
proscribed by the Federal Rules.

Thank you.

Deborah

--

Deborah Martin Norcross, Esq.
MartinNorcross LLC
60 Marion Road West
Princeton, NJ 08540
(609) 249-5860
(609) 945-3912 Fax
dmnorcross@martinnorcross.com

2/7/2008

## ACKNOWLEDGMENT OF RECEIPT OF
## PLUS ONE'S OCCUPATIONAL SAFETY AND HEALTH PLAN

I HAVE RECEIVED A COPY OF THE PLUS ONE OCCUPATIONAL SAFETY AND
HEALTH PLAN.

I UNDERSTAND THAT I MUST READ THE PLAN AND THE TRAINING MATERIALS
INCLUDED. MY SIGNATURE BELOW INDICATES THAT I HAVE BEEN EDUCATED
AND TRAINED ON ALL SECTIONS OF THIS PLAN.

_Rhonda Mann_
NAME (print)

_Rhonda Mann_
SIGNATURE

_Claudia Ashfort_
WITNESS SIGNATURE

_8-13-02_
DATE

– 20 –

JM 0113



JM 0114



JM 0015

+1

## INTERNAL POSTING APPLICATION
### To be completed by employee

Employee Name:
Jordan Mann

Current Job Title and Location:
Massage Therapist @ Goldman Sach - 30 Hudson

Would like to be considered for the position of:
receptionist @ the Trump facility

Date of Hire (in current position):
March 2002

Overall rating of last performance review:
N/a

My qualifications for the position include: B.A. in Communications,
computer literate and superb customer service
skills

2-15-06                                    _Jordan S____
Date                                       Employee Signature

---

**PART-II**

## CURRENT MANAGER
### To be completed by employee's current manager

☑ Employee recommended

☐ Employee not recommended. Please provide competency, based reasons by
attaching supporting documents.

2/15/06                                    _Sean Begley_
Date                                       Manager's Signature

JM 0016



fitness
physical therapy
spa
health management

07 June 2006

To Whom It May Concern:

Ms. Jordan Mann is currently employed by Plus One as a Receptionist in our Plus One
Trump International Hotel and Tower Spa.

Ms. Mann has been employed with us since August 12, 2002. She was a part time NJ
Massage Therapist for the first three years and effective March 6, 2006 she became a full
time Receptionist.

If you have any further questions regarding Ms. Mann's employment with Plus One,
please do not hesitate to contact me at heather.davis@plusone.com or at 646.312.6233.
Thank you for your assistance on Jordan's behalf.

Sincerely,

Heather A. Davis
HR Generalist/Recruiter
Plus One Holdings, Inc.

+1 Corporate Headquarters • 75 Maiden Lane • Suite 801 • New York • NY 10038
212.791.2300 • Fax 212.269.2720 • www.plusone.com

JM 0117

Dec 18 06 12:01p    MartinNorcross    (609) 945-3912    p.14

# Enrollment / Change Form (Consolidated)

Employer: Complete Section A
Employee: Complete Sections B-G

Insured and/or Administered by
Connecticut General Life Insurance Company
CIGNA HealthCare

CIGNA

*Please print and thank you for providing this information*

## TYPE OF CHANGE:
- OPEN ENROLL.
- ☑ NEW HIRE
- CHANGE
- REINSTATE

**EMPLOYER ADDRESS**
75 Maiden Lane #801 NY, NY

Last Name: Mann
First Name: Jordan

ADDRESS: 259 5th St. Jersey City

HOME PHONE: (201) 420-0498
WORK PHONE: (646) 313-7630

DEPENDENT SPOUSE SECURITY NO.: 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

DATE OF BIRTH: 10-8-68

HOME & EMAIL ADDRESS: Jersey City

BRANCH CODE

CAR GROUP NO. 834040N
SUB GROUP NO. 75 Maiden Lane #801 NY NY

SOCIAL SECURITY NO. 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

DIV/SUBGROUP/CLASS: D4 DU2 JacoDu Plus One
D2 Dzeldo

Received Dec-18-2006 11:39am    From-609 945 3912    To-EEOC-NYDO (7)    Page 014

JM 0118

SIGNATURE: 3-30-06

N/A

# EXHIBIT 1-A

JM 0119

## Milani, David

| | |
|---|---|
| **From:** | Miller, Esther |
| **Sent:** | Thursday, June 22, 2006 1:14 PM |
| **To:** | Motta, Mike |
| **Cc:** | Milani, David |
| **Subject:** | Jordan Mann - Former +1 Employee |
| **Importance:** | High |

Hi Mike,

Jordan Mann called me on my line...............

She wanted you to know that she is cancelling her meeting with Dave Milani for tomorrow and asked that you/he speak with her lawyer instead:

Patrick O'Keke
Phone: 718-855-9595

*Esther M. Miller*
*Administrative Assistant*
*Plus One Holdings*
*75 Maiden Lane, Suite #301*
*New York, NY 10038*
*Phone: 646-312-6224; Fax: 646-312-6291*
*E-mail: Esther_Miller@plusone.com*
*"Maximizing Your Human Potential"*
*To Get Your Own On-Line Personal Trainer Click On: www.PlusOneActive.com*

*[handwritten notes:]*
LM 6/23
11:35 am

12:35 PM - SPOKE TO P. O'KEKE
• LTRS TO ALL PTYS.
• DEF PTY NOT WK
• AGREED TO TALK TO
  PH BEFORE LETTERS
  TO CLIENTS.
• YET. NO EEOC COMP
  FILED.

6/23/2006

*[handwritten:]* JM 0120

## Milani, David

| | |
|---|---|
| **From:** | Mann, Jordan |
| **Sent:** | Friday, June 09, 2006 9:44 AM |
| **To:** | Milani, David; Murray, Michael; Macdonald, Jamie |
| **Cc:** | Motta, Mike |
| **Subject:** | June 8 and 9 incident report of harassment |
| **Attachments:** | June 8.doc |

Attached is my incident report about the harassment and hostile work environment at Trump World Tower. As per Jamie MacDonald, I am being sent home indefinitely with pay.

Regards,

Jordan Mann

6/15/2006

**Milani, David**

| From: | Milani, David |
|---|---|
| Sent: | Tuesday, June 06, 2006 12:44 PM |
| To: | Mann, Jordan |
| Subject: | Confidential |

Jordan,

I started work yesterday as Plus One's new VP of Human Resources.  Mike Motta asked me to follow up with you regarding some concerns you have raised.  I'm eager to discuss these issues with you in hopes of understanding your perspective and resolving any outstanding items.  Please let me know the best way to reach you so that we may schedule a mutually convenient time to meet in person.

Thanks,
Dave Milani

6/16/2006

JM 0122

## Milani, David

**From:** Mann, Jordan
**Sent:** Wednesday, June 07, 2006 10:50 AM
**To:** Milani, David
**Subject:** FW: grooming policy

here are the emails per your request. see you on Friday at 11:30am.

---

**From:** Mann, Jordan
**Sent:** Mon 6/5/2006 6:51 AM
**To:** Motta, Mike
**Cc:** Ciatto, Chris; Macdonald, Jamie
**Subject:** RE: grooming policy

Mike,

I've had a copy of the Trump standards since April 6. In addition, if you had investigated my allegations up to date, you would not have me deal with Chris Ciatto or Jamie MacDonald who were part of the discrimination/harassment. Chris asked me to "get braids" and "trim my hair" and questioned me as to why "no other Black women in the office have hair like" me. Also, Jamie was the first person at Plus One to start the harrassment and discrimination by saying my hair was "not normal," "inappropriate" and that "Plus One did not make allowances for individuals" with hair like me.

The lack of investigation leads me to believe that PlusOne accepts and fosters an environment conducive for herrassment and discrimination, when the perpetrator is part of management.

Sincerely,
Jordan

---

**From:** Motta, Mike
**Sent:** Wed 5/31/2006 3:18 PM
**To:** Mann, Jordan
**Cc:** Ciatto, Chris; Macdonald, Jamie
**Subject:** RE: grooming policy

Jordan,
I apologize for the delay in my response and any misunderstanding that may have occurred regarding the grooming standards at Trump World.
To expedite the process and prevent too many emails from crossing each other, Chris Ciatto and Jamie Macdonald will work with you directly.
They will make sure that you have a written copy of the standards that we are required to maintain at Trump World.
They will also address any other questions that you have regarding these standards.
Regards,
Mike

Michael Motta
President, Plus One
(646) 312-6200 direct
mike.motta@plusone.com

6/15/2006

JM 0123

**From:** Mann, Jordan
**Sent:** Tuesday, May 30, 2006 12:29 PM
**To:** Motta, Mike
**Subject:** RE: grooming policy

Please advise on the status of your investigation.

Regards,
Jordan

---

**From:** Motta, Mike
**Sent:** Mon 5/22/2006 10:23 AM
**To:** Mann, Jordan
**Cc:** Ciatto, Chris; Macdonald, Jamie
**Subject:** RE: grooming policy

Jordan,
Thank you for giving me this information.
I will investigate as per your request.
Regards,
Mike

Michael Motta
President, Plus One
(646) 312-5200 direct
mike.motta@plusone.com

---

**From:** Mann, Jordan
**Sent:** Monday, May 22, 2006 10:00 AM
**To:** Motta, Mike
**Subject:** grooming policy

Mike,

I'm emailing you again because I am being singled out in respect to the grooming policy at Trump World Tower again. On his first day here, Christian Garcia, the new temporary site manager had a meeting with me and questioned me about my grooming, specifically my earrings. He provided an example that males are not allowed to wear earrings at reception. After speaking with co-workers, I found out that I was the only staff member questioned about grooming. Eventhough, other staff members have been violating policy well before I was employed at Trump World Tower and have continued to do such.

To date, no one at PlusOne has been able to give me a factual and/or objective statement as which rule I specifically violate with respect to the grooming policy. It is my hope that you investigate all the issues I have informed you of to date, to rectify these events.

Sincerely,
Jordan

---

6/15/2006

JM 0124

**From:** Motta, Mike
**Sent:** Thu 5/11/2006 9:35 AM
**To:** Mann, Jordan
**Cc:** Salomon, Richard; Ciatto, Chris; Macdonald, Jamie; Welter, Bob; Davis, Heather; Niszczak, Tom
**Subject:** RE: response to your letter received in the mail

Jordan,
I apologize for the typo in the letter.
We are looking forward to hearing from your attorney so we can resolve all the issues.
Sincerely,
Mike

Michael Motta
President, Plus One
(646) 312-6200 direct
mike.motta@plusone.com

---

**From:** Mann, Jordan
**Sent:** Thursday, May 11, 2006 6:39 AM
**To:** Motta, Mike
**Cc:** Salomon, Richard; Ciatto, Chris; Macdonald, Jamie; Welter, Bob; Davis, Heather; Niszczak, Tom
**Subject:** response to your letter received in the mail

Dear Mike,

I recently received your letter in the mail addressed to "**Mr. Jordan Mann**." Please note that I am a female working at the Trump World Tower site. And like you said in your letter, there is confusion, as well as inequalities, with respect to me and my hair with your management and staff. On numerous occasions, they have stressed grooming examples, standards and hair lengths which they have only applied to Plus One males. Furthermore, it is my understanding that no policy states that women must not grow their hair past three inches, nor has any other non-Black woman ever been subjected to a hair length rule of this kind.

Please note that my attorney will fully address all the other issues with respect to your letter.

