customer service.

MS. NORCROSS: Mark this as Defendant's Exhibit 22.

(Whereupon the above referred to document was marked, Defendant's Exhibit 22, for identification, as of this date, by the reporter)

Q Take a look at what the reporter has marked as Defendant's Exhibit 22, and tell me if you can identify it, please.

A Yes, I can.

Q What is it?

A It looks like information used in my training for my position at Trump.

Q And you attended this training, correct?

A I believe via phone.

Q And the training was on or about April 6; would that be correct?

A Yes.

MR. UMOH: I am going to object to the extent the document seems to be missing some pages.

MS. NORCROSS: There is

nothing missing from my deposition exhibit.

MR. UMOH: Let me finish my objection, please.

MS. NORCROSS: I thought you were finished. I am sorry.

MR. UMOH: It appears to only have 7 and 8.

I object to the introduction of this document.

Q Miss Mann, the training occurred on or around April 26; would that be correct?

A Yes.

Q Just to make sure we are clear, the top page is an e-mail that you sent, right?

A Yes.

Q And you signed it Jordan Mann?

A Yes.

Q Which was not your name on April 26, correct?

A That was the name I went by.

Q That was not your accurate legal name, correct?

A No.

Q Now during this training, was there discussion about how to handle difficult residents or customers?

A I don't recall the specific training.

Q Okay.

Do you recall being trained on what to do with an upset customer?

MR. UMOH: Objection. The document is dated April 26. I have a standing objection to any question that pertains to this document.

MS. NORCROSS: I think it's pretty nervy for someone who has withheld as many pieces of paper as you have, to try to put that kind of objection on the record.

Q I am asking you specifically what, if any, training you received on how to handle difficult customers or residents.

A To tell you the truth, this was such a long time ago, I really can't -- I don't know if Jennifer went over the whole program or document, or even if it was specific to Trump.

Q You recall other events that occurred in April of 2006, correct?

A Yes.

Q But you can't recall this, correct, this training?

A Unfortunately, I can't recall everything that's happened in my lifetime. Sometimes things stand out and sometimes they don't.

Q Let's go through without referring to specifically this training program.

Do you recall being instructed that when you had difficult residents, you were to allow the person to speak without interruption, in words or substance? I am not asking if you recall those specific words, but in words or substance?

MR. UMOH: Objection.

A I don't remember Jennifer specifically saying -- I can only go by an example of what happened, by watching my supervisors. I don't recall Jennifer saying that.

Q That's not my question.

Page 158

158

My question is, during any training you received, whether it was Jennifer or somebody else, do you recall being instructed to allow the upset person, whether it was a customer or a resident, to speak without being interrupted? Do you remember that?
A I don't remember that.
Q Do you recall being instructed that if you had a difficult resident or customer, that you should -- if you could not handle it, you should go to your manager or someone in the building or in the physical facility?
MR. UMOH: Objection.
A They did not tell me what to do if no one was present, because at the time, that account was in such turmoil, and they had fired my supervisor; so there was no supervisor at the time.
Q What time are you talking about? I did not specify a time.
A I guess I was speaking about my time at Trump.
Q If someone had a question that you could not answer during your time at Trump, what

Page 159

159

would you do?
A I would find the answer.
Q How would you do that?
A I would ask whoever I thought would have the answer.
Q If that person was not physically in the building, what would you do?
A I would leave a message.
Q Pick up the phone?
A Yes.
Q And so if you had a problem with a resident, wouldn't you consider picking up the phone?
MR. UMOH: Objection.
A It depends on the situation. It depends on the severity of the situation.
I can't make that judgment. I would have to be put in the predicament to see what the best answer or best choice of action would be. If it's a 911 call, it depends on the situation.
Q On June 8, 2006 you did not pick up the phone to try to reach anyone at either Plus One or in the building, correct?

Page 160

160

MR. UMOH: Objection.
A Incorrect. I spoke directly with Mike Murray, my manager.
Q Mike Murray was there, wasn't he?
A Yes.
Q You mentioned this a few times, and I may be paraphrasing, but you mentioned issues with Jamie?
A Yes.
Q Describe for me what it is that you mean when you referred -- earlier in your deposition, when you referred to the problem between you and Jamie.
A Describe?
Q Tell me what you know.
A I was directly referring to the insults and I thought discriminatory practices that he was doing towards me.
Q Tell me, not in characterizations, but tell me, as a matter of fact, precisely what you claim Jamie did, and when.
A At least a few times, he discriminated against me based on my natural characteristics of an African American person.

Page 161

161

Q Again, please, facts.
MR. UMOH: Objection. Is that a question?
Q You could answer?
A Facts on how he discriminated against me?
Q Tell me precisely, as best you can remember?
A He would --
MR. UMOH: Objection.
A He would single me out on saying that I was not complying to Trump policy.
And I never even received the policy, but he would walk by white employees who were blatantly violating policy in black and white, but never said anything to them in my presence, but he would always single me out.
Q He never said anything to them in your presence?
A I questioned each person that was there, and they told me directly they were never questioned whatsoever.
Q My question is, do you allow for the possibility that Mr. MacDonald may have had

conversations with other people to which you were not privy? Yes or no?

A No, I don't ascribe to the possibility, because I believe the credibility of the co-workers.

Q Who were the co-workers?

A Ryan, Magaly.

Q Does Ryan have a last name?

A I would have to look at my notes.

Q What notes?

A I mean, I furnished a lot of paperwork in the beginning to the E.E.O.C.

Q That's what you are referring to as notes, what you sent to the E.E.O.C.?

A Yes.

Q Is there anything else you are referring to other than what you sent to the E.E.O.C.?

A It could have been notes that I jotted down for myself.

Q Where are those notes, if they continue to exist?

A Most likely in storage.

Q Since the beginning of this case,

have you made any effort to obtain those notes, or find them in storage?

A Yes, I have made an effort.

However, I would find things in piecemeal, and they would be at different locations, because I was moving around, yes.

Q Let me tell you why I am having difficulty with this.

You filed the lawsuit. We got it in the mail. You filed the lawsuit, and there are certain obligations that go with that.

A Yes.

Q What I am trying to determine when I start asking about these papers is, what else is in existence that has not been searched or provided to us, which is a problem. That's what I am trying to figure out.

I understand about moving, and I understand about storage units and all that stuff. What I am trying to figure out is what is still out there that we don't have. It's an explanation for why I keep asking about this paper, that's all.

So my question is, you say you have

notes that you made to yourself.

What I am asking is, where are they, because I don't have them.

MR. UMOH: Objection.

A I mean, it was not anything like professional or court presentation. It's on a little note pad, like let me write down Ryan's name or something.

Q It's not my job to explain what it is you're supposed to produce. That's your lawyer's job. I will leave that for you two to discuss.

We are entitled to all of it, and we are going to need somehow for it to be produced quickly, okay?

A Okay.

Q So there may be some notes?

A Yes.

Q Ryan's last name is?

A I don't remember.

I do remember first names, though.

Q Magaly, you don't know?

A I saw it in here. It was in one of these documents.

Q Okay. At this point, I am just concerned about time?

MR. UMOH: Let the record reflect, plaintiff was not allowed to refresh her memory.

MS. NORCROSS: It's up to me whether I show her a document to refresh her memory.

Q Anyone else?

A The question, who was employed there while I was there?

Q No. The question was, who were these other people that you are sure Jamie never spoke to that you described as violations?

A Lisa. No, not Lisa. Sylvia.

Q Anyone else?

A Those are the ones that pop out right now.

Q Before we get to those people, the specifics of those people, I want you to tell me, please, exactly how you claim Jamie singled you out, which is the way you put it.

A Well, he singled me out based on his dislike of my African American traits, my hair,

Page 166

166

because he walked right by the employee who was violating the Trump policy that he showed me afterwards.

Even though he could not say how I violated the policy, he continued to say my hair was not normal, it was not appropriate, it was not current, it's not appropriate for this establishment.

Then even Chris Ciatto admitted to me Jamie made a mistake in reprimanding me for my hair, and he apologized for Jamie.

I was the only one basically sent home, because every time I saw a different person in Plus One, they had a new issue or making up some way why I was not compliant, but could not say why.

Q Again, I am trying to get facts.

Jamie said something or things to you about your hair; is that right?

A Yes.

MR. UMOH: For the record, I want to request a copy of Plaintiff's deposition to review.

MS. NORCROSS: Sure.

Page 167

167

Q I want to show you again what we have previously marked as Defendant's Exhibit 18, the third page of that exhibit.

A Yes.

Q It is accurate that you did not function as the receptionist at Trump between 2002 and 2006, correct?

A You are saying I did not act as receptionist?

Q You did not?

A I had many hats while an employee at Trump, so receptionist was one of them.

Q Between 2002 and February 2006, you were a massage therapist, right?

A Yes.

Q But this resume reflects that you were assistant to general manager for a four-year period, roughly, does it not?

A I went to the work force. And you have to go through a series of trainings, and they tell you how to format your resume and what to put on there.

I always put the last position I held. When I go to the interview, how I got to

Page 168

168

that position at the company.

Q Similarly, a couple of pages back, where you identify your job at Plus One as customer service manager, you similarly have the dates there, 2002 to 2006, correct?

A On the sheet that I am looking at, the date says 2002 to 2006.

Q Okay. I want you to, as best you can, tell me exactly what Jamie McDonald said to you, the words he used, as best you can remember, that you found problematic or inappropriate.

A He commented that my hair was not normal, it was not current, that my hair was inappropriate.

Q Anything else that you can remember?

A Those are the three things that stood out for me.

Q Did he say those three things on one occasion or were they different occasions?

A Several. He repeated those on more than one occasion.

Q When you say more than one, how

Page 169

169

many?

A It could have been like two or three.

Q But I need you to tell me how many it was. Not what it could have been, but what it was.

A Roughly two to three.

Q Were these on different dates or on the day?

A Then that changes the situation, because he said those words, okay? He said those words sometimes frequently, like more than once in one meeting. I know at least to three times during that meeting, he had said that. Like the first time he came out of the elevator, he said, it's not normal. It's not current.

Another time, when I had a meeting with him and Tom and I, he said those things again. I know he called me on the phone one time. I know at least two different dates.

Q So on two different occasions --

A At least.

Q On two that you remember --

A What stands out right now are two,

170

definitely. Right now, I definitely remember two specific incidents.

I don't recall the other times where I encountered Jamie and the topic came up again.

Q There are times you can remember, sitting here right now --

A Yes.

Q -- that you can recall having these -- that Jamie was saying these things, correct?

A Yes.

Q Can you recall more than two?

A I would have to reflect on my memory.

If I take time and think, I don't want to be pressured and have it seem I am trying to waste time.

Q I don't think your trying to waste time.

A If I recall correctly, it's at least more than two times. But right now, I can remember specifically two times.

Q And that's what I am trying to get at. I am trying to find out what it is that you

171

remember.

And you remember two specific incidents?

A Yes.

Q When did the first incident occur?

A If I can recall correctly, it was April 5, 2006.

Q And where did this incident occur?

A It occurred at Trump World Towers.

Q Where?

A The health club.

Q Was it at the front desk?

A Yes, it was.

Q And was there anyone else present during this --

A Yes, there was.

Q Who was that?

A It was out in the open. There were residents working out, employees working.

Q Can you give me their names please?

MR. UMOH: Objection.

MS. NORCROSS: What is the objection?

MR. UMOH: Who is "they"?

172

MS. NORCROSS: The clients, residents, employees she just identified.

A Specifically, I think that information can be gotten from Plus One's attendance log, because I had to punch in the information every day of who was in attendance.

Plus One should have information, clients who were present at that time in the facility.

Q Do you know the names?

A I don't recall right now.

Q What, if anything, would help you recall, other than what you think Plus One may have?

A It's hard to recall specifically who was working at that time. I really was not in social interaction, like I kept in touch with these people, so I don't remember their names.

Sometimes it's like the residents would have their friends come in as guests, as well.

Q Sitting here today, can you identify for me the name of anyone that you claim was an

173

observer or a witness to this interaction you're describing between yourself and Jamie McDonald?

A I know there is a co-worker, Magaly. Her last name is in one of the documents here. She saw Jamie come in.

Q She saw Jamie come in?

A I am sorry. She was present right when Jamie came in. As soon as he came off the elevator, Magaly was present.

Q Then what occurred after he came off the elevator?

A As soon as he came off the elevator, he kind of jolted when he looked at me. And he was walking around the front desk, and he was looking at me askew. And I was a little bit puzzled as to why he was looking at me like that.

Q Had you ever met Jamie before?

A I believe once prior to that.

Q Would you say you knew him well on April 6, 2006?

