1                                              1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT

3    X------------------------------------------X

4    JORDAN MANN,

5                          Plaintiff,

6            -against-

7    PLUS ONE FITNESS, TRUMP WORLD TOWERS, "ROBERT"

     DOE, JAMIE MACDONALD AND DOES 1-10 INCLUSIVE,

8

9                          Defendants.

10   X------------------------------------------X

11                      120 Broadway

                        New York, New York

12

                        August 12, 2008

13                      9:30 a.m.

14

15           EXAMINATION BEFORE TRIAL OF

16   the plaintiff, JORDAN MANN, held at the

17   above mentioned time and place, pursuant to

18   Order, before a Notary Public of the State

19   of New York.

20

21

22                              **CONDENSED**

23

24

25



Page 2

1
2    IT IS HEREBY STIPULATED AND AGREED by and
3    between the attorneys for the respective parties
4    hereto that objections to any questions, except
5    as to the form of the question, are reserved for
6    the Trial of this action.
7
8        IT IS FURTHER STIPULATED AND AGREED that
9    this deposition may be sworn to by the witness
10   being examined before a Notary Public other than
11   the Notary Public whom this examination was
12   begun.
13
14       IT IS FURTHER STIPULATED AND AGREED that the
15   filing and certification of the original of the
16   deposition is waived.
17
18       IT IS FURTHER STIPULATED AND AGREED, that
19   Counsel for the witness shall receive a free
20   copy of this examination without charge.
21
22
23
24
25

Page 3

1
2    A P P E A R A N C E S
3    UWEM UMOH, ESQ.
         Attorney for Plaintiff
4        255 Livingston Street
         Brooklyn, New York  11217
5    (718) 360-0527
6
7
8
9    DEBORAH MARTIN NORCROSS, ESQ.
         Attorney for Defendants
10       Plus One Fitness and Jamie MacDonald
         60 Marion Road West
11       Princeton, New Jersey  08540
     (609) 249-5860
12
13
14
15   LESTER, SCHWAB, KATZ & DWYER, LLP
         Attorneys for Defendant
16       Trump World Towers
         120 Broadway
17       New York, New York  10271
     BY:  HAROLD DERSCHOWITZ, ESQ., of Counsel
18
19
20
21   ALSO PRESENT:  HEATHER DAVIS
22
23
24
25

Page 4

1
2    J O R D A N  M A N N,
3        the plaintiff herein, after having been
4        first duly sworn by a Notary Public of the
5        State of New York, was examined and
6        testified as follows:
7    EXAMINATION BY
8    MS. NORCROSS:
9        Q    Please state your name for the
10   record.
11       A    Jordan Mann.
12       Q    Please state your address for the
13   record.
14       A    2137 Pitkin Avenue, Brooklyn,
15   New York 11207.
16       Q    Miss Mann, good morning.  My name is
17   Deborah Martin Norcross.  I am an attorney
18   representing Plus One Holdings, Incorporated and
19   Jamie MacDonald.
20       Today is your deposition.  I will be
21   deposing you for a period of time; and then
22   Mr. Derschowitz, who is representing Trump World
23   Towers and John Henriques, will ask you some
24   questions.
25       Those questions are going to be

Page 5

1
2    pertaining to the claims you have raised from
3    your complaint, in all of the versions of your
4    complaint, as well as some background and other
5    information.
6        A    Okay.
7        Q    Have you had your deposition taken
8    before, ever?
9        A    No, I have not.
10       Q    Let me just go over a couple of the
11   ground rules.  I will ask you a series of
12   questions.  I will make them as singular and as
13   simple as I can.
14       If there is any question I ask you
15   that you don't hear, let me know that, and the
16   court reporter will read the question back for
17   you.
18       The court reporter is taking down
19   everything that everybody says, which will be
20   compiled in a transcript.
21       A    Okay.
22       Q    If there is any question I ask you
23   that you don't understand, tell me that, and I
24   will do my best to rephrase it so that you can,
25   so that I am being as clear as I can be.

2 (Pages 2 to 5)

Page 6

1                              6
2          We need to be careful not to talk
3   over one another.
4     A    Sure.
5     Q    Because the court reporter can only
6   get one person down at a time.
7          Objections to questions in a federal
8   court deposition are very limited, for the most
9   part.  A defending attorney may only object to a
10  question if it crosses over into what he
11  believes is a privileged area.
12    A    Okay.
13    Q    Or if he has some kind of issue with
14  the form of the question.
15    A    Okay.
16    Q    All other objections are reserved.
17         However, in the course of
18  depositions, attorneys do sometimes object.
19         If your counsel objects, I would like
20  you to not answer the question until we resolve
21  the objection.
22    A    Okay.
23    Q    And then either he will direct you or
24  I will direct you whether or not to answer.
25         Are we good so far?

Page 7

1                              7
2     A    Yes.
3     Q    Are you currently suffering from any
4   medical condition that would in any way impair
5   your ability to hear, understand and answer
6   questions?
7     A    No.
8     Q    Are you taking any medication?
9     A    No.
10    Q    Let me finish the question, otherwise
11  the transcript becomes unclear.
12         You may realize what I am going to
13  ask but that won't be clear on the transcript.
14    A    Okay.
15    Q    Are you taking any medication that
16  would in any way impair your ability to hear,
17  understand and answer questions?
18    A    No.
19    Q    What is your name?
20    A    Jordan Mann.
21    Q    Is that your complete name, or is
22  there a middle name?
23    A    Middle name, Sudan.
24    Q    How long have you been known by that
25  name?

Page 8

1                              8
2     A    Legally, you mean?
3     Q    Legally.
4     A    I think it became legal in 2006.
5     Q    Do you remember when in 2006?
6     A    It had to be in the later part of
7   2006, around there.
8     Q    Can you put a month to it?
9     A    Possibly November.
10    Q    Prior to the time that you changed
11  your name -- and that was a name change; is that
12  correct?
13    A    Yes.
14    Q    Prior to the time you changed your
15  name to Jordan Sudan Mann, what was your name?
16    A    Rhonda Renee Mann.
17    Q    Is it accurate that you made an
18  application to have your name changed, a legal
19  application, legal papers?
20    A    Yes, I filed legal papers.
21    Q    And when did you do that?
22    A    It had to be, I believe, 2006.
23    Q    Did you have a lawyer to assist you
24  in that process?
25    A    No.

Page 9

1                              9
2     Q    You did that yourself?
3     A    Yes.
4     Q    Would it be accurate to say you did
5   that in Hudson County, New Jersey?
6     A    Yes.
7     Q    Were you living in Hudson County,
8   New Jersey at that time?
9     A    Yes.
10    Q    Why did you change your name?
11    A    Spiritual reasons.
12    Q    What are they?
13    A    Religious reasons.
14    Q    What were they?
15    A    Specifically?
16    Q    Yes, ma'am?
17    A    I had changed professions altogether.
18         I was in the entertainment business
19  before then.  Then when I went to massage
20  school, I totally changed my outlook on life and
21  how to approach it and spiritual philosophy.
22  That's why I changed it.
23    Q    What was it about the name Jordan
24  Sudan Mann that met those spiritual reasons?
25    A    I just liked the two names.  That's

3 (Pages 6 to 9)

10

1
2  why I chose them.
3      Q    Was your birth name Rhonda Renee
4  Mann?
5      A    Yes.
6      Q    Have you ever been married?
7      A    No.
8      Q    Do you have any children?
9      A    No.
10     Q    Have you ever used a false name?
11     A    No.
12     Q    Have you ever signed a false name to
13  a governmental document?
14     A    No.
15     Q    Have you ever signed a false name to
16  an employment document?
17     A    No.
18         MS. NORCROSS:  Mark this as
19     Defendant's Exhibit 1.
20         (Whereupon the above referred
21      to document was marked, Defendant's
22      Exhibit 1, for identification, as of
23      this date, by the reporter)
24     Q    I am handing you Defendant's
25  Exhibit 1 to your deposition.  I am going to ask

11

2  you to look it over.
3         When you are done looking it over,
4  let me know so I can ask you some questions,
5  okay?
6      A    Okay.
7      Q    Can you identify that for me?
8      A    Yes.  This is the -- it looks like
9  it's a copy of the court judgment or paperwork
10  that I used that shows that I changed my name
11  legally.
12     Q    The printing on the first page of the
13  document -- I mean the printing, because there
14  is a stamp in the corner -- but the printing, is
15  that your printing?
16     A    Yes.
17     Q    Look at the bottom of the first page
18  of the document.  Do you see the number 13?
19     A    Yes.
20     Q    Does that indicate that there are 12
21  previous pages to this document?
22     A    No.  I don't know where that 13 came
23  from.
24     Q    When was the last time you saw this
25  document?

12

1
2      A    Actually, I keep it on me, because a
3  lot of times back in the past, a lot of times,
4  like my credit card records, I have to send it
5  for them to change over the name.  I keep it on
6  me.
7         Even with my college records and my
8  massage certificate, it was in my former name.
9      Q    That would apply to any employment
10  and medical records prior to the time you
11  changed your name?
12     A    I don't understand the question.
13     Q    Any medical records that might exist
14  pertaining to you that concern a period before
15  November of 2006, those records would not be in
16  the name of Jordan Mann, would they?
17     A    Actually, I don't know, to be honest
18  with you.
19     Q    What was your legal accurate name
20  before November 2006?
21     A    My legal name was Rhonda Renee Mann.
22         I know I did research on the
23  Internet, and I was talking to some people.  And
24  all my business associates and everyone knew me
25  as Jordan.

13

1
2         There could be some promotional
3  material.
4      Q    What about an official record, like a
5  medical record?  Would that be in your real name
6  or another name?
7      A    To be honest, I would say it could be
8  either or.
9      Q    On the top of this document, do you
10  see the fax line?
11     A    Yes.
12     Q    Who is Patrick O'Keke, Esquire?
13     A    Patrick is one of the lawyers that I
14  first contacted to handle my case.
15     Q    You mean this case?
16     A    Yes.
17     Q    Did Mr. O'Keke, did he assist you in
18  the name change process, or no?
19     A    No, he did not.
20     Q    I am just trying to figure out what
21  that fax line reflects, if anything.
22         Where were you physically located on
23  July 14, 2008?
24     A    Where was I living?
25     Q    Yes.

14

1
2    A    I was staying in my sister's
3    apartment in Harlem.
4    Q    On July 14, 2008, you were not in
5    Guam?
6    A    Yes, I was.
7    Q    So did you fax this document to
8    anybody on July 14, 2008?
9    A    I don't remember.
10         I can check my records and find out,
11   like my e-mail account, and let you know.
12   Q    We have some time tomorrow, so if you
13   can do that?
14   A    Yes.
15   Q    Do you have in your possession -- not
16   necessarily with you here today, but anywhere --
17   do you have any other records other than these
18   two pieces of paper pertaining to your name
19   change application?
20   A    Well, I have a couple originals, like
21   one is in storage, and one I keep on me.  I know
22   I have sent others out.  I think I have two
23   copies of that.
24   Q    They would be the same as the exhibit
25   you have in front of you?

15

2    A    I believe so.
3    Q    I am going to ask you to check that.
4         I will tell you why.  This may not be
5    the case, but typically, when a document has the
6    number 13 at the bottom, or any number at the
7    bottom, that indicates page number.  And if it's
8    13, it's a rational conclusion there are pages 1
9    through 12.
10        I am going to ask you to check and
11   see if you have any of those other pages, if
12   they exist.
13   A    I only received two pages, total,
14   from Jersey at that time.
15   Q    Did you file any papers with the
16   court to effectuate this name change?
17   A    Yes.  There is a series of procedures
18   that you have to go through.  And I just don't
19   know how many pages I did in the beginning.
20        I know this was the final form that
21   they sent to me in the mail.
22   Q    Did you retain copies of the other
23   papers you had to complete and send to the
24   court?
25   A    No, I don't think so.

16

1
2         Once I got, like, the final, it did
3    not make sense for me to keep it.  I don't
4    believe I did.
5    Q    Have you made any effort to look and
6    determine whether you have any other papers
7    pertaining to your name change?
8    A    I did not make any effort because I
9    knew that it would seem out of character for me
10   to hold onto paper.  I always get a lot of
11   paper, junk mail, so I would shred it.
12        It did not mean anything because I
13   had the final product.
14   Q    Did you shred these papers?
15   A    I don't know.  I could have just
16   ripped them up and thrown them in the garbage.
17   Q    Do you know that you discarded them,
18   or you are not sure about that?
19   A    I am not sure, but I will check.
20   Q    And you have not made any effort up
21   until now to check, would that be accurate?
22   A    Correct.
23        MS. NORCROSS:  Mark this as
24   Defendant's Exhibit 2 and mark this
25   as Defendant's Exhibit 3.

17

1
2         (Whereupon the above referred
3    to documents were marked, Defendant's
4    Exhibits 2 and 3, for identification,
5    as of this date, by the reporter)
6    Q    Miss Mann, your name has never been
7    Jordan Rhonda Mann; is that correct?
8    A    No.  Sometimes people would make
9    mistakes, and then sometimes it's like I will --
10   well, people would put brackets.  As long as it
11   was the same social security.
12   Q    Do you know what a form W-4 is?
13   A    Yes.
14   Q    What is it?
15   A    It's a paper, your deductions.
16   Q    It's a government form, would that be
17   accurate?
18   A    Yes.
19   Q    I am going to hand you what the
20   reporter has marked Defendant's Exhibit 2 to
21   your deposition.  Look it over and tell me
22   whether you can identify it, please.
23   A    Yes.
24   Q    What is that?
25   A    It's a W-4 form that I filled out.

Page 18

1                       18
2       Q       And you filled it out, correct?
3       A       It looks like my handwriting.
4       Q       And you signed it at the bottom?
5       A       Yes, I did.
6       Q       What name did you use when you signed
7    it?
8       A       I used Jordan.
9       Q       Jordan Mann, correct?
10      A       Yes.
11      Q       That was not your name in March of
12   2006, was it?
13      A       That's what I went by.
14      Q       What was your legal name in March of
15   2006?
16      A       My legal name was Rhonda Renee
17   Mann.
18      Q       And not Jordan Rhonda Mann,
19   correct?
20      A       Well, I was told by my accountant
21   that I could use Jordan because it was operating
22   as a business.
23      Q       Is it accurate to say this is a W-4
24   form that you completed when you were employed
25   by Plus One Fitness, Inc. or Plus One Holdings,

Page 19

1                       19
2    Inc.?
3       A       Yes, I am assuming so.
4       Q       And you were not employed by Plus One
5    as a business, were you?
6       A       No.
7       Q       Okay, let me hand you Defendant's
8    Exhibit 3 to your deposition.
9               Take the time to look it over and
10   identify it for me, if you can.
11      A       See, I am kind of curious.  Why did I
12   have to sign two forms?
13      Q       Before we get to that, take a look
14   and just tell me whether you can identify that
15   for me first, okay?
16      A       It looks like a W-2 form.
17      Q       W-2 or W-4?
18      A       W-4.
19      Q       Does that form bear your signature?
20      A       Yes.
21      Q       And what name did you sign on this
22   W-4?
23      A       Jordan.
24      Q       Just Jordan?
25      A       Jordan Mann.