Sincerely,

Ms. Jordan Mann
Trump World Tower
646 313 7630

---

**From:** Motta, Mike
**Sent:** Fri 5/5/2006 10:48 AM
**To:** Mann, Jordan
**Cc:** Salomon, Richard; Ciatto, Chris; Macdonald, Jamie; Welter, Bob; Davis, Heather; Niszczak, Tom
**Subject:** Response to your email to me dated May 5, 2006

Dear Jordan,

Thanks for your e-mail. I am glad you wrote to me. I have decided, as President of Plus One, that your hair is acceptable for our business purposes.

Please understand that business purposes may vary depend on the site. What dress may be suitable in Soho or Chelsea may not be suitable at certain uptown locations. I myself dress and wear different clothes to some meetings than to others. Some may even change their hairstyle depending on the business purpose. Please

6/15/2006

appreciate that we conduct ourselves differently in some ways at your current site than we do in other sites, and we expect employees to appreciate the differences in the business climate at each of our sites.

As to your hairstyle though, it is acceptable in all of our sites. Some hairstyles are not, and we have taken action at your current location to ask some of our employees to change their hairstyle when working at that site. I personally regret that there was some confusion on our part with respect to your hairstyle, and you have my sincere apology.

That being said, I ask you to be sensitive to our business purposes, to wear a headband if you wish to, and to maintain your hair length at its current length if that suits your personal wishes. While the 3 inch hair rule is a fair and appropriate general guideline for that location, it will not be applied in your case or in any other instances where it is unsuitable to do so.

Jordan, I do not know whether your statement of events in the e-mails you forwarded to me is, or is not, accurate in all respects. But, it does not make a difference to my decision today, so there is no need for me to address those statements.

You have been a valuable employee of Plus One. I am sorry this matter has stressed you out, and understand why you feel that way. I hope that you will place this matter behind you as soon as possible so that you are free from extraneous concerns in the workplace. And do not hesitate to contact me if you feel that any others at Plus One have not placed this matter behind them as well, despite my direction to do so. Having spoken to Chris Ciatto about this matter, I can tell you that he and I are in complete agreement with respect to your hair. I will ask Chris to convey our decision and our philosophy on this matter to Jamie Macdonald as well. Finally, you may or may not know that Bob Welter has decided to resign as head of Human Resources, and I have asked Chris to discuss this matter with his replacement when hired.

Again, thanks for your e-mail, and keep up the good work. Also, a paper copy of this email will be sent to your home address.

Sincerely,
Mike

Michael Motta
President, Plus One
(646) 312-6200 direct
mike.motta@plusone.com

---

**From:** Mann, Jordan
**Sent:** Friday, May 05, 2006 6:52 AM
**To:** Motta, Mike
**Subject:** FW: discrimination and harassment

Dear Mike,

Below is an email I sent to Chris Ciatto. I originally met with him in early April about my situation but he never got back to me. As it stands, according to human resources, I will be terminated if I do not change my hair. Please note that my current hairstyle is an afro and has been such since my employment with PlusOne.

I'm sending this email to you as my last resort to rectify the discrimination and harassment to which I have been subjected.

Sincerely,

Jordan Mann
receptionist
Trump World Tower site

6/15/2006

JM 0126

846 313 7630

6/15/2006

JM 0127

Milani, David

**From:** Davis, Heather
**Sent:** Thursday, June 08, 2006 12:31 PM
**To:** Milani, David
**Subject:** FW: Incident Report Form, June 8, 2006

fyi

Thank you!
Heather

---

**From:** intranet@plusone.com [mailto:intranet@plusone.com]
**Sent:** Thursday, June 08, 2006 12:27 PM
**To:** Incident Report; Macdonald, Jamie; James.Macdonald@plusone.com
**Subject:** Incident Report Form, June 8, 2006

**Date of incident:** 06 / 08 / 06    **Time of incident:** 11.15am

**Client's name:** --

**Address:** --

**Home phone:** --

**Business phone:** --

**Facility name / address where incident occurred:**    Trump World Tower

**Staff attending:**    Mike Murray Jordan Mann

**Witness / others present:**

**Details of incident:**    Mike Murray (TWT GM) was working in the office at the facility at 11:15am and overheard two residents having a squabble at the PC on the gym floor. The male Resident (refused to sign in and identify himself) left the female resident (Mrs Wong) shaken up. The male resident then vented to Mike and left the facility but then returned and proceeded to talk to Jordan and Mike at the desk justifying his side of the argument. He perceived that Jordan was trying to find his apartment number so that it would be given to Mrs Wong for her to report the incident to the building management. He pointed at Jordan, threatened to have her fired, threatened to have Mike fired. He subsequently repeated the threat on three more return visits to the facility in the next 20 minutes. Jordan felt shaken and nervous. He swore at both employees : "Fuck you, this is bullshit " Jordan felt threatened and anxious the Resident would escalate the confrontation to physical action. Mike took the view he would cover the rest of her shift to 2pm to provide a safe working environment and send her home. He would call her later today to see how she feels.

**Action taken by staff:**    --

JM 0128

**June 8, 2006**

Approximately 11am, resident Lily Wong entered the pool area to ask me about tenant Robert who according to her, was harassing her while she was at the computer. She wanted to know what his name was. Upon her description, I realized I was familiar with the tenant but did not know his name. Site general manager Mike Murray and Lily Wong wanted to know the tenant's name and apartment number.

I went to ask co-worker Magaly and she gave me his first name and I came back to tell Mike Murray and Lily Wong. Lily was extremely upset about an altercation she had with Robert. She was so shaken that she said she was filing a report with the building manager. After she left, I continued to look on the tenant list to find out exactly who this Robert was.

From her apartment, Lily called down to the fitness center to find out the full name and apartment number of Robert. While I was on the phone with her, Robert was at the reception area listening to my conversation. Once I hung up with Ms. Wong, Robert accused me of giving out his apartment number and then began to berate, curse at and threaten me. He said things like you're 'bullshit...I don't like you...I will have you terminated...fuck you...I'm going to do everything in my power to have you gone.' He said this while pointing his finger at me and hovering over the reception desk. He then cursed out and threatened Mike Murray because he was trying to mediate the situation between Robert and I. Then through out the time of my shift, Robert continued to come down(at least 20times between the hours of 11am and 1pm) to harass me. Extremely shaken, I asked if I could leave because I didn't feel safe in the environment. Mike told me to wait and that he had to call regional vp Jamie MacDonald. While Mike was on the phone with Jamie, I was told to write a report of the incident. I told Mike I would do such but I said I wouldn't stay here to do it because I was emotionally overwhelmed.

Later, at home around 5pm, I called Trump World Tower healthclub reception and spoke to Ryan Fairall to see if the tenant had been banned from the club because of his threats and harassment. Ryan said no and that all Mike did was file an incident report. This made me even more nervous to come to work at Trump World Tower to an already hostile work environment because of continued harassment and discrimination from PlusOne and Trump management.

**June 9, 2006**

Approximately 6:20am, Tenant Robert exited off the elevator. I said 'good morning.' In a hostile threatening tone, he said, 'don't speak to me. I don't want to talk to you.' When I realized that the abusive tenant was not barred from the healthclub and was still hostile, I called the police. The police showed up and took a report. During that time, the tenant Robert continued to rant about how he would 'have me out of here' in two hours. He threatened that he would make sure that I would no longer be here at Trump World Tower. He also cursed, using the word 'bullshit.'

I called the police because Plus One nor Trump building management did nothing to secure my safety. Plus One and Trump building management was well aware of the

harassment and threats since yesterday morning but allowed the tenant to continue to come to the fitness center.

After the police left, Trump security came down. The security guard just took down the spelling of my name. Security then told tenant Robert that he was able to continue using the gym facilities and not to worry about this.

Over and over, Robert was entering and exiting the fitness club coming by the reception desk saying he would have me fired, that he 'wouldn't hire me' because I was "fat and not beautiful.' He also said that 'this AIN'T(stressing this word) a Black thing.'

I then made emergency calls to site general manager Mike Murray, regional vice president Jamie MacDonald and building manager John Henriques.

**8:14**
Jamie MacDonald returned my call. I told him I was very upset and felt extremely threatened and that the Trump World Tower site continues to be a hostile work environment for me. I also said that I was extremely distressed with the treatment with PlusOne and Trump and said I even had issues with Jamie himself because of his harassing and discriminatory comments/actions he made towards me. I told him I called the police because PlusOne nor Trump did nothing to prevent Robert from entering the gym or providing a safe environment even though I still was being harassed by Robert. I asked why PlusOne nor Trump was not barring this tenant from the healthclub. Jamie said that John Henriques was supposed to handle the situation. Jamie said that I wasn't being singled out and that Robert had harassed and threaten Mike Murray and others. He said that I should go home with pay until further notice and until PlusOne had 'secured the premises.' I told Jamie that I was going to corporate headquarters to meet with the vice president of human resources. He also said that a report was issued to the building manager John Henriques and he would follow up.

**8:34am**
Mike Murray returned my called and said that he handled the situation by filing an incident report and emailed Jamie. He said that Jamie handled it from there. Mike did not say that the tenant would be barred from the facility. Mike told me to call Christian Garcia, intermin manager and tell him I was leaving for home.

**9:10**
I called Mike Motta and told him about the harassment situation. I asked him was this tenant was not being barred from the site. He said that Jamie MacDonald is handling the situation.

**9:15am**
I called Lily Wong and she told me that later yesterday she felt afraid that Robert 'was going to attack her" while he was "hanging around the mezzanine level." She also said she filed a report with the building manager John and that according to her, John said

that 'the building has been trying to throw him out for years' and 'that he's unstable and dangerous.' She gave me her home number and said she would talk to police.

JM 0131

# EXHIBIT 2

JM 0132

# WELCOME STATEMENT

Congratulations and thank you for accepting Plus One's offer of employment. Since 1986, one of the keys to our success as a company is hiring great people. We have hired you because we believe you have the skills and the potential to help Plus One succeed. We expect and depend upon you to perform your job to the best of your abilities. We believe that hard work and commitment will not only help us succeed but may give you a sense of pride and accomplishment as well.

We are glad to have you as a member of the Plus One Team. Our goal and part of our Mission Statement is to create a positive, professional, enriching and supportive working environment for every Plus One team member. You have a role in this Mission and can "**Make yourself a nice place to work**". We value the abilities, experience and background that you bring with you to our company. You provide the services that our clients rely upon and enable us to grow and create new opportunities in the years to come.

Our Management Team will provide you with support and the resources to help you perform your job effectively. If, at any time, you need assistance or guidance, please do not hesitate to ask me or any member of the Management Team. We all want you to succeed.

Once again, welcome to Plus One; we are proud to have you with us.