A 2000 --

Q 2006?

A I just met him, yes.

Q You would agree with me, you did not know him well?
A Right. Yes.
Q So he got off the elevator. He looked at you, as you described it, askew.
And then what occurred?
MR. UMOH: Objection.
A When he was coming off the elevator his facial expression, it did not seem pleasant. It seemed like he had a grimace on his face, looking at me in disgust. And I could not understand, well, why would he be, you know.
Then he came around and said, Did Tom talk to you about your hair? And I was like, No. What are you talking about? He said, You need to change your hair. I thought he was joking. I thought it was banter, because I did not know him.
He said, No. I am serious. I said, You are not joking. He said, Your hair is not normal. It's inappropriate. You have to do something with it. It's not current.
He started reprimanding me. I felt I was being insulted out in the open. And even

Bob Welter --
Q Let's stay with what occurred -- well, was Bob Welter there during this incident?
A No.
Q Let's stick to this incident.
What occurred at this point in time? Did he say anything else?
A Yes, he did say other stuff.
I knew something was fishy because he never could tell me what policy I was violating at Trump.
Q Miss Mann, I am only going to interrupt you because are you still describing for me what occurred on this specific incident, on April 5?
A Yes, the interaction and how it was strange, because he was saying that I needed to change my hair. He could not give me a reason how my hair was violating policy.
He said, Did you get the policy, grooming standards? I said, What grooming standards?
While I was employed at Trump, I was

never given any grooming standards from Trump. I could not understand what he was talking about.
The first time I met Jamie, I had a head wrap on.
Q Okay, I need you to focus on my questions.
A Okay.
Q I am talking about the date that you have given me as April 5, 2006, okay?
A Okay.
Q On April 5, 2006, did you have a head wrap on?
A No.
Q Did Jamie say anything else other than what you have already told me?
A Yes. We continued the conversation.
And he was like, Well, Tom did not give you -- something about if Tom did not give you the grooming standards. He had to find it, and he was not sure whether Tom even had it.
He said, You have to change your hair. I just remember this was a very urgent matter, basically.

Then we had set up a meeting with Tom Nizsczak, my supervisor, to discuss the grooming standards.
Q How long did this discussion between you and Jamie last?
A I can only estimate.
Q Sure.
A Can you repeat the question?
Q I sure can.
My question was, how long did this conversation on April 5, 2006 between you and Jamie last?
A It could have been approximately, back and forth, a half hour. It could be.
Q It could have been less, but probably not more than half an hour, would that be accurate?
MR. UMOH: Objection.
A I don't believe it could have been less, because I think I remember Jamie had to call me back, and we discussed it again --
Q Okay.
A -- when he left the facility that day.

178

Q You talked to Jamie twice that day; is that true?

A Well, I know I spoke to him -- okay. I don't remember in the time frame of the next time I had to meet with Jamie and Tom.

I can definitely say yes, we spoke about the whole hair thing on April 5, about a half hour.

Q Let me make sure I understand. You had an in-person conversation with Jamie on or about April 5?

A Yes.

Q When he got off the elevator and you talked about your hair, correct?

A Yes.

Q That conversation lasted about a half hour, give or take; is that correct?

A Yes.

Q That conversation alone, is there anyone that you know of that witnessed or observed or heard that conversation?

MR. UMOH: Objection.

A I can't say who was paying attention or what they were able to hear, per se, because

179

I would be speaking for them. But I know who was in close proximity and acknowledged the conversation and so forth.

Q Let me make sure I understand your answer.

What you are saying is, there were some people around, but you don't know whether they heard the conversation or did not?

A I don't know if they heard the entire conversation.

Q Do you know if anybody did?

A I believe Magaly did. We had a discussion after Jamie left.

Q What was that discussion?

A The discussion was my job being in jeopardy and me being in trouble for breaking Trump standards that I did not see.

Q And that is something you told Magaly?

A No. You are talking about common knowledge, that everybody knows already.

Q Did she specifically tell you she had heard the conversation between you and Jamie?

A I know that she -- okay. I am trying

180

to think specifically what she said, verbatim.

I know she did communicate to me that she knew I was in trouble. I can definitely say that. She did communicate that to me.

Q Did she tell you she had heard the conversation between you and Jamie?

A I don't recall.

Q Then you said you had another conversation with Jamie that day; is that correct?

A I am not sure. But there was another time where we did speak. I know he called, and there was a point where that's when we made the meeting with Tom. I know there was contact with either Tom or I to schedule the next meeting about my hair.

Q During that contact to schedule the meeting, did Jamie say anything to you specifically about your hair, or was the conversation just about setting up the meeting?

A About changing my hair.

Q What did he say?

A I don't remember specifically. Like

181

I knew something was strange, because he could not give me, okay, well how am I not complying; and he could not answer me.

Q Did you ask him that question?

A Yes, I did.

Q You have to let me finish.

A I am sorry.

Q That's okay.

Did you ask him that question in the conversation to set up the meeting?

Understand, I am trying to separate out, as much as possible, the different conversations.

A Sure. Well, he set up the meeting, and it was not my decision. It was his decision.

I am sorry. The question again? I am sorry. I have had so many questions today.

Q That's all right.

The question was -- let me try it this way.

You had an in-person conversation on April 5, then you had a conversation with somebody about setting up a meeting?

182

A Yes.
Q Do you remember if that was Jamie or Tom, or you don't know?
A I know Tom, definitely. We discussed having the meeting, yes. I know Tom and I, we discussed having a meeting.
Q Then you had the meeting, correct?
A Yes, we did.
Q Where did the meeting take place?
A The meeting took place in Tom Nizsczak's office at Trump World Towers.
Q What date?
A I have it reflected in some of the documents here.
Q Tell me what you remember.
A Of the meeting?
Q My question is, when did the meeting take place?
A Soon after the April 5, 2006 incident.
Q And who was present?
A Jamie MacDonald, Tom Nizsczak and I were present.
Q As best you can remember, please tell

183

me what was said, and by whom.
A Well, the majority of the conversation was between Jamie and I. Tom was basically neutral. He was just being a witness, and I guess taking down information.
I know he had interjected -- tom interjected he never saw the Trump grooming standards. Jamie reiterated how my hair was not normal, it was inappropriate.
Q Was anything resolved at that meeting?
A No, nothing was resolved.
Since nothing was resolved, I immediately contacted Human Resources.
Q And you had a conversation with Heather Davis; is that correct?
A Yes.
Q Heather Davis, sitting to my left?
A Yes.
Q So you two know each other?
A Yes.
Q Please tell me, as best you remember, what you said and what she said in that meeting.
A I know I initiated this meeting

184

because I was flabbergasted and shocked and could not believe this was happening.
And I felt I was being discriminated against, so I went to Heather. I started telling her what had happened between Jamie and I. And I believe I mentioned the meeting with Tom, saying how Jamie had discriminated against me, reprimanded me because of my hair.
Then I was concerned as to Jamie had veered away from company policy by reprimanding me out in the open instead of in a closed office. Basically I was discussing what happened and how to take action.
Q You were upset, right?
A I was upset. A variety of emotions: Upset, in amazement, kind of sad, in 2006, someone would have the gall to say that to another person.
Q You told me what you said.
What did Miss Davis say?
A I know I could remember that she got real nervous once I said that I had filed some forms with the E.E.O.C. So the meeting was adjourned, and I assume she went to go talk to

185

her supervisor.
Q Do you know that?
A I just said I assumed. I don't know.
Q Had you ever met Heather before?
A To be honest with you, I don't know. It could be I had filled out prior paperwork. I don't remember.
Q Would you agree with me that at the time you had this meeting with her, you did not know her well?
A Correct. Yes.
Q How was it that you concluded she was nervous?
A Well, I concluded that because she jumped up, and she was sort of jittery, going back to and fro. Her movements were not slow and deliberate.
Q Would it surprise you to know, her movements are never slow and deliberate?
A I was observing her composure, and it changed.
Q In all of the conversations you had with Jamie, did he ever say the problem with

186

your hair is because you're African American?

A Well, it depends how you interpret it. He said, We can't make allowances for people with hair like you.

Q Did he say because you were African American?

A He did not specifically quote that.

Q Do you know whether Jamie supervised any other African American employees?

A Yes.

Q And did he?

A Yes. I don't know if any African American employees were under his immediate supervision, but I am sure a couple of levels down, sure. There were other African Americans who worked at the Trump world site.

Q Do your knowledge, did he say anything to those other African American employees about their hair?

A Well, the African American guy that I can't remember, he had a shaved head.

Q Do you know if Jamie said anything to that employee about his shaved head?

A I can't say.

187

Q After you met with Heather, you scheduled a meeting with her immediate superior, did you not?

A I believe so.

I know eventually I set up a meeting with Bob Welter.

Q Bob Welter was the president of Human Resources; is that correct?

A Yes.

Q and you went to his office to have that meeting?

A Yes.

Q You brought a tape recorder?

A Yes, I did.

Q At the time you had the meeting with Bob Welter, were you represented by counsel?

A No.

Q When you walked into Mr. Welter's office, you told him you had a tape recorder and asked for permission to record the conversation; is that right?

A All I know is, we had a conversation.

Q Isn't it true, you did not even tell him you were recording the conversation?

188

MR. UMOH: Objection.

A I remember me bringing a ruler.

Q And you measuring your own hair?

A No. He actually measured it.

Q Have you listened to the tape recording recently?

A No, I have not.

Q I would suggest that you listen to it.

A Okay.

Q You may want to change that part of your testimony.

A His hands were on my head. I can say we both did it at the same time.

Q Your testimony is whatever it is.

I am telling you, I will give you the opportunity to correct it.

A Yes, that is cool.

Q When you went to have the meeting with Mr. Walter, why did you take a tape recorder?

A In the meeting with Heather, I knew something was very fishy because when they said if I did not cut my hair, I had to get a

189

transfer, but the job was not promised. When they said the job was not promised, then that means I won't have a job, and that's like being fired.

I said, Can I get this in writing, if I get a transfer, I will definitely have a job?

I knew something was fishy when Heather objected to me getting something in writing.

Q What exactly did Heather say in that regard?

A In regard to?

Q Getting something in writing, as you were just testifying.

A From what I recall, she said she could not give me something in writing.

Q Did she say anything else?

A Yes. There was more discussion within the meeting. You can ask me specific questions on issues.

I also talked about, like, the focus is like on my hair.

She definitely said people should not come off the elevator and be shocked. The word

190

shocked was a word used.

Jamie was not reprimanded, how he handled the situation, reprimanded me out in the open.

Q Do you know whether or not Jamie was reprimanded?

A No, I don't.

Q I am still trying to figure out, why did you decide to bring a tape recording into your meeting with Mr. Welter?

A So everyone could know what the truth was.

Q Everyone, meaning who?

A Basically, I already filed a charge with the E.E.O.C.

Q Okay.

A So that was on April 5.

And I wanted to make sure the truth and everything was out in the open.

I know early on, they were trying to say that I was given the Trump grooming standards, which I was not. And I was hired well before this whole Jamie incident happened.

It was strange how Jamie, Jamie was

191

never up front as to how I violated the policy. He could not even tell me the first day, and then he made something up.

Every time I went to a different person in Plus One management, they had something different to say about my hair.

MS. NORCROSS: Move to strike.

Q My question is, why did you bring a tape recorder into the meeting with Mr. Welter?

A Because I wanted to make sure the truth was known.

Q Known to whom? That's the question you did not answer.

A Well, for one, people at Plus One.

I wanted to see what Bob Welter was going to say. I wanted to hold people accountable to there word.

Q Why did you hide the fact that you were recording the conversation?

A I did not hide the fact.

Q Did you tell Mr. Welter you were going to record the conversation?

192

A I don't remember if I told him.

Q Did you ask Mr. Welter's permission to record the conversation?

A I don't remember asking.

Q Where was the tape recorder?

A It was in my hand.

Q Where was your hand?

A Like I am sitting in a chair, if I recall, I was sitting like this. The desk was a little shorter.

Yes, I am sitting like this, and it's in my hand.

Q Did you ever provide Mr. Welter a copy of the recording, or the recording itself?

A No, I did not.

Q Did you provide that recording to the E.E.O.C.?

A I don't think so. I don't remember. I honestly don't know.

Q Did you provide it to anyone else?

A Yes, I did.

Q To whom?

A I provided it to my lawyer.

193

Q Other than your lawyer, did you ever give it to anyone else?

A No.

Q Why not?

A Well, why would anyone need to know?

Q Well, your earlier testimony was, you were recording it so the people at Plus One would know the truth, or words to that effect.

A I think by the time I copied it, Bob was no longer at the company. He had put in his resignation.

Q Did you provide it to Chris Ciatto?