Page 20

1                       20
2       Q       Actually Jordan Rhonda Mann; isn't
3    that correct?
4       A       Well, you said what did I sign it
5    as.
6       Q       Fair enough.
7               The signature line says Jordan
8    Mann?
9       A       Yes.
10      Q       The printing up at the top of the
11   page, do you see the printing where it says
12   Jordan Rhonda Mann?
13      A       Yes.
14      Q       Is that your printing?
15      A       Can I take a look at this really
16   quick?
17      Q       Sure.
18              MS. NORCROSS: Let the record
19          reflect the witness is comparing
20          Defendant's Exhibit 2 with
21          Defendant's Exhibit 3.
22      A       On one of the forms, it does not look
23   like I wrote Rhonda on this one.  It does not
24   look like my handwriting.
25      Q       On which?

Page 21

1                       21
2       A       The one that was signed on
3    March 14.
4       Q       You mean the signature line?
5       A       No.  On line 1, where it says you
6    have to put your first name and then your last
7    name and social security.
8       Q       I am not sure I understand what you
9    are saying.
10              Let's take it in pieces.  On line 1
11   on Defendant's Exhibit 2, which is the March 14
12   W-4 -- are you with me?
13      A       Yes.
14      Q       Line 1, the word Jordan, did you
15   print that?
16      A       Yes, I did.
17      Q       The word Rhonda, did you print
18   that?
19      A       It does not look like I did.
20      Q       The word Mann, did you print that?
21      A       Yes.
22      Q       Social security number on line 2, did
23   you print that?
24      A       Yes, I did.
25      Q       The address, did you print that?

Page 22

22

1
2    A    Yes, I did.
3    Q    And the signature is your signature,
4    correct?
5    A    Yes.
6    Q    And the date, 3-14-06, did you print
7    that?
8    A    Yes.
9    Q    Look at Defendant's Exhibit 3.
10        Again, same series of questions:
11   Line 1, the word Jordan, did you print that?
12   A    Yes.
13   Q    Same line, the word Rhonda, did you
14   print that?
15   A    Yes.
16   Q    The word Mann, did you print that?
17   A    Yes.
18   Q    The social security number, did you
19   print that?
20   A    Yes.
21   Q    Did you print the address?
22   A    Yes.
23   Q    Did you insert the number of
24   deductions -- or allowances, excuse me -- on
25   line 5?

Page 23

23

2    A    Yes.
3    Q    The signature on that page is your
4    signature?
5    A    Yes.
6    Q    And you wrote -- is it accurate you
7    inserted the date 3-31-06?
8    A    Yes.
9    Q    On 3-31-06, your legal name was
10   Rhonda Renee Mann, correct?
11   A    Yes.
12   Q    It was not Jordan Rhonda Mann,
13   correct?
14   A    Correct.
15        MS. NORCROSS:  Mark this as
16       Defendant's Exhibit 4, please.
17        (Whereupon the above referred
18       to document was marked, Defendant's
19       Exhibit 4, for identification, as of
20       this date, by the reporter)
21   Q    Miss Mann, I am handing you what the
22   court reporter has marked as Defendant's
23   Exhibit 4 to your deposition.  Take your time
24   and look it over, and then when you are
25   finished, let me know whether you can identify

Page 24

24

1
2    it, please.
3    A    Okay.
4    Q    Will you tell me what that is?
5    A    It looks like an internal posting
6    application to be considered for another
7    position within the company of Plus One.
8    Q    Did you complete the portion of this
9    document under the section that says internal
10   posting application to be completed by employee,
11   the first two-thirds of the page?
12   A    Yes, I did.
13   Q    So the printing on that form is
14   yours, correct?
15   A    Yes.
16   Q    And the date, where it says 2-15-06,
17   you inserted that date; is that correct?
18   A    Yes.
19   Q    Over the signature line it says
20   employee signature.
21        Is that your signature?
22   A    Yes.
23   Q    What name did you sign?
24   A    Jordan Mann.
25   Q    That's the name you printed above,

Page 25

25

1
2    where it says employee name?
3    A    Yes.
4    Q    In 2006, your legal name was not
5    Jordan Mann, was it?
6    A    No.
7        I am not too sure about that.
8    Q    You said your name was changed in
9    November 2006, right?
10   A    I know in certain states there are --
11   well, I am not a lawyer.
12   Q    Well, you had not received the court
13   order that we have marked as Defendant's
14   Exhibit 1 at the time you filled this -- you
15   completed this internal posting application; is
16   that right?
17   A    I had not received it yet.
18   Q    Had you filed it?
19   A    I don't know.
20        I had been going back and forth with
21   changing it.  I really don't know the exact date
22   when I started the whole thing.
23   Q    By the way, who is Jordan Thomas, if
24   you know?
25   A    That's my e-mail address.  I had an

Page 26

1
2  old e-mail address. That's not a person.
3      Q   Do you know what the e-mail address
4  was that went with the name Jordan Thomas?
5      A   It could have been
6  BuddhaChildOne@Yahoo.
7      A   Or it could be my current one,
8  JordanSudan@Yahoo.com.
9      Q   Concerning the address
10  JordanSudan@Yahoo.com, have you always used the
11  name Jordan Thomas to coincide with that
12  address?
13      A   No.
14      Q   Over what period of time did you use
15  Jordan Thomas?
16      A   I don't know an exact answer.
17      I did not know how to change the
18  prompts and profiles.
19      Q   Why did you use the name Jordan
20  Thomas?
21      A   My grandfather.
22      Q   What about your grandfather?
23      A   His name is Thomas Jordan. I think
24  at the time when I got the e-mail address, I did
25  not want a lot of bulk mail or something like

Page 27

2  that. I did not want to put my personal
3  information.
4      I did not know how to use Yahoo at
5  the time.
6      Q   Did you use either Rhonda Mann or
7  Jordan Mann prior to using Jordan Thomas for
8  e-mail purposes?
9      A   I don't remember. I honestly don't
10  remember.
11      Q   Did you make a deliberate decision to
12  stop using your name and use the name Jordan
13  Thomas for a period of time?
14      A   I was not using the name Jordan
15  Thomas as introducing myself to people or
16  representing myself to people at all. I never
17  used that name.
18      MS. NORCROSS: Mark this as
19  Defendant's Exhibit 5.
20      (Whereupon the above referred
21  to document was marked, Defendant's
22  Exhibit 5, for identification, as of
23  this date, by the reporter)
24      Q   Miss Mann, let me hand you what the
25  reporter has marked as Defendant's Exhibit 5.

Page 28

1
2      If you would please look it over, and
3  after you have had a chance to review it, tell
4  me whether or not you can identify it, okay?
5      A   Okay. This looks like the first form
6  that I signed for the E.E.O.C.
7      Q   This is the first paperwork that you
8  completed to begin your charge at the E.E.O.C.,
9  would that be right?
10      A   Exactly.
11      Q   Would you look at the last page of
12  the document, please?
13      A   Okay.
14      Q   I am correct, it's dated 4-5-06,
15  correct?
16      A   Yes.
17      Q   April 5, 2006?
18      A   Yes.
19      Q   Is that your signature next to where
20  it says signature?
21      A   Yes.
22      MS. NORCROSS: Mark this as
23  Defendant's Exhibit 6.
24      (Whereupon the above referred
25  to document was marked, Defendant's

Page 29

1
2  Exhibit 6, for identification, as of
3  this date, by the reporter)
4      MS. NORCROSS: With everbody's
5  permission, I am going to staple the
6  last page of this document to
7  Exhibit 6.
8      MR. UMOH: That's fine.
9      Q   Looking at page 6, at the bottom of
10  the page, where it says 4-5-06, and then below
11  that it says signature, is that your
12  signature?
13      A   Yes, it is.
14      Q   And did you print the name below the
15  signature, where it says print name?
16      A   Yes.
17      Q   And what name did you sign?
18      A   Jordan Mann.
19      Q   And your name had not been changed to
20  Jordan Mann in April of 2006, correct?
21      A   No, it had not been.
22      Q   And above the signature it says --
23  just tell me if I am quoting this correctly -- I
24  declare, certify, verify or state under penalty
25  of perjury that the foregoing is true and

Legal Ease Reporting, Inc.
212-481-3500

Page 30

```
1                    30
2   correct, to my knowledge.
3           Did I read that correctly?
4       A    Yes.
5       Q    You understood this was a government
6   document when you signed it, correct?
7       A    I knew it was from the E.E.O.C.,
8   yes.
9       Q    You understand the E.E.O.C. is a
10  federal agency, correct?
11      A    Yes.
12      Q    Miss Mann, I am now handing you what
13  the reporter has marked as Defendant's
14  Exhibit 6.
15          I am going to hand you Exhibit 6 and
16  let you take the opportunity to review it,
17  okay?
18      A    Okay.
19      Q    Have you had a chance to look over
20  Exhibit 6?
21      A    Yes.
22      Q    Can you identify it?
23      A    It's the charge that I filed with the
24  E.E.O.C.
25      Q    Can you tell from looking at this
```

Page 31

```
1                    31
2   document when you filed it?
3       A    It looks like they received it on
4   August 3, 2006.
5       Q    Now is it accurate to say that you
6   signed this document and had your signature
7   notarized?
8       A    Does it call for a notary?
9       Q    Look at the bottom of the first page
10  of the exhibit.
11      A    Okay.  Then I must have had it
12  notarized.
13      Q    Now, is it accurate that it was
14  signed and notarized on August 1, 2006?
15      A    Yes.
16      Q    Where did you have this notarized?
17      A    I know it was in New York City, in
18  Manhattan.
19      Q    Can you read the Notary Public's name
20  in the document that was provided to us by your
21  lawyer?  It's obscured a bit.
22      A    One of the names, I can't see it off
23  the copy, it looks like Mohinder.
24      Q    That's what it looks like to me, too.
25          Do you know what the last name is?
```

Page 32

```
1                    32
2       A    No.  I can't make that out.
3       Q    Specifically where did you go to have
4   this notarized?
5       A    I think it was somewhere on Broadway.
6   It could have been like a stationery store.
7       Q    Is it accurate that you went to some
8   business with which you were not otherwise
9   familiar to get it notarized?
10      A    Correct.
11      Q    You did not have one of your lawyers
12  notarize it for you?
13      A    No.  I did it myself, had it
14  notarized.
15      Q    Did the notary request that you
16  provide him with identification of who you were
17  before he or she notarized it?
18      A    I don't know.  I don't know.  I can't
19  remember.
20      Q    What name did you use when you signed
21  this document?
22      A    Jordan Mann.
23      Q    And on top of the second page, which
24  bears Bates stamp number JM005, that's your
25  signature in the upper right-hand corner?
```

Page 33

```
1                    33
2       A    Yes.
3       Q    And on August 1, 2006, your name was
4   still Rhonda Mann; is that right, legally?
5       A    Yes.
6       Q    Did you tell the notary that you were
7   not using your correct legal name when you
8   signed this?
9       A    I don't remember having any
10  conversation.  I just asked them to notarize it.
11          MS. NORCROSS:  Counsel, I am
12      going to ask for a better copy, if
13      you have one.
14          MR. UMOH:  I will take it
15      under advisement.
16          If I do have one, I will turn
17      it over.
18      Q    Let me ask you one other question
19  about this.
20      A    Sure.
21      Q    The signature appears on the first
22  page of your typewritten statement; is that
23  right?
24      A    Yes.
25      Q    Your signature and the notary stamp
```

Legal Ease Reporting, Inc.
212-481-3500

34

1
2 appears on the second page of this document
3 bearing bate stamp JM005; is that right?
4     A    Did I write that?
5     Q    That's where your signature is,
6 correct?
7     A    Yes.
8     Q    And that's where the notary stamp is,
9 too, correct?
10     A    Yes.
11     Q    Did that signature -- did you intend
12 for that signature to cover all three pages of
13 the statement that follow it?
14     A    Yes.
15     Q    So when you had this notarized, you
16 were basically saying that everything you wrote
17 in this whole document was true --
18     A    Yes.
19     Q    -- under penalty of perjury?
20     A    Yes.
21          MS. NORCROSS:  Mark this as
22 Defendant's Exhibit 7.
23          (Whereupon the above referred
24 to document was marked, Defendant's
25 Exhibit 7, for identification, as of

35

2          this date, by the reporter)
3     Q    Let me hand you what the reporter has
4 marked as Exhibit 7.  And again, look it over,
5 and tell me if you can identify it, okay?
6     A    Yes, I can identify it.
7     Q    And what is this?
8     A    It was a letter that I wrote to the
9 person who was handling my charge at the
10 E.E.O.C.
11     Q    You wrote this letter?
12     A    Yes.
13     Q    And you signed it?
14     A    Yes.
15     Q    That's your signature at the bottom,
16 correct?
17     A    Yes.
18     Q    It's dated September 6, 2006,
19 correct?
20     A    Yes.
21     Q    And you signed it Jordan Mann,
22 correct?
23     A    Yes.
24     Q    And that was not your legal name at
25 the time, correct?

36

1
2     A    No.
3     Q    No, it's not correct, or no, it was
4 not your name?
5          Is it correct that Jordan Mann was
6 not your legal name in September 2006?
7     A    Correct.
8     Q    Now is it accurate that in this
9 letter, you provided the E.E.O.C. with some
10 additional -- or with some witness
11 information?
12     A    Witness information, I don't know
13 about witness information.
14          Let me read this.
15     Q    Sure.
16     A    I think I was just doing contact
17 information.
18     Q    So you were giving your contact
19 information for whom?
20     A    What do you mean, for whom?
21          For John Henriques and Thomas Pienkos
22 of Trump.
23     Q    Is it accurate to say on September 6,
24 2006, you had contact information for John
25 Henriques?

37

1
2     A    Yes.
3     Q    It's accurate on September 6, 2006,
4 you had contact information for Thomas
5 Pienkos?
6     A    Yes.
7     Q    If a document was provided in the
8 course of this case is saying you did not have
9 that contact information, that would be
10 inaccurate; is that true?
11          Do you want me to rephrase the
12 question?
13     A    Yes.
14     Q    I will rephrase it.
15          If Defendants were told that you did
16 not have contact information for Mr. Henriques
17 or Mr. Pienkos, that would not be a true
18 statement, because you did have that contact
19 information, correct?
20     A    I am assuming this is correct,
21 because this is what I had when I was at Plus
22 One.
23          I don't know if it had changed or if
24 it's actually, you know, I was trying to
25 research and do the best to my ability.

38

1
2      Q     To the best of your ability, this is
the contact information for these two
gentlemen?
5      A     Yes.
6      Q     You had that information in 2006,
7  right?
8      A     Yes.
9      Q     So you would have had it after 2006,
10  also, correct?
11      A     That would be hard to say.
12          This could have been in storage.
13  When I had to get out of my apartment, it was in
14  storage, and I did not have access.
15      Q     Are there documents that remain in
16  storage that may pertain to anything relating to
17  this case, meaning your employment with Plus One
18  or anything else you discussed in your
19  complaint?
20      A     There could be.  I have not gone
21  through.
22          I just got into town a few days ago.
23  I have not been able to go all through myself.
24      Q     Were you aware documents were
25  requested of you in January 2008?

40

1  challenging.
2
3      Q     When did you make that search for
4  your tax returns?
5      A     I don't know specific dates
6  offhand.
7      Q     Give me the best approximation you
8  can.
9      A     I can't even do that.
10      Q     Where were you living at the time?
11      A     September 6?
12      Q     No, when you were looking for your
13  tax returns.
14          Where were you living at the time you
15  were looking for your tax returns?
16      A     Well, I would be able to let you
17  know, if I knew when I was searching for the tax
18  information.
19      Q     So where you were living is not going
20  to help you?
21      A     Yes.
22      Q     Did you look for your tax returns
23  before the complaint was filed?
24      A     Before I filed the E.E.O.C. charge?
25      Q     Sure, yes.