Michael Motta
President

# MISSION STATEMENT

- To consistently address the unique needs of each Plus One client, member and patient by providing the finest care available and world-class service. **Care and Service Rule.**

- To create a positive, professional, enriching and supportive working environment for every Plus One team member. **Make Yourself a Nice Place to Work.**

- To balance the science of healthcare with fun and motivating programs. **Juggle Some Serious Fun.**

- To offer comprehensive health services that set the industry Gold Standard for safety, effectiveness, professionalism and cutting edge creativity. **Strive to be the Gold Standard.**

i

Jm 0133

**Table of Contents**

WELCOME STATEMENT.................................................................................I

MISSION STATEMENT ...............................................................................I

I.  INTRODUCTION ......................................................................................1

   A.  DESCRIPTION OF HANDBOOK.....................................................1

II.  EMPLOYMENT RELATIONSHIP............................................................2

   A.  EMPLOYMENT AT WILL ...............................................................2

   B.  EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER.............................2

III.  COMMENCING EMPLOYMENT...........................................................4

   A.  BACKGROUND CHECKS...............................................................4

   B.  IMMIGRATION COMPLIANCE........................................................4

   C.  EMPLOYMENT STATUS ...............................................................4

   D.  INTRODUCTORY PERIOD..............................................................5

   E.  JOB DUTIES ...............................................................................5

IV.  PAYROLL ...............................................................................................6

   A.  WORKING HOURS & SCHEDULE ...................................................6

   B.  TIMEKEEPING PROCEDURES.........................................................6

   C.  OVERTIME..................................................................................6

   D.  PAYMENT OF WAGES...................................................................6

   E.  SALARY PAY POLICY ..................................................................7

   F.  BONUSES...................................................................................7

II

G. WAGE GARNISHMENTS.................................................................7

V. PERSONNEL................................................................................8

   A. OPEN-DOOR POLICY ...............................................................8

   B. STATEMENT ON UNIONS...........................................................8

   C. UNLAWFUL HARASSMENT..........................................................8

   D. PROHIBITED CONDUCT............................................................10

   E. CONDUCT & EMPLOYMENT OUTSIDE WORK ..................................12

   F. DRUG & ALCOHOL ABUSE .......................................................12

   G. PUNCTUALITY & ATTENDANCE .................................................14

   H. INVESTIGATIONS OF CURRENT EMPLOYEES ...............................15

   I. PERFORMANCE EVALUATIONS...................................................15

   J. IMPROVING EMPLOYEE JOB PERFORMANCE................................15

   K. CLIENT RELATIONS ...............................................................15

   L. CONFIDENTIALITY..................................................................16

   M. EMPLOYEE DRESS & PERSONAL APPEARANCE ...........................16

VI. PLUS ONE FACILITIES...............................................................17

   A. POLICIES AGAINST WORKPLACE VIOLENCE ................................17

   B. OPERATION OF VEHICLES.......................................................18

   C. USE OF EQUIPMENT...............................................................18

   D. SOLICITATION & DISTRIBUTION OF LITERATURE............................20

   E. SMOKING POLICY ..................................................................20

   F. HEALTH & SAFETY .................................................................20

iii

JM 0135

VII.    BENEFITS.................................................................................21

    A.  HOLIDAYS .........................................................................21

    B.  VACATIONS........................................................................21

    C.  INSURANCE BENEFITS .....................................................21

    D.  POST-TERMINATION CONTINUATION OF MEDICAL INSURANCE.....22

    E.  SICK LEAVE........................................................................22

    F.  PERSONAL DAYS ..............................................................23

    G.  LEAVES OF ABSENCE ......................................................23

    H.  OTHER TIME OFF .............................................................27

    I.  TRAINING PROGRAMS AND SEMINARS .........................28

    J.  EDUCATIONAL ASSISTANCE/TUITION REIMBURSEMENT.................28

    K.  401(K) PLAN ......................................................................29

VIII.    TERMINATION......................................................................30

    A.  VOLUNTARY TERMINATIONS.........................................30

    B.  INVOLUNTARY TERMINATIONS .....................................30

    C.  REDUCTIONS IN FORCE...................................................30

    D.  SEVERANCE PAY .............................................................30

IX. CONCLUSION .......................................................................31

* * * * *

Arbitration Clause

Acknowledgment & Agreement

iv

Received   Dec-18-2006  11:38am    From-609  945 3912      To-EEOC-NYDO (7)      Page  032

JM 0136

## I.    INTRODUCTION

### A.    DESCRIPTION OF HANDBOOK

This Employee Handbook contains information about the employment policies and practices of Plus One Holdings, Inc. ("Plus One" or "the Company"). We expect each Employee to read this Employee Handbook carefully, as it is a valuable reference for understanding your job and the Company. This Employee Handbook supersedes all previously issued Employee Handbooks and inconsistent verbal or written policy statements. Except for the policy of at-will employment, which can only be changed with respect to a particular employee by the President or the Chief Operating Officer in writing, the Company reserves the right to revise, delete, and add to the provisions of this Employee Handbook. All such revisions, deletions, or additions will ordinarily be in writing and be signed by the President of the Company, the Chief Operating Officer, or the Vice President of Human Resources. No oral statements or representations can change the provisions of this Employee Handbook.

None of the Company's personnel documents and benefit plans, including this Employee Handbook, constitutes, or is intended to constitute, an express or implied contract guaranteeing continued employment for any Employee. No Manager has any authority to enter into a contract of employment—express or implied—which changes or alters the at-will employment relationship. Only the President or the Chief Operating Officer has the authority to enter into an employment agreement that alters the at-will employment relationship with respect to a particular employee, and any such agreement must be in writing. This Employee Handbook is the property of Plus One. All rights are reserved. No part of this Employee Handbook may be reproduced in any form or by any electronic or mechanical means, including information storage and retrieval systems, without permission in writing from the Vice President of Human Resources.

Not all Plus One policies and procedures are set forth in this Employee Handbook. If you have any questions or concerns about this Employee Handbook or any other policy or procedure please ask your Manager or the Vice President of Human Resources.

## II.    EMPLOYMENT RELATIONSHIP

### A.    EMPLOYMENT AT WILL

While we hope that your employment will prove mutually satisfactory, please understand that continued employment cannot be guaranteed for any Employee. Employment at the Company is employment at will. This means that you are free to leave your employment at any time, with or without cause or notice, and the Company retains the same right to terminate your employment at any time, with or without cause or notice. This policy of at-will employment may be changed with respect to a particular employee only by a written employment agreement signed by the President or the Chief Operating Officer that expressly changes the policy of at-will employment. Unless your employment is covered by a written employment agreement, this policy of at-will employment is the sole and entire agreement between you and the Company as to the duration of employment and the circumstances under which employment may be terminated.

Terms and conditions of employment with the Company may be modified at the sole discretion of the Company with or without cause or notice at any time. No implied contract concerning any employment-related decision or term or condition of employment can be established by any other statement, conduct, policy, or practice. Examples of the types of terms and conditions of employment that are within the sole discretion of the Company (subject to any applicable restrictions imposed by law) include, but are not limited to, the following: promotion; demotion; transfers; hiring decisions; compensation; benefits; qualifications; discipline; layoff or recall; rules; hours and schedules; work assignments; job duties and responsibilities; subcontracting; reduction, cessation, or expansion of operations; sale, relocation, merger, or consolidation of operations; determinations concerning the use of equipment, methods, or facilities; or any other terms and conditions that the Company may determine to be necessary for the safe, efficient, and economic operation of its business.

### B.    EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER

Plus One is an equal employment opportunity employer and strives to comply with all applicable laws prohibiting discrimination based on race, color, creed, sex, age, national origin or ancestry, physical or mental disability, veteran status, marital status, alienage, citizenship, sexual orientation, as well as any other category protected by federal, state, or local laws. All such discrimination is unlawful and all persons involved in the operations of the Company are prohibited from engaging in this type of conduct.

In accordance with applicable federal and state law protecting qualified individuals with known disabilities, the Company will attempt to reasonably accommodate those individuals unless doing so would create an undue hardship on the Company. Any qualified applicant or Employee with such a disability who requires a reasonable accommodation in order to perform the essential functions of the job should contact the Vice President of Human Resources and request such an accommodation.

Updated: May, 2001                          2

0138

You should feel free to report every instance of unlawful discrimination to your Manager or the Vice President of Human Resources of the Company, regardless of whether you or someone else is the subject of the discrimination. Detailed reports—including names, descriptions, and actual events or statements made—will greatly enhance the Company's ability to investigate. Any documents supporting the allegations should also be submitted. Based on your report, the Company will conduct an investigation, as appropriate. The Company prohibits any and all retaliation for submitting a report of unlawful discrimination and for cooperating in any such investigation. Any Manager or Employee who retaliates against the accuser or those involved in the investigation will be disciplined, up to and including discharge from employment.

If the investigation determines that prohibited discrimination or other conduct violative of Company policy has occurred, the Company will take the disciplinary action it deems appropriate, up to and including termination of employment, against those who engaged in the misconduct. The Company will also evaluate whether other employment practices should be added or modified in order to deter and prevent any such unlawful conduct in the future.

Updated: May, 2001                    3

JM 0139

## III.   COMMENCING EMPLOYMENT

### A.   BACKGROUND CHECKS

The Company recognizes the importance of maintaining a safe workplace with Employees who are honest, trustworthy, qualified, reliable, and nonviolent, and do not present a risk of serious harm to their coworkers or others. For purposes of furthering these concerns and interests, the Company reserves the right to investigate an individual's prior employment history, personal references, and educational background, as well as other relevant information that is reasonably available to the Company.

In the event that a background check is conducted, the Company will comply with the federal Fair Credit Reporting Act and applicable state laws, including providing the prospective Employee with any required notices and forms. Prospective Employees subject to an investigation are required to cooperate with the Company's lawful efforts to obtain relevant information.

### B.   IMMIGRATION COMPLIANCE

Plus One will comply with applicable immigration law, including the Immigration Reform and Control Act of 1986 and the Immigration Act of 1990. As a condition of employment, every individual must provide satisfactory evidence of his or her identity and legal authority to work in the United States. The most common forms of identification are a driver's license and social security card; however, other documents can be used. If you have any questions or need more information on immigration law issues, please contact the Vice President of Human Resources.

### C.   EMPLOYMENT STATUS

Employees at Plus One are classified as exempt, full-time nonexempt, or part-time nonexempt.

#### 1.   Exempt Employees

Exempt Employees are those whose job assignments meet the legal requirements for overtime exemption. Exempt Employees are compensated on a salary basis and are not eligible for overtime pay. Generally, executive, administrative, professional, and certain outside sales Employees are overtime exempt. Your Manager will inform you if your status is exempt.

#### 2.   Full-Time Nonexempt Employees

Full-time nonexempt Employees are those who are normally scheduled to work and who do work a schedule of 30 or more hours per week and meet the legal requirements for overtime pay.

#### 3.   Part-Time Nonexempt Employees

Part-time nonexempt Employees are those who are scheduled to and do work less than 30 hours per week. Part-time nonexempt Employees may be assigned a work schedule in advance or may work on an as-needed basis.

Received   Dec-18-2006  11:39am     From-609  845 3912          To-EEOC-NYDO (7)         Page  036

JM  0140

### D.   INTRODUCTORY PERIOD

The first three months of continuous employment at Plus One will no doubt be a learning experience. You will be learning your job duties and responsibilities, getting acquainted with your Manager(s) and fellow Employees, and familiarizing yourself with the Company in general. We refer to this initial period of employment as your introductory period.

This introductory period may also include a training period with your respective director and/or the Director of Training or an assistant of his/her designation. This training period may be offered to new employees at no expense to them. However, if an employee voluntarily leaves the company before the end of their introductory period, that employee may be required to reimburse Plus One for the cost incurred by the company to provide that training to them, equal to but not limited to, one week's salary.

While we understand that you will be learning a lot about your new job, you are still expected to perform satisfactorily and your performance will be reviewed closely. Also, please understand that completion of the introductory period does not guarantee continued employment and does not change the at-will nature of the employment relationship.

### E.   JOB DUTIES

As part of your initial orientation, you will learn the various duties and responsibilities of your job. You may be provided with a copy of a written job description for your individual position. The Company typically maintains certain expectations and standards applicable to your job position. Your Manager will likely review these with you. It is expected that Employees will perform additional duties and assume additional responsibilities as needed by their Manager for the efficient operation of the Company. In order to adjust to changes in our business, it may become necessary to modify your job duties, add to or remove certain duties and responsibilities, or reassign you to an alternate job position.