A No. I remember Chris had said he was not familiar with human resource policy or whatever. He actually referred it to Bob Welter.

Q Did you provide it to -- do you know the man who was here before, Dave Milani?

A Yes.

Q In fact, you scheduled a meeting with Mr. Milani, correct?

MR. UMOH: Objection.

A Scheduled a meeting?

Q After Mr. Welter, you scheduled a

194

meeting to talk to Mr. Milani, did you not?

A I believe it was he who initiated it, because he was taking up for Bob Welter.

Q You did, in fact, schedule a meeting with Mr. Milani, or he --

A I know I did meet with Dave. I don't know if that was after June 9. I am not cool on the day. I have to look at my notes again that I wrote down, you know.

Q You recall that you had a meeting scheduled with him. That's all I am trying to get at.

A Well, I know that I asked him to continue where Bob had left off, because I had continued to be singled out.

Q Did you give Mr. Milani a copy of your tape recording?

A No, I did not.

Q Why not?

A I don't think it was transferred by then. I don't think it was transferred to e-mail or CD format.

I had a P.C., and I did not have the necessary software to transpose it. I did not

195

know how to do that yet. It was from a digital recorder.

Q Did you take it to Mr. Milani's office and let him listen to it?

A No.

MS. NORCROSS: Mark this as Defendant's Exhibit 23.

(Whereupon the above referred to document was marked, Defendant's Exhibit 23, for identification, as of this date, by the reporter)

Q Take a look at what has been marked as Defendant's Exhibit 23, and tell me if you can identify it when you are finished looking it over, okay?

A Okay. I have looked it over.

Q Have you seen these e-mails before?

I will tell you this: This document is a collection of e-mails between you and other Plus One employees, correct?

A Yes.

Q Have you seen these e-mails before?

A Yes, I have, yes.

Q I would like you to go to the second

196

to the last page of the document bearing the little numbers on the right hand corner, JM0125.

Do you see where I am?

A Yes.

Q That e-mail says sent Friday, 5-5-2006. Do you see that?

A Yes.

Q Is this an e-mail that you received from Michael Matto?

A Yes.

Q Mr. Matto is the president of Plus One; is that correct?

A I don't know what he is right now, but at the time, he was.

Q When you got this e-mail, he was the president of the company?

A Correct.

Q At the time you received this e-mail, did you read it?

A Yes, I did.

Q And did you come to some understanding about what it meant?

A Some understanding, yes.

Q Okay. What was that?

197

A I was still a little bit puzzled as to why I was still being singled out, but I got this letter.

Q Say it again.

A Like for instance, even though it says my hair was acceptable, they still -- within the e-mail, he still wanted me to make changes to my hair.

So I could not understand why he singled me out as opposed to any other co-workers who were blatantly violating policy, but he was still asking me to change my hair in some respect.

Q In this e-mail, he tells you your hair --

A Well --

Q Hang on. Let me finish.

In this e-mail, he said, and I quote, As to your hairstyle, though it is acceptable in all of our sites, some hairstyles are not. And we have taken action at your current location to ask some of our employees to change their hairstyle when working at that site.

I personally regret that there was

198

some confusion on our part with respect to your hairstyle, and you have my sincere apology.

A Okay.

Q Did you read that paragraph?

A Yes, I did.

Q Did you have any understanding of what was being said to you in that paragraph?

A Well, in my interpretation, I felt it was basically, I did not get the answer until he consulted his lawyer, and that it was a legal response, and it did not come from the heart.

There are women at the site that had hair a foot longer than I. I could not understand why he was focusing on me, with my hair length, but women had hair like a foot longer than me. That kind of made me feel uncomfortable to see how real his response was, sincere.

Q You wrote to him that morning, you wrote Mr. Matto, the president of the company, at 6:52 on May 2, 2006, correct?

A I would have to look at the e-mail.

Q Well, look at it. It's right there in front of you.

199

A Yes, okay.

Q So you wrote Mr. Motto at 6:52 that morning, correct?

A Yes.

Q And he responded to your e-mail at 10:48 that same morning, correct?

A Correct.

Q But that did not satisfy you; is that correct?

A Well, I did not feel that my job was still safe because when they hired a new site manager, the first day the site manager started, I was the only one questioned about grooming standards and taken behind closed doors.

Q Are you talking about Christian Garcia?

A Yes. I had a handshake, and he was coming up with new regulations. I was not supposed to where stud earrings.

Q Mr. Garcia came from the Waldorf Astoria to the Trump World Towers, correct?

A I don't know.

Q He was from another facility?

A Correct.

200

Q Different facilities have different standards, correct?

A No facility operates the same.

Q Are you aware of the fact that at the Waldorf Astoria, the fitness employees are not permitted to wear earrings?

A Well, Christian did not make that distinction. He did not say whether or not I could wear earrings. He was -- well, whatever.

MS. NORCROSS: Move to strike. Read back the question.

(Whereupon, the above referred to question was read back by the reporter.)

Q Let me rephrase it.

Are you aware of the fact that in 2006, at the Waldorf Astoria, the fitness employees were not permitted to wear earrings?

A I was not familiar with Waldorf policy.

Q On the day that you and Christian had this conversation, are you aware of the fact that you were the only employee there at the time who was wearing earrings?

201

A Repeat the question.

MS. NORCROSS: Read it back, please.

(Whereupon, the above referred to question was read back by the reporter.)

A Well, if I can recall correctly, if Magaly was present that day, she always wore earrings; and Magaly is a female.

Q You are saying if she was present. Do you know if she was?

A Plus One records would be able to reflect that.

Q That is not my question. My question is, do you know?

A From what I remember, I thought she was there that day.

MR. UMOH: Before we go on, it's past 5:00. She has been deposed for seven hours.

MS. NORCROSS: You showed up here about a quarter after 10:00, and you took long for lunch. It has not been seven hours.

Page 202

202

MR. UMOH: We showed up at 1:00, and we were sitting downstairs for a half hour.

MS. NORCROSS: I came in at 1:00, and there was no one there.

MR. UMOH: Off the record.

(Discussion off the record)

MR. UMOH: This is Plaintiff's counsel. And we are in the middle of the deposition, and we would like the judge to resolve it, if possible.

THE LAW CLERK: The judge is not available now.

MR. UMOH: The judge allocated 10 hours for the deposition today and an unspecified amount tomorrow.

MS. NORCROSS: We have the judge's order. It has to do with the hour allocation, is the best I understand this.

The judge ordered 10 hours of deposition time today and then additional time tomorrow morning, depending upon when Miss Mann needs

Page 203

203

to leave for her flight to Singapore.

And we resolved earlier this morning, she needs to leave about 12:30, which is fine.

The issue that has arisen is Plaintiff's counsel believes that -- he is concerned about the allocation of deposition time between me, as counsel for two of the Defendants, and Harold, as counsel for the other two.

I have taken six hours of deposition. We have been here for approximately seven There was a one-hour lunch break.

What Mr. Umoh is suggesting is that the one-hour lunch brake counts towards my seven hours, which I have explained to him is contrary even to the comments in the federal rule book.

THE LAW CLERK: Mr. Umoh, is that correct?

MR. UMOH: That is correct.

Page 204

204

Plaintiff has been produced so far for seven hours of deposition.

We feel the deposition with Plus One is concluded.

MS. NORCROSS: We have the court reporter here. The actual deposition time has been something just under six hours, but call it six.

My intent at this point is to finish up one line and then let Mr. Derschowitz start. We are going to be going until whenever.

THE LAW CLERK: The judge is on the bench.

I can't give you a ruling on this. I am only the law clerk, and not the appointed judge.

But my reading of the letter is that the plaintiff is to be questioned for 10 hours, and I am sure the judge would say that does not include a lunch brake.

So we can call you back when

Page 205

205

she is off the bench.

MR. UMOH: One defendant may depose her for 10 hours?

THE LAW CLERK: My reading of the letter, the letter said plaintiff may be questioned for 10 hours on August 12.

MS. NORCROSS: The only thing we don't seem able to agree on, we are in the Lester Schwab offices.

THE LAW CLERK: If I were you guys, I would try to resolve this before the judge calls you back.

But give me a call back in a few minutes if you would like to speak to the judge.

MS. NORCROSS: Thank you.

Off the record.

(Discussion off the record)

MS. NORCROSS: There is an Exhibit that was just marked as 22 that should be marked as 23.

Mark this as Defendant's Exhibit 24.



Page 206

206

(Whereupon the above referred to document was marked, Defendant's Exhibit 24, for identification, as of this date, by the reporter)

Q Miss Mann, please look at what has been marked as Exhibit 24 to your deposition, consisting of four pages, with Bates stamp numbers 207 through -- excuse me, 297 through 300. And I would like you to look over them and then tell me if you can identify those pages.
A Yes, I can identify them.
Q What are they?
A They are a description of my incident report that I filed about the incident that happened on June 8 and June 9 of 2006.
Q And this is the incident involving the exchange between you and Robert Schuller; is that right?
A Yes.
Q What I would like you to do is read through this description of the incidents and tell me if everything you wrote here is accurate.
A Okay.

Page 207

207

Q I have a question pending, but I think I will withdraw it.
You prepared pages 298 through 300, correct? You wrote this?
A Correct.
Q And is it accurate?
A It's not inclusive of everything that happened. I mean, I wrote this under duress. I wrote it to the best of my ability.
Q Is there any statement in here that is not accurate?
A Not to my knowledge. I would have to reread it again.
Q Well, there are ways to do this. I can go through this entire incident, and it will take another hour; or I can ask you to read this, and you tell me if you were truthful when you wrote this.
A Yes, I was truthful when I wrote it.
Q Is what you wrote accurate?
A Yes, this is accurate.
But it does not portray, I did not put the -- I don't think I really described in

Page 208

208

detail the physical threat that I felt, how Robert was coming at me during the incident.
Q In fact, you did not say anything about physical threat at all in this memo, correct?
A Well, it was.
Q Just answer my question, please.
A I know I said threatened, and I was scared for my safety.
Q Is there anything in here that is not accurate?
A From what I recall, this is what I put down.
Q Is there anything in there that is not accurate?
A It may not portray the whole story.
Q Is there anything that is not accurate?
A Not in my opinion.
Q And you wrote this on the day of the incident, correct, June 9?
A Yes.
MS. NORCROSS: All right. I am going to stop at this point and

Page 209

209

reserve my right to continue once counsel has had an opportunity to question you.
I need to say for the record, there are serious problems with discovery coming from your end, which may mean you may have to come back, according to the judge's letter.
EXAMINATION BY
MR. DERSCHOWITZ:
Q Good afternoon, Miss Mann. My name is Harold Derschowitz. I represent Trump and Mr. Henriques in this case. I am going to ask you some questions.
I will try my best not to repeat some of the questions that have been asked. If I do, please accept my apology.
If you don't understand my question, please tell me, and I will be happy to rephrase it for you.
A All right.
Q You testified earlier, when you were asked about the reason for terminating your employment with P.I.C. in 2006, the first reason you gave would be you had to come to New York to

Page 210

210

give a deposition in this case.

A Yes.

Q You said there were other reasons.

I would like to know what the other reasons were?

A The thing is, I would not have resigned that early with P.I.C. I would have stayed with them longer.

But the reason why I resigned, I gave my resignation on July 5th, was the primary reason to come back to New York so I could be here in person for a deposition.

However, I would have continued to work at P.I.C. and then later, in August, I would have resigned to go to school.

Q Right. You would have intended to leave P.I.C. in either way, whether for the deposition or whether for school?

A In August.

Q When in August would you have to leave there to get ready for school?

A Initially I was planning on getting to Singapore late, like August 21.

But then I got an e-mail from the

Page 211

211

student services that they recommended that I come much earlier to give me time to find housing there.

Q When did they suggest that you come down, or come up, whatever it may be?

A I know they sent the e-mail in the summertime. I can check my e-mail and furnish that information.

Q I am going to ask you to check your e-mails and produce any e-mails between you and the school regarding the program that you are in from the time you were accepted in it until the present, I guess.

A Sure.

Q Do you recall what date they told you you have to get there by?

A They suggested I get there August 4. Orientation starts around August 25. I think that's a Monday. They told me I should get there August 4.

Q In effect, you would have had to leave basically the same time, whether you were coming up here for the deposition or whether you were starting school, because you --

Page 212

212

A I would assume so.

I did not think I had to come back to New York then when I found out my whole schedule changed.

Q We went over earlier a couple of your employers since the time that you left Plus One.

A Yes.

Q I am going to demand, on the record, all of the employers you mentioned during your testimony.

A Okay.

Q Have you received any records from Rita Buck, Ann Boris or Marcy Friedman regarding treatment?