39

2      A     Specifically, what documents?
3      Q     Any documents?
4      A     2008 of this year?
5      Q     Yes, ma'am.
6      A     I don't believe there is a request
7  for anything.
8          I mean, I would have to look at my
9  e-mail account.  I really have to check my
10  e-mail account.
11      Q     At any time since you filed this
12  complaint, did you make a search for documents
13  that might have any bearing on the allegations
14  you made in that complaint?
15      A     Did I make a search for documents?
16      Q     Yes, ma'am.
17      A     I am trying to think.
18          Like what documents would I be
19  searching for?
20      Q     Any documents.
21      A     Yes, taxes.  I know taxes,
22  definitely.
23          Like my tax returns, I don't keep
24  them for the last seven years, so I had to
25  search for tax information, which was kind of

41

1
2      A     No.
3      Q     Do you know when you filed your
4  complaint in federal court?
5      A     No, I don't.
6      Q     Are you aware that you filed three
7  different ones?
8      A     No.
9          MS. NORCROSS:  Mark this as
10  Defendant's Exhibit 8.
11          (Whereupon the above referred
12          to document was marked, Defendant's
13          Exhibit 8, for identification, as of
14          this date, by the reporter)
15      Q     Miss Mann, let me hand you what Sandy
16  has marked as Defendant's Exhibit 8.  Take as
17  much time as you need to look it over, because
18  when you finish reviewing it, I am going to ask
19  you if you can identify it, okay?
20      A     Okay.
21      Q     Have you ever seen this before?
22      A     Yes, I have.
23      Q     When did you see it for the first
24  time, if you remember?  You can approximate.
25      A     Looking at the date, it must have



42

1
2  been the summer of 2007.
3      Q    Do you know if you saw this before or
4  after it was filed?  Are you able to tell me
5  that?
6      A    It must have been after.
7      Q    Let's say this was the summer of
8  2007.
9          At any time since the summer of 2007,
10  up until today, have you made a search for any
11  documents, including those that might be in
12  storage that you referred to before, pertaining
13  to this case?
14      A    Yes, I did make a search for
15  documents.
16      Q    What documents did you search for,
17  and when?
18      A    Again, I know definitely, my taxes.
19  I know that was a stickler for me.
20          In terms of specific documents, I
21  would have to look at my e-mail to tell you
22  which ones I was searching for.  I don't know
23  what is applicable or what is necessary.
24          Whenever I talked to my lawyer, this
25  is what he needs, you know.

43

2      Q    Why is it you would have to look at
3  your e-mail?  Is that because that's where your
4  communications with your counsel would be
5  reflected?
6      A    Yes.
7      Q    Since you remember the tax returns,
8  specifically, does this help you remember, at
9  least generally, when you made the tax return
10  search?
11      A    It would definitely have to be after
12  June 21, 2007 up to this point.  It would have
13  to be after that.
14      Q    Let me ask you this.  Let's see if we
15  can get a finer time frame on it.
16      A    Okay.
17      Q    At some point, I don't want to get
18  into privileged areas, but at some point you
19  were asked to look for your tax returns; would
20  that be right?
21      A    Yes.
22      Q    Do you remember what time of year
23  that was; in other words, what season it was?
24  Was it the summer, winter?
25      A    I don't remember what season it was.

44

1
2      I just remember the difficult time.
3  I had to go back and forth and go to the I.R.S.
4  It actually took me a long time to get the
5  documents, because I was having issues with
6  I.R.S. sending it to my P.O. box and them not
7  sending it and rerouted it.
8      Q    Where were you living at the time
9  when you were doing this back and forth with the
10  I.R.S. to get your returns?
11      A    I know I was in New York City, but I
12  don't know which address I was at when I was
13  searching.
14      Q    Fair enough.
15          But you had not gone to Guam yet,
16  correct?
17      A    Correct.
18      Q    You said you had to look in storage.
19          Where is that storage?
20      A    In Brooklyn.
21      Q    Is it a storage facility, somebody's
22  house?
23      A    It's a storage facility.
24      Q    How long have you had that storage
25  facility?

45

1
2      A    Well, this most recent one, months.
3  I mean, I can find out the actual
4  day.  I can call them and find out.  I don't
5  know exactly what month I did it, but it's been
6  well over six months.  It could be eight months.
7  It could even be a year.
8      Q    Have you had different facilities?
9      A    Yes, I have had different facilities,
10  yes.
11          Now I have to remember how many
12  storage places I had.  At one time I was storing
13  at someone's apartment, and then at a storage
14  facility, then I had another storage facility.
15  I can't say how long everything has been in
16  storage.
17      Q    Okay.
18      A    I would say I have had my stuff in
19  storage since sometime in 2006.
20      Q    Why did you put stuff in storage in
21  2006?
22      A    I had to leave my apartment in 2006
23  because I could not afford the rent anymore, and
24  I had to move.
25      Q    I am going to skip ahead a little bit

12 (Pages 42 to 45)

46

1  and let me ask a background question.
2         You have been working most recently
3  at a facility in Guam, correct?
4      A    Correct.
5      Q    And you traveled back to New York
6  recently, correct?
7      A    Correct.
8      Q    When did you get here?  When did you
9  get back to New York?
10     A    Last week, which was early morning --
11 you mean when did I land in J.F.K.?
12     Q    When did you land?
13     A    Tuesday, August 5.
14     Q    You flew into J.F.K.?
15     A    Yes.
16     Q    Where did you fly from?
17     A    The original departure?
18     Q    Yes, ma'am.
19     A    Guam.
20     Q    Do you have a return flight?
21     A    It's not a return flight, it's a one
22 way.
23     Q    So if it was represented that you had
24 a return flight sometime after today, let's say,

47

2  that would be an inaccurate statement; is that
3  right?
4      A    I would not think it would be
5  inaccurate.  It depends how you look at it.
6      Q    You made a distinction that I am
7  following up on.
8              MR. UMOH:  Allow the witness
9          to finish answering.
10     A    Well, really, it's yes, I am going
11 back.  I am not staying in New York.
12         With the one way, I phrase it like
13 that because of money purposes, because there is
14 restrictions on how you can change the ticket.
15     Q    Are you scheduled to leave New York
16 this week?
17     A    Yes.
18     Q    When?
19     A    Tomorrow.
20     Q    What time?
21     A    The flight leaves at 4:30 p.m.
22     Q    And what airline?
23     A    Air China.
24     Q    And that's a flight to Singapore?
25     A    Yes, final destination.

48

1
2      Q    So you are not going back to Guam?
3      A    No.
4      Q    So if someone were to describe --
5      A    Well, initially it was like going
6  back to Guam, because of the --
7              MS. NORCROSS:  Is there
8          something funny, Counsel?
9              MR. UMOH:  Don't worry about
10         it.  It's an inside joke.
11     A    I was trying to get the cheapest
12 flight.  I was trying to do the return back to
13 Guam to see if it was cheaper.
14         But it just turned out, I did not
15 know when I would be able to get out of my
16 contract where I was.  I had to finagle it on
17 the Internet.
18     Q    Your intention was to go tomorrow,
19 which is August 13, to go from New York to the
20 ultimate destination of Singapore; is that
21 correct?
22     A    Yes.  But originally, I thought I
23 would be able to come here early and get time
24 off from my massage gig in Guam, so I thought I
25 would be able to get out and at least take a

49

1
2  week off.
3         But it was busy season, and then it
4  got closer and closer to the day.  Now I had to
5  go straight to Singapore.
6      Q    So you are going to Singapore
7  tomorrow, not Guam?
8      A    Correct.
9      Q    When did you book that flight?
10     A    It had to be two weeks before
11 August 13.
12         I did it through the e-mail.  I will
13 check my e-mail account.
14     Q    Okay.  If you can do that, that would
15 be good.
16         So you booked the flight about two
17 weeks ago, give or take?
18     A    Yes.
19     Q    At the time you booked the one, you
20 did it as two one-ways?
21     A    Yes.
22     Q    Because of the ticket pricing?
23     A    Yes.
24     Q    The first leg of that trip was from
25 Guam to New York?

50

1
2    A    Yes.
3    Q    Did it stop in Japan?
4    A    Yes, in Japan and L.A.
5    Q    At the same time you booked that leg,
6  you booked the second leg from New York
7  ultimately to Singapore; is that right?
8    A    I did not purchase them on the same
9  day. I was waiting for the price and checking
10  it. No, I did not purchase it the same day.
11    Q    You purchased the first leg, and then
12  a couple of days later, you purchased the second
13  leg?
14    A    Yes.
15    Q    From the time you booked the second
16  leg, have you made any effort to change the
17  flight?
18    A    Yes. I called Air China, but then
19  when I looked on my ticket, there are no
20  changes, basically.
21    Q    When did you make that call?
22    A    It must have been very soon after I
23  bought the ticket.
24    Q    Is there some way you can check
25  that?

51

2    A    I did not use a cell phone.
3       All I know, it was soon after. It
4  had to have been at least two weeks before the
5  13th.
6    Q    Let me see if I can narrow it down.
7       About two weeks ago, give or take,
8  you booked a one-way ticket from Guam through
9  other airports to J.F.K., correct?
10    A    More than two weeks for the one
11  coming to J.F.K.
12    Q    A couple of days later, you booked
13  another one-way flight, originating in New York,
14  with an ultimate destination in Singapore; is
15  that right?
16    A    Not a couple of days later. It could
17  have been maybe two weeks later.
18    Q    Let's try it a different way.
19    A    Okay.
20    Q    Starting with today as your reference
21  point, how long ago did you book the flight to
22  Singapore?
23    A    Backtracking from August 13, within
24  the last two weeks.
25    Q    Is that because you have to use it to

52

1  get a two-weeks advance fare?
2    A    Yes.
3    Q    You booked an Air China flight with
4  the ultimate destination of Singapore?
5    A    Yes.
6    Q    Then at some point you called to see
7  if you could change that flight; is that
8  correct?
9    A    I know I called the priceline 800
10  number. Then I looked on their terms and
11  conditions and agreements, and it says it was
12  nonnegotiable, you could not change it.
13    Q    Did you actually talk to someone at
14  priceline about changing it, or not?
15    A    No, I don't think I talked to anyone
16  at priceline.
17       I know I talked to someone at Air
18  China. But talking to someone at priceline, I
19  don't remember.
20    Q    You said you called the priceline 800
21  number.
22       Did you actually talk to anybody
23  there?
24    A    I could have, but I know I did not

53

1  get the result that I wanted.
2    Q    You did not get the result you wanted
3  from Air China either, correct?
4    A    Correct.
5    Q    About when did you make those calls?
6  You can time it one of two ways: How long ago,
7  starting with today, or how long after you made
8  your original flight reservations.
9    A    When I called to see if I could
10  change it, it must have been a few days or even
11  a day or couple of days that I called to see if
12  I could change it.
13    Q    Why did you call to see if you could
14  change it? I am not asking you to review the
15  content of the discussions you may have had with
16  your lawyer, because those are privileged.
17       MR. UMOH: I object to the
18       question to the extent it touches on
19       any discussions.
20       MS. NORCROSS: I already said
21       that, Counsel.
22    Q    Why did you try to change your
23  flight?
24    A    Am I supposed to answer that?



Page 54

54

1
2    Q    Yes, ma'am.
3    A    To try and make accommodations to be
4    available for the deposition.
5    Q    Other than the one time that you
6    talked to Air China within a couple, few days
7    after you originally booked the ticket, have you
8    made any other efforts to change your flight?
9    A    Well, I was trying to get a
10   different -- I was trying to actually get a
11   refund off of -- I was trying to get a refund
12   off my first one-way ticket, and I was trying to
13   buy the multi destination ticket with miles.  I
14   was going to be able to change the dates, but it
15   did not come through in time.
16   Q    I am talking about the return flight
17   now.
18   A    But I already bought the first leg.
19   Then I bought the second leg.
20        When I was trying to change the
21   dates, I went on the Internet, he was giving me
22   a good price, for a multi destination.
23   Q    I see.
24        When was the last time you made any
25   effort to change your flight arrangements?

Page 55

55

2    A    It must have been the last day I left
3    Guam.  It was August 5 in Guam when I left.
4    Q    Is it accurate you could have changed
5    your flights, but it would have cost money?  In
6    other words, the flights were available, it was
7    just the cost of it that caused you not to
8    change your flights; is that accurate?
9    A    Well, even when I was -- like my
10   first one way, I called American, and they said
11   nothing was available.  I could not believe it,
12   that nothing was available.  I was just going
13   with the ticket that I already bought.  I was
14   sort of waiting closer to the day for this guy
15   on the Internet to get back to me.
16   Q    But the leg between New York and
17   Singapore, you could have taken that flight if
18   you were willing to pay the extra fare?
19   A    I bought that through priceline.
20   Q    You could have changed it, but you
21   would have had to buy a new ticket; is that
22   right?
23   A    Well, technically, it's not changing.
24   Technically, it's like buying a whole other
25   ticket.

Page 56

56

1
2    Q    But you could have done that,
3    correct?
4         MR. UMOH:  Objection.
5    Q    You did not look into that?
6         MR. UMOH:  Objection.
7         MS. NORCROSS:  What is the
8    basis of the objection?
9         MR. UMOH:  That's not a
10   question.  That's a statement.
11   Q    Is it accurate that you did not look
12   into booking a new flight to Singapore?
13   A    But, I did.  I was going through this
14   guy who had a travel company.
15   Q    When did you determine finally that
16   you were not going to be able to change your
17   flight to Singapore?
18   A    I literally was waiting up to the day
19   I left.  The guy never got back to me.
20   Q    By August 5 in Guam, which I guess
21   would be the 4th here, you knew you were not
22   going to be able to change your flight, would
23   that be accurate?
24   A    Up until that point, I knew I had not
25   changed it.