Updated: May, 2001                    5

Jm 0141

## IV.    PAYROLL

### A.    WORKING HOURS & SCHEDULE

The Company is normally open for business from 5:30 a.m. to 10:00 p.m., Monday through Friday and from 5:30 a.m. to 8:00 p.m., Saturday and Sunday. You will be assigned a work schedule and you will be expected to begin and end work according to the schedule. In order to accommodate the needs of our business, it may be necessary to change individual work schedules on either a short-term or long-term basis.

Full-time Exempt and Nonexempt Employees will typically be given a 60 minute break period, to be scheduled by their manager on duty. Part-time Nonexempt employees working more than four hours, but less than eight hours will typically receive one 15 minute break.

At times, emergencies such as power failures, fire, or severe weather may interfere with the Company's operations. In such an event, the Company may order a temporary shutdown of part or all of its operations. Depending on the circumstances, time off may or may not be paid.

### B.    TIMEKEEPING PROCEDURES

General Managers or their payroll managers will keep record of hours worked by nonexempt employees in order to record their compliance with wage and hour laws. However, employees are encouraged to keep track of their own hours to assist the company in compliance to these laws. Altering, falsifying, and tampering time records, or recording time on another Employee's time record is prohibited and subject to disciplinary action, up to and including termination of employment. Exempt Employees may also be required to record their time worked and report full days of absence from work for reasons such as leaves of absence, sick leave, or personal business. Any errors in your time records should be reported immediately to your Manager, who will attempt to correct legitimate errors.

### C.    OVERTIME

When operating requirements or other needs cannot be met during regular working hours, you may be scheduled to work overtime. All overtime work must be authorized in advance by your Manager. Working overtime without prior authorization may result in disciplinary action. Full-Time Nonexempt Employees will be paid time and one-half compensation for all hours worked in excess of 40 hours in one workweek and as otherwise required by law. Exempt Employees are expected to work as much of each workday as is necessary to complete their job responsibilities. No overtime or additional compensation is provided to exempt Employees unless you are asked by a manager to cover another employee's shift beyond your 40 hours in one week.

### D.    PAYMENT OF WAGES

Paydays are on Friday of every other week for work performed during the previous two-week pay period. If a regular payday falls on a holiday, Employees will be paid on the preceding workday. Settlement of commissions and payment of bonuses and incentives based on monthly financial statements are ordinarily made at the end of the following month.

Paychecks are normally available by 1:00 p.m. on a payday. If there is an error in your check, please report it immediately to your Manager. No one other than the Employee to whom the paycheck is written will be allowed to pick up a paycheck unless written authorization has been given for another person to do so.

Jm0142

### E.   SALARY PAY POLICY

Exempt Employees will be paid a salary in accordance with applicable law. Although exempt Employees are generally entitled to their salary for any week in which work is performed, deductions may be made when, for example, an exempt Employee is absent for personal reasons or for incomplete initial or final weeks of work. There may also be other occasions when an exempt Employee's salary may be reduced. Please contact your Manager or the Vice President of Human Resources for more information.

### F.   BONUSES

Employees may be eligible for year-end merit bonuses, which are awarded to employees who have performed exceptionally during the prior year. Such bonuses are not automatically awarded to any employee, are entirely discretionary and are separate from salary reviews.

Employees are eligible for bonuses only if they are still employed by Plus One as of December 15 following the fiscal year for which the bonus is awarded. Plus One does not distribute partial-year bonuses.

### G.   WAGE GARNISHMENTS

Plus One would like to avoid incurring the administrative costs of garnishments and wage assignments for Employees. Accordingly, Plus One encourages all Employees to meet their financial obligations without involving the Company. Nonetheless, the Company will adhere to legally imposed wage assignments and garnishments, and will not modify the terms of those legal arrangements unless ordered to by an appropriate authority.

Updated: May, 2001                    7

Jm   0143

## V.    PERSONNEL

### A.    OPEN-DOOR POLICY

Plus One recognizes that Employees may have suggestions for improving the workplace, as well as complaints about the workplace. The most satisfactory solution to a job-related problem or concern is usually reached through a prompt discussion with your Manager. Please feel free to contact your Manager with any suggestions and/or complaints. If you do not feel comfortable contacting your Manager or are not satisfied with your Manager's response, please submit your complaint or suggestion to the Vice President of Human Resources. The Vice President of Human Resources will review your request and provide you with a final resolution. While the Company provides you with this opportunity to communicate your views, please understand that not every complaint can be resolved to your satisfaction. Even so, Plus One believes that open communication is essential to a successful work environment.

### B.    STATEMENT ON UNIONS

Plus One is proud of the direct and close working relationship that exists between our Managers and our Employees. We will strive to preserve this relationship because our ability to work together remains the best way to improve our working environment and resolve any issues that may arise. We want to support an environment where Employees feel comfortable coming forward to discuss any concerns without feeling the need to seek out third-party intervention. For this reason, we believe that labor unions are both unnecessary and undesirable in our workplace.

We strongly encourage all of our Employees to raise all problems, issues of concern, and suggestions. Communication is critical to the Company's success and to building good working relationships among our Employees. We believe that outside organizations such as labor unions can interfere with direct communications and mutual efforts to resolve issues that may arise.

Plus One recognizes that Employees have the right under federal law to organize and join unions. The law also gives Employees the right not to join unions and to refuse to sign cards authorizing a union to represent them. Before signing an authorization card, we hope that each Employee will seriously consider the effect that a labor union would have on our working conditions and the positive relationships that exist among our Employees.

This statement of our position regarding labor unions is provided for information only. It is not a rule, policy, or standard, the violation of which would subject Employees to discipline.

### C.    UNLAWFUL HARASSMENT

Plus One prohibits sexual harassment and harassment because of race, color, national origin, ancestry, religion, creed, physical or mental disability, marital status, alienage, citizenship, sexual orientation, age, or any other basis protected by federal, state, or local law. Any such harassment may violate the law and will not be tolerated.

Updated: May, 2001                                         8

Updated: May, 2001                                         9

### 3.    Plus One's Complaint Procedure

Plus One's complaint procedure ordinarily provides for an immediate, thorough, and objective investigation of any claim of prohibited harassment or discrimination, appropriate disciplinary action against one found to have engaged in prohibited harassment, and appropriate remedies for any victim of harassment. A claim of harassment may exist even if the Employee has not lost a job or some economic benefit.

If you believe you have been unlawfully harassed on the job, or if you are aware of the unlawful harassment of others, you should advise your Manager or any other Manager with the Company or the Vice President of Human Resources, the Chief Operating Officer, or the President as soon as possible.

Applicable law also prohibits retaliation against any Employee by another Employee or by the Company for using this complaint procedure or for filing, testifying, assisting, or participating in any manner in any investigation, proceeding, or hearing conducted by a governmental enforcement agency. Additionally, the Company will not knowingly permit any retaliation against any Employee who complains of prohibited harassment or who appropriately participates in an investigation.

All incidents of prohibited harassment that are reported will ordinarily be investigated with an objective investigation of the harassment allegations. The investigation will be completed and a determination regarding the reported harassment made.

If the Company determines that prohibited harassment has occurred, the Company will take effective remedial action commensurate with the circumstances. Appropriate action will also be taken to deter any future harassment. If a complaint of prohibited harassment is substantiated, appropriate disciplinary action, up to and including discharge, will be taken.

### 4.    Responsibility For Harassment

Any Employee who engages in prohibited harassment, including any Manager or supervisor who knew about the harassment but took no action to stop it, may be held responsible for the prohibited conduct, and may be subject to discipline up to and including discharge.

### D.    PROHIBITED CONDUCT

In order to assure orderly operations and provide the best possible work environment, Plus One expects Employees to follow rules of conduct that will protect the interests and safety of personnel and clients. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, but the following are examples of infractions of rules of conduct that may result in disciplinary action, including suspension, demotion, or termination of employment.

Received    Dec-18-2006  11:39am    From-609  945 3912    To-EEOC-NYDO  (7)    Page 042

JM 0146

JM 0147

1. Falsification of employment records, employment information, or other records.

2. Recording the work time of another Employee, allowing any other Employee to record your work time, or allowing falsification of any time card, whether your own or another Employee's.

3. Theft or the deliberate or careless damage of any Company property or the property of any Employee or client.

4. Removing or borrowing Company property without prior authorization.

5. Unauthorized use of Company equipment, time, materials, or facilities.

6. Possessing, distributing, selling, transferring, or using—or being under the influence of—alcohol or illegal drugs in the workplace.

7. Provoking a fight or fighting during working hours or on premises owned or occupied by the Company or client.

8. Carrying firearms or any other dangerous weapons, at any time, on premises owned or occupied by the Company or client.

9. Engaging in criminal conduct whether or not related to job performance, and being convicted of a felony for such conduct.

10. Causing, creating, or participating in a significant disruption of any kind during working hours or on premises owned or occupied by the Company or client.

11. Insubordination, including but not limited to failure or refusal to obey the orders or instructions of any Manager or member of management, or the use of abusive or threatening language toward any Manager or member of management.

12. Using abusive language at any time during working hours or while on premises owned or occupied by the Company or client.

13. Failing to notify the appropriate Manager when unable to report to work.

14. An unreported absence on a scheduled workday.

15. Leaving work without obtaining prior permission during normal working hours.

16. Failing to observe working schedules, including breaks and lunch periods.

17. Abusing paid sick leave.

18. Failing to provide a physician's certificate when requested or required to do so.

19. Sleeping or malingering on the job.

Updated: May, 2001

11

Jm 0148

20. Making or accepting extended or unduly frequent personal telephone calls during working hours.

21. Working overtime without authorization or refusing to work assigned overtime.

22. Wearing unprofessional styles of dress or hair while working.

25. Violating any safety, health, or security policy, rule, or procedure of the Company and client.

26. Committing a fraudulent act or a breach of trust in any circumstances.

The Company does not have a formal progressive discipline policy requiring a set number of warnings or counseling sessions. Instead, each case is considered based on its own facts. In the case of misconduct or violation of the Company's policies, immediate termination may be appropriate depending on the facts.

**This statement of prohibited conduct does not alter or limit the Company's policy of employment at will.** Either you or the Company may terminate the employment relationship at any time for any reason, with or without cause or without notice.

### E.    CONDUCT & EMPLOYMENT OUTSIDE WORK

In general, the Company does not seek to interfere with Employees' off-duty activities. However, the Company will not tolerate off-duty conduct that impacts negatively on the Company, either in terms of an Employee's individual work performance or the business interests of the Company, including its reputation. For example, the Company prohibits any illegal conduct by an off-duty Employee that affects or has the potential to adversely affect the Company. Also, the Company prohibits outside employment (including self-employment) that conflicts with employment at Plus One, impacts the Employee's work performance or schedule, and/or affects the business interests of the Company. Employees must contact the Vice President of Human Resources prior to engaging in any outside employment.