A No. When I was seeing them, no, they never gave anything to me directly.

I was assuming they made notes and sent it to the insurance company. I assumed the files were there.

Q Did you have an insurance company that was paying their bills at that time? Was it Medicare, Medicaid or something?

A I believe I started seeing Miss Buck when I was employed at Plus One, and it was

Page 213

213

under the Plus One insurance.

Then Dr. Boris and Marlene was Medicaid, so it was free health insurance, because I did not have enough income at the time I qualified.

Q Have you paid any medical bills for either of the providers that we have mentioned so far?

A From what I recall, like when I say Miss Buck, I had to pay a co-pay.

Q And what about the others?

A No, I don't recall ever paying them anything directly from my pocket.

Q I want to start and go in chronological order, which of these medical providers you saw first, and then continue from when you first started seeing them, up until the present time, so I can get a full history of all of your medical treatment that's the subject of this lawsuit.

Who did you see first, and when was it?

A I first started seeing Rita Buck.

Q Does she have a specialty? Is she a

214

doctor or social worker, psychiatrist, or something else?

A If I can recall correctly, she was a licensed clinical social worker.

Q Were you referred to her by anybody?

A No. I looked her up in the health insurance company website.

Q Where was her office?

A I saw her on 11th Street. It was a street in the Village.

Q In Manhattan?

A Yes, in Manhattan.

Q When you first saw her, what were your complaints?

A My complaints, just the emotional distress I was going through, based on my discrimination at Plus One.

Q When was the first time you saw her?

A From what I recall, late April. But it should be reflected in the health insurance records.

Q I have no records. I have to go by

215

what you say, at this point.

A Sure. From what I can recall, it must have been late April, maybe the third week.

Q Was it after the incidents you described earlier with Mr. MacDonald taking place?

A Yes.

Q What, exactly, did you tell her was bothering you? What were your symptoms or your complaints?

A Well, obviously it was very apparent I showed a lot of anger. I was depressed, frustrated. I felt powerless and just basically ill at ease.

I had problems sleeping. I was very anxiety ridden. I was very jumpy, especially because I felt my job was on the line, getting fired.

Yes, I was definitely not in the best of shape.

And I had digestive issues, too, just a lot of stomach cramps. And then I was getting headaches.

216

Q Had you ever felt these symptoms at any time prior to your first visit to Miss Buck?

A You mean -- well, I have experienced those emotions throughout my lifetime.

Q When was the most recent?

Well, did you ever receive treatment for these symptoms?

A Yes. That's why I was going to Miss Buck and Marlene.

And I was confiding a lot in my pastor at the time.

Q You told me the first time you saw anyone about your situation at work was in late April, when you saw Miss Buck, correct?

A Yes.

Q You just gave me a list of physical complaints you mentioned to Miss Buck on your first visit.

Had you ever been treated for those symptoms or complaints before that?

A By a medical doctor?

Q By anybody.

A Yes, I have had headaches before,

217

where I have taken Tylenol, throughout my lifetime.

Maybe in my early twenties, I went to the doctor and said, I have a stomachache, but I have never taken any medication. I always try to go the natural route.

Q Is it fair to say you have not seen any medical providers or hospitals or doctors for any of the complaints made to Miss Buck at the end of April '06?

A I was just relying on my peers in terms of telling me what herbal supplements to take.

I went to nutritional school, as well.

I believe in alternative health so I was doing my own research.

Q What were you taking?

A If I had headaches, I am trying to think what I was taking. I would take Ginger.

I would take this thing like a colon collection. It would be a mixture of herbal supplements into one.

Then also, for the headaches, there

218

is peppermint oil, and rub them on my temples.
Q Had you experienced these headaches or stomach problems before April of '06, when you saw Miss Buck?
A I had experienced those problems throughout my lifetime.
Well, not consistent throughout my lifetime. It was not a chronic problem.
Q Periodically?
A Yes. Once in a blue moon, I would have a headache.
I have never been hospitalized.
Q What did Miss Buck do for you? I don't want to know what she told you. What did she do for you on your first visit?
A From what I recall, on the first visit, a lot of it was intake. She was like, okay, why are you here?
A lot of times she was asking information for clarification and trying to find out, why did I go and see her.
Q Did she prescribe any medication to you or recommend that you see any other persons or doctors or therapists at that point?

219

A I don't recall if she did.
I know if she recommended me to take medication, I would have flatly out denied it.
Q I am just interested in what you recall.
A Sure. Miss Buck did not; but I know Marlene did suggest, yes.
Q To your knowledge, she did not recommend any medication.
She did not refer you to anyone else?
A No, because I had to stop seeing her because my insurance ran out.
MR. DERSCHOWITZ: I move to strike the portion that's not responsive.
Q Did she prescribe you any medication or refer you to anybody after your first visit?
A No.
Q How many times did you see Miss Buck?
A An average of once a week. I think one time I saw her twice a week.

220

Q For how long a time period?
A It had to coincide with when my insurance ended. I think it was the same week that I was no longer insured, health insurance, by Plus One; so I am thinking I ended seeing her by June 16, 2006.
Q And how many times, in total, did you see her?
A I am taking a guess, about 10.
Q Did she do anything different for you on the other nine times you saw her than the first time you saw her? Did she just do intake, listen to what you were saying?
MR. UMOH: Objection.
Q You tell me.
A Her strategy seemed consistent.
I mean, she would ask me questions, and she would offer questions as to, like post different scenarios and try to get me to look at different things about myself.
Q Do you have any pending appointments with her?
A No, I don't have any.
Q Who is the next person you saw after

221

Miss Buck?
A I believe that was Marlene Friedman.
Q And does she have a specialty?
A I don't know her specialty.
Q Is she a doctor?
A I don't know if she is a psychiatrist. She could be a licensed clinical social worker.
I don't know how they do it with the classifications of psychotherapist.
Q Do you know if she has an M.D. after her name?
A That's a good question. I don't know.
Q Did anyone refer you to her?
A No.
Q How did you find her?
A Through health insurance on the website.
Q When was the first time you saw her?
A I don't recall the first day or time. But I know when I did see her, it was warm

Page 222

222

weather.

Q Do you know if it was 2006 or 2007? Do you know what year it was?

A It was like whatever year that I got the free health insurance.

I can get back to you on that. I don't know the day I started getting free health insurance.

Q Was she the next person you saw after you stopped seeing Miss Buck?

A Yes.

Q Do you recall if you saw Marlene a year later or --

A I think it was sometime in 2007. I am not positive.

Q Do you have any records of Marlene Friedman in your possession?

A No, not currently any records.

Q I mean, did anything go back and forth with you in terms of correspondence or e-mails or anything like that?

A No.

Q When you first saw Marlene Friedman, what were your complaints?

Page 223

223

I still had a lot of unresolved anger issues. I just felt like I had been -- I was frustrated, how I had been terminated from a job which I felt was based on discriminating against me, and retaliation because I brought up discrimination, and the frustration of finding a job, even though I had skills, and not being able to work as a massage therapist.

Q You had not seen anyone for a year, since the last time, right?

A I was confiding in my pastor.

Q On your first visit to Marlene Friedman, what did she do for you? Not what did she tell you, but what did she do for you?

A You mean --

Q Did she conduct any tests? Did she examine you? Did she take X-rays, CAT scan, blood work?

A She just asked questions.

Q Did she prescribe any medication or course of treatment or refer you to anybody else on that first visit?

A The first time, no.

Q Did you see Marlene Friedman more

Page 224

224

than once?

A Yes, I did.

Q How many times did you see her, in total?

A I am taking a guess, like maybe four. It could be four, five.

Q When was the last visit out of the four?

A I don't remember what day or month that was.

Q Do you remember what year?

A I am taking a guess. If I had the free health insurance in 2007, then it was in 2007.

Q Do you know if it was the beginning, the middle, the end of the year? Can you narrow it down at all, if possible?

A I am assuming -- I remember that I did not have a coat, so it had to be warm. I am assuming the summer.

Q Would it be fair to say, all your visits to Marlene Friedman were in the summer of 2007?

A I would say so.

Page 225

225

Q What did she do for you on your other visits? Not what did she tell you, but what did she do for you?

A Ask me questions. And she would give me an analysis of where I was at.

Q Did she examine you in any way, or run any tests?

A No.

Q Did she prescribe any medication?

A I don't think she was able to prescribe, so the answer is no.

But she did recommend -- she posed the possibility. She said, why don't you consider medication.

Q But she did not mention a particular type, or she was not able to write you out a prescription?

A We never got that far, so I don't know if she is able to write out a prescription.

Q Did she refer you to any other specialists?

A Yes, she did.

Q Who did she refer you to?

A She referred me to St. Luke's

Page 226

226

Hospital, where Dr. Boris, the third person I saw, was employed.

Q Did she refer you to that particular doctor, or just to the hospital?

A I could say definitely the hospital. I don't recall if it was the specific doctor.

Q Did there come a time when you saw Dr. Boris at St. Luke's Hospital?

A Yes.

Q when was that?

A It could have been weeks after I saw Marlene Friedman, because Marlene Friedman had recommended a couple of people, but everybody else was booked up, and it took me a while to actually -- for an appointment to open up, and I could see Dr. Boris. So I am thinking a couple of weeks after I finished seeing Marlene Friedman.

Q Would that have been late summer or early fall of 2007?

A I would say late summer.

Q Does Dr. Boris have a specialty?

A If she does, I don't remember it.

Q When you first saw Dr. Boris, what

Page 227

227

were your complaints?

A The similar issues that I spoke with Miss Buck and Marlene Friedman, the same issues.

Q There were no changes in your symptoms from the first time you saw Dr. Buck in April of 2006 until the time you were seeing Dr. Boris in 2007?

A It did shift. It became more of a nervous condition and anxiety, because I did not have a job at the time.

That was really the forefront, the nerves and my heart murmur and all this other stuff.

Q Did someone tell you you had a heart murmur?

A Yes.

Q Who told you that?

A A doctor at one point -- I don't remember which doctor, but I know I do have a heart murmur. I don't recall which doctor told me this.

Q When were you told this?

A I don't remember.

Page 228

228

Q Well, was it before you started working at the Trump facility Plus One?

A Yes.

Q What did Dr. Boris do for you on your first visit? I don't want to know what she told you, I just want to know what she did for you.

A Asked questions, and we filled out an intake form.

Q Did she conduct any tests or prescribe any medication or examine you in any way?

A She did not prescribe any medication, but there was some type of test, but I don't know what it was. I know it was more inclusive than what Miss Buck and Marlene had done in the past. I don't remember what she did, though.

Q Do you know if it was a diagnostic test?

A Yes, diagnostic, yes.

Q If I leave a blank in the transcript, do you have any records that would reflect what type of test you underwent with Dr. Boris?

A No. I don't have any records.

Q How many times did you see

Page 229

229

Dr. Boris?

A I don't recall, but I am thinking at least three or more.

Q When was the last time you saw Dr. Boris?

A I am assuming it was around late August of 2007.

Q What did Dr. Boris do for you on all of the other visits that you went to see her? Not what did she tell you, but what did she do for you on those other visits?

A She just asked questions and added commentary.

I did not see her individually. It was in a group setting.

Q So these were not individual appointments.

Was it part of a therapy group?

A It was part of a therapy group, because she said that was the only thing available. She was booked up with the individual sessions. That was all she could give me.

Q Did the therapy group have a name, or

Page 230

230

is it referred to as something?
A Not that I recall. It was her patients.
Q Do you know what the nature of the therapy was, whether it was anger management, or stress, or anything else in particular?
A I don't know if it was anything in particular. I know everyone had different issues that were discussed.
Q Everybody basically got up and spoke at these meetings?
A Yes.
Q Now did you also see a Crystal Huggins?
A Yes, I did.
Q When did you first see Crystal Huggins?
A Pertaining to the Trump incident?
Q No, pertaining to your present lawsuit and your claim of personal and mental injuries as a result of this.
A I distinctly remember talking to her right around the time -- yes, it was right around the time I got terminated from Plus

Page 231

231

One.
Q That would be in June of '06?
A Yes, June of '06.
Q When you say you spoke to her, was this on the phone, or you saw her in person?
A It was on the phone. I remember it was summer. I remember it was over the phone.
Q Does Crystal Huggins have a specialty? Do you know if she is a doctor, something else?
A She is a reverend.
Q Is she the pastor you were talking about previously?
A Yes.
Q What did you tell her the first time you spoke to her on the phone?
A Concerning this matter?
If I recall correctly, I think I was crying, just sort of being frustrated.
Q Was she a pastor at the church you went to, or did you know her from somewhere else?
A I knew her from somewhere else.
Q From where did you know her?