Page 57

57

1
2    Q    My question is, you had determined,
3    before you got on the plane to come to New York,
4    you had determined you were not going to be able
5    to change your flights, either coming to
6    New York or leaving New York tomorrow?
7         MR. UMOH:  Objection as to
8    form.
9    Q    Is that correct?
10   A    Well, the way you're phrasing it, you
11   are saying I was determined not to change my
12   flight.
13   Q    No, I am sorry.  I am not trying to
14   give that impression.
15        All I am trying to do is figure out
16   when you stopped making any effort to change
17   your flight.  I just want to know when you took
18   the last step to see whether you can change your
19   flights.
20   A    The last time I looked into it was
21   definitely before I boarded the plane.
22   Q    On the 5th, Guam time; is that
23   right?
24   A    I am sorry.  What was the question?
25   Q    I am trying to figure out when it was



Page 58

```
1                    58
2   you came to the conclusion that you were not
3   going to be able to change your flight and
4   therefore stopped making any further effort to
5   do it.
6           MR. UMOH:  Objection.
7       A    Well, it's like you are saying that I
8   have stopped.
9           I never stopped.  I have not been
10  able to.  I think that's what I am trying to
11  say.
12      Q    That's fair enough.
13          Let me try to clarify it.
14          When was the last time you took any
15  step to change your flight to Singapore, the
16  timing of your flight to Singapore?  Does that
17  help?
18      A    Well, if I am e-mailing people --
19  well, I don't know a specific date.
20      Q    My effort is to try to find out when
21  you took the last step.
22          In other words, if you decided you
23  are not going to be able to do it, and decided
24  not to take any further steps to try to do it,
25  then there is nothing wrong with that.  I just
```

Page 59

```
1                    59
2   want to know when that was.
3           Again, the question is, when was the
4   last time you took any step or any action to try
5   to change your flight to Singapore?
6       A    Well, I was trying to ask my father
7   for money.  I don't have money.
8           Right now, it's going to cost
9   thousands of dollars.  I don't have that
10  money.
11      Q    I am just trying to figure out when,
12  not why.
13      A    Last week.
14      Q    Last week?
15      A    Yes.
16      Q    By last week, do you mean after you
17  arrived in New York?
18      A    Yes.
19      Q    Tell me everything -- tell me each
20  thing you did to try to change your flights last
21  week.
22      A    I did not call priceline.  They
23  already said I could not change it.
24      Q    So then what did you do?
25      A    Internet search.
```

Page 60

```
1                    60
2       Q    And what did you search on the
3   Internet?
4       A    It's Craigslist.
5       Q    Were you trying to trade your
6   ticket?
7       A    I did not even know I could do that.
8   It never occurred to me to trade a ticket.
9           It was just sort of buying miles,
10  which is cheaper, from someone who had miles.
11      Q    Why were you doing that if the ticket
12  you already purchased was nonchangeable and
13  nonrefundable?
14      A    I was doing that because it still
15  would have been cheaper.
16          And I felt nervous because if I was
17  not able to be here, it would negatively impact
18  my case.
19      Q    So you searched on the Internet.
20          Did you come up with anything?
21      A    No, nothing that I thought was
22  legitimate.  Throughout my whole search, you
23  know, or else I would have had my ticket.
24          MR. UMOH:  Off the record.
25          (Discussion off the record)
```

Page 61

```
1                    61
2       Q    Do you have any of the documents
3   pertaining to your tickets?  By documents, I
4   mean things like confirming e-mails, receipts
5   for the tickets, any documents pertaining to
6   these flights?
7       A    E-mail confirmation.
8       Q    Did you use any E-ticket coming into
9   New York?
10      A    Yes.
11      Q    Do you have any portion of that
12  E-ticket?
13      A    Yes, I do.
14      Q    This likely will continue tomorrow
15  morning, so I am going to ask you to bring those
16  documents with you, okay?
17      A    Okay.
18          MS. NORCROSS:  Let's take a
19  short break.
20          (Discussion off the record)
21      Q    Miss Mann, did you know your
22  deposition was noticed in January, February?
23      A    Yes, I think I remember the talk of
24  deposition around 2008.
25          I don't know the dates when it was
```

16 (Pages 58 to 61)



Page 62

62

1
2  supposed to take place. I don't remember.
3      Q    But earlier this year -- and by that
4  I mean, January, February time frame -- you knew
5  that your deposition had been noticed or
6  scheduled by us?
7      A    I knew I would have to do it
8  sometime, but I did not know -- I don't remember
9  the dates. I knew eventually I would have to do
10  it.
11      Q    Where was your most Recent
12  employment, if any?
13      A    In Guam.
14      Q    What is the name of your employer?
15      A    Former employer is P.I.C. Resort.
16      Q    When you say former employer, have
17  you terminated your employment with the P.I.C.
18  Resort?
19      A    Yes, I have.
20      Q    What were the circumstances under
21  which your employment terminated?
22      A    By contract, I had to give them
23  30 days notice.
24      Q    When did you give them 30 days
25  notice?

Page 63

63

2      A    It had to have been either July 5th
3  or July 4th, one of those days.
4      Q    Was that notice in writing?
5      A    Yes, it was.
6      Q    And do you have a copy of that
7  notice?
8      A    Not with me.
9      Q    Where is it?
10      A    I can get a copy. I sent it via
11  e-mail.
12      Q    Do you have access to your e-mail
13  while you're in New York?
14      A    Yes.
15      Q    Can you bring it tomorrow?
16      A    Yes.
17      Q    Is it accurate to say you resigned
18  from your employment at the P.I.C. Resort?
19      A    I think it's more accurate to say I
20  terminated the agreement.
21      Q    Okay. Is it right that you
22  terminated voluntarily? You made the decision
23  to terminate?
24      A    Yes.
25      Q    And why did you decide to terminate

Page 64

64

1
2  your employment at the P.I.C. Resort?
3      A    Well, I knew I had to be here in
4  person for a deposition.
5      Q    And that's why you terminated?
6      A    That was the first reason, yes.
7      Q    You said you terminated 30 days ago,
8  correct?
9      A    Yes.
10      Q    Is there any other reason why you
11  terminated? Again, when I say terminated, I
12  mean terminated your employment with the P.I.C.
13  Resort.
14      A    No. I was in good standing with the
15  company.
16      Q    Did you submit an application to
17  attend an educational program?
18      A    Yes, I did.
19      Q    And when did you submit that
20  application?
21      A    For education?
22      Q    Yes, ma'am.
23      A    It had to have been sometime at the
24  end of February. Yes, end of February or early
25  March.

Page 65

65

1
2      Q    Tell me how you obtained your
3  position at the P.I.C. Resort.
4      A    I found a job listing through
5  Craigslist, and I answered an ad via e-mail, and
6  I had a phone interview, and they hired me.
7      Q    Can you identify with any level of
8  detail the Craigslist listing to which you
9  responded?
10      A    Like what did it say?
11      Q    What did it say, who was it to, what
12  was the job number?
13      A    I don't remember the job number.
14           Usually Craigslist is anonymous when
15  you respond.
16           But from what I recall, it was about
17  a new venture of a healing center, spa, looking
18  for a certified massage therapist.
19      Q    And when was that?
20      A    Even though I got hired in February,
21  I had contacted them months before, but there
22  were no positions.
23           And then, just following up again, I
24  made contact with them, I believe it was
25  February.



Page 66

66

1
2    Q    February 2008; is that right?
3    A    February 2008, or it could have been
4  January.
5        I am thinking about when I actually
6  bought my ticket and when I was on the interview
7  on the phone; so January, February.
8    Q    Now you had a phone interview.
9        Did they call you, or did you call
10  them?
11    A    Both.
12    Q    You had more than one interview; is
13  that right?
14    A    Correct.
15    Q    When was the first interview?
16    A    It had to be either January or
17  February.
18    Q    And in the first interview, did they
19  call you, or did you call them?
20    A    I am trying to think. I reached out
21  to them first, and then they called me right
22  back. It went straight to voice mail. So it
23  was they first and then me.
24    Q    Did these calls occur to and from a
25  cell phone or from a land line?

Page 67

67

2    A    The one that went straight to voice
3  mail, that was my cell phone. But there was no
4  record, because my cell phone was off.
5        Then I called them from a land
6  line.
7    Q    Are there any documents that you can
8  think of that would pinpoint more accurately
9  when those phone calls took place?
10    A    I could check my e-mail.
11    Q    Do you have e-mail going directly to
12  and from the P.I.C. Resort?
13    A    Yes, I have e-mailed them directly.
14    Q    I will tell you, none of those
15  e-mails have been produced, although they have
16  been requested.
17        I will ask you to bring those also
18  tomorrow.
19        MR. UMOH: I will take it
20        under advisement.
21    Q    I am going to ask you to look for
22  them, okay? If your lawyer tells you not to
23  produce them, we will have to deal with that.
24    A    Is it regarding my employment, or
25  corresponding back on a personnel level, or are

Page 68

68

1  you talking about employment only?
2    Q    It's hard for me to answer that,
3  since I can't see them.
4        Basically what I am looking for
5  regarding this specific thing -- right now, what
6  I am talking about are any e-mails between you
7  and anybody at the P.I.C. Resort regarding your
8  interview, your employment, your decision to
9  leave, anything regarding your employment.
10    A    Okay.
11    Q    The P.I.C. Resort offered you a job;
12  is that right?
13    A    Yes.
14    Q    Did they do that on the phone, in
15  person, by e-mail, or by some other means?
16    A    Over the phone.
17    Q    Do you remember when that was?
18    A    It had to have been February.
19    Q    Why did it have to be February?
20    A    Well, it was either late January or
21  early February, because I remember I did not
22  have enough -- like I was the last one. I had
23  to leave in like two weeks, like pack up and go.
24  It had to be February.

Page 69

69

2    Q    What do you mean, you were the last
3  one?
4    A    Someone ended up not going. They
5  needed one more person, so I was the last person
6  hired.
7        MS. NORCROSS: Mark this as
8        Defendant's Exhibit 9.
9        (Whereupon the above referred
10        to document was marked, Defendant's
11        Exhibit 9, for identification, as of
12        this date, by the reporter)
13    Q    Miss Mann, I am going to hand you
14  what has been marked as Exhibit 9.
15        Look it over, and then after you have
16  done that, tell me whether you can identify it,
17  okay?
18    A    Sure. Okay.
19    Q    Can you tell me what Defendant's
20  Exhibit 9 is?
21    A    Yes. It is a letter from New York
22  University saying that I have been accepted into
23  an educational program.
24    Q    When did you apply for this
25  program?

18 (Pages 66 to 69)



Page 70

1
2      MR. UMOH:  Objection.  Asked
3    and answered.
4      MS. NORCROSS:  No, actually,
5    it has not been.
6    Q    Now that you have the document, does
7  that help you identify when you applied?
8      MR. UMOH:  Objection.
9    A    I did tell you earlier.
10    Q    Tell me again.
11    A    I already told you earlier.
12    Q    Well, you can tell me again.
13    A    Okay.
14    Q    I will ask a different question.
15       Did you apply for the Tisch Program
16  before or after you accepted the employment at
17  the P.I.C. Resort?
18    A    That's a good question.  I don't
19  know, because it was all around the same time,
20  like everything was shifting all at the same
21  time.  I don't know offhand.  It was very, very
22  close.
23    Q    Let's see if we can bring it a little
24  bit closer.
25       Do you recall whether, when you

Page 71

2  interviewed with the P.I.C. Resort, whether you
3  told them that you were applying to an
4  educational program?
5    A    No.  I did not tell them I was
6  applying, no.
7    Q    At the time you interviewed with the
8  P.I.C. Resort, had you made the decision to
9  apply to this N.Y.U. program?
10    A    I know I was definitely contemplating
11  it.
12    Q    But do you know if you made a
13  decision?
14    A    I don't know if I submitted documents
15  or anything like that.  I don't know the exact
16  dates.  I would have to go back and research.
17      MS. NORCROSS:  Mark this as
18    Defendant's Exhibit 10.
19      (Whereupon the above referred
20    to document was marked, Defendant's
21    Exhibit 10, for identification, as of
22    this date, by the reporter)
23    Q    Miss Mann, let me hand you what the
24  reporter has marked as Exhibit 10, and ask you
25  to again look it over.  And then when you have

Page 72

1
2  finished looking it over, tell me whether you
3  can identify it.
4    A    Yes, I can identify it.
5    Q    What is this?
6    A    This is my employment agreement that
7  I signed with my former employer.
8    Q    Is it your testimony that the P.I.C.
9  Resort did not terminate the agreement or fire
10  you or anything like that?
11    A    Correct.
12    Q    The termination of this agreement was
13  entirely voluntary, by you?
14    A    Yes.
15    Q    Do you have employment in Singapore?
16  Do you have a job lined up?
17    A    No.
18    Q    Miss Mann, had you decided to
19  terminate your employment with the P.I.C. Resort
20  in June of 2008?  Had you made that decision?
21    A    No, not to terminate.  No, not in
22  June.  No, that would not make sense.  There
23  would be no way I would think about terminating.
24      I knew I had to come back here
25  eventually, in person, but I did not want to

Page 73

1
2  terminate my agreement.
3    Q    You knew in April of 2008 that you
4  had been accepted at the N.Y.U. program in
5  Singapore, correct?
6    A    That's different.  I did not know
7  whether I would get the funding to actually
8  go.
9    Q    Please just answer my question.
10      My question was, by April 2008, you
11  knew you had been accepted into that program in
12  Singapore?
13    A    Yes.
14    Q    You applied for that program, we
15  already established, sometime before April of
16  2008, correct?
17    A    Yes.
18    Q    Now you mentioned funding.  What
19  funding are you referring to?
20    A    Tuition is very expensive.  Sometimes
21  how the interest rates go, you know, I did not
22  know whether or not I would get a scholarship
23  and have money for housing when I moved there.
24  That was the whole thing.  It was sort of like a
25  money issue, would I be able to afford it.

19 (Pages 70 to 73)

74

1
2    Q    What did you do to resolve that money
3  issue?
4          MR. UMOH:  Objection, but you
5      can answer.
6    Q    You can answer.
7    A    I tried to apply for as many
8  scholarships as possible.  Of course, applying
9  for grants.
10   Q    Over what period of time did you make
11 these applications?
12   A    Well, I know it must have been at
13 least after April 10, because when I found out I
14 got accepted, I was like, okay, how am I going
15 to pay for it?
16         I know I applied for some
17 scholarships.
18   Q    What scholarships did you apply
19 for?
20   A    I am trying to think.  Like various
21 foundations, I would send inquiry letters.  I
22 don't know the exact names, but I have them
23 written down.
24   Q    Where do you have them written
25 down?