### F.    DRUG & ALCOHOL ABUSE

Plus One maintains a strong commitment to provide a safe, efficient, and productive work environment. The Company expects that Employees will perform their duties safely and efficiently in a manner that protects their interests and those of their coworkers and clients. In keeping with this commitment, Plus One maintains zero tolerance for drug and alcohol abuse by its Employees. Illicit drug use and excessive alcohol consumption put everyone at risk and cannot be tolerated. Consistent with our efforts to promote health and safety and protect the interests of our Employees, clients, and the Company, we cannot allow anyone to use, possess, distribute, manufacture, purchase, or be under the influence of alcohol or illegal drugs, intoxicants, or controlled substances at any time on Company or client's premises, or while on Company business. Accordingly, the use of alcohol and the illegal use of drugs, intoxicants, or controlled substances while on the Company's or client's property or while working on Company business is strictly prohibited.

Jm  0149

### 1.    Prohibited Acts

The following rules and standards of conduct apply to all Employees.  The Company strictly prohibits:

a.  Possession, use, or being under the influence of alcohol or an illegal drug, intoxicant, or a non-prescription controlled substance while on the job or on Company or client's premises;

b.  Distributing, selling, manufacturing, or purchasing—or attempting to distribute, sell, manufacture, or purchase—an illegal or over-the-counter drug, intoxicant, supplement, or controlled substance during working hours or while on Company-owned or occupied premises;

c.  Testing positive on a required or requested drug or alcohol test or screen;

d.  Refusing either to take or to release information regarding a required or requested drug or alcohol test or screen; and

e.  Violating any Company rule or policy regarding alcohol and drug use.

### 2.    Testing Program

The Company may request drug and/or alcohol testing:

a.  After an offer of employment, but before the applicant commences employment;

b.  When a reasonable suspicion exists that any Employee is under the influence of alcohol or any illegal drug, intoxicant, or controlled substance while on the job, or is otherwise in violation of this policy.  Reasonable suspicion means suspicion based on information regarding, among other things, the appearance, behavior, speech, attitude, mood, and/or breath odor of any Employee;

c.  When any Employee is found in possession of alcohol or any illegal drug, intoxicant, or controlled substance in violation of Company policy, or when any of those items are found in an area controlled or used by the Employee, such as a desk or locker;

d.  When an accident, near-miss, or incident occurs in which safety precautions are violated or careless acts are performed, and a reasonable suspicion exists that the Employee involved is under the influence of alcohol or any illegal drug, intoxicant, or controlled substance;

Employees suspected of possessing alcohol, illegal drugs, intoxicants, or controlled substances are subject to inspection and search, with or without notice.  Employees' personal belongings, including any bags, purses, briefcases, and clothing, and all Company property, are also subject to inspection and search, with or without notice.  Employees who violate the Company's drug and alcohol abuse policy will be removed from the workplace immediately.  The Company may also bring the matter to the attention of appropriate law enforcement authorities.  Any conviction for criminal conduct involving illegal drugs, intoxicants, or controlled substances, whether on or off duty, or any violation of the Company's drug and alcohol abuse policy, including having a positive drug-test result, may lead to disciplinary action, up to and including termination.

The use of prescription drugs and/or over-the-counter drugs may also affect an Employee's job performance and seriously impair that Employee's value to the Company. Any Employee who is using prescription or over-the-counter drugs that may impair his or her ability to safely perform the job or may affect the safety or well-being of others must submit a physician's statement that the prescription drug use will not affect job safety. The Employee is not required to identify the medication or the underlying illness. Various federal, state, and local laws protect certain rights of individuals with disabilities and others with regard to the confidentiality of medical information. Nothing contained in this policy is intended to violate or interfere with individual rights under these laws.

**NOTE:** On occasion, managerial, executive, and sales staff may entertain clients during work hours or after work hours as representatives of the Company. These occasions may include lunches, dinners, and business conferences. On these occasions, only the moderate and limited use of alcoholic beverages is acceptable. In addition, occasionally, alcohol is served at social events sponsored by the Company. Alcohol may be served at these events only with the approval of the Vice President of Human Resources. Only the moderate and limited use of alcohol is acceptable. Employees are expected to remain responsible, professional, and sober at all times.

### 3. Accommodation of Employees Seeking Treatment/Rehabilitation

The Company will attempt to reasonably accommodate Employees with chemical dependencies (alcohol or drugs), if they voluntarily wish to seek treatment and/or rehabilitation. Employees desiring that assistance should request an unpaid treatment or rehabilitation leave of absence. The Company's support for treatment and rehabilitation does not obligate the Company to employ any person who violates the Company's drug and alcohol abuse policy or whose job performance is impaired because of substance abuse. The Company is also not obligated to reemploy any person who has participated in treatment or rehabilitation if that person's job performance remains impaired as a result of dependency. Employees who have had an opportunity to seek treatment and/or rehabilitation and are involved in any further violations of this policy will not necessarily be afforded a second opportunity to seek treatment or rehabilitation.

### G. PUNCTUALITY & ATTENDANCE

Plus One expects you to report to work on a reliable and punctual basis. Absenteeism, early departures from work, and late arrivals burden your fellow Employees and the Company. If you cannot avoid being late to work or are unable to work as scheduled, you must call your Manager as soon as possible.

Every time you are absent or late, or leave early, you must provide your Manager with an honest reason or explanation. You must also inform your Manager of the expected duration of any absence. The Company will comply with applicable laws relating to time off from work, but it is your responsibility to provide sufficient information to enable the Company to make a determination. You must notify your Manager of any change in your status as soon as possible.

Excessive absenteeism or tardiness may lead to disciplinary action, up to and including termination of employment.

If you fail to report for work without any notification to your Manager, you may be considered to have abandoned your employment.

Individuals with disabilities may be granted reasonable accommodation in complying with these policies if undue hardship does not result to the Company's operations. However, regular attendance and promptness are considered part of each Employee's essential job functions.

Updated: May, 2001                                          14

Jm  0151

## VII.   BENEFITS

### A.   HOLIDAYS

Plus One observes the following paid holidays:  New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas.  If a holiday falls on a weekend day, it is usually observed on the preceding Friday or the following Monday.   Holiday observance will be announced in advance.

Part-Time Employees are not eligible for holiday pay.  Holiday pay will be calculated based on your straight time pay rate (as of the date of the holiday) times the number of hours you would have otherwise worked on that day.   To be eligible for holiday pay, you must work the last scheduled day immediately preceding and the first scheduled day following the holiday.

If you are required to work on a designated holiday, you will receive a "floating holiday" that can be used upon approval by your Manager.  If a holiday occurs during your vacation period, you will be granted one day of vacation in lieu of that holiday, to be taken at a time approved in advance by your Manager.

### B.   VACATIONS

Full-time Employees accrue paid vacations in accordance with the schedule below.  Part-time and temporary Employees do not accrue paid vacation time.

Eligible Employees who receive two weeks of paid vacation accrue vacation at a rate of 0.83 days per month.  Other employees who receive more or less than two weeks paid vacation will accrue this time at a rate proportionate with the number of days received per year.  No vacation time may be taken until after completion of the first three months of employment.   Unused vacation at year-end will not carry over to the subsequent year absent the permission of the Vice President of Human Resources.

Employees are encouraged to take their accrued vacation each year.  You must request vacation as far in advance as possible.  Vacations will be scheduled so as to provide adequate coverage of job and staff requirements.  The Vice President of Human Resources or Director for Training will make the final determination in this regard.  If a holiday occurs during your vacation period, you will be granted one day of vacation in lieu of that holiday, to be taken at a time approved in advance by your Manager.

Vacation does not accrue during unpaid leaves of absence or other periods of inactive service.

### C.   INSURANCE BENEFITS

#### 1.   Medical Insurance

Medical insurance coverage is a benefit provided by the Company to Full-Time Employees. Employees should consult the Summary Plan Description for more complete information about eligibility and the details of the Company's medical insurance plan.  Copies of the Plan Document and Summary Plan Description are available from the Vice President of Human Resources.  The Plan Document is controlling the medical insurance in effect at the time.

Updated: May, 2001                    21

Jm 0153

## 2.    Disability Insurance

Employees are covered by New York State Disability Insurance.  Under certain conditions, disability insurance is payable when you cannot work because of illness or injury unrelated to your employment at the Company.

## 3.    Unemployment Compensation

The Company contributes to the Unemployment Insurance Fund on behalf of its Employees.

## 4.    Social Security

The Company matches each Employee's Social Security contribution dollar for dollar.  You may be eligible to receive these benefits upon your retirement and/or perhaps in other circumstances in accordance with the Social Security laws.

## 5.    Workers' Compensation

If you are injured or become ill on the job, then you may receive, at no cost to you, workers' compensation insurance benefits which may include medical care, compensation, and vocational rehabilitation.  To receive workers' compensation benefits, you must:

a.  Report any work-related injury to your Manager immediately.

b.  Complete a written claim form and return it to the Vice President of Human Resources.

c.  Seek medical treatment and follow-up care if required.

Any person who knowingly makes or presents a false statement or representation, or fails to disclose a material fact for the purpose of influencing any determination regarding the payment of workers' compensation benefits, whether for oneself or for any other person, is guilty of a felony.

## D.    POST-TERMINATION CONTINUATION OF MEDICAL INSURANCE

The Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") provides eligible individuals with the option to continue medical insurance coverage under the Company's policy, at their own expense and for a certain period of time, upon the termination of employment as well as in other circumstances.  For more information please contact the Vice President of Human Resources.

## E.    SICK LEAVE

Plus One provides paid accrued sick leave to all eligible Employees for periods of temporary absence due to illness or injury.  Sick leave may be taken only for an Employee's own illness or injury.  Sick leave is not for "personal" absences.

Full-time Employees are entitled to sick leave in accordance with the schedule below.  Part-time and temporary Employees do not accrue sick leave.

After three months of service Full-time Employees will have three paid sick days per calendar year.  Once the three paid sick days have been used, no further paid sick days will be given for the year.  Unused sick days cannot be carried over to the following year.  New employees with the company will be entitled to proportionally less paid sick days based upon their start date with the company during the first calendar year.

Updated: May, 2001                               22

Jm 0154

Certification by your health care provider is required for absences of four or more consecutive workdays or for intermittent absences due to the same reason. A health care provider's certification is also required prior to reinstatement after one of those absences. A health care provider's certification may also be required in other circumstances. It is your responsibility to apply for any disability benefits for which you may be eligible as a result of illness or disability, including New York State Disability Insurance, workers' compensation insurance, and/or any short-term disability insurance benefits for which you qualify.

Exempt Employees must use available sick leave for otherwise unexcused absences from work for a day or more. Full-Time Nonexempt Employees must use available sick leave for otherwise unexcused time away from work during their regularly scheduled hours. Sick leave may not be used during holidays, vacation, or hours of work outside an Employee's regular schedule. Your sick leave benefits will be fully integrated with other benefits available to you so that at no time will you be paid more than your regular compensation. If sick leave is misused, sick pay will not be awarded and you may be disciplined and even discharged. Employees will not accrue sick leave during unpaid leaves of absence.

## F.     PERSONAL DAYS

Plus One offers Exempt Employees personal days to take care of non-medical emergencies. Personal days are designed to attend to personal business that cannot be resolved during the employee's non-working hours of the day. This may include family emergencies, housing emergencies or attending job related courses, seminars or events other than those sponsored by the company.

After three months of service Employees receive two personal days per calendar year. Once the two paid personal days have been used, no further paid personal days will be given for the year. Unused personal days cannot be carried over to the following year. Personal days do not accrue during unpaid leaves of absence or other periods of inactive service. Your personal day benefits will be fully integrated with other benefits available to you so that at no time will you be paid more than your regular compensation.

These days are not to be used for additional vacation days or holidays. If personal days are misused, pay will not be awarded and you may be disciplined and even discharged. Whenever possible, an employee is requested to give up to two weeks advanced notice to the General Manager for use of personal days.