Page 232

232

A I met her at a -- I believe it was, I attended one of her work shops. I took some classes. She teaches about spiritual issues. She taught holistic healing information and just techniques on how to better your life.
Q After you first spoke to her on the phone in June of 2006, did you actually schedule an appointment to see her?
A After I spoke with her the first time, it was not like an appointment every week. It was basically when I had a breakdown, she would be the first person I would call.
Q You would talk to her if you had any complaints about anything in particular?
A Yes.
Q How often would you call her?
A When I was really stressed, I would call her several times like each week.
It would really depend on my emotional state. If I was feeling stressful and down and out and emotional, I would call her during the week. And then I would get a handle, and then I would just call once a week.
Sometimes I can remember calling

Page 233

233

three times in one week, not being able to necessarily reach her, but placing the calls.
Q For how long a period of time did you call her at least once a week?
A Actually until today.
Q So you are still calling her once a week, at least once a week?
A Actually I have been calling her, trying to reach her more frequently, because I have been nervous about getting here for the deposition, back to New York.
Q It is your testimony you have been calling her from June of '06 until your termination from Plus One.
Were there times you called her that involved other issues?
A There were times when I mentioned other things. Some stemmed from Plus One. Others did not.
There were times I called just asking for information, just what do you recommend on relaxation techniques. I do yoga.
Eventually I got to the point, I tried to focus more on healing rather than being

Page 234

234

in a state of frustration and despair and sadness. I think I am getting a handle on it.

Q Other than Miss Buck, Marlene Friedman, Dr. Boris and Crystal Huggins, have you seen any social workers, psychiatrists, medical providers, therapy groups, or anything else relating to this incident?

A No.

Q Miss Mann, I am going to show you a photograph and ask you if you have ever seen this before.

A Yes, I have. I have seen the photo before.

MR. UMOH: Can we mark it, please?

MR. DERSCHOWITZ: Yes. I wanted to see if she first recognized this.

Mark this photo as Defendant's Exhibit 25.

(Whereupon the above referred to document was marked, Defendant's Exhibit 25, for identification, as of this date, by the reporter)

Page 235

235

Q Miss Mann, I am going to show you what has been marked as Defendant's Exhibit 25.

Can you tell me if you recall when that was taken?

A I know I gave the day -- I know the approximate day it was taken. I e-mailed my lawyer. I know it was taken around my birthday in October, but I have to look in my e-mail to tell you which year.

I know it was during my employment at Plus One, but it was before I worked at Trump Tower.

MR. DERSCHOWITZ: I am going to leave a blank in the transcript. If you can find a copy of the e-mail, will you provide that information, and so we know when this photo was taken?

THE WITNESS: Okay.

MR. UMOH: Objection.

MR. DERSCHOWITZ: We were not given the exact time --

MR. UMOH: I am objecting. She is unsure as to the year.

Page 236

236

MR. DERSCHOWITZ: She said she definitely sent her attorney it in the month it was taken.

Q Anyway please provide us what year this was.

A Yes.

Q Miss Mann, can you tell me if your appearance in this photograph accurately reflects the appearance of your hairstyle as it existed in April of 2006?

A It's similar, yes.

Q Do you know if your hair was longer or shorter or anything else?

A Well, it's hard to say in this photo, because there is a shadow. I can see on the right side of the photo, there is a shadow behind, so it puts an extra appearance that makes my Afro look bigger. I can't tell whether or not that's the exact height.

Q The same question, but for May of 2006. Would your answer be the same? I asked you about April of '06.

A Similar hairstyle. I can't confirm the length, though.

Page 237

237

In terms of hairstyle, yes, that's how I was wearing my hair.

Q But the length, you can't say whether it was longer or shorter or the same?

A Yes, because how the photo is.

Sometimes when I take photos with my hair, the reflection of the flash, it makes it look bigger than what it is.

Q Let me ask you this: From the time the photo was taken, is it fair to say you have had your hair cut until April of 2006, or no?

A I don't know. I don't know if I went to a professional.

I have done things to my hair, yes.

Q I am just asking about the length, that's all, whether you shortened it at any time from when the photo was taken through April of '06.

A I don't recall getting an extreme haircut, no.

Q I don't know what extreme is.

I am just asking you if you had it cut at any time between the photo and April of '06.

Page 238

238

A I don't remember getting it cut.
Q I am going to show you a document that's been marked as Defendant's Exhibit 24. I am going to refer you to page 2 of the document. I am going to ask you to read the fourth paragraph, under June 8, 2006.
A It reads as, later at home --
Q No, you don't have to read it out loud.
A Sorry.
Yes, I have read it.
Q Can you tell me what you meant when you said, continued harassment and discrimination from Trump management?
A Like being singled out, where it just puzzled me how my other co-workers would come in, like violating policy.
And that had been the case since I was employed at Trump. And they had never changed their, like wearing the hair gel and wearing overly large earrings.
Then also, it was really weird. Independent of Trump, I was talking with another department in Plus One. They were helping me

Page 239

239

with my application for my massage license.
A week before, they mysteriously asked me, well, we want to know whether or not you are going to sue Plus One, because they are having reservations about going through with my license.
MR. DERSCHOWITZ: Move to strike the whole answer as not responsive.
Q You're writing in this paragraph, continued harassment and discrimination from Trump management.
My question to you is, what is that based upon?
A It's based upon Jamie MacDonald's comments that it was Trump One who said they disapproved of my hair.
Q My question is, that's somebody else telling you something.
Did you personally experience any harassment or discrimination from anyone at Trump management while you were at Plus One?
A I should have been more specific and said that Jamie, acting on Trump management's

Page 240

240

behalf.
MR. DERSCHOWITZ: I move to strike the portion that's not responsive.
Q Miss Mann, you never experienced any harassment or discrimination from any Trump management employee while you were at Plus One, did you?
MR. UMOH: Objection.
A When I wrote it, it was written with the assumption that whoever was carrying out those duties for Trump. There were times when Jamie said he is responsible for carrying out Trump management.
In semantics, I should have said, instead of management, the policy.
Q When did you start working for Plus One Fitness?
A August of 2002.
Q When you were hired by Plus One Fitness in August of '02, did you have sign any employment contractor agreement?
A I don't recall, but I know I signed the application. I know you certify. I know I

Page 241

241

signed something. I don't recall what it was, specifically what it said.
Q Do you know if you were an at-will employee of Plus One Fitness?
A Well, I assume at-will is applicable for employees of New York State.
Q I am just asking if that was your understanding.
A I never really thought about it that way, but I did know in 2006.
Q Miss Mann, I am going to show you what has been marked as Defendant's Exhibit 16.
A Sure.
Q And I draw your attention to page 2 and ask you to read the paragraph that begins with, I certify that the facts contained.
A Okay, I see it.
Q Does that refresh your recollection as to whether you were an at-will employee at Plus One Fitness when you were hired by them?
MR. UMOH: Objection.
A Looking at it, definitely, I was informed.
Q And you signed that agreement,

Page 242

242

correct?

A Yes.

Q And you read it before you signed it?

A I am assuming I did.

Q Okay.

Were you given any papers or documents when you were first hired by Plus One, describing the terms of your employment?

A Like specific responsibilities and duties?

Q Maybe guidelines or policies of the company, or any type of manual to welcome you?

A To be honest with you, it's such a long time ago. I don't know if I got like a pamphlet or something.

But I know there was an orientation that I went to, like a meeting.

MR. DERSCHOWITZ: Mark this as Defendant's Exhibit 26.

(Whereupon the above referred to document was marked, Defendant's Exhibit 26, for identification, as of this date, by the reporter)

Page 243

243

Q Miss Mann, I am going to show you a document that's been labeled Defendant's Exhibit 26, and ask you if you recognize that.

A It looks like it is an employee handbook.

Q Were you ever given this document once you started employment with Plus One?

A There is a possibility I could have gotten it when I started at Trump, but I don't recall getting it when they hired me as a massage therapist.

Q Do you recall having seen this document during your employment at Plus One at any time?

A I can't confirm.

I may have seen it in 2006 when I started Trump.

Q That still counts.

A Okay.

Q At some point in time, at the latest, when you started work at the Trump facility, you were shown a copy of this document?

A Page 124 is missing.

Usually Plus One has their logo

Page 244

244

everywhere. I don't know if I actually saw this particular handbook.

Q When did you start work at Plus One at 845 United Nations Plaza?

A I don't remember the exact date. I don't know whether it was the end of February or March, because I had been interviewing in February, so I don't know when the actual hire date for this position commenced. I don't remember, so it had to have been late February, early March.

Q What was your job title when you started there?

A The title there was receptionist.

Q That was receptionist at the health club, right?

A Yes.

Q Did your job title change during the time you worked at 845 U.N. Plaza, Plus One?

A No.

Q Who was your employer when you worked at 845 U.N. Plaza from the end of March until June?

MR. UMOH: Objection.

Page 245

245

A This is where I am a little bit unclear, because I thought that Plus One hired me to work for Trump Towers, and they were just managing the facility.

Q Did someone ever tell you that?

A I remember having a conversation, that Plus One managed the facilities for Trump Towers.

Q Were you under the impression that you were an employee of the Trump World Organization?

MS. NORCROSS: I object.

A Well --

Q Did anyone ever tell you you were employed by anybody other than Plus One during the time period of March to June 2006?

A No.

Q Did you receive paychecks during the time period from March to June of 2006?

A Yes, I did receive paychecks.

Q Whose name was on the paychecks?

A Plus One Fitness.

Q Did you receive a W-2 for the time you worked from March to June of 2006, that time

period?
A Yes, I did.
Q Who was listed as your employer?
A Plus One.
Q Who were your supervisors when you worked for Plus One at 845 U.N. Plaza?
A Immediate supervisors?
Q Anyone who was your supervisor.
A John Henriques, Tom Nizsczak, Mike Murray, Jamie MacDonald, Christian Garcia.
Q Now in what way did the persons you mentioned supervise you? Did they all give you daily work assignments?
A In certain instances, they would give me directives, and I would have to do stuff and perform duties and give feedback about my accomplished tasks.
Q Did all the persons you mentioned, were they all employed by Plus One Fitness?
A No.
Q Plus One Fitness was your employer, correct?
MR. UMOH: Objection.
A Yes.

Q Who was not employed by Plus One Fitness, of the persons you mentioned?
A I believe John Henriques.
Q When you say he was your supervisor, did you meet with him on a daily basis to go over your job assignments?
A No, not on a daily basis.
Q Did you ever meet with him to discuss your job assignments?
A He was not like meeting. He would come down when --
MR. DERSCHOWITZ: Move to strike the unresponsive portion.
Q Just yes or no, did you ever meet with him to discuss your your job assignments?
A It would depend what day I saw him.
Q How often did you meet with John Henriques?
A It was probably a few times when I was there when other supervisors were not present. He would give me a directive of manning the pool and doing whatever when Tom was not present.
Q How many times would he give you

directives, from the time you started working there at the Trump facility until the time you were terminated?
A I can remember about two.
Basically, we had to listen to everything that he said and take immediate action when there was a problem.
Q He told you that on those two occasions?
A John did not tell me that.
Tom Nizsczak directed me to follow his directive. I guess Tom said he had to meet and report to John.
Q You said earlier, he gave you directives on two occasions during the time you worked at the Trump facility.
A It was a continual problem, about the pool being unmanned.
Q So on those two occasions, was that what he spoke to you about?
A I believe so.
Q Did he call you into his office to meet with you, or did he happen to just be down in that area and say, do something?

A He would come down.
Q Other than those two occasions, did you ever meet with Mr. Henriques?
A No.
Q Did you ever meet with anyone from the board of managers of the Trump World Towers condominium?
A If I can recall correctly, they would come to the front desk and vocalize their displeasure on certain things.
Q Did they meet with you to discuss your work assignments?
A No, not work assignments.
Q Did you ever receive any reviews or work evaluations while you worked for Plus One at the Trump facility?
A Not to my knowledge.
Q Did John Henriques ever speak to you about your physical appearance from the time you started working at the Trump facility until the day of your termination?
A He did not speak to me directly.
Q Did anyone ever tell you that John Henriques had commented about your personal

250

appearance, from the time you first started working at the Trump facility until the day of your termination?

A Yes.

Q Tell me who told you and when they told you.

A It was Jamie MacDonald who told me this.

Q What did he tell you?

A I know he mentioned this in the meeting that I had with Tom regarding the Trump grooming policy. That's when he he brought it up.

Q That was the meeting in early April '06?

A Correct.

Q And what did he say? What did Jamie tell you that John said?

A In the meeting, I don't know if he specifically said John Henriques, but I know he said Trump management disapproved of my hair.