75

2    A    On my computer.
3    Q    Do you have that computer in New York
4  with you?  I don't mean in this room.
5    A    Yes, I do.
6    Q    I am going to ask you to produce
7  those tomorrow, too?
8          MR. UMOH:  Take it under
9      advisement.
10         MS. NORCROSS:  I don't know
11     what that means, take it under
12     advisement.
13         Only judges can take it under
14     advisement.
15   Q    Did you obtain any scholarship
16 foundation or grant money?
17   A    I know Tisch gave me money, the
18 school.  I have not heard back from any other
19 places.
20   Q    How much money did Tisch give you?
21   A    You are talking per year?
22   A    Yes.
23         It's not a lot.  It's only 6,000.
24   Q    Even though these financial issues
25 have not been resolved, you are still going,

76

1
2  correct?
3    A    Right now, that's what I have to
4  clear up with the bursar's office, just to make
5  sure.
6    Q    Well, you already booked your flight,
7  correct?
8    A    Yes, definitely.
9          Basically, my account is current.  I
10 have to make sure.  Like when you get there, you
11 have to sign papers, promissory notes for them
12 to release the funds.
13   Q    Are you saying the only thing you
14 need to do is sign papers when you get to
15 Singapore?
16   A    Exactly.
17         MS. NORCROSS:  Mark this as
18     Defendant's Exhibit 11.
19         (Whereupon the above referred
20     to document was marked, Defendant's
21     Exhibit 11, for identification, as of
22     this date, by the reporter)
23   Q    Miss Mann, take a look at what Sandy
24 has marked as Exhibit 11.
25         Again, look it over.  And when you

77

1
2  are finished, you can identify it.
3    A    Yes, this is something I got
4  notarized while I was in Guam.
5    Q    Did you write this?
6    A    Under the advisement of my lawyer.
7    Q    Did you sign it?
8    A    Yes, I did.
9    Q    And you signed it and had it
10 notarized, correct?
11   A    Yes, I did.
12   Q    Did you read it before you signed
13 it?
14   A    Yes.
15   Q    Okay.  Just one other question.
16         At the time you signed Exhibit 11,
17 you knew you had been accepted into the Tisch
18 program, correct?
19   A    Yes.
20   Q    And you therefore knew you were going
21 to be terminating your employment with the
22 P.I.C. Resort; is that correct?
23   A    Eventually, yes.
24         MS. NORCROSS:  Off the record.
25         (Whereupon a lunch break was taken)



Page 78

1                          78
2          MS. NORCROSS:  Mark this as
3    Defendant's Exhibit 12.
4          (Whereupon the above referred
5    to document was marked, Defendant's
6    Exhibit 12, for identification, as of
7    this date, by the reporter)
8     Q     Miss Mann, you are reviewing what the
9    reporter has marked as Exhibit 12 to your
10   deposition.
11    A     Yes.
12    Q     When you have had a chance to look
13   that over, let me know, and tell me if you can
14   identify it.
15    A     Yes, I can identify it.
16          These are my pay stubs from my last
17   job.
18    Q     When you say your last job, you
19   mean?
20    A     From P.I.C.
21    Q     Now look through them.
22          What I would like you to do is tell
23   me if these pay stubs reflect all of the monies
24   you have earned, whether they reflect all of the
25   money you earned while you were employed by the

Page 79

1                          79
2    Pacific Island Club in Guam.
3     A     These only reflect credit card tips.
4    It does not reflect the cash tips.  That's the
5    only difference.
6     Q     Do these documents cover every pay
7    period that you worked for the --
8     A     Yes, every pay period.
9     Q     Is it accurate that these documents
10   reflect all of the money you were paid, other
11   than cash tips?
12    A     Correct.
13    Q     What, if any, records do you have
14   that reflect the cash tips that you received?
15    A     I don't have records of cash tips.
16    Q     Did you keep track of them?
17    A     No.
18    Q     How do you intend to report them on
19   your next tax filing?
20    A     It's sort of like I do an estimate.
21          I know basically, at the resort, the
22   Korean and Japanese culture, their custom is not
23   to tip.  Luckily, it would be a dollar or three
24   a week.  I knew there would be no way that I
25   would inaccurately reflect under than what I got

Page 80

1                          80
2    paid in terms of cash tips.
3          At the resort, it's customary where
4    you don't get tips.
5          The only tips reflected here are
6    American tips.
7     Q     You did receive cash tips in addition
8    to whatever is reflected on Defendant's
9    Exhibit 12?
10    A     Yes.
11    Q     In any of your prior jobs -- I am
12   going to get to your employment history, but let
13   me ask you this now.
14          In any of your prior jobs, did you
15   receive cash tips?
16    A     Yes.
17    Q     And in any of those prior jobs, did
18   you keep detailed records of the cash tips you
19   received?
20    A     My accountant helped me do all that.
21          Yes, I must have.  I remember me
22   claiming cash on certain tax returns, so yes.
23    Q     I am sorry?
24    A     I did not answer directly.
25    Q     Exactly.

Page 81

1                          81
2     A     What is the question?
3     Q     The question is, in any position
4    previous to the Pacific Island Club, did you
5    keep records reflecting cash tips you
6    received?
7     A     Yes, I did.
8     Q     Where are those records today, do you
9    know?
10    A     I am assuming -- I would only keep
11   the receipts and everything.  I think it's up to
12   three years, my tax return.  Seven years back I
13   would not have kept them.
14          However long you're supposed to keep
15   your tax returns, I would have them.  I am sure
16   they are in storage.
17    Q     In the storage that you talked about
18   earlier today?
19    A     Yes.
20    Q     Documents reflecting your earnings
21   have been requested a long time ago, so I am
22   going to ask you to search for those documents
23   and produce them.
24    A     I apologize.
25          When I was moving, I had storage for



Page 82

82

1  well over a year, and I tried to give them as
2  soon as possible.  I know I gave stuff to my
3  attorney in piecemeal.  The only reason why I
4  remember the tax things is because that was the
5  most difficult that I had to go back and forth
6  with.
7          MS. NORCROSS:  Mark this as
8      Defendant's Exhibit 13.
9          (Whereupon the above referred
10     to document was marked, Defendant's
11     Exhibit 13, for identification, as of
12     this date, by the reporter)
13         MS. NORCROSS:  I will get
14     copies of this made for everybody
15     later.
16  Q    Miss Mann, I am handing you what the
17  reporter marked as Exhibit 13.  Would you look
18  it over, please?
19     A    Okay.
20     Q    Just tell me when you are done
21  reviewing it.
22     A    Okay.
23     Q    Have you ever seen that document
24  before?

Page 83

83

2      A    To be honest with you, there has been
3  so many forms back and forth with my lawyer.
4          The document that you presented to me
5  earlier, it all looks the same.
6      Q    That's the caption.
7          Do you recall, sitting here today,
8  whether you have ever seen what has been marked
9  as Exhibit 13 before?
10     A    I don't recall.
11     Q    Did you ever take a document that had
12  questions and spaces on it and fill in the
13  answers?
14         MR. UMOH:  Objection.
15     A    To be honest with you, I know I have
16  given my lawyer information back and forth.
17     Q    I understand that.
18         My question to you right now is, did
19  you ever sit down with a document that had
20  questions, and then blank spaces after the
21  questions, like this one does, like number 13
22  does, and actually write answers on it?
23     A    I don't recall.
24     Q    Or type answers?
25         MR. UMOH:  Objection.

Page 84

84

1     A    I don't recall.
2          MS. NORCROSS:  Mark this as
3      Defendant's Exhibit 14.
4          (Whereupon the above referred
5      to document was marked, Defendant's
6      Exhibit A, for identification, as of
7      this date, by the reporter)
8      Q    Take a look at what has been marked
9  as Defendant's Exhibit 14.  It's got a lot of
10  pages, so take your time, and let me know when
11  you are finished reviewing it.
12     A    Okay.
13     Q    Have you ever seen this document
14  before?
15     A    I can't recall, because this
16  basically looks like the one you just showed
17  me.
18     Q    Take a look at the second page, just
19  to help you distinguish them.
20     A    Okay.
21     Q    Well, let's take it from the first
22  page.
23         Do you see on the front page of
24  Defendant's Exhibit 14, where it says

Page 85

85

2  Plaintiff's Responses to Defendant Plus Ones, et
3  cetera, Interrogatories?
4      A    Okay.
5      Q    And on number 13, it's just
6  interrogatories.  Do you agree with me?
7      A    Yes.
8      Q    Please turn to page 4, defendant's
9  Exhibit 14, and look in particular right at the
10  top of the page, where it says interrogatory
11  number 1 --
12     A    Yes.
13     Q    -- and then the answer.
14     A    Okay.
15     Q    I guess I will read this for the
16  record.  Tell me if I am reading this correctly,
17  please.
18         Interrogatory number one, please
19  identify each person other than your counsel in
20  this action who assisted in preparing your
21  answers to these interrogatories, and provide
22  the interrogatory numbers, each person assisting
23  in answers.
24         Identify all documents concerning the
25  information requested in this interrogatory.

22 (Pages 82 to 85)



Page 86

```
1                          86
2          Answer, plaintiff received no help in
3   preparing her answers for these interrogatories.
4          Do you see that?
5      A   Yes.
6      Q   Have you seen that response to
7   interrogatory number one before today?
8      A   I don't recall.
9      Q   You don't remember; is that right?
10  Is that your testimony, you don't remember?
11     A   Exactly.
12     Q   If you would, please, go to the
13  second to last page of Exhibit 14.
14         And in particular, look at what we
15  call the jurat, which is the bottom half of the
16  page, starting State of New York County of
17  Kings.
18         Do you see that?
19     A   Yes.
20     Q   There is some typewriting and a line
21  with a handwritten signature.
22         Do you see that?
23     A   Yes.
24     Q   Is that your signature?
25     A   I don't recall.
```

Page 87

```
1          Well, I was in New York at the time.
2   I was definitely in New York. It's just
3   paperwork to me, really.
4      Q   Let me try to ask this question.
5          Do you have an independent
6   recollection of signing answers to
7   interrogatories, attesting to the accuracy and
8   truthfulness of those answers?
9      A   I know I gave answers, but I don't
10  recall like when I gave them.
11         Is that answering your question?
12     Q   No.
13     A   Okay. Rephrase it please.
14     Q   When did you leave to go to Guam?
15     A   February 21.
16     Q   And when did you commit to going to
17  Guam?
18     A   You mean personally?
19         At first, I did not think it was a
20  legitimate company, and I thought they were
21  joking.
22         But when I saw the electronic ticket,
23  it was a week before February 22. It was about
24  the 14th, 15th.
```

Page 88

```
1                          88
2      Q   Focus, if you would, please, on the
3   notary stamp below the sworn and subscribe line.
4          Do you see where I am?
5      A   Yes.
6      Q   Who is that person, if you know?
7      A   That's my lawyer.
8      Q   Did you sit with your lawyer -- don't
9   tell me any content, because I am not trying to
10  get into privileged matters.
11         But what I want to know is, did you
12  sit with your lawyer and sign this document in
13  his presence?
14     A   I have sat several times and signed
15  documents. I don't recall, specifically, but I
16  know I have signed stuff with him before.
17     Q   What other things have you signed?
18     A   Like some of the things you had in
19  the exhibits already, the thing that I submitted
20  to the E.E.O.C.
21     Q   But that was somewhere else, you
22  testified, correct?
23     A   I am sorry?
24     Q   When you testified about signing the
25  E.E.O.C. charge, you said you took it somewhere
```

Page 89

```
1   in midtown, not your attorneys?
2      A   That was like the charge.
3          I was talking about the E.E.O.C.
4   questionnaire that I first filled out on
5   April 5.
6          I did not have representation at all.
7   That was not even a thought on my mind.
8      Q   Then when you completed the actual
9   charge, which you marked as Exhibit 6, the Notary
10  Public on that document is not one of your
11  attorneys, is it?
12     A   Correct.
13     Q   Then you said that you signed what we
14  have marked as Exhibit 11; but you signed this
15  in Guam, correct?
16         MR. UMOH:  Objection.
17         MS. NORCROSS:  This is the
18         affidavit.
19         MR. UMOH:  I understand.
20     Q   Is it correct, you signed Exhibit 11
21  while you were in Guam?
22     A   Yes.
23     Q   And the Notary Public who notarized
24  this document was not one of your attorneys,
```

90

1  correct?
2      A    Correct.
3      Q    Is it your testimony -- and you may
4  have already said this.  Is it your testimony
5  you have no recollection of whether you signed
6  this in the presence of your lawyer or not?
7      A    Correct.
8      Q    But you said there were other
9  documents you signed in the presence of your
10 attorney.
11          Is that what you said, or did you not
12 mean to say that?
13          MR. UMOH:  Objection to the
14      form of the question.
15     A    I don't think I said that.
16     Q    Let me ask you this question.
17         Is there any document that you can
18 remember signing with your attorneys where your
19 attorneys then notarized it?
20     A    I don't know.
21     Q    Going back to the answer to
22 interrogatory number 1 on Exhibit 14 -- are you
23 with me?
24     A    Yes.

91

2      Q    Plaintiff received no help in
3  preparing her answers for these interrogatories.
4          Does that mean you prepared the
5  answers to these interrogatories?
6      A    To me, it means that these are my
7  answers.  I mean, if you want to play semantics,
8  received no help, you know, someone typing it.
9      Q    I don't want to play semantics.  I
10 want to know what the truthful --
11     A    It means they are my answers,
12 basically.
13     Q    Did you answer -- the interrogatory
14 specifically says, other than your counsel.
15         But the answers to these
16 interrogatories, did you answer them?
17     A    I must have.  I mean, if these were
18 submitted, then I must have done this.
19     Q    Do you have any recollection of
20 answering these interrogatories?
21     A    There is another court document that
22 looked exactly like this with similar answers.
23 Well, not similar answers.
24     Q    I understand it can be confusing.
25         However, I am not talking about any

92

1  other document now, except the one that's in
2  front of you.
3          In fact, not even this.  Only look at
4  Defendant's Exhibit 14.  These are represented
5  to be Plaintiff's Responses to Defendant's
6  Interrogatories.
7      A    Yes.
8      Q    Plaintiff is you, correct?
9      A    Yes.
10     Q    And there is a signed -- would you
11 agree with me, there is a copy of a signed,
12 notarized, what we call a jurat statement, that
13 says these are true and accurate answers?
14     A    Yes.
15     Q    And you signed this, correct?
16     A    I must have.
17     Q    But you have no memory of doing it?
18         MR. UMOH:  Objection.  It's
19     been asked and answered.
20         MS. NORCROSS:  It's been
21     asked; it has not been answered.
22         MR. UMOH:  It's been asked and
23     answered.
24     A    I don't recall.

93

2          But I know throughout this whole
3  time, I have just been giving information after
4  information.
5      Q    I understand what you are saying.
6          My question, though, pertains
7  specifically to this document.
8      A    Sure.
9      Q    And specifically to this document,
10 because these are answers that are required to
11 be, and were, according to the document anyway,
12 not only answered by you, but answered by you
13 under oath.  That's why I am pressing you.
14         My only question about them right now
15 is, are these your answers?
16     A    When I look at interrogatory
17 number 11, and it says please state your
18 residential address, and I had a ton of
19 addresses I had to give up.
20     Q    Did you just testify that you
21 provided, in your words, a ton of addresses, in
22 response to interrogatory number 11 on
23 Exhibit 14?
24         MR. UMOH:  Objection.
25     A    That's a play on words.  I did not

Page 94

94

1    mean a ton.
2         In terms of my residential address,
3    basically I lost my apartment. So after that, I
4    was not staying at that particular address.
5    Q    Okay, I understand.
6         Let me ask you this question.
7    Approximately, if you cannot be specific, how
8    many residential addresses have you had in the
9    past ten years?
10   A    Well, see, it's kind of difficult to
11   answer that question. Well, not difficult.
12        It does not take into account when I
13   was -- for instance, I wouldn't consider Guam my
14   permanent address. Places where I have been on
15   vacation. You see what I mean?
16   Q    Residential addresses means places
17   where you live. They do not mean hotel rooms
18   where you stay on vacation.
19        MR. UMOH: Objection.
20        MS. NORCROSS: I am simply
21        responding to her expressed inability
22        to define residential.
23   Q    My question is, in the past ten
24   years, how many residential addresses have you

Page 95

95

2    had, approximately, if you can't be specific?
3    A    Well, here's the thing.
4         Are you talking about legal address,
5    because where I stayed, or what was my legal
6    address?
7    Q    Are they different in some
8    instances?
9    A    I think so, because if you're staying
10   over at someone's house for, let's say, a month,
11   is that my legal address? You see what I am
12   saying?
13   Q    Let's try this. Let's define a
14   residential address as anyplace where you might
15   receive mail.
16   A    Okay.
17   Q    In the past ten years, how many of
18   those have you had?
19   A    I would say, if you're saying within
20   the past two years --
21   Q    Ten.
22   A    Ten years, about two.
23        No. Hold that. Hold on. It could
24   be about three or four.
25   Q    There is going to be motion practice.

Page 96

96

2         If your attorney has not explained
3    that to you, you can talk to him directly.
4         There is going to be motion practice
5    about the deficiency of these answers to
6    interrogatories.
7         You can decide with your counsel
8    whether you want to provide that and some of the
9    other information that's requested. I am only
10   concerned about the amount of time that it would
11   take, given that last answer; so we will not
12   continue on that interrogatory at this moment.
13   A    Sure.
14   Q    What, if anything, did you do to
15   prepare for today's deposition?
16   A    Made sure I got enough sleep, and I
17   got the earliest train.
18   Q    Where are you staying while you're
19   here?
20   A    I am visiting my father.
21   Q    What state?
22   A    New Jersey.
23        I have not seen him in a while.
24   Q    Did you do anything else to prepare
25   for your deposition?