## G.     LEAVES OF ABSENCE

### 1.     General Provisions

Plus One may grant unpaid leaves of absence in certain circumstances. You should notify your Manager and/or the Vice President of Human Resources in writing as soon as you become aware that you may need such a leave of absence. The Company will consider your request in accordance with applicable law and the Company's leave policies. You will be notified whether your leave request is granted or denied. If you are granted leave, you must comply with the terms and conditions of the leave, including keeping in touch with your Manager or the Vice President of Human Resources during your leave, and giving prompt notice if there is any change in your return date.

You must not accept other employment or apply for unemployment insurance while you are on a leave of absence. Acceptance of other employment while on leave will be treated as a voluntary resignation from employment at the Company. Benefits, such as vacation and holidays, will not accrue while you are on a leave of absence. Upon return from a leave of absence, you will be credited with the full employment status that existed prior to the start of the leave.

Updated: May, 2001                                       23

The Company may hold in abeyance or proceed with any counseling, performance review, or disciplinary action, including discharge, that was contemplated prior to any Employee's request for or receipt of a leave of absence or that has come to the Company's attention during the leave. If any action is held in abeyance during the leave of absence, the Company reserves the right to proceed with the action upon the Employee's return. Requesting or receiving a leave of absence in no way relieves Employees of their obligation while on the job to perform their job responsibilities capably and up to the Company's expectations and to observe all the Company policies, rules, and procedures.

### 2.    Family And Medical Leave

The Company will grant unpaid family and medical leave in accordance with the requirements of applicable state and federal law in effect at the time the leave is granted. No greater or lesser leave benefits will be granted than those set forth in the relevant state or federal laws.

Please contact your Manager as soon as you become aware of the need for a family and medical leave. The following is a summary of the relevant provisions.

#### a.    Employee Eligibility

To be eligible for family and medical leave benefits, you must: (1) have worked for the Company for a total of at least 12 months; (2) have worked at least 1,250 hours over the previous 12 months; and (3) work at a location where at least 50 Employees are employed by the Company within 75 miles.

#### b.    Leave Available

Eligible Employees may receive up to a total of 12 workweeks of unpaid leave during a 12-month period. A 12-month period begins on the date of the Employee's first use of family and medical leave. Successive 12-month periods commence on the date of an Employee's first use of family and medical leave after the preceding 12-month period has ended.

Leave may be used for one or more of the following reasons: (1) for the birth of a child or placement of a child with an Employee for adoption or foster care; (2) to care for an immediate family member (spouse, child, or parent) with a serious health condition; or (3) to take medical leave when the Employee is unable to work because of a serious health condition. Under some circumstances, Employees may take family and medical leave intermittently—which means taking leave in blocks of time, or by reducing their normal weekly or daily work schedule.

Certain restrictions on these benefits may apply.

#### c.    Notice & Certification

If you need family and medical leave, you may be required to provide:

1. 30-day advance notice when the need for the leave is foreseeable;

2. Medical certification from a health care provider (both prior to the leave and prior to reinstatement);

3. Periodic recertification; and

4. Periodic reports during the leave.

JM 0156

When leave is needed to care for an immediate family member or your own serious health condition, and is for planned medical treatment, you must try to schedule treatment so as not to unduly disrupt the Company's operation.

### d.    Compensation During Leave

Family and medical leave is unpaid.  The Company may require you to use accrued paid leave (such as vacation leave) to cover some or all of the family and medical leave.  The use of paid time off will not extend the length of a family and medical leave.

### e.    Benefits During Leave

The Company will maintain, for up to a maximum of 12 workweeks of family and medical leave, any group health insurance coverage that you were provided before the leave on the same terms as if you had continued to work.  In some instances, the Company may recover premiums it paid to maintain health coverage if you do not return to work following family or medical leave.

If you are on family and medical leave but you are not entitled to continued paid coverage, you may continue your group health insurance coverage through the Company in conjunction with federal COBRA guidelines by making monthly payments to the Company for the amount of the relevant premium. Please contact your Manager for further information.

### f.    Job Reinstatement

Under most circumstances, upon return from family and medical leave, you will be reinstated to your previous position, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions.  However, upon return from a family and medical leave, you have no greater right to reinstatement than if you had been continuously employed rather than on leave.  For example, if you would have been laid off had you not gone on family and medical leave, or if your position has been eliminated during the leave, then you will not be entitled to reinstatement.

If you are returning from family and medical leave taken for your own serious health condition, but you are unable to perform the essential functions of your job because of a physical or mental disability, the Company will attempt to reasonably accommodate you.  Your use of family and medical leave will not result in the loss of any employment benefit that you earned or were entitled to before using family and medical leave.

### 3.    Parental Leave Benefit Program

### a.    Definition

Plus One's Parental Leave Benefit Program (PLBP) is designed to provide a benefit to the company's employees who need to take leave after the birth of a child or the placement of a legally adopted child, provided that employee returns to, and remains at, work thereafter.  This additional benefit supplements any available basic Disability Insurance carried by Plus One (as required by New York State).

The amount of Parental Leave Benefit available to an employee is determined based on years of service to the company, calculated from the employee's initial date of hire.  The PLBP is calculated based upon a percentage of the employee's weekly compensation during the time employee is out due to parental leave. Any period of paid leave provided by the PLBP is to coincide with any available period of unpaid FMLA Leave, up to a maximum of twelve (12) weeks. The amount of this benefit by years of service is illustrated in Table A, with a corresponding example.

Updated: May, 2001                            25

### b.      Eligibility

Participation in this program offered by Plus One is voluntary. The requirements for participation in this program are the same as those outlined by the FMLA. The requirements are that you must (1) have worked for the company for a total of at least twelve (12) months; (2) have worked at least 1,250 hours over the previous twelve (12) months; and (3) be the primary caregiver for the child.

### c.      Notification

Notification of intended participation in this program should take place 30 days in advance of the anticipated parental leave. Employees requesting leave will also be required to certify that they are the primary care giver for the child. Employees will also be required to read and sign an agreement with Plus One which will explain the benefits of the PLBP and outline the requirements for participation as well as the penalties for defaulting on the agreement.

### d.      Default

Employees will be considered in default of their PLBP agreement if they (1) do not report back to work by the end of the twelve (12) week period for parental leave; or (2) leave at any time prior to the nine (9) month period after returning to work after parental leave. The outline of default penalties is provided in Table B below.

**Table A**

| Years of Service | Percentage Benefit |
| --- | --- |
| 1 – 3 | 25% |
| 3.1 – 5 | 50% |
| 5.1+ | 75% |

**Example:**

An employee earns $30,000.00 per year and has worked for the company for four (4) years. The employee would earn 50% of his or her regular base salary under the PLBP. The breakdown would be as follows:

|  |  |
| --- | --- |
| $30,000.00 | Annual Salary |
| $    576.92 | Weekly Salary |
| $  6,923.04 | Weekly x 12 weeks |
| $  3,461.52 | x 50% |
| $    576.92 | per Pay Period |

Updated: May, 2001                    26

Table B

| Timing of Departure After Leave | Default Return Percentage |
|---|---|
| failure to return from leave | 100% |
| < 3 months | 75% |
| 3 – 6 months | 50% |
| 6 – 9 months | 25% |
| > 9 months | 0% |

## H.    OTHER TIME OFF

### 1.    Funeral or Bereavement Time Off

Any Employee may take up to five consecutive workdays off with pay following the death of the Employee's current spouse, parent, child, sister, brother, domestic partner, or grandparent. In certain circumstances, the Vice President of Human Resources may approve additional unpaid time off.

### 2.    Time Off for Jury Duty

Plus One encourages Employees to serve on jury duty when called. You must notify your Manager of the need for time off for jury duty as soon as a notice or summons from the court is received. For the first three days of jury service, you will be paid your regular salary/wage. For the remainder of your jury service, you will be paid one-half of your regular salary/wage minus whatever the government agency pays for your service. You will be required to provide verification from the court clerk confirming your service as a juror and you will be expected to report or return to work for the remainder of your work schedule on any day you are dismissed from jury duty.

### 3.    Time Off for Victims and Witnesses in Criminal Proceedings

You may take time off without pay to exercise your rights under state law as the victim of a crime or violation, or on account of your required attendance as a witness in a criminal proceeding. You are requested to notify the Vice President of Human Resources of the need to take time off as far in advance as is possible, but in no event later than on the date prior to taking witness or victim leave.

### 4.    Voting Time Off

If you cannot vote in a public election before or after working hours, then you will be allowed sufficient time off to go to the polls. The Company will pay you for up to the first two hours of absence from regularly scheduled work that is necessary to vote in a public election. Any additional time off for this purpose will be without pay. You must give at least two days notice to your General Manager of the need to have time off to vote.

### 5.    Military Leave

Employees who are members of the Reserves or National Guard will be granted, upon request, an unpaid leave of absence for military training duty. However, they must present their orders in advance to their department manager. Employees eligible for vacation time may use their vacation for military leave.

Updated: May, 2001                    27

A military leave will also be granted to employees who enter active military service in the Armed Forces or who are ordered for an initial period of active duty for training in the Reserves or the National Guard. Employees who return to work after extended absence for military service are eligible for reinstatement in accordance with applicable law. They must, however, seek reinstatement within the required time limits and be qualified for work.

For an employee whose period of service in the uniformed services is less than 31 days, he or she must notify Plus One of his or her intention to return to work no later than the beginning of the first full regularly scheduled work period on the first full calendar day following the completion of the period of service. The employee need not provide this notification until after an appropriate period of time has passed for him or her to return to his residence after the military service.

For an employee whose service is more than 30 days but less than 181 days, he or she must submit an application for reemployment no later than 14 days after the period of service.

For an employee whose service is 181 days or more, he or she must submit an application for reemployment no later than 90 days after the completion of service.

If you have any questions regarding military leave, please contact the Human Resources Department.

### I.   TRAINING PROGRAMS AND SEMINARS

During your employment at Plus One, you may be required or you may request to attend a training seminar, conference, et cetera.  When your attendance at one of these functions is required or granted by the Company, you may be reimbursed for reasonable expenses you incur for attending the function and you will be compensated at your regular rate.  You must obtain your Manager's written approval prior to attending one of these functions.  You must also account for your expenses for attending the function and submit them to your Manager for approval. You will not be reimbursed for expenses without prior written approval from your Manager.  Please note that an Employee's voluntary attendance at seminars or other educational forums, other than at the request of the company, is not subject to compensation or reimbursement of expenses.

### J.   EDUCATIONAL ASSISTANCE/TUITION REIMBURSEMENT

Plus One Employees are encouraged to continue learning within their profession or career. Accordingly, all full-time Employees may be eligible to receive tuition reimbursement, for educational courses directly related to their performance and/or position with the Company. If you qualify for reimbursement, you must submit a course description at least four weeks in advance of the beginning of the course to the Vice President of Human Resources for approval by the Company.   Courses must be taken at an accredited or approved school to qualify for reimbursement. However, employees are encouraged to expand their professional knowledge through Plus One University, a company sponsored program designed to offer technical, managerial, service and facility-related subjects to assist employees in their professional advancement. If a non-degreed course is offered both by an outside institution and Plus One University, the employee is required to attend the Plus One course.

Tuition will be reimbursed to the Employee upon satisfactory completion of the course, and submission of documentation showing a grade of C or better.  In order to receive reimbursement, Employees must provide receipts establishing enrollment in the course.