Q But he did not attribute it to any particular person. He just said Trump management disapproves of your hair?

251

MR. UMOH: Objection.

Q You can answer.

A He did not communicate that verbally.

Q So he did not mention anyone specifically by name. He just said Trump management disapproves of your hair?

A From what I recall from the meeting.

Q Okay. Did you ever send any written correspondence to, or receive any correspondence from, either John Henriques or the board of managers at Trump World Towers condominium regarding your job performance or appearance?

A No, I did not.

Q Were you ever told by any Plus One employees that you have to conform with any grooming requirements which they told you were promulgated by Trump?

A Yes, I did.

Q When was the first time you were told this?

A I don't know if Jamie said this, like on April 5, with the first incident about him

252

saying my hair was not normal.

But I know definitely, when I met with him and Tom, that's when he told me about the compliance with the Trump hair grooming policy.

Q When was the first time you had ever seen any type of grooming requirements which Plus One attributed to Trump?

MR. UMOH: Objection.

A It was after of the first incidents with Jamie MacDonald, so it was after April 5.

Q Did someone present you with these requirements, in written form or otherwise?

A Yes.

Q And who presented them to you?

A Jamie MacDonald.

Q I am going to show you Defendant's Exhibit 1, and I am going to ask you if these are the documents, the grooming requirements that you just referred to that was presented to you by Jamie MacDonald.

A Yes, it looks like what Jamie MacDonald did give me, yes.

Q Can you tell me if that document has

253

any particular letterhead or stationery reflecting who it was prepared by?

Is the symbol you're pointing to, Plus One?

A Yes, it's Plus One.

Even though it has the same -- I don't remember ever seeing the Plus One logo on the initial one that I saw, and it looked like the title was different.

I don't remember that being the title. I don't remember seeing the Plus One logo. It seems like someone added that on.

I thought I submitted this to the E.E.O.C.

Q I am asking you, is this the document that Jamie MacDonald showed to you after your meeting with him and Tom in April of '06?

A I don't believe it's the exact same document. I don't believe it's the exact same copy.

Q Do you know how that copy that's in front of you would have differed from the one that you were shown?

A No. I don't know who furnished

Page 254

254

this.

Q Can you read it for content and tell me, apart from the letterhead and title, do you recall if the content is the same?

A For the most part.

I am not reading through everything, but when I look at it, yes, the content, no deadlocks -- yes, the content is pretty much across the board.

Yes, the content is the same.

Q Can you tell from this document who prepared it?

A No.

Q Is there anything on this document that would lead you to believe that this came directly from Trump, other than the fact that someone wrote Trump's name at the top of it?

A Yes. I was taking them at face value.

Q If they say that was Trump's grooming requirements, you would assume that --

A It was the grooming requirements, yes.

Q Now did you file a claim with the

Page 255

255

Equal Employment Opportunity Commission?

A Yes, I did.

Q I am going to show you what has been marked as Defendant's Exhibit 5 and ask you to read the first paragraph on page 4.

A Yes, I have read it.

Q Was this document prepared by you?

A Yes.

Q And it's your handwriting on it?

A Yes.

Q And do you state on the document, my new regional manager said my hair was inappropriate and it does not comply with Plus One standards?

A That's what I wrote.

Q Did you write on there that it did not comply with anyone else's standards?

A Not on the document.

Q Who was the new regional manager you were talking about, in this document marked Defendant's Exhibit 5?

A Jamie MacDonald.

Q Miss Mann, I am going to show you what has been marked as Exhibit 26 and ask you

Page 256

256

if you could turn to page 15 of that document. It's Bates stamped page 32. It begins with the letter H at the top.

A Yes.

Q I am going to refer you to section K on that page and ask you if you have ever seen that document or that provision during the time you worked at the Trump facility for Plus One.

A I don't remember ever reading this or seeing it.

Q Did anyone from Plus One ever provide you with this document at any time while you were working at the Trump facility, or prior to that time?

A I am thinking, if I met with Heather Davis, then I guess I would have received it from Heather Davis.

I don't remember whether I actually had an orientation. I think that would have been the only time I would have been given --

Q When would that have been in terms of date and time? Would that have been April or March of '06?

A Yes, roughly on or about, yes.

Page 257

257

Q Besides what is in the document, section K, did anyone from Plus One ever verbally instruct you as to the provisions that are set forth in section K?

A No, not to my knowledge.

Q Were you familiar with the provisions sets forth in section K during the time you worked at the Trump facility for Plus One?

A No, I was not.

Q Did anyone at Plus One ever instruct you what you should do if you had words with a tenant or a resident at the building?

A No.

Q Did anyone ever tell you that you should seek out another employee or a supervisor from Plus One in the event you were encountering difficulty with a tenant or residents at the Trump facility?

A No one ever told me that specifically in those words.

Q On June 9, 2006, were you involved in an incident with a tenant or resident of the building at 845 U.N. Plaza?

A Yes, I was.

Page 258

258

Q When did you first see that tenant or resident on June 9 of '06?
A Early in the morning.
I know I wrote it down in one of the statements. I know it was in the morning, like around 6:30 a.m.
Q And did you initiate a conversation with that tenant or resident at that time?
A Did I initiate a conversation? No. I was following what --
Q Ma'am, I am just asking if you initiated a conversation.
MR. UMOH: Objection.
A It was not a conversation. I was doing my task that I was told to do every time when someone walks off the elevator.
Q When you saw this particular tenant or resident, you initiated a conversation, correct?
MR. UMOH: Objection.
Q Did you talk first? That's all I want to know.
A When you say initiated a conversation --

Page 259

259

Q You're just interpreting what I am saying.
Did you talk first to him, or did he talk first to you?
A I spoke first.
Q What do you recall saying?
A Good morning.
Q Did the tenant or resident inform you that he did not want to talk to you?
A Yes. That's when he started to become hostile.
Q But he said to you, I don't want to talk to you, correct?
MR. UMOH: Objection.
A Correct.
Q And it was at that time that you called the police?
A No.
Q How much time went by?
A I don't know exactly how much time.
But there were a series of incidents where he would be coming back and forth, lunging over the table and pointing in my face.
It got to the point where my

Page 260

260

co-worker said look, go inside the office, don't come out. Call the police.
Q And this is on June 9?
A June 9, on a Friday.
Q I am going to show you the document that's been marked as Defendant's Exhibit 24. And I am going to show you your statement of the incident of June 9, and I am going to ask you why the information you just gave us is not contained in here.
A I am assuming, when I look at this, sometimes like when I write, it's automatically assuming. Sometimes it's when you're repeating stuff and putting it on, you don't say everything that happened. It relatively happened so fast.
Basically, I wrote it the same time that I was emotionally distraught. I stayed to type this up.
One of my driving factors was to hurry up and sort of be out of Robert's presence.
Q Is it correct to say, the version you just gave now is not the version that's on the

Page 261

261

June 9 statement that we previously marked as Defendant's Exhibit 24?
MR. UMOH: Objection.
A I would say incorrect.
What I stated there is the truth. I did not put everything that happened on the piece of paper which is reflected in the Police Report that was filed.
Q Is there anything on this document where you provided a statement of the June 9 incident that says that the tenant physically threatened you?
A In here, it does not specifically say that. But to me, it's assumed.
Q Ma'am, I am just asking if it says it.
A It does not say it specifically, yes.
Q Did anyone at Plus One ever tell you that calling the police on a resident was a viable option as part of your job?
A That was never discussed.
Q What is the basis of your claim that John Henriques intentionally or arbitrarily

Page 262

262

procured the breach of your contract of employment with Plus One?

MR. UMOH: Objection.

A According to Jamie MacDonald, Jamie was saying it was John Henriques who said that my hair was not acceptable at Trump.

Q But when did he say that this took place?

A It had to have been after the first incident. It was like during the meeting.

Q You are talking about in April?

A Yes, the meeting with Tom Nizsczak and Jamie and I.

Q Ma'am, you were terminated in June of 2006, correct?

A Correct.

Q Did anyone ever tell you that John Henriques had you terminated from employment arbitrarily?

MR. UMOH: Objection.

Q Because that's your claim in your lawsuit. You have claimed that, and I want to know what the basis of that claim is.

A Well, the basis is, it all started

Page 263

263

with Jamie MacDonald. He was saying my job is in jeopardy because of my hair, because of the Trump grooming standards.

Q Ma'am, you did receive an e-mail from the president of the company saying that your hair was acceptable in May of 2006; isn't that correct?

MR. UMOH: Objection.

A It's correct.

But they continued to discriminate against me.

Q When you say "they," I am asking you about Mr. Henriques.

How did Mr. Henriques discriminate against you?

A I did not have any direct communication with John Henriques about my hair.

Q So as we sit here today, you don't have any basis for claiming that Mr. Henriques discriminated against you because of your hair, do you?

MR. UMOH: Objection.

A Only on the basis Jamie MacDonald's

Page 264

264

statements.

Q What about the board of managers of Trump World Towers condominium? What is the basis of your claim that they discriminated against you?

MR. UMOH: Objection.

A It's based on the grooming standard that they created, according to Jamie MacDonald.

Q Is it your claim that the grooming standard which was on Plus One's stationery and mentions the name Trump, that that grooming standard discriminated against you?

A It was how they were implying it, jamie saying he was acting on behalf of John's directive

Q Did you ever speak to John about that?

A I never spoke directly to John about my hair.

Q Did you ever receive any written correspondence or memos or e-mails or anything from John about your hair?

A No.

Page 265

265

Q Or from anyone from the board of managers of Trump World Towers condominium about your hair?

A I don't know if I can answer that question accurately.

I was under the assumption that the Trump grooming policy was from them.

Q I am asking if you received any e-mail or correspondence from John Henriques or the board of managers of Trump World Towers concerning your hair or appearance.

A Exclusive of the grooming, no.

Q The grooming was a document you were handed that you don't know who prepared it, correct?

A Correct.

Q Were you ever told the reason you were terminated, by anyone?

A Yes. I know that I was on the phone with Dave Milani.

Q From Plus One?

A Yes.

Q Was he the person who told you you were being terminated, or was it someone else?

Page 266

266

A He was the one who told me I was terminated.

Q Was that on June 16, or somewhere about that?

A I am kind of thinking it was a little built earlier than June 16.

Q Do you recall the date?

A No. It was in the week period that I was at home. And he was saying at that point, it might be best you look for another job.

June 16, I believe that's when he said, we no longer want you employed at Trump or Plus One.

Q Is this in person, he told you, or by telephone phone, or something else?

A I remember this was over the phone.

Q Did he give you a reason for why you were being terminated?

A I remember him distinctly saying that he was -- Plus One did not like the fact that I exercised my right to protect myself by calling the police.

That was one of the reasons, I believe. I remember him saying, we don't like

Page 267

267

it that you called the police.

Q Were those his words?

A I can almost pretty much say that it was.

Q But he did not mention anything about your appearance or your hair during the time he told you you were being terminated, did he?

A Well, I know --

Q I am just asking whether he mentioned it or not. I hate to cut you off.

MR. UMOH: Objection.

A I am sorry. Rephrase the question.

Q When Mr. Milani informed you you were being terminated, did he mention that your hair or your physical appearance was a reason for your being terminated?

A He did not say that.

Q Miss Mann, I am going to show you what has been previously marked as Defendant's Exhibit 19.

A Okay.

Q Have you had a chance to look at that document?

A Yes.

Page 268

268

Q Do you recall whether this document was given to you by Plus One or by anyone else, or where you came to be in possession of this document?

A I am thinking it was Plus One.

Q Do you know when you would have been given this document, or by whom?

A I don't remember about this.

I just remember specifically about the one about the Trump regulations.

I don't remember whether this was specifically Plus One, like generally for all the employees.

Q Ma'am, I have to know where this document originated. It does not have a letterhead or anything else on it.

A I am assuming this is Plus One, and not Trump.

Q Besides the fact it has nothing on it that says who it is or what it is, I am just asking you, because you furnished it to us. I am asking you what this is supposed to represent, since you supplied it.

A If I turned it over, it was turning

Page 269

269

over all the documents I had that I felt were pertinent to the case that was needed.

Q Do you know if you got it off the website, possibly, or from anywhere else, because you seem to have attached it to the other documents that were marked as Defendant's Exhibit 20 that had the pictures of the two general managers on it.

A I don't think it came from the website, because it does not have the thing at the bottom.

I don't remember. I know I did not get this until I started working at Trump.

Q This document?

A Yes.

Q Okay. Ma'am, can you tell me the basis of your claim that John Henriques and the board of managers of Trump World Towers condominium terminated your employment on the basis of race and national origin?

A How did they terminate me?