Page 97

97

1    A    Just making sure I knew the exact
2    address and making sure I was not late.
3    Q    Did you meet with your attorneys to
4    prepare?
5    A    I did not meet to prepare.
6    Q    Who is your attorney? Do you have
7    one, or more than one?
8    A    Are you talking about a firm, or who
9    is handling the specifics?
10   Q    I just want to know who you consider
11   to be your attorney in this lawsuit.
12   A    The firm of Chide, Eze.
13   Q    Do you consider Mr. Eze your counsel,
14   or Mr. Umoh?
15   A    I always considered it collaborative.
16   Q    Did you meet with any of your
17   attorneys to prepare for today's deposition?
18   A    There was no preparing.
19   Q    So you did not meet with them to
20   prepare for today's deposition?
21   A    Not to prepare.
22   Q    You arrived in New York on the 5th;
23   is that right?
24   A    Yes.

Legal Ease Reporting, Inc.
212-481-3500



Page 98

98

1
2    Q    Between the 5th and today, did you
meet with your attorneys?
3
4         Don't tell me substance.  Just tell
5    me yes or no.
6    A    Yes.
7    Q    When?
8    A    Saturday, August 9.
9    Q    And for how long did you meet with
10   your attorneys on Saturday, August 9?
11   A    I know it was about at least a half
12   hour.
13   Q    Was it more than an hour?
14   A    I was not checking my watch.  I don't
15   know whether I was in there for an hour.
16   Q    Was it more than two hours?
17   A    No.
18   Q    To prepare for your deposition, did
19   you review any documents?
20   A    What I did, I looked at -- not with
21   my lawyer, on my own, I looked at some of my own
22   paperwork by myself.  I wanted to make sure I
23   was accurate with giving my answers, and
24   familiar, because this has been going on for
25   quite some time.

Page 99

99

2    Q    What papers did you look at?
3    A    The E.E.O.C. charge.
4    Q    Anything else?
5    A    No.
6         I think the charge had the affidavit
7    explaining the whole scenario from April 5 to
8    June.
9    Q    The E.E.O.C. charge with the attached
10   statement?
11   A    Yes.
12   Q    Is there anything else that you
13   reviewed besides that?
14   A    Actually, I was jogging my memory to
15   make sure I had an account basis of what
16   happened with Jamie, just the verbal exchange
17   and what happened, the discrimination that took
18   place.  I wanted to look at my statement, just
19   to look at it again.
20   Q    In addition to that, did you review
21   any other documents?
22   A    I don't think so.
23        I can't think of any other.  I don't
24   remember if I did.
25   Q    When you met with your attorneys to

Page 100

100

1    prepare for your deposition, did you look at any
2    documents?
3         MR. UMOH:  Objection.
4    A    It was verbal.
5
6    Q    I am not permitted, and I am not
7    trying to go into content of the discussion you
8    had with your lawyers.
9    A    I just remember us talking.
10   Q    Please tell me in chronological
11   order, to the best you can, where, if anywhere,
12   you have been employed since June 16, 2006.
13   A    Since 2006?
14   Q    Yes, ma'am.
15   A    I have been employed at P.I.C.
16   Resort.  I have been employed at --
17        well, I have a question.  Independent
18   contractor, or just an employee?
19   Q    We will split them up.
20        As an employee, first.
21   A    P.I.C. Resort, Holiday Temp
22   Services.
23        I remember receiving unemployment,
24   but I would have to look at my tax return to
25   know all the other employers, because I

Page 101

101

1    definitely got a W-2, so I have to look at my
2    taxes.
3         I know definitely Holiday Temp
4    Services, P.I.C.
5         In terms of employee, I don't
6    remember what else, but it's on my taxes.
7    Definitely employers, I can remember those, too.
8    Q    Do you have your tax returns for
9    2006, 2007 -- 2006 and 2007?
10   A    I definitely filed them.
11        I am still trying to get my
12   accountant to give me a copy of 2006.
13   Q    Who is your accountant?
14   A    Steven Lauler.
15   Q    Where is Mr. Lauler located?
16   A    It's either Englewood or Hackensack,
17   New Jersey.
18   Q    When you tried to get these documents
19   from Mr. Lauler, how have you done that?
20   A    E-mail, and left phone messages.
21        MS. NORCROSS:  Counsel, those
22        are also things that that should have
23        been produced.
24   Q    I am going to ask you to search for

Page 102

102

1
2  those and provide them to us.
3          MR. UMOH:  Take it under
4          advisement.
5      Q    When was the last time you tried to
6  contact Mr. Lauler to get your tax returns?
7      A    It had to be during my employment
8  while I was in Guam.
9          I know I did not file my taxes for
10 2007 and 2006 until recently.  I believe it was
11 even after April 15 of this year.  It could have
12 been late spring, early summer.
13         But I know I reached out to him.  I
14 sent him a couple of e-mails.
15         He never responded in sending all my
16 tax returns.  I never got 2006.
17     Q    Did you get 2007?
18     A    I know I got part of it.  I have to
19 check my e-mail again.
20         He was busy, or whatever.
21         Maybe he was waiting for a payment.
22     Q    Was he waiting for a payment?
23     A    No, because I had paid him in
24 advance.
25         I submitted it close to -- I don't

Page 103

103

2  remember when I was able to give him all of the
3  information about my taxes, but I do know that
4  when I submitted all the information to him, he
5  said, Well, you will have to wait, because it's
6  crunch time.  He has a lot.  Don't worry.
7          He filed an extension for me.
8      Q    Where did you do work as an
9  independent contractor since June of 2006?
10     A    I know definitely, Linblad
11 Expeditions.
12     Q    Anywhere else?
13     A    I know that sticks out, because I got
14 paid something substantial in that job.  I mean,
15 I know I could have temped, but I don't know if
16 I -- I don't recall actually getting a temp
17 assignment.
18         Again, it's on my taxes.
19     Q    What work, if any, did you do for
20 Holiday Temp Services?
21     A    They sent me out on a customer
22 service job.
23     Q    Just one job?
24     A    Yes.
25     Q    Is there any reason why --

Page 104

104

1
2      A    Now I remember.
3          What it was, I got an assignment at a
4  company in Brooklyn, but then they had layoffs.
5  They laid me off right after Christmas.  So
6  that's why I contacted Holiday Temp Services, to
7  get another job.
8      Q    I am sorry.
9          Who laid you off around Christmas?
10     A    Novel Box Company.
11     Q    Were you employed by Novel Box
12 Company, or were you working for them as an
13 independent contractor?
14     A    I am trying to remember if they took
15 taxes out or not.  I am not sure about that, but
16 my taxes would have that information.
17         I don't know if I signed a W-4 form
18 or not, but it should be reflected in my taxes.
19         I am sorry.  I keep being
20 repetitive.
21     Q    When did you work for Novel Box?
22     A    It was around Christmastime.
23     Q    Christmas of what year?
24     A    End of 2007 to the beginning of
25 2008.

Page 105

105

1
2      Q    How long did you work for them?
3      A    It could not have been more than a
4  few months, even if it was that.
5      Q    Was it full time or part time?
6      A    It was full time.
7      Q    How many hours a week ?
8      A    I think it paid by the hour.  It was
9  a project that I was working on.
10     Q    So how did you get paid?
11     A    By check.
12     Q    Did you get paid a set fee for a
13 project?
14     A    I am trying to think if I was billing
15 them hours over that.
16         I know it was not a set thing every
17 week, because sometimes they would close the
18 office.
19     Q    I don't understand.  And we don't
20 have any documents about this.
21         Let me try to figure this out.
22     A    Okay.
23     Q    You worked for Novel Box the end of
24 2007 to early 2008?
25     A    Yes.

27 (Pages 102 to 105)

106

1
2    Q    What did you do for them?
3    A    They took me on as a graphic
4  designer.
5    Q    And what did you do for them as a
6  graphic designer?
7    A    I was editing their jewelry
8  catalogue.
9    Q    Were you editing text or graphics?
10    A    Both.
11    Q    And what was your compensation
12  arrangement with them?
13    A    I got paid weekly.
14    Q    Did you get paid a set amount weekly,
15  or did it vary?
16    A    It varied.
17    Q    And what did it vary on?
18    A    Whether the office was open or not.
19    Q    Did you ever do work at home, or did
20  you do it all at the office?
21    A    I worked at home, but I did not get
22  paid for working at home.  I did it because I
23  wanted to --
24    Q    So if the office was closed, is it
25  accurate you would not get paid, even if you

107

2  worked at home while the office was closed; is
3  that correct?
4    A    Yes, correct.
5    Q    What kind of company is Novel Box?
6    A    They probably moved to Jersey by now.
7  That was part of the reason they laid me off.
8       It's a -- you know, when you go to a
9  jewelry store, they are the ones that
10  manufacture the jewelry boxes.  They manufacture
11  some in there warehouse and they actually buy
12  from manufacturers in China.  They do a little
13  bit of both.
14    Q    Do they buy the boxes and then put
15  designs on them?
16    A    They do that, as well.
17       MS. NORCROSS:  I have to take
18    a five-minute break.
19       (Discussion off the record)
20       MS. NORCROSS:  Mark this as
21    Defendant's Exhibit 15.
22       (Whereupon the above referred
23    to document was marked, Defendant's
24    Exhibit 15, for identification, as of
25    this date, by the reporter)

108

1
2    Q    Miss Mann, please look at what the
3  reporter has marked as Exhibit 15.  And just let
4  me know when you are finished reviewing it,
5  please?
6    A    Okay.
7    Q    Have you ever seen that document
8  before?
9    A    I don't recall, but I know the
10  information, I have.
11    Q    Just so I am clear, I am not asking
12  about the information.  I want to know if you
13  have seen that document before.
14    A    I don't recall.
15    Q    Is there anything that would help you
16  remember?
17    A    I can't think of anything at this
18  point that would help me remember.
19    Q    You mentioned your e-mails several
20  times.  Would your e-mails help you remember?
21    A    Looking through some of the
22  information, I know that I have e-mailed some of
23  this information to my lawyer, yes.
24    Q    My question is, are there e-mails
25  that would help you remember whether you have

109

1
2  seen this document before?
3    A    Not that I can recall, not
4  specifically.  Not a specific e-mail, but I know
5  I had e-mailed this information to --
6    Q    Again, I am not talking about the
7  information; I am talking about the document.
8    A    There is no one specific e-mail that
9  could make me pinpoint this document.
10    Q    Where were you physically located by
11  city, state, country, whatever, on June 16,
12  2008?
13    A    I was in Guam.
14    Q    If you had received this document on
15  or about June 16, would that have been -- would
16  that be reflected in an e-mail you got?
17    A    There are a bunch of e-mails.  I
18  don't know.
19    Q    Look, we have limited time.  So what
20  I am trying to do, I am asking you to try to
21  answer the questions I am asking.
22       My question is, if you had seen this
23  document before, would it have been e-mailed to
24  you, do you think?
25    A    Possibly.  I have to check my

Page 110

110

1    e-mails.
2    Q    You would check your e-mails?
3    A    Yes.
4    Q    I am going to ask you to do that.
5    A    Okay.
6         MR. UMOH:  Objection to the
7         extent it calls for any communication
8         between counsel and the witness.
9         MS. NORCROSS:  I want to know
10        whether she saw the document before.
11    Q    Miss Mann, it is accurate, is it not,
12   that at some point you became employed by Plus
13   One Fitness?
14    A    Yes.
15    Q    When did you become employed by Plus
16   One?
17    A    August 2002.
18    Q    And how did that come about?
19    A    I saw an ad in a local newspaper, and
20   I answered it.
21    Q    And did you then have an interview?
22    A    Yes, I did.
23    Q    Do you remember who you interviewed
24   with?

Page 111

111

2    A    I believe -- I am not sure of her
3    last name.  I believe it was the head massage
4    therapy person at the time.  I think her name
5    was Christian, C-h-r-i-s-t-i-a-n.
6    Q    Was that a phone interview, or was
7    that done in person?
8    A    In person.
9    Q    What position did you apply for?
10   A    Massage therapist.
11   Q    Where was that position located, do
12   you remember?
13   A    In New Jersey.
14   Q    Do you remember where in
15   New Jersey?
16   A    It started off at Plus One's Merrill
17   Lynch's site.
18   Q    Which one?  Which location?
19   A    I forget the street.  It was in
20   Jersey City.
21   Q    You said it started out there?
22   A    Yes.
23   Q    Where else were you assigned?
24   A    I did Goldman Sachs.  I had a
25   standard shift there.

Page 112

112

2         They sent me on various sites in
3    New York City, like the New York Stock Exchange,
4    several events over the course of those years.
5    Q    When you were a massage therapist for
6    Plus One, was this a full-time or part-time
7    position?
8    A    That was part time.
9    Q    And do you recall what your rate of
10   pay was?
11   A    Starting out?
12   Q    Yes, ma'am.
13   A    No, I don't recall what it was
14   starting out as, because I got paid a different
15   rate, depending on what kind of job it was.
16        The rate at Merrill Lynch was
17   different from the rate at Goldman Sachs.
18        When I did health expose, that was a
19   different rate, as well.
20   Q    As a massage therapist in New Jersey,
21   you were licensed; is that right?
22   A    No.  At that time, in 2002, there
23   were no -- there was not any licensing
24   requirements in New Jersey.  They had not passed
25   legislation.

Page 113

113

2    Q    Did there come a time when you did
3    become licensed as a massage therapist in
4    New Jersey?
5    A    I am thinking, at the time, I don't
6    know if I was grandfathered in.  I don't know if
7    they did past legislation where you have to have
8    a license.
9         I don't know if you have to register
10   with the police now.
11   Q    Did you ever obtain a massage
12   therapist license in New Jersey?
13   A    No.
14   Q    Did you ever obtain a massage
15   therapist license in New York?
16   A    No.
17   Q    When you worked at Plus One as a
18   massage therapist, it was during a period when
19   you were not required to be licensed in
20   New Jersey; is that correct?
21   A    Correct.
22   Q    Were you eligible, to the best of
23   your knowledge, to obtain a massage therapist
24   license in New York at any point in time?
25   A    Yes.

29 (Pages 110 to 113)

Page 114

114

1
2    Q    And did you ever obtain one?
3    A    I was in the process of getting it.
4    Q    Did you ever obtain one?
5    A    No.  Because the reason why --
6    Q    I did not ask why, ma'am.
7    A    Okay.  I will just answer the
8  question.
9    Q    Only, again, because we are so
10  constrained for time.
11        It's not that I am trying to be rude.
12  I am trying to make some effort to be
13  sufficient.
14    A    Okay.
15    Q    When you were employed as a massage
16  therapist at Plus One, did you ever earn, in any
17  given year, any one year, more than $10,000 from
18  Plus One?
19    A    From Plus One?
20    Q    Yes.
21    A    I would have to look at my tax
22  records.
23    Q    Sitting here today, do you recall
24  whether you ever earned more than $10,000 from
25  Plus One when you were a massage therapist?