The Company's commitment to providing educational assistance should not be understood as guaranteeing that successful completion of a course will result in the Company providing additional compensation or job benefits.

Updated: May, 2001                         28

Jm 0150

## K.    401(K) PLAN

Plus One has adopted a 401(K) Plan for all Full-time Employees.  Under the Plan, an eligible Employee may elect to contribute up to a certain percentage of his or her pre-tax total compensation, not to exceed the annual limits established by the Internal Revenue Service.

Updated: May, 2001                    29

Jm 0161

## VIII.  TERMINATION

### A.  VOLUNTARY TERMINATIONS

If you decide to leave your employment with Plus One, we ask that you give us at least four weeks written notice. This will give us the opportunity to make the necessary adjustments in our operation. You are required to return all property owned by the Company (e.g., computers, keys, uniforms, training manuals, identification badges) prior to your departure.

### B.  INVOLUNTARY TERMINATIONS

While the decision to commence employment is consensual, the same is not always true when the time comes to end the employment relationship. As an at-will employer, the Company reserves the right to end the employment relationship at any time, with or without cause or notice. In the event your employment is terminated, you are required to return all property owned by the Company to the Vice President of Human Resources prior to your departure.

### C.  REDUCTIONS IN FORCE

While the Company hopes to continue growing and providing employment opportunities, business conditions, client demand, and other factors are unpredictable. Changes or downturns in any of these or other areas could create a need to restructure or reduce the number of people employed. In light of these uncertainties, please be advised that it may become necessary to conduct layoffs at some point in the future.

In the event that the Company determines to lay off any Employee or a number of Employees, the Company retains full discretion to select, in accordance with applicable law, which Employee(s) will be laid off.

### D.  SEVERANCE PAY

If Plus One terminates the employment of an employee, it may, in its sole discretion, pay severance to the employee. There is no assurance, however, that the company will pay severance in any particular case.

In determining whether to pay severance and the amount, if any, to be paid, the company may, but shall not be obligated to, consider such factors as the circumstances of the particular employee's departure, the employee's prior contribution to the company, the reasons for the termination of employment, the difficulty the employee is likely to have finding a new job, and the employee's prior level of compensation.

The company will, as a pre-condition for payment of severance, require that an employee execute a general release in favor of the company, its officers, its directors and its employees.

The company further reserves the right, whether in an individual case or more generally, to alter, reduce or eliminate the payment of severance, in whole or in part, without notice.

Received   Dec-18-2006  11:39am     From-609  945 3912        To-EEOC-NYDO (7)        Page  062

JM 0162

JM 0163

JM 0164

## IX.   CONCLUSION

**IN CLOSING**

Many Plus One policies and Employee benefits have been treated only briefly in this Employee Handbook. If you have any questions or want more information, your Manager will be glad to fill in the details for you. The Vice President of Human Resources will also be happy to help you with questions or problems.

Updated: May, 2001                          31

JM 0165

## ARBITRATION CLAUSE

In consideration of the mutual agreement between you and Plus One to arbitrate the claims described below and your being hired by Plus One, you and we agree to the following:

You and we will submit to binding, final and exclusive arbitration in New York, New York, before an impartial arbitrator selected by the American Arbitration Association, on any unresolved employment claims, defamation claims, wrongful or unlawful discharge claims, or harassment claims, that you now or hereafter may have relating to your hiring, your employment, or any termination of your employment, by us. You understand that, by agreeing to arbitrate such claims, you and we are voluntarily giving up the opportunity to have a judge or jury determine any such disputes in a formal court proceeding. You and we are nonetheless agreeing to arbitrate such claims in the hope of obtaining, through arbitration, a speedier resolution of any such dispute, with greater economy, simplicity and informality.

You and we agree that the arbitrator will be required to issue an award, in writing, containing the names of the parties, a summary of the issues in controversy, and a description of the award issued, with that award decision available to the public. You and we agree that the arbitrator may award damages, including punitive damages and/or other relief, only to the extent then permitted a New York arbitrator under New York law, and subject to the same statutes of limitation and administrative deadlines set by applicable law.

The term "employment claims," as used here, includes any federal, state, local or administrative claims arising under:

    (1) the Civil Rights Acts of 1866, 1870 and 1871;

    (2) the Equal Pay Act of 1963;

    (3) Title VII of the Civil Rights Act of 1964, as amended;

    (4) the Age Discrimination in Employment Act of 1967, as amended;

    (5) the Older Worker Benefits Protection Act;

    (6) The Civil Rights Act of 1966;

    (7) the Rehabilitation Act of 1973;

    (8) the Vietnam-Era Veterans' Readjustment Assistance Act of 1974;

    (9) the Veteran's Reemployment Rights Act;

    (10) the Immigration Reform and Control Act;

    (11) the American with Disabilities Act of 1990;

    (12) the Employee Retirement Income Security Act (ERISA);

    (13) the Civil Rights Act of 1991;

Jm 0166

(14) the Family and Medical Leave Act (FMLA);

(15) the Worker Adjustment and Retraining Notification (WARN) Act;

(16) the Fair Labor Standards Act (FLSA);

(17) the New York State Executive Law;

(18) the New York State Human Rights Law;

(19) the New York City Administrative Code; and

(20) any applicable federal state or local anti-discrimination or equal employment opportunity statutes or regulations.

You understand that this arbitration agreement is not a contract of employment between you and us and does not establish either the duration or the terms and conditions of any employment by us of you.

Updated: May, 2001                          33

JM 0167



# *Charge Contact Information*



**Charge Number:** _____

_____    v.    _____
*Charging Party*                 *Respondent*

| *Charging Party's Info.* | *Respondent's Info.* |
|---|---|
| Address: | Address: |
| | |
| | |
| | |
| Tel: | Tel: |
| Fax: | Fax: |
| Other: | Other: |
| *CP's Attorney's Info.* | *Respondent's Attorney's Info.* |
| Name: | Name: |
| Firm: | Firm: |
| | |
| | |
| | |
| Tel: | Tel: |
| Fax: | Fax: |
| Other: | Other: |

Jm 0168



**U.S. Equal Employment Opportunity Commission**
**New York District Office - 520**

33 Whitehall Street
5th Floor
New York, NY 10004
(212) 336-3620
TTY (212) 336-3622
FAX (212) 336-3625
1-800-669-4000

Respondent: PLUS ONE HOLDINGS
EEOC Charge No.: 520-2006-01431
FEPA Charge No.:

August 15, 2006

Jordan  Mann
259 5th Street
Jersey City, NJ 07302

Dear Ms. Mann:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge.  The information provided indicates that the charge is subject to:

[ X ]    Title VII of the Civil Rights Act of 1964 (Title VII)

[ ]    The Age Discrimination in Employment Act (ADEA)

[ ]    The Americans with Disabilities Act (ADA)

[ ]    The Equal Pay Act (EPA)

You need do nothing further at this time.  We will contact you when we need more information or assistance.  A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

[X]    Please be aware that we will send a copy of the charge to the agency listed below as required by our procedures.  If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official.  Then the agency will investigate and resolve the charge under their statute.  If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding.  To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case.  Otherwise, we will generally adopt the agency's finding as EEOC's.

JM 0169

New York State Division Of Human Rights
Federal Contract Unit
One Fordham Plaza, 4 Fl.
Bronx, NY 10458

Please notify this office of any change in address or of any prolonged absence from home. Failure to cooperate in this matter may lead to dismissal of the charge.

Sincerely,

Joan Marchese
Investigator
(212) 336-3782

Office Hours: Monday -- Friday, 8:30 a.m. - 5:00 p.m.
TDD: 1-800-669-6820
www.eeoc.gov

Enclosure(s)

JM @ 170

EEOC FORM 131 (5/01)

**U.S. Equal Employment Opportunity Commission**

| | PERSON FILING CHARGE |
|---|---|
| **PLUS ONE HOLDINGS**<br>**Director of Personnel**<br>**75 Maiden Lane, 8th Floor**<br>**New York, NY** | **Jordan Mann** |
| | THIS PERSON (check one or both) |
| | [X] Claims To Be Aggrieved |
| | [ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**520-2006-01431** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act          [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act   [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [X] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **05-SEP-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to _____
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Joan Marchese,<br>Investigator | **New York District Office - 520**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|
| *EEOC Representative* | |
| *Telephone* **(212) 336-3782** | |

Enclosure(s):  [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE  [X] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [X] OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **August    15, 2006** | **Spencer H. Lewis, Jr.,**<br>**Director** | |

JM 0171



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Phone: (212) 336-3620
General Fax: (212) 336-3625
TTY: (212) 336-3622

Joan Marchese
Investigator
Phone (212) 336-3782
Fax (212) 336-3790

November 14, 2006

Ms. Jordan Mann
80 St. Nicholas Avenue
#5A
New York, NY 10026

Re:   Jordan Mann v. Plus One Holdings
      Charge No.  520-2006-01431

Dear Ms. Mann:

I am providing a copy of Respondent's position statement submitted in response to the above referenced charge. If you wish to rebut what has been stated your written rebuttal, along with any supporting information, should be received on or before December 1, 2006.

Thank you for your cooperation in this matter.

Sincerely,

Joan Marchese
Senior Investigator

JM 0172

# WolfBlock

250 Park Avenue, New York, NY 10177
Tel: (212) 986-1116 ■ Fax: (212) 986-0604 ■ www.WolfBlock.com



Russell E. Adler
Direct Dial: (212) 883-4950
Direct Fax: (212) 672-1150
E-mail:  radler@wolfblock.com

September 19, 2006

**VIA FACSIMILE (212) 336-3790**
**& FIRST CLASS MAIL**

Ms. Joan Marchese, Investigator
United States Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004

        Re:    Mann v. Plus One Holdings, Inc.
              EEOC Charge No. 520-2006-01431
              <u>Respondent's Statement of Position</u>

Dear Ms. Marchese:

    We are counsel for Respondent, Plus One Holdings, Inc. ("Plus One") and hereby submit this statement of position in response to Complainant Jordan Mann's charge of unlawful discrimination.[1]

<u>Summary of Position</u>

    Ms. Mann's charge accurately notes that after she complained of alleged harassment and discrimination with regard to her Afro hairstyle, Plus One advised Ms. Mann that her Afro was acceptable under Plus One's personal appearance policy. Thus, by her own admission,

---

[1]    Plus One notes that Ms. Mann is bound by the terms of an arbitration agreement binding upon all Plus One employees and that this response is not a waiver of Plus One's right to enforce the arbitration agreement and/or preclude Ms. Mann from any recovery obtained by the EEOC on her behalf. In addition, this Statement of Position is also submitted by Respondent in an effort to assist the EEOC in informally conciliating this charge and, as such, is governed by and protected from disclosure by Sections 706(b) and 709(e) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(b) and 2000e-8(e).

NYC-708165.1/phi016-237341

Boston, MA ■ Cherry Hill, NJ ■ Harrisburg, PA ■ New York, NY ■ Norristown, PA ■ Philadelphia, PA ■ Roseland, NJ ■ Wilmington, DE

WolfBlock Government Relations - Harrisburg, PA ■ WolfBlock Public Strategies - Boston, MA and Washington, DC

Wolf, Block, Schorr and Solis-Cohen LLP, a Pennsylvania Limited Liability Partnership

Jm 0173

Ms. Joan Marchese, Investigator
September 19, 2006
Page 2

Ms. Mann was not subjected to harassment or discrimination on the basis of her race, color or sex.