Q This is your claim. I am asking you to tell me the basis of your claim.

A They used the Robert incident as an

270

excuse.

Q Well, did the Robert incident involve any discrimination or any words or statements about your hair or your appearance?

A Not directly from Trump.

Q Can you tell me the basis of your claim that the board of managers of Trump World Towers condominium and John Henriques acted in bad faith in terminating your employment?

A I was not given the same treatment as the other employees when they violated grooming standards, although I did not violate the grooming standards.

Q Well, did Mr. Henriques or anyone on behalf of the Trump organization ever tell you that you had violated any grooming standards?

A No. I never spoke directly to John Henriques about my hair.

Q Or anyone on the board of managers of Trump World Towers condominium?

A Correct.

Q Can you tell me the basis of your claim that John Henriques or the board of managers of Trump World Towers condominium acted

271

in malice regarding your termination from employment?

A Not dealing properly with the harassment I was subject to from the resident, Robert.

Q Can you think of any reason that Mr. Henriques would have any malice towards you, or the board?

MR. UMOH: Objection.

A I would say if they feel I am not conforming to their grooming standards, they want me out.

Q But they never told you that was the case, correct?

A I never spoke to them directly.

Q Can you tell me the basis for your claim that John Henriques and the board of managers of Trump World Towers condominium and John Henriques intentionally interfered with your contract of employment with Plus One?

A It's all based on information that I got from Dave Milani, because I did not speak directly to the Trump board or Trump management about my termination.

272

Q Well, you told me earlier that when Mr. Milani told you you were being terminated, that his comment was that Plus One did not like the fact that you had called the police.

A He said they don't like it and we don't like it, referring to they, Trump.

He proceeded to raise his voice and say, you don't call the police on a client.

Q Ma'am, is it your claim that by calling the police on a client, that that was not a valid basis for your termination?

A Can you repeat the question?

Q Yes.

MR. DERSCHOWITZ: Read it back.

(Whereupon, the above referred to question was read back by the reporter.)

A Correct.

Q Ma'am, do you have any present physical complaints or mental complaints regarding the incident or regarding your termination from employment at Plus One?

A Present complaints?

273

Q Yes.

A Residual emotional distress.

Q Can you tell me how that manifests itself?

A It has escalated to anxiety, heart palpitations, mostly nervousness and anxiety, and the mere fact that I am rehashing over this right now.

Q Other than seeing the pastor, you have not had any treatment or seen any other doctors or social workers or anyone else since the summer of 2007, right?

A Correct.

MR. DERSCHOWITZ: Off the record.

(Discussion off the record)

CONTINUING EXAMINATION

BY MS. NORCROSS:

Q Miss Mann, you testified before that there are other African American Plus One employees working at the Trump site when you were there, right?

A Yes.

Q who were they?

Page 274

274

A I believe his name was Kenrick, I don't remember his last name. And Freddy Nicholas.

Q On one of your documents, you identified Freddy Nicholas as a person with information about this case.

What information does he have, that you know of?

A He was present during my employment. He was present for the second Robert incident.

Q Okay.

A Basically, he was there at the time of my Plus One employment.

Q Had you spoken to him about your lawsuit or any of the facts underlying your lawsuit?

A I did reach out to him, yes.

Q When did you do that?

A This is Freddy we are talking about now?

Q Yes.

A I don't know specifically what date I contacted him, but I know I did reach out to him to have him give a statement of what happened.

Page 275

275

Q Did he give a statement?

A I don't know if he did an affidavit and submitted to the court.

At this point, that's my answer, yes. I don't know if he furnished something directly to the court.

Q Have you ever seen a document prepared by Freddy Nicholas relating to any of your claims in this case?

A He sent me an e-mail that he would be willing to give his account of the situation.

MS. NORCROSS: That e-mail should have been produced, and I ask that it be produced as quickly as possible.

Q Is there anyone else you spoke to regarding the factual claims you may have here?

A I spoke directly to Mike Murray.

Q When was that?

A I don't know, roughly, but I know I did speak to him.

It was definitely after my termination at Plus One.

Page 276

276

Q Was it before or after you filed this lawsuit? You filed the lawsuit in June of 2007.

A That's a hard call. I don't know. I don't know if I did before or after. I can't recall the specific dates right now.

Q Did you talk to him before or after you went to Guam?

A It had to have been before Guam.

Q Why?

A Because Guam, I was so busy working, and it was difficult to reach people here.

Q Did you feel better while you were in Guam, while working for P.I.C.

MR. UMOH: Objection.

Q Better in the respect of the symptoms that you described to Mr. Derschowitz?

A They were not as severe as they were closer to my termination.

Q So would it be accurate to say you were less anxious while you were in Guam?

A When I did not hear about the lawsuit.

But as soon as I heard now there is deposition issues, yes, it started back up

Page 277

277

again.

Q While you were working in Guam, and other than when you had to think about the lawsuit, you felt better than you had before you went to Guam?

A I would say so.

Q What did you say to Mr. Murray, and what did he say to you?

A I don't remember specifically, verbatim.

I remember I asked him if he was willing to make a truthful statement about what happened.

Q And did he respond to you?

A He said, I remember what he was like, Jordan.

He was very friendly. He was basically saying, you know what, I would like to, but I think I need to check this out with Plus One first.

I was like okay, cool, fine.

Q As far as you know, did he check it out with Plus One?

A Yes, he did check it out.

Page 278

278

He called me back, and he apologized and said he was sorry, he could not make a statement.

Q Did he tell you why?

A I don't think he went into detail as to why.

From what I recall, it was basically his supervisor said he was not allowed to.

Q Did he tell you that, or is that something you are concluding from what he did say?

A I don't remember concluding that.

It was like, they won't let me.

Q Now do you know whether or not another employee or hire was placed in the receptionist position at the Trump facility?

A When?

Q Anytime after you left?

MR. UMOH: Objection.

A I don't know, because I was not working there anymore.

Q You said you have spoken to some of your former co-workers, correct?

A Yes, I have.

Page 279

279

Q Did you ever ask them if anybody replaced you?

A No. That was not my concern.

Q Did you have any reason to determine what the race of the person who replaced you, if anybody, was?

A My focus was on why I was not placed to a different site. That was my discussion with my former co-workers, because that was policy.

Q Did you ever question why you were not?

A I got some comments that it was not right and it was discriminatory, it was racist.

Q Who said it was racist?

A I remember particular Plus One employees at the Goldman Sachs site who knew me for at least two years while I worked at that site.

Q Please give me their names.

A I believe her name was Debbie.

Q What race is Debbie, if you know?

A I don't know what race. I know she

Page 280

280

is of color.

Former co-worker, Sylvia, who was actually employed at Trump.

Q Employed by Plus One at Trump?

A Contracted at Plus One to work at Trump. She commented it was discrimination.

Freddy Nicolas commented it was discrimination.

Tom Nizsczak, my former supervisor, before he left, he commented that Jamie was in the wrong, and that I should hold true to my complaint.

Q Did he say Jamie was in the wrong because of your race, or Jamie was in the wrong, generally?

MR. UMOH: Objection.

A It was a bunch of things.

It's sort of like I am answering for him, and I don't know what he was thinking.

Q I want to know what he said to you.

I understand you can't tell what somebody else is thinking.

A I remember him saying, hold tight to your complaint. Jamie was in the wrong.

Page 281

281

And then he went into detail how Jamie did not supply him with all of the information.

Q He had difficulties with Jamie, too, correct?

A I was never privy to any of their discussions.

Q Did Tom ever tell you he was having trouble with Jamie or problems with Jamie?

A Tom told me he was having problems with Trump management.

Q Did he say who at Trump?

A I can't specifically say.

I don't think he ever singled out John Henriques, but it was always the environment, whenever John Henriques came down, we really had to be on point, because he was looking at every little thing.

Q Would you agree with me, that's normal, when you have somebody who is overseeing your work --

MR. UMOH: Objection.

MS. NORCROSS: Let me finish the question.

Page 282

282

Q -- to be on a little bit on guard when the boss is looking at what you're doing?

MR. UMOH: Objection.

A I disagree. I would not say it was normal.

Under certain circumstances, it was a very tenuous situation. They had problems with the relationship, and they were nitpicking.

Q Trump was nitpicking?

A Correct.

Q Is it your view that nitpicking was based on race?

MR. UMOH: Objection.

A I thought we were just talking about generally why John Henriques would come down. Now you are going to something --

Q It's a different question.

My question is, is it your belief that John Henriques' nitpicking was based on race?

A According to what Jamie MacDonald told me, then yes, it was based on race.

Q Is that because you believe that John Henriques told Jamie that you could not continue

Page 283

283

to work at the Trump facility?

MR. UMOH: Objection.

A It was basically how Jamie was presenting the whole entire situation.

Q Let's talk about that.

A Sure.

Q You did not like Jamie very much, did you?

MR. UMOH: Objection.

A I did not know him enough to dislike him.

Q Did you find him abrasive?

A I found his comments disrespectful and harassful, yes.

Q Did you find him to interact with anyone else that way?

A Not to my recollection.

I only remember dealing with him primarily about my hair.

I did not know him until about a month into my employment at Trump.

Q When you left, Freddy was still employed at Plus One, correct?

A I am not sure if he remained.

Page 284

284

Q At the time you left, was he still working there?

A That day, June 9, as far as I know, he was still working that day.

Q And what about Kenrick? Was he still working there?

A Good question. I don't know about that.

Q Have you told us everything that you believe supports your claim that you were working in a discriminatory, hostile environment?

A I believe I gave all the major points.

Q Are there any other points.

A Well, because I am not a lawyer, I don't know how to answer it in a legal way.

Q I am only asking, you told us all of the facts that caused you to believe you were subjective to a racially hostile working environment?

A Based on your comment, I don't believe all the questions have been asked. I am sure there could have been something left out.

Page 285

285

Q Other than what you have already told us, please tell me what additional facts there are that you think support your claim that you were working in a racially discriminatory environment.

A One, the fact that it was quite weird how Jamie could not articulate, the first time he saw my hair, as to how it violated the policy.

Number 2, in a meeting with Tom and I, he knew how I violated the policy and said that buns and twists can't be above three inches. I thought that interpretation was incorrect because my hair is not a bun, it's an Afro. This is how it naturally grows.

He was interpreting incorrectly toward me, where it was subjective on how he was interpreting it.

There had been employees who had been violating written policy from a grooming standard continually, and would walk by Jamie, and he never mentioned it at all.

Even the same day, he just kept focusing on my hair, while other people, like

even after that incident, he would see other employees. Other employees would be violating, showing massive tattoos, hair wet, big hoop earrings, hair in their face, over their eyes.

Q I am going to stop you.

I want you to give me the specifics.

MR. UMOH: You can allow her to speak and move to strike.

She has to give her responses. You keep interrupting the witness.

MS. NORCROSS: No, I don't keep interrupting the witness.

The witness does not answer the questions.

MR. UMOH: Please allow the witness to speak. This is going on all day.

MS. NORCROSS: I am not getting into colloquy with you.

MR. UMOH: The attorney is not allowing the witness to answer the question here.

MS. NORCROSS: The record will speak for itself, the entire record

of this case.

Q Anyway, let's do this. I will withdraw that question.

Now here's what I want you to do.

A Sure.

Q For a lot of the day today, you have talked in generalities about this employee was doing, this employees was violating this policy.

I would like you to tell me exactly the name of each person you claim was violating the grooming policy, and the portion of the grooming policy you contend he or she was violating.

Do you understand what I am asking?

A Yes.

Q I want specifics, not generalities.

A Let's see.

All the women that were working at the facility would have hair over their eyes and in their face.

Q Please give me their names.

A Sylvia, I don't know her last name. Magaly, her last name is in the records. There was another receptionist. I don't remember her

name. She was a receptionist on the weekends, so I hardly saw her.

Q Anyone else?

A His name was Ryan. He would consistently have gel in his hair and would groom his hair to stand straight up, which could have been close to three inches, how he was grooming it.

Q Anyone else?

A In terms of the jewelry factor, Magaly was wearing hoop earrings larger than what was allowed on the Trump grooming policy.

Q Anyone else?

A Okay, I talked about Sylvia.

I would have to look at the Trump grooming thing and I could let you know. I have to go through it, and it will tell me.

MR. DERSCHOWITZ: Note my objection to the characterization of the Trump grooming thing. Maybe we can refer to it as an exhibit.

Q While I am looking for that, let me ask you, do you have any personal knowledge as to whether or not Jamie or any other Plus One

employee spoke to the people you have named regarding the items you have identified: Hair, gel and hoops?

MR. UMOH: Objection. Asked and answered.

A Did I answer that already?

Q No, did you not.