Page 115

115

2    A    Again, I would have to look at my tax
3  records to say yes or no.
4        MS. NORCROSS:  Mark this as
5    Defendant's Exhibit 16.
6        (Whereupon the above referred
7    to document was marked, Defendant's
8    Exhibit 16, for identification, as of
9    this date, by the reporter)
10    Q    Please review what the reporter has
11  marked as Defendant's Exhibit 16.
12        And when you are finished, please
13  tell me if you can identify this document.
14    A    It looks like my application for
15  employment with Plus One.
16    Q    On the second page of the document,
17  about midway through, do you see where it
18  says -- it begins -- it's a single-spaced
19  paragraph, I certify the facts contained, and it
20  goes on.  Do you see that?
21    A    Yes.
22    Q    You see a signature below that
23  paragraph?
24    A    Yes.
25    Q    Is that your signature?

Page 116

116

1
2    A    Yes.
3    Q    Your name then was Rhonda Mann; is
4  that correct?
5    A    Yes.
6    Q    And that's what you signed it as,
7  correct?
8    A    Yes.
9    Q    You attended Howard University?
10    A    Yes.
11    Q    When?
12    A    I attended from 1986 to 1990.
13    Q    And did you graduate?
14    A    Yes, I did.
15    Q    And what was your degree?
16    A    A bachelor of arts.
17    Q    And with what major?
18    A    Broadcast journalism.
19    Q    Do you have a copy of your
20  certificate of graduation, diploma?
21    A    It's in storage, yes.
22    Q    That same storage place you were
23  talking about before?
24    A    Yes.
25    Q    If you know, what is Jordan Holistic

Page 117

117

1
2  Center?
3    A    I am trying to remember if that was
4  the name of my website.
5        It was basically the name of how I
6  presented my free-lance massage holistic
7  counseling business.
8    Q    Is that a business that you actually
9  had?
10    A    Yes.  I filed a sole proprietorship.
11        I don't remember what years, but I
12  know I definitely registered like a business.
13        But in terms of promotional material,
14  I know Jordan was in a lot of the promotional
15  material.
16    Q    Did you actively do work for this
17  business that was called Jordan's Holistic
18  Center?
19    A    Yes.
20    Q    Over what period of time?
21    A    It had to be while I was employed
22  with Plus One part time.
23    Q    I am sorry.  I don't understand your
24  answer.
25        First give me dates.

Legal Ease Reporting, Inc.
212-481-3500

Page 118

118

1
2 Between what period and what period
3 did you actually perform work as Jordan's
4 Holistic Center?
5 A    I don't remember what date or year I
6 actually started calling it Jordan's Holistic
7 Center.
8 But I know as soon as I graduated
9 from massage school, I did free-lance work as a
10 massage therapist and holistic health
11 counseling.
12 Q    When did you graduate massage
13 school?
14 A    December 2002.
15 Q    Is it accurate, you did not do any
16 work for Jordan's Holistic Center or as Jordan's
17 Holistic Center before you graduated from
18 massage school?
19 MR. UMOH:  Objection.
20 A    I don't know when I started using
21 Jordan's.  I don't know when I started using
22 Jordan's Holistic Center.
23 I do know, once I got into holistic
24 health, I would counsel people; but I don't know
25 when I actually started using Jordan's name.

Page 119

119

2 Q    Look again at Defendant's Exhibit 16.
3 Where, if at anywhere, on this
4 application does Jordan's Holistic Center
5 appear?
6 A    It does not appear here at all.
7 It would not have to be.  On this
8 sheet, it's for former employers, so there is a
9 difference.
10 Q    You consider you did not have to
11 identify Jordan's Holistic Center because you
12 did not consider it an employer?  Is that
13 correct?  Is that what you're telling me?
14 A    Yes.
15 Q    Did you do work through Jordan's
16 Holistic Center during the time you were
17 employed as a massage therapist at Plus One?
18 A    Yes, I did.
19 Q    Did you tell that to Plus One, or did
20 you think you did not have to?
21 MR. UMOH:  Objection to the
22 question.
23 A    Well, I can remember there was no
24 signed exclusive contract.
25 Q    I am not looking for a reason or

Page 120

120

1
2 rationale.
3 All I am asking you is, did you tell
4 them or did you not?
5 A    That I had like other jobs?
6 Q    No, ma'am.
7 A    Sorry.
8 Q    If this continues, I am going to
9 start having the reporter reading the questions
10 back.
11 My question is, during the time you
12 worked as a massage therapist for Plus One, did
13 you tell Plus One you were also doing massage
14 therapy for Jordan's Holistic Center?
15 MR. UMOH:  Objection.
16 Q    Do you need the question read back?
17 A    Sure.
18 MS. NORCROSS:  Read back the
19 question.
20 (Whereupon, the above referred
21 to question was read back by
22 the reporter.)
23 THE WITNESS:  I am trying to
24 remember if I had specific
25 conversations, but my co-workers and

Page 121

121

1
2 my supervisor knew.
3 MS. NORCROSS:  Move to
4 strike.
5 Q    My question is, did you tell
6 anybody?
7 A    Yes, I told someone.
8 Q    Who did you tell?
9 A    It had to have been whoever was
10 working at the Merrill Lynch site from 2002,
11 because that was the first site I worked at, to
12 2004.
13 Q    You put a question mark at the end.
14 Are you not sure?
15 A    I am not sure how many times I told
16 them.
17 Q    That's not my question.
18 My question was, did you tell them.
19 And then my question was, who did you
20 tell?  And that's what I am trying to figure
21 out.
22 A    I don't remember their specific
23 names, but it had to have been the people at the
24 Merrill Lynch site.
25 Q    Who was your supervisor at the

31 (Pages 118 to 121)

Page 122

122

1 Merrill Lynch site?
2     A    There were several.
3     Q    Who were they?
4     A    There was one woman named Claudia.  I
5 don't recall her last name.
6     There was another gentleman named
7 Steve, another woman named Laura, another one
8 named Richard, Vanessa.  I don't recall their
9 last names.
10    Q    What was Claudia's title?
11    A    I am assuming, general manager.
12    Q    What was Steve's title?
13    A    It was either assistant general
14 manager or manager on duty.
15    Q    Manager on duty is not a title.
16    Do you know what his title was?
17         MR. UMOH:  Objection.
18    Q    I am correct, manager on duty is not
19 a title, am I not?
20         MR. UMOH:  Objection.
21    A    I don't know that distinction.
22    Q    Manager on duty is a function that
23 one takes over from time to time; am I
24 correct?
25

Page 123

123

2     A    I am not familiar with that.
3     Laura, I think her title was general
4 manager.
5     Q    Richard, what was his title?
6     A    Again, he could have been manager on
7 duty, acting.
8     You know what, Vanessa, I think she
9 was the assistant.
10    Q    And which of these people, if any,
11 did you tell that you were performing massage
12 therapy duties outside of Plus One?
13    A    It could have been --
14    Q    If you don't know, please tell me you
15 don't know.  The guessing will not help.
16    A    I don't remember.
17    Q    Can you sit here today and tell me a
18 single person that you recall telling you were
19 doing massage therapy outside of Plus One?
20    A    Yes.
21    Q    Who?
22    A    Steven.
23    Q    What is Steven's last name?
24    A    I don't recall, but he was definitely
25 an employee of Plus One, so they should have it

Page 124

124

1 on file.
2    Q    And is Steven one of the people whose
3 title you don't know?
4    A    Yes.
5    If I recall, I believe he was
6 assistant general manager.
7    Q    Tell me what he said on the topic of
8 you doing massage therapy outside of Plus One.
9    A    I don't recall specifics.
10    Q    Do you recall anything?
11    A    I mean, I don't remember verbatim how
12 I said I was working somewhere.
13    Q    Well, do you remember anything that
14 you said?
15    A    There were so many conversations.
16    Q    That's not my question.
17    My question is, do you recall --
18         MR. UMOH:  Please don't
19    interrupt the witness.
20         MS. NORCROSS:  Your witness is
21    not answering questions that I ask
22    her.
23    Q    You need to answer the questions I
24 ask, as opposed to thinking out loud.

Page 125

125

2    A    Okay.
3         MS. NORCROSS:  Mark this as
4    Defendant's Exhibit 17.
5         (Whereupon the above referred
6    to document was marked, Defendant's
7    Exhibit A, for identification, as of
8    this date, by the reporter)
9    Q    Miss Mann, take a look at what has
10 been marked as Exhibit 17.
11    And when you have had a chance to
12 look it over, tell me if you recognize it,
13 please.
14    A    Okay.  No, I don't recognize this,
15 because I don't have the full document.
16    Q    If you don't recognize it, how is it
17 you know you don't have the full document?
18    A    Because it looks incomplete.
19    At the bottom, it's 02.
20    Q    The 02 is a Bates stamp number put on
21 for the purposes of this litigation.
22    A    It looks like an incomplete document,
23 just looking at it.
24    Q    Do you recognize it?
25    A    No.

126

1
2      Q    Is that a copy of your signature on
3   the document?
4      A    Yes, it is.
5      Q    So you did sign this.  That's your
6   signature, correct?
7      A    Yes.
8      Q    Please go back to Exhibit 16.
9          Other than Jordan's Holistic Center,
10  did you list all of your employment prior to
11  Plus One on page 2 at the top there, where it
12  says former employers?
13     A    I believe so.
14     Q    Did you skip anybody?
15     A    That could be a possibility.  There
16  could be free-lance things I picked up on the
17  side as independent contractor, but these were
18  my major employers.
19     Q    What is Hoffman Entertainment?
20     A    It's a talent management firm.
21     Q    What did you do for them?
22     A    I was a tour coordinator and
23  marketing assistant.
24     Q    What does that entail?
25     A    Handling travel for musicians on

127

1
2   domestic and promo tours.
3      Q    Is it basically a clerical job?
4      A    No.
5      Q    Did you record your proper, accurate
6   salary at that job, at $27,500?
7      A    I believe that was my starting
8   salary, or ending.  It was probably my ending.
9      Q    Did you have a new job when you left
10  Hoffman Entertainment?
11     A    I sure did.
12     Q    What does that say?
13     A    Hervey and Company.
14     Q    What is Hoffman Entertainment's
15  address?
16     A    I don't know their current address.
17     Q    What was their address when you
18  worked for them in December '97 and December
19  '98?
20     A    I believe it was West 55th Street in
21  New York City.
22     Q    And to your knowledge, did they move
23  from that address?
24     A    I believe so.
25     Q    Who was your immediate supervisor?

128

1
2      A    Randy Hoffman.
3      Q    How many employees were there at that
4   company, about?
5      A    Five or six.
6      Q    How did you come to be employed by
7   Hervey and Company?
8      A    Through friends.
9      Q    Where were you living at the time
10  that you worked for Hervey and Company?
11     A    New Jersey.
12     Q    Where in New Jersey?
13     A    Jersey City.
14     Q    Is it accurate, Hervey and Company
15  was located in Chappaqua?
16     A    Yes.
17     Q    At the time you accepted the
18  position, did you know how far it was between
19  Jersey City and Chappaqua?
20     A    Yes.
21     Q    How did you get there?
22     A    Bus to Grand Central, and then the
23  train from Grand Central Station, all the way to
24  Chappaqua, Metro North.
25     Q    You worked there for six months?

129

1
2      A    Yes.
3      Q    Were you asked to leave?
4      A    No.
5      Q    Did you have a position when you
6   left?
7      A    I am not sure.  I don't remember.  I
8   don't know which came first.
9      Q    And then you went to work for HBO; is
10  that right?
11     A    Yes.
12     Q    Did you record your accurate salary
13  at HBO on this application?
14     A    I believe that was my last salary.
15         That's not what I came in at.  I
16  think that's when I left.
17     Q    Did you inflate your salary?
18     A    No.  In fact, I may be off a few
19  hundred.
20     Q    Why did you leave?
21     A    Career change.
22     Q    What does that mean?
23     A    I left the entertainment industry to
24  go into holistic health and alternative
25  health.

33 (Pages 126 to 129)

130

1
2    Q    Focus, if you would, please, on the
3  statement -- the paragraph right above your
4  signature.  Do you see that?
5    A    Yes.
6    Q    When you signed this, you understood
7  if you falsified statements in this application,
8  your employment could be terminated.
9        You understood that?
10   A    Yes.
11   Q    How long did you work as a massage
12 therapist at Plus One?
13   A    Up until the time I was terminated.
14   Q    Is it your testimony that you worked
15 as a massage therapist when you were employed in
16 New York?
17   A    I would still go to Goldman Sachs,
18 which is in New Jersey, and do full body massage
19 there.
20   Q    When did you do that?
21   A    Definitely in 2006.
22       But I know when the whole thing
23 started with the incident with Jamie, when that
24 happened, it became stressful, and I told them I
25 had to take a little time off, just to sort of

131

2  get my bearings.
3        MR. UMOH:  Objection.  Counsel
4     is interrupting.
5        MS. NORCROSS:  Counsel is not
6     interrupting a thing.
7        MR. UMOH:  I want to state my
8     objection for the record.  Counsel
9     keeps interrupting the witness from
10    responding accurately to her
11    statements.
12       MS. NORCROSS:  Counsel has not
13    interrupted her a single time.
14   Q    Ma'am, I am going to show you what is
15 marked as Exhibit 4, which I believe you
16 identified as your job posting.
17   A    Yes.
18   Q    Is it accurate to state that you
19 applied for a position as the receptionist in
20 the Trump World Towers facility?
21   A    Yes.
22   Q    And when did you do that?
23   A    This says February 15, 2006.
24   Q    And the position you applied for was
25 as a receptionist?

132

1
2    A    Yes.
3    Q    It was not assistant general
4  manager?
5    A    Correct.
6    Q    It was not as customer service
7  manager, correct?
8    A    Correct.
9    Q    And it was not as an assistant to the
10 general manager, correct?
11   A    Incorrect.
12       I did have some duties that I was
13 assisting Tom.
14   Q    But your title was receptionist,
15 right?
16   A    Okay.
17   Q    Yes or no?
18   A    The title here, yes.
19   Q    The title of the position was
20 receptionist?
21   A    Yes.
22   Q    The title was not front desk manager,
23 correct?
24   A    The title here.
25       But Tom said that's what I was

133

1
2  doing.
3    Q    I am talking about --
4    A    Yes, the title here on the paper, on
5  the internal posting, says receptionist.
6    Q    And the title of the position was
7  receptionist, correct?
8    A    Yes.
9    Q    Did you ever represent to anyone that
10 your title was other than receptionist?
11   A    I know when I had sent out job
12 applications, I reworded it so people could
13 understand what I did on my resume.
14   Q    Was it your belief that a person
15 looking at a resume would not understand what a
16 receptionist did?
17   A    What it is, like in certain
18 positions, there is a difference between if
19 you're just a receptionist, and you have no
20 other duties outside of answering the phone.
21 Sometimes people assume you just like answer the
22 phone.
23       Even though sometimes some people are
24 assistant, they are actually manager.  I just
25 think it's semantics.

134

1
2    Q    To convey the reality of the
3  position, did you, in fact, tell potential
4  employers that you had a title different than
5  the one you actually had?
6    A    I did not tell employers I had a
7  title differently than what I had.
8        On my resume, it's like with all my
9  resumes.  I have changed them so much to gear it
10  to each potential employer so they would
11  understand what I did.
12        When I would go to interviews, they
13  would ask me, what does this mean?
14    Q    Did you ever change your resume to
15  show your job title at Plus One as being
16  assistant general manager instead of
17  receptionist?
18    A    I never recall representing myself as
19  assistant general manager, assistant to.
20        It must have been a typo or
21  something.  I don't remember.
22    Q    Did you ever represent on a resume
23  that you were a customer service manager?
24    A    I don't remember.
25    Q    But it's possible?