Ms. Mann's charge conveniently glosses over (and inaccurately portrays the facts regarding) the unrelated incident that caused her termination – her act of calling the police following a verbal disagreement with "Robert," a resident of Trump World Tower ("Trump"), Plus One's client, the location where Ms. Mann worked.

Notably, Ms. Mann neglects to mention that it was she who called the police to Trump's premises and that her own written statement regarding the incident confirms that although Robert was rude and disruptive, he never threatened her in any physical manner. Plus One by no means condones Robert's alleged behavior; however, it is the reality of customer service businesses, like Plus One's, that members of the public will, on occasion, conduct themselves inappropriately. It is by no means pleasant, but a necessary part of the job. By improvidently calling the police after the incident with Robert, Ms. Mann exercised poor judgment which jeopardized Plus One's relationship with its client, Trump. As a result of this incident, Trump justifiably told Plus One that Ms. Mann was not welcome as a Plus One employee on its premises. This led to her termination of employment.

### About Plus One

Founded in 1986, Plus One provides management expertise and staff at fitness and physical therapy facilities for a broad range of companies including hospitals, luxury hotels, financial services firms, condominiums and other businesses. Plus One operates fitness centers at various locations, including the Trump World Tower, where Ms. Mann was employed at all times relevant to this charge.

### The Alleged Discrimination and Hostile Work Environment

Ms. Mann provides a detailed account of the events between April 5, 2006 (when she alleges Plus One first questioned the propriety of her hairstyle) and May 5, 2006 (when she was told by Plus One's President that her hairstyle was acceptable), but for purposes of Plus One's response, the specifics of each date are irrelevant. It is simply unproductive to challenge each of Ms. Mann's assertions (many of which merely describe how Ms. Mann felt about various alleged events) when her charge itself notes that she did not suffer any adverse action as a result of her complaints and that Plus One promptly and fully remedied her complaints as soon as she wrote to Plus One's President.

It is undisputed that within one month after Ms. Mann first voiced her complaint, she wrote to Plus One's President, who promptly responded to Ms. Mann and advised her that her hair was acceptable, explained the reasoning for Plus One's personal appearance policy, and

NYC:708165.1/plu016-237341

JM 0174

Ms. Joan Marchese, Investigator
September 19, 2006
Page 3

apologized for any stress and concerns she may have experienced. (Exhibit A). At no time did Ms. Mann suffer any adverse consequences (e.g., loss of pay, reduction in responsibilities, etc.). Thus, even if Plus One's investigation was deficient (as Ms. Mann alleges), her concerns were addressed and remedied as she was specifically permitted to maintain her hair in the style of her choosing. Accordingly, Ms. Mann's discrimination and harassment claims are wholly without merit.

## Ms. Mann's Termination Following the Incident with a Trump Resident

Ms. Mann's charge focuses on her allegations of harassment and discrimination in relation to her hair; however, she only briefly addresses the actual events that led to her termination: her act of calling the police on "Robert," a Trump resident. In addition, she either omits or exaggerates the events with Robert in an obvious after-the-fact attempt to justify her ill-conceived decision to call the police.

First, with regard to Ms. Mann's reference to verbal threats from "Robert," she neglects the fact that she noted in the written statement she herself provided to Dave Milani, Plus One's Vice President of Human Resources, that "Robert" merely threatened to have her fired *but never threatened her with physical harm.* (Relevant portions of her statement are included within Exhibit B). This is a key fact, as Plus One would have fully supported Ms. Mann's decision to contact the police had Robert threatened her with physical harm. Merely telling an employee that you will try to get her fired, however, is hardly a valid reason to call the police. Second, Ms. Mann neglects to mention in her charge that it was she who called the police in the first place and it was she who requested to be sent home after the incident with Robert. (See Exhibit B). Finally, Plus One and Mr. Milani categorically deny the unfounded allegation in Ms. Mann's charge that he told her to look for another job as a result of her previous complaints and that she was not to receive severance because she went to the EEOC.[2]

Dealing with rude or inappropriate members of the public, such as "Robert," is an unfortunate part of Plus One's business. Ms. Mann is certainly aware of this aspect of the job as she was employed by Plus One for several years. Ms. Mann's actions in contacting the police jeopardized Plus One's relationship with Trump; therefore Trump was within its contractual rights when it requested that Ms. Mann be removed from its facility and Plus One was obligated to comply.

---

[2]    Ms. Mann's assertion that Plus One's highest level human resources representative made such retaliatory and incriminating statement is simply not credible, thereby calling into question Ms. Mann's credibility.

NYC:708165.1/plu016-237341

JM 0175

Ms. Joan Marchese, Investigator
September 19, 2006
Page 4

<u>Conclusion</u>

     Based on the foregoing, Plus One respectfully requests the EEOC dismiss Ms. Mann's charge and issue a finding of no probable cause.

                             Very truly yours,

                             Russell E. Adler
             For WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP

NYC:708165.1/plu016-237341

JM 0176

# Exhibit A

JM 0177

**From:** Motta, Mike
**Sent:** Friday, May 05, 2006 10:49 AM
**To:** Mann, Jordan
**Cc:** Salomon, Richard; Ciatto, Chris; Macdonald, Jamie; Welter, Bob; Davis, Heather; Niszczak, Tom
**Subject:** Response to your email to me dated May 5, 2006

Dear Jordan,

Thanks for your e-mail. I am glad you wrote to me. I have decided, as President of Plus One, that your hair is acceptable for our business purposes.

Please understand that business purposes may vary depend on the site. What dress may be suitable in Soho or Chelsea may not be suitable at certain uptown locations. I myself dress and wear different clothes to some meetings than to others. Some may even change their hairstyle depending on the business purpose. Please appreciate that we conduct ourselves differently in some ways at your current site than we do in other sites, and we expect employees to appreciate the differences in the business climate at each of our sites.

As to your hairstyle though, it is acceptable in all of our sites. Some hairstyles are not, and we have taken action at your current location to ask some of our employees to change their hairstyle when working at that site. I personally regret that there was some confusion on our part with respect to your hairstyle, and you have my sincere apology.

That being said, I ask you to be sensitive to our business purposes, to wear a headband if you wish to, and to maintain your hair length at its current length if that suits your personal wishes. While the 3 inch hair rule is a fair and appropriate general guideline for that location, it will not be applied in your case or in any other instances where it is unsuitable to do so.

Jordan, I do not know whether your statement of events in the e-mails you forwarded to me is, or is not, accurate in all respects. But, it does not make a difference to my decision today, so there is no need for me to address those statements.

You have been a valuable employee of Plus One. I am sorry this matter has stressed you out, and understand why you feel that way. I hope that you will place this matter behind you as soon as possible so that you are free from extraneous concerns in the workplace. And do not hesitate to contact me if you feel that any others at Plus One have not placed this matter behind them as well, despite my direction to do so. Having spoken to Chris Ciatto about this matter, I can tell you that he and I are in complete agreement with respect to your hair. I will ask Chris to convey our decision and our philosophy on this matter to Jamie Macdonald as well. Finally, you may or

JM 0178

may not know that Bob Welter has decided to resign as head of Human Resources, and I have asked Chris to discuss this matter with his replacement when hired.

Again, thanks for your e-mail, and keep up the good work. Also, a paper copy of this email will be sent to your home address.

Sincerely,
Mike

Michael Motta
President, Plus One
(646) 312-6200 direct
mike.motta@plusone.com

---

**From:** Mann, Jordan
**Sent:** Friday, May 05, 2006 6:52 AM
**To:** Motta, Mike
**Subject:** FW: discrimination and harassment

Dear Mike,

Below is an email I sent to Chris Ciatto. I originally met with him in early April about my situation but he never got back to me. As it stands, according to human resources, I will be terminated if I do not change my hair. Please note that my current hairstyle is an afro and has been such since my employment with PlusOne.

I'm sending this email to you as my last resort to rectify the discrimination and harassment to which I have been subjected.

Sincerely,

Jordan Mann
receptionist
Trump World Tower site
646 313 7630

Jm 0179

# Exhibit B

JM 0180

**June 8, 2006**

Approximately 11am, resident Lily Wong entered the pool area to ask me about tenant Robert who according to her, was harassing her while she was at the computer. She wanted to know what his name was. Upon her description, I realized I was familiar with the tenant but did not know his name. Site general manager Mike Murray and Lily Wong wanted to know the tenant's name and apartment number.

I went to ask co-worker Magaly and she gave me his first name and I came back to tell Mike Murray and Lily Wong. Lily was extremely upset about an altercation she had with Robert. She was so shaken that she said she was filing a report with the building manager. After she left, I continued to look on the tenant list to find out exactly who this Robert was.

From her apartment, Lily called down to the fitness center to find out the full name and apartment number of Robert. While I was on the phone with her, Robert was at the reception area listening to my conversation. Once I hung up with Ms. Wong, Robert accused me of giving out his apartment number and then began to berate, curse at and threaten me. He said things like you're 'bullshit...I don't like you...I will have you terminated...fuck you...I'm going to do everything in my power to have you gone.' He said this while pointing his finger at me and hovering over the reception desk. He then cursed out and threatened Mike Murray because he was trying to mediate the situation between Robert and I. Then through out the time of my shift, Robert continued to come down(at least 20times between the hours of 11am and 1pm) to harass me. Extremely shaken, I asked if I could leave because I didn't feel safe in the environment. Mike told me to wait and that he had to call regional vp Jamie MacDonald. While Mike was on the phone with Jamie, I was told to write a report of the incident. I told Mike I would do such but I said I wouldn't stay here to do it because I was emotionally overwhelmed.

Later, at home around 5pm, I called Trump World Tower healthclub reception and spoke to Ryan Fairall to see if the tenant had been banned from the club because of his threats and harassment. Ryan said no and that all Mike did was file an incident report. This made me even more nervous to come to work at Trump World Tower to an already hostile work environment because of continued harassment and discrimination from PlusOne and Trump management.

**June 9, 2006**

Approximately 6:20am, Tenant Robert exited off the elevator. I said 'good morning.' In a hostile threatening tone, he said, 'don't speak to me. I don't want to talk to you.' When I realized that the abusive tenant was not barred from the healthclub, I called the police. The police showed up and took a report. During that time, the tenant Robert continued to rant about how he would 'have me out of here' in two hours. He threatened that he would make sure that I would no longer be here at Trump World Tower. He also cursed, using the word 'bullshit.'

I called the police because Plus One nor Trump building management did nothing to secure my safety. Plus One and Trump building management was well aware of the

JM 018¹

harassment and threats since yesterday morning but allowed the tenant to continue to come to the fitness center.

After the police left, Trump security came down. The security guard just took down the spelling of my name. Security then told tenant Robert that he was able to continue using the gym facilities and not to worry about this.

Over and over, Robert was entering and exiting the fitness club coming by the reception desk saying he would have me fired, that he 'wouldn't hire me' because I was "fat and not beautiful.' He also said that 'this AIN'T(stressing this word) a Black thing.'

I then made emergency calls to site general manager Mike Murray, regional vice president Jamie MacDonald and building manager John Henriques.

JM 0182



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office

*Jordan Mann*

*Call 1st*
*mail her "Okay"*
*change*

# I N T A K E   M E M O R A N D U M

Date:       4/7/2006

To:         H. STEWART

From:       J. DOUGLASS., CRTU SUPERVISOR

Comments:

**Please Take Appropriate Action.  THANK YOU!**

*520-2006-04731*

*J. M   Take appropriate*
*action*
*call her after 7PM*

*JM0183*

Enclosure with EEOC
Form 131 (5/01)

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

Jm 0184