Go ahead and answer.

A I know I spoke directly with -- I made a point to not assume and do my ground work.

No, they had never been called aside on those issues.

Q You spoke to each one of these people?

A Yes, I did.

Q When?

A During my employment at Trump.

Q So sometime between April and June?

A Yes.

MR. UMOH: Objection.

A You mean, were they violating policy between April and June?

Q No. My question was, when did you

Page 290

290

speak to them?

A After April 5, 2006.

Q So between April 5 and June 16, that's when you spoke to each one of these people?

A Yes.

Q If any or all of these folks were to testify that your recollection of the conversations you say you had with them was incorrect, would that surprise you?

A No, it would not surprise me, if they were still employed by Plus One.

Q Why is that?

A Because I know, it just makes common sense, if you're employed by a company, your job is at stake, so you are going to follow the instructions of your employer; just like Mike Murray who said he could not, you know, be forthgiving of information.

Q If what you testified to about your conversations with these people is accurate, and they disagree with you, or they say that you're wrong, are you then saying they would be lying?

Page 291

291

MR. UMOH: Objection.

A No, I am not saying they are lying.

Some people, they could remember it differently. The conversation could have been interpreted differently. There are just so many reasons.

Q Would you agree with me, then, they might have understood the conversation differently than you did?

MR. UMOH: Objection.

A They could not have misunderstood my questions, you know.

They could be responding about a particular time period.

I would have to see their statement to say otherwise.

Q You were looking at that exhibit to determine whether there was anyone else that you believe was in violation of a grooming standard.

A I can think of those four people I named that I remember. I definitely made a note of that when I went through.

It did not make sense that all this hoopla was about me and my hair, and they

Page 292

292

blatantly had things that were not acceptable.

Q So you perceived it as being unfair, then; would that be correct?

A I perceived it as being discriminatory.

Q Explain to me why you concluded that it was because of your race.

MR. UMOH: Objection. Asked and answered.

MS. NORCROSS: No, she did not answer that.

MR. UMOH: Objection. Asked and answered.

A How I concluded I was being discriminated based on my race?

Q I want to know why you believe that the dispute about your hair was because of your race and not something entirely unrelated to your race.

A Based on the comments and how I was being treated.

Q Well, this was asked before.

But I want to make sure, in this context, no one said to you, we don't like your

Page 293

293

hair because it's African American hair, or anything like that; would that be correct?

MR. UMOH: Objection.

A They did not make a specific comment like you just quoted it.

They said, We don't make allowances for people with hair like you.

Q First of all, who said that?

A Jamie MacDonald.

Q Did you ask him what he meant by that?

A I don't know if I did or not.

Q Where is Jamie from, do you know?

A No, I do not.

Q Is he American?

A I don't know if he is American or not.

To make a comment like, Your hair is not current, you know. I mean obviously, he was alluding to the fact back in the '60s, like black people had Afros.

Q How do you know that?

A Well, I can't speak for Jamie.

Basically how everything went down,

294

other employees who were nonblack were given certain privileges, and I was not.

Q Tell me who those employees are and what privileges they were given.

A I listed those four employees who were able to consistently break policies, but were never sent home for the day, were never sent to Human Resources for discussion, was never told that their job was in jeopardy based on violating the policies.

I don't recall ever seeing anyone being harassed. It was a continual thing. They would come to work, and no one would say anything.

And I am like, why am I the only one being singled out?

Q Would you agree with me, that conclusion might be incorrect if some of those people have been disciplined, and you just did not know about it?

A I don't think it's incorrect.

Q You don't think you're incorrect when --

A I think if they were still employed,

295

see, I don't know whether or not they were disciplined after I got fired.

But I know that, like I specifically asked them, have you ever been called out, and they said no.

It could be a situation of like which particular month they did get called out.

MR. UMOH: Off the record.

(Discussion off the record)

MS. NORCROSS: Mr. Umoh, do you have a tape recorder on?

MR. UMOH: I don't have a tape recorder.

Q I do have to tell you this.

MR. UMOH: Be careful what you tell my client.

MS. NORCROSS: I am telling her on the record.

MR. UMOH: Don't have a conversation with my client --

I am recording you, by the way.

MS. NORCROSS: Then I am not continuing.

296

Are you recording?

MR. UMOH: It's off.

MS. NORCROSS: Harold, could you look at that and tell me if it's recording?

Q All right, let's do this.

Are you okay?

A I am just tired.

Q Let's do this. You have a claim that Plus One and Jamie MacDonald discriminated against you because of your lawful off-duty activities.

A Which were those?

Q I can show you where I am reading from, and it's right here, that paragraph.

MS. NORCROSS: For the record, I am showing her paragraphs 54 and 55 of the Third Amended Complaint.

A After I got off duty, I went to E.E.O.C. to file a complaint.

Q I want to know what the off-duty activity was that you are referring to in that claim.

297

MR. UMOH: Objection.

A I am assuming when I got off duty, I went to the E.E.O.C. to file a claim.

Q That paragraph does not refer to your hair, right? The hair, all that occurred on duty, correct?

A But the hair, that's why why I made the charge to the E.E.O.C.

Q When you called the police, you did that while you were on duty, correct?

A Yes, I was on duty.

Q By the way, have you -- to your knowledge, have you sued Mr. Schuller, Robert Schuller?

A No, I have not sued Robert Schuller.

Q Is there any particular reason why not?

A I can't find him.

Q There were some efforts made, were there not, to attempt to place you in another position within the Plus One system following the Trump, after June 9, 2006, correct?

MR. UMOH: Objection.

Page 298

298

A Repeat the question again.

Q To your knowledge, did Plus One make any efforts to try to find you an alternative position after June 9, 2006?

MR. UMOH: Objection.

A I would be speaking for Dave, and you would have to ask Dave Milani, because he is the resources person.

Q Did Dave tell you they were looking for --

A I remember he said I should start looking for another job.

Q Did Dave tell you they were looking to determine if there was another position for you at Plus One?

A I don't recall him saying that.

Q Did you ever ask him if he was making such an effort?

A I don't recall.

I know I was definitely still fixated on, did you do the investigation about the discrimination.

Q Did you receive an answer to that question?

Page 299

299

A After I got terminated.

Q You received the answer on June 16, did you not? Pardon me, June 19?

A Yes. It was after I was terminated.

Q Did you receive your termination letter and the letter regarding the investigation on the same day?

A I don't believe so. I think they came in the mail different dates.

Q You were not qualified to work as a massage therapist in New York in June 2006; is that correct?

MR. UMOH: Objection.

A When you say qualified --

Q I will rephrase it for you.

Is it your understanding that you must have a license to be a massage therapist in New York State?

A In order to do full body massage and call yourself a massage therapist, you have to have a license by some New York government organization.

Q And in June of 2006, you did not have

Page 300

300

that license; is that correct?

MR. UMOH: Objection.

A In June 2006, no, my application was not completed.

Q Why did you decide to leave the P.I.C. Resort club before your contract expired?

MR. UMOH: Objection. Asked and answered.

A I did answer that earlier.

Q To go to school, correct?

A I answered earlier, that I had to come to the deposition.

MR. UMOH: Objection.

Q But you applied for school way before this deposition, correct?

MR. UMOH: Objection.

A Before the deposition, yes, I did apply, yes.

Q When did you leave New York to go to Guam to work at the P.I.C. Resort club, what date?

MR. UMOH: Objection. Asked and answered.

Page 301

301

MS. NORCROSS: No, it has not been asked and answered.

MR. UMOH: Objection.

Q I am just looking for a date.

A Because of the time difference, I don't know whether it was the 21st or the 22nd.

Q Of which month?

A February of 2008.

MS. NORCROSS: I am going do stop. I don't have anything else to ask you tonight.

I am not closing the deposition, for the reasons I explained to you before. There are some serious problems.

THE WITNESS: However, because I am staying with my father, I have to know before I leave today, because it takes me two hours to get here.

MS. NORCROSS: You're talking about tomorrow morning?

THE WITNESS: No, we won't continue tomorrow morning.



Page 302

302

MR. DERSCHOWITZ: We are talking about rights, about deposing you in the future.

EXAMINATION BY
MR. UMOH:

Q You testified earlier that the only documents that you turned over were the tax returns; is that correct?

A No, they were not the only documents that I turned over.

The only reason why I was focusing on the tax documents is because those were the most challenging, going back and forth with the accountant and trying to get my paperwork in storage.

I know over the course of the time of this situation, I have given a copy of my employment contract with P.I.C., I have given an affidavit, e-mails. A photo of my hair I have given.

The only reason I was focusing on the tax records is because that was the most challenging.

Q Now all the documents you just

Page 303

303

testified to that you turned over, were those documents that counsel directed you to turn over?

A As far as I know.

MS. NORCROSS: Objection. My objection is, it appears as though the question calls for Miss Mann to waive the attorney/client privilege, and that is how we are going to take it.

MR. DERSCHOWITZ: I would agree.

Q Let me rephrase the question.

Earlier, you were asked whether or not you had turned over certain documents to your attorney.

In response to that question, you stated that you turned over solely your tax documents; is that correct?

MS. NORCROSS: Objection.

A No, that's not correct.

I turned over more documents than my tax records.

Q On Saturday, August 9, 2008, did you

Page 304

304

and I meet to prepare for this deposition?

A Yes, we did meet.

Q Without divulging any of our conversations, how long did we meet on Saturday to discuss this deposition?

MS. NORCROSS: Objection. Asked and answered.

A I know it was not more than two hours, but it could have been an hour and a half

MR. UMOH: That's it.

CONTINUING EXAMINATION
BY MS. NORCROSS:

Q Did you have any conversation with anybody -- I don't want to hear the substance of it.

Did you have any conversation with anybody about the length of your deposition prep between the time I asked you the question this morning and just now?

A Repeat that question.

Q Did you prepare for that particular question at any time between this morning and now?

A I had talked about the deposition,

Page 305

305

but I was not staged to say that answer.

MS. NORCROSS: Move to strike.

Q My question was whether you had any conversation about that question.

A And which question was that?

Q The question of how long did you meet with your lawyer to prepare for your deposition.

A I am trying to think.

MR. UMOH: I object to the question.

A I know when I was hesitant to say about my meeting with my lawyer, because I thought it was attorney/client privilege. That's why I was like, I don't know if I should say this.

Then I was asking, is it okay to say these things.

Q You don't need to tell me the substance of your conversations with your lawyer.

MR. UMOH: I will direct she not answer that question.

MS. NORCROSS: I am not asking

substance.

MR. UMOH: I would direct that she not answer.

Q I am not going to try to force you to answer it right now.

Let me just say, number one, this question does not go to the attorney/client privilege.

MS. NORCROSS: I have no further questions.

(Whereupon the E.B.T. was concluded at 9:00 p.m.)

______________________________
JORDAN MANN

Subscribed and sworn to before me this ______day
__________________, 2008.

______________________________
NOTARY PUBLIC

JORDAN MANN

E R R A T A S H E E T

Page Line

I N D E X O F E X H I B I T S

| DEFENDANT'S EXHIBIT # | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Court judgment for legal name change | 10 |
| 2 | W-4 form | 17 |
| 3 | | 17 |
| 4 | Internal posting application for Plus One | 23 |
| 5 | E.E.O.C. paperwork | 27 |
| 6 | Charge filed with E.E.O.C. | 28 |
| 7 | Letter written by deponent to E.E.O.C. | 34 |
| 8 | Complaint filed in federal court | 41 |
| 9 | Letter from New York University | 69 |
| 10 | Employment agreement | 71 |
| 11 | Notarized affidavit | 76 |
| 12 | Pay stubs from P.I.C. Resort | 78 |
| 13 | Plaintiff's Response to Interrogatories | 82 |
| 14 | Plaintiff's Responses to Defendant Plus One Interrogatories | 84 |
| 15 | | 107 |
| 16 | Application to Plus One | 115 |
| 17 | | 125 |

I N D E X O F E X H I B I T S
(Continued)

| DEFENDANT'S EXHIBIT # | DESCRIPTION | PAGE |
|---|---|---|
| 18 | Resume | 137 |
| 19 | Grooming standard for Plus One or Trump | 148 |
| 20 | Pages from Plus One website | 149 |
| 21 | Trump work staff apparel, uniforms | 151 |
| 22 | Training materials for Trump Towers | 154 |
| 23 | E-mails between deponent and Plus One employees | 195 |
| 24 | Incident report, 4 pages | 206 |
| 25 | Photograph of deponent | 234 |
| 26 | Employee handbook | 242 |

310

CERTIFICATE

I, SANDY ESKENAZI, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That JORDAN MANN, the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

Sandy Eskenazi

NOTARY PUBLIC