135

2    A    I sent out hundreds of resumes.  I
3  seriously don't recall.
4    Q    You said your undergraduate degree is
5  in broadcast journalism?
6    A    No.  I said my major was broadcast
7  journalism, and I have a Bachelor of arts.
8    Q    On your resumes, how, if at all, did
9  you represent that degree?
10    A    That I graduated from Howard
11  University.
12    Q    Did you ever represent that your
13  major was journalism?
14    A    Sometimes I abbreviated.  Sometimes I
15  put journalism.  Sometimes I did not put my
16  major on it.  Sometimes I put Bachelor of Arts.  Sometimes
17  I highlighted my minor.
18        Whatever employer I was sending the
19  resume, I put what I knew they were focusing
20  on.
21    Q    Did you represent your Bachelor of
22  Arts was in communications?
23    A    Yes.
24    Q    Did you ever represent that your
25  Bachelor of Arts was in broadcast and

136

1
2  television?
3    A    Yes, same thing.  Broadcast
4  journalism is more specific.
5    Q    You changed your resume, depending
6  who you were sending the resume to; is that
7  accurate?
8    A    Yes.  I tailored it to each potential
9  employer.
10    Q    By tailoring, you include changing
11  your job title; is that correct?
12        MR. UMOH:  Objection.
13    A    I changed the duties, I changed what
14  I did.
15        If I was going for a temp job, I
16  would stress my administrative skills.  Or if I
17  was going for an art job, I would --
18    Q    You had a job title at Plus One.
19        And all I am asking, and I think you
20  have said yes, is you changed that job title on
21  the resume, depending who you sent that resume
22  to; is that correct?
23        MR. UMOH:  Objection.
24    A    I believe I changed the way I was
25  explaining by job responsibilities and duties.

137

1
2        MS. NORCROSS:  Mark this as
3  Defendant's Exhibit 18.
4        (Whereupon the above referred
5        to document was marked, Defendant's
6        Exhibit 18, for identification, as of
7        this date, by the reporter)
8    Q    Please look over what the reporter
9  has marked as Defendant's Exhibit 18.
10        I know it's a little bit lengthy.
11  Just let me know when you have had a chance to
12  review it.
13    A    Okay.  Okay.
14    Q    Have you had a chance to look it
15  over?
16    A    Yes.
17    Q    Go to the third page of the packet.
18    A    Okay.
19    Q    This is from Jordan Mann.
20        That's you, right?
21    A    Yes.
22    Q    And it's dated Monday, January 14,
23  2008, 11:03 a.m.?
24    A    Yes.
25    Q    On the section -- on your resume, on

35 (Pages 134 to 137)

Page 138

138

1  here, the first entry, employment 2002 to
2  2006 -- do you see where I am?
3  
4      A    Yes.
5      Q    What did you reflect as having been
6  your job title at Plus One?
7      A    Well, actually on the letter, I did
8  not reflect the job title. It was more I was
9  explaining to people my job responsibilities,
10  and I felt assistant to general manager was more
11  accurate in terms of the duties I did at Plus
12  One.
13      Q    The title reflected here for your
14  Plus One employment is, assistant to general
15  manager; is that correct? Is that what it
16  says?
17      A    It's not a title. It's a description
18  of what I did.
19      Q    On this resume, you said your job at
20  Plus One was assistant to the general manager?
21      A    Yes.
22      Q    Go back two more pages?
23      A    Okay.
24      Q    Do you see where it says 6-22-2008,
25  9:17 p.m.

Page 139

139

1  
2      A    Yes.
3      Q    On this one, the job title you used
4  for Plus One employment was Customer Service
5  Manager, correct?
6      A    Yes, Customer Service Manager.
7      Q    Go back one page.
8          Just for the record, these appear to
9  be the dates when they were printed about by
10  counsel, 6-22-2008, 7:33 p.m.
11          Are you on that page?
12      A    Yes.
13      Q    That page contains a portion of your
14  resume?
15      A    Yes.
16      Q    What title did you use for your Plus
17  One job there?
18      A    I used the description of what I did,
19  front desk manager.
20      Q    Front desk manager, correct?
21      A    I used the description because I knew
22  who I was sending this to, they would
23  understand, just gearing towards what they would
24  look for.
25      Q    Go to the next page in the same

Page 140

140

1  package.
2      A    Yes.
3      Q    what job title did you use on this
4  resume?
5          MR. UMOH:  Objection.
6      Q    This says subject, receptionist
7  position, date, Wednesday, January 30, 2008,
8  6:22 p.m.
9      A    I used the description of
10  receptionist, because I knew they were looking
11  to hire a receptionist.
12      Q    I see.
13          The move to the position as the
14  receptionist in the Trump facility is one you
15  initiated, right?
16      A    Yes.
17      Q    Okay, why?
18      A    Health benefits.
19          That was a major concern. I knew if
20  I had a full-time job, I would get health
21  benefits.
22      Q    You wanted to make the move to become
23  full time; is that correct?
24      A    For health benefits, and plus I

Page 141

141

1  knew -- well, I felt it would help my
2  application, along with having Plus One sign off
3  on my New York massage license.
4      Q    How does Plus One sign off on a --
5      A    Well, because I did not go to school
6  in New York, and I was already a professional,
7  certified, working in New Jersey, I could be
8  grandfathered into the New York program.
9          Plus One had to submit, sign off on a
10  letter of recommendation and show proof that I
11  had worked all those years as a massage
12  therapist and had clients. I had to show I had
13  worked as a massage therapist during those
14  years, on my application.
15          I had to have someone other than
16  myself sign off on that. I had to have a
17  reference.
18      Q    Were you not required to take certain
19  courses to obtain a New York State massage
20  license?
21      A    If you have not been a working
22  professional massage therapist, there is a
23  different protocol.
24          But when your coming from another

Page 142

```
1                    142
2    state, and you're moving, there are certain
3    allowances you can bypass without having
4    specific courses.
5        Q    But you still need to take some of
6    the courses, correct?
7        A    Or if you have not been a
8    professional massage therapist before sending
9    your application in.
10           That's only true -- well, from my
11   understanding, true for students who had just
12   graduated, and they have no professional
13   experience.
14       Q    Now you have said already you were
15   not licensed in New Jersey?
16       A    Yes.  Plus One hired me while I was
17   still in school.  Everyone knew I was still in
18   school and did not graduate.
19       Q    You did not graduate?
20       A    Yes.
21           There was no legislation enacted.  In
22   New Jersey, you can work as a massage therapist
23   without being certified or anything.
24       Q    But you were enrolled in a course; is
25   that right?
```

Page 143

```
1                    143
2        A    Correct.  Yes, full time.
3        Q    Do I understand, you did not graduate
4    from that course; is that correct?
5        A    Incorrect.
6            I graduated in the summer of 2002.
7        Q    You meant you did not graduate before
8    you started working for Plus One?
9        A    Correct.
10       Q    What, if anything, were you told
11   about working at the Trump facility before you
12   took the position?
13       A    I know I was definitely told the
14   salary.
15       Q    Okay.
16       A    And that upon taking that position, I
17   had to be on call at Goldman Sachs and Merrill
18   Lynch and other sites.
19           Something about the hours, they said
20   I could not hold a constant shift somewhere,
21   some legality or something.
22           In essence, I can only be on call as
23   a massage therapist in New Jersey.
24       Q    You had a full-time position as a
25   receptionist at Trump; is that right?
```

Page 144

```
1                    144
2        A    Right.
3        Q    Were you told about the grooming
4    standards?  Were you told what you were supposed
5    to wear, behave, anything like that, in
6    preparation for going to work for the Trump
7    Towers?
8        A    Could you repeat the question?
9            MS. NORCROSS:  Read back the
10           question.
11           (Whereupon, the above referred
12           to question was read back by
13           the reporter.)
14           THE WITNESS:  I was told that
15           I definitely had to wear a uniform.
16           I was told that I definitely had to
17           wear a name tag.  I was told
18           definitely, when clients came through
19           the door, I had to stand up and greet
20           them.
21       Q    Anything else you remember?
22       A    Are you saying, was I informed of
23   grooming standards before Jamie or post Jamie?
24       Q    I am asking you a general question.
25           I want to know what you were told
```

Page 145

```
1                    145
2    about, before you went to the Trump facility.  I
3    want to know what you were told about what you
4    needed to do, what standards might apply at that
5    facility.
6        A    Those were like the main points,
7    right there.  And that I had to do the morning,
8    opening up shift, that -- to fill in for Tom
9    when he was not there, accept equipment, and so
10   forth.  Those were the major things.
11       Q    What kind of facility is the Trump
12   World Towers?
13       A    Small fitness center, a yoga room and
14   a small pool.
15       Q    How would you describe the facility
16   itself, the building itself, not just the
17   fitness facility?
18       A    It was quite stuffy, because it was
19   in the basement.  A lot of the equipment, the
20   clients, the residents, would constantly
21   complain the machines were not working.
22       Q    The Trump World Towers is a
23   residential building, correct?
24       A    I believe so.
25       Q    It's a residential facility,
```

37 (Pages 142 to 145)

146

1
2 correct?
3    A    Yes.
4    Q    A very expensive residential
5 facility, wouldn't that also be correct?
6    A    Yes.
7    Q    With residents who are, let's say,
8 not to get political -- celebrities; would that
9 be correct?
10    A    I have seen a couple of
11 celebrities.
12    Q    In your experience working at Plus
13 One, do different facilities have different
14 requirements?
15    A    Yes.
16    Q    The way in which a Plus One employee
17 needs to dress, for example, is different,
18 depending upon the facility where you're
19 working; would that not be correct?
20    A    Yes.
21    Q    If you're working at the Goldman
22 Sachs facility, you might have to dress
23 differently than if you were working at Merrill
24 Lynch, right?
25    A    Yes.  But there are certain

147

2 guidelines that have to be followed across the
3 board.
4    Q    Plus One's business is to operate
5 fitness centers in buildings owned and operated
6 by other companies, correct?
7    A    Correct.
8    Q    And those other buildings and
9 companies have their own rules and requirements,
10 correct?
11    A    Yes.
12    Q    The Trump requirements might be
13 different than Goldman Sachs, right?
14    A    Yes.  And they might be different
15 from the Waldorf Astoria, correct.
16    A    Yes.
17         MS. NORCROSS:  Mark this as
18    Defendant's Exhibit 19.
19         (Whereupon the above referred
20    to document was marked, Defendant's
21    Exhibit 19, for identification, as of
22    this date, by the reporter)
23    Q    Take a look at Defendant's
24 Exhibit 19?
25    A    Sure.

148

1
2    Q    And identify it for me, if you can,
3 okay?
4    A    I don't remember if this is Trump or
5 if this is just Plus One.
6    Q    Have you had a chance to review the
7 document?
8    A    Yes.
9    Q    Have you seen it before?
10    A    Yes.
11    Q    This is a grooming standard that
12 applied at either Plus One or Trump, or both; is
13 that accurate?
14    A    It could be.
15    Q    Is this a grooming standard that you
16 consider applied to you during the time you
17 worked for Plus One at the Trump facility?
18    A    This one, particularly?
19    Q    Yes, ma'am.
20    A    I can't say.
21         If I can recall correctly, I did not
22 see this until after I was employed at Trump.
23    Q    Who put the circle around the
24 sentence that says, long hair must be pulled
25 back, et cetera?

149

1
2    A    Good question.  I don't remember.
3    Q    Didn't you do that?
4         MR. UMOH:  Objection.
5    A    The whole thing was, I looked at the
6 asterisk.  And I don't do an asterisk like that,
7 so I don't know who actually circled that.
8         MS. NORCROSS:  Mark this as
9    defendants Exhibit 20.
10         (Whereupon the above referred
11    to document was marked, Defendant's
12    Exhibit 20, for identification, as of
13    this date, by the reporter)
14    Q    Take a look at what Sandy has marked
15 as Defendant's Exhibit 20.
16    A    Yes.
17    Q    Do you recognize the document?
18    A    Yes.
19    Q    What is it?
20    A    This is a couple of pages printed out
21 from the Plus One website.
22    Q    Okay.  And who printed them out from
23 the Plus One website?
24    A    I don't recall.
25         I know this was an example that I

38 (Pages 146 to 149)

150

1
2  used in terms of how I thought I was being
3  discriminated against.
4      Q    Whose printing is that on the top
5  there?
6      A    That looks like my handwriting.
7      Q    On the second page, is that also your
8  handwriting?
9      A    Correct.
10     Q    Does that help you to remember
11  whether you printed out these two pages from the
12  Plus One website?
13     A    I must have.
14         I am sure I must have printed it out
15  for human resources.
16     Q    Did you know Bonnie Parsells?
17     A    No, I did not know her.
18     Q    Did you know where she worked?
19     A    No, I did not.
20     Q    Did she work at Trump?
21     A    No, she did not.
22     Q    And what about Joan Hatfield?  Did
23  you know her?
24     A    No, I did not.
25     Q    Did she work at Trump?

151

2      A    Not when I was there.
3      Q    So she worked someplace else, right,
4  as far as you know?
5      A    Yes.
6      Q    Now the example of hair on face,
7  which is what you wrote at the top here, are you
8  referring to Bonnie Parsells' bangs?
9      A    Yes.
10     Q    The example of hair on face for Joan
11  Hatfield, are you also referring to her bangs?
12     A    Yes.
13         MS. NORCROSS:  Mark this as
14     Defendant's Exhibit 21.
15         (Whereupon the above referred
16     to document was marked, Defendant's
17     Exhibit 21, for identification, as of
18     this date, by the reporter)
19     Q    Please take a look at what has been
20  marked as Exhibit 21.
21         And when you have had a chance to
22  review it, let me know if you can identify it
23  for me.
24     A    Okay.  This was the document that
25  Jamie produced after he insulted me about my

152

1
2  hair.
3      Q    Do you recognize this document?
4      A    Yes, I do.
5      Q    Can you tell me what it is?
6      A    It is the Trump work staff apparel,
7  uniforms.
8      Q    Did you understand Trump had certain
9  apparel and uniform requirements specific to its
10  facility?
11         MR. DERSCHOWITZ:  Note my
12     objection.
13     A    Are you talking about this specific
14  document?
15     Q    No, anything.
16         Did you know Trump had its own
17  requirements?
18     A    No.
19     Q    Did you know if Trump had its own
20  appearance standards?
21     A    I found out after Jamie insulted me
22  about my hair.  That's when I found out.
23         That was the first time I saw this
24  document.
25         MS. NORCROSS:  I am going to

153

1
2      move to strike.
3      Q    I am asking you about standards,
4  okay?
5      A    Okay.
6      Q    Did you understand that there were
7  particular standards relating to appearance or
8  grooming that pertained specifically to the
9  Trump World Towers condominium complex?
10         MR. UMOH:  Objection.
11     A    Not until after April 6 of 2006.
12     Q    Were you aware of any requirements
13  that applied to you as a Plus One employee,
14  working in the Trump World Towers, pertaining to
15  how you dealt with customers or clients or
16  residents or the people that you serviced?
17         MR. UMOH:  Objection.
18     A    There was a specific greeting.
19         But yes, I was aware how I was to
20  greet the clients.
21     Q    Were you aware of requirements
22  regarding how you dealt with clients that might
23  be difficult?
24     A    Nothing specific.
25         Anything that went along with basic