154

1  customer service.
2       MS. NORCROSS: Mark this as
3       Defendant's Exhibit 22.
4       (Whereupon the above referred
5       to document was marked, Defendant's
6       Exhibit 22, for identification, as of
7       this date, by the reporter)
8  Q    Take a look at what the reporter has
9  marked as Defendant's Exhibit 22, and tell me if
10 you can identify it, please.
11 A    Yes, I can.
12 Q    What is it?
13 A    It looks like information used in my
14 training for my position at Trump.
15 Q    And you attended this training,
16 correct?
17 A    I believe via phone.
18 Q    And the training was on or about
19 April 6; would that be correct?
20 A    Yes.
21      MR. UMOH: I am going to
22      object to the extent the document
23      seems to be missing some pages.
24      MS. NORCROSS: There is

155

1  nothing missing from my deposition
2  exhibit.
3       MR. UMOH: Let me finish my
4       objection, please.
5       MS. NORCROSS: I thought you
6       were finished. I am sorry.
7       MR. UMOH: It appears to only
8       have 7 and 8.
9       I object to the introduction
10      of this document.
11 Q    Miss Mann, the training occurred on
12 or around April 26; would that be correct?
13 A    Yes.
14 Q    Just to make sure we are clear, the
15 top page is an e-mail that you sent, right?
16 A    Yes.
17 Q    And you signed it Jordan Mann?
18 A    Yes.
19 Q    Which was not your name on April 26,
20 correct?
21 A    That was the name I went by.
22 Q    That was not your accurate legal
23 name, correct?
24 A    No.

156

1  Q    Now during this training, was there
2  discussion about how to handle difficult
3  residents or customers?
4  A    I don't recall the specific
5  training.
6  Q    Okay.
7       Do you recall being trained on what
8  to do with an upset customer?
9       MR. UMOH: Objection. The
10      document is dated April 26. I have a
11      standing objection to any question
12      that pertains to this document.
13      MS. NORCROSS: I think it's
14      pretty nervy for someone who has
15      withheld as many pieces of paper as
16      you have, to try to put that kind of
17      objection on the record.
18 Q    I am asking you specifically what, if
19 any, training you received on how to handle
20 difficult customers or residents.
21 A    To tell you the truth, this was such
22 a long time ago, I really can't -- I don't know
23 if Jennifer went over the whole program or
24 document, or even if it was specific to Trump.

157

1  Q    You recall other events that occurred
2  in April of 2006, correct?
3  A    Yes.
4  Q    But you can't recall this, correct,
5  this training?
6  A    Unfortunately, I can't recall
7  everything that's happened in my lifetime.
8  Sometimes things stand out and sometimes they
9  don't.
10 Q    Let's go through without referring to
11 specifically this training program.
12      Do you recall being instructed that
13 when you had difficult residents, you were to
14 allow the person to speak without interruption,
15 in words or substance? I am not asking if you
16 recall those specific words, but in words or
17 substance?
18      MR. UMOH: Objection.
19 A    I don't remember Jennifer
20 specifically saying -- I can only go by an
21 example of what happened, by watching my
22 supervisors. I don't recall Jennifer saying
23 that.
24 Q    That's not my question.



Page 158

1
2       My question is, during any training
3   you received, whether it was Jennifer or
4   somebody else, do you recall being instructed to
5   allow the upset person, whether it was a
6   customer or a resident, to speak without being
7   interrupted?  Do you remember that?
8       A    I don't remember that.
9       Q    Do you recall being instructed that
10  if you had a difficult resident or customer,
11  that you should -- if you could not handle it,
12  you should go to your manager or someone in the
13  building or in the physical facility?
14          MR. UMOH:  Objection.
15      A    They did not tell me what to do if no
16  one was present, because at the time, that
17  account was in such turmoil, and they had fired
18  my supervisor; so there was no supervisor at the
19  time.
20      Q    What time are you talking about?  I
21  did not specify a time.
22      A    I guess I was speaking about my time
23  at Trump.
24      Q    If someone had a question that you
25  could not answer during your time at Trump, what

Page 159

1
2   would you do?
3       A    I would find the answer.
4       Q    How would you do that?
5       A    I would ask whoever I thought would
6   have the answer.
7       Q    If that person was not physically in
8   the building, what would you do?
9       A    I would leave a message.
10      Q    Pick up the phone?
11      A    Yes.
12      Q    And so if you had a problem with a
13  resident, wouldn't you consider picking up the
14  phone?
15          MR. UMOH:  Objection.
16      A    It depends on the situation.  It
17  depends on the severity of the situation.
18          I can't make that judgment.  I would
19  have to be put in the predicament to see what
20  the best answer or best choice of action would
21  be.  If it's a 911 call, it depends on the
22  situation.
23      Q    On June 8, 2006 you did not pick up
24  the phone to try to reach anyone at either Plus
25  One or in the building, correct?

Page 160

1
2           MR. UMOH:  Objection.
3       A    Incorrect.  I spoke directly with
4   Mike Murray, my manager.
5       Q    Mike Murray was there, wasn't he?
6       A    Yes.
7       Q    You mentioned this a few times, and I
8   may be paraphrasing, but you mentioned issues
9   with Jamie?
10      A    Yes.
11      Q    Describe for me what it is that you
12  mean when you referred -- earlier in your
13  deposition, when you referred to the problem
14  between you and Jamie.
15      A    Describe?
16      Q    Tell me what you know.
17      A    I was directly referring to the
18  insults and I thought discriminatory practices
19  that he was doing towards me.
20      Q    Tell me, not in characterizations,
21  but tell me, as a matter of fact, precisely what
22  you claim Jamie did, and when.
23      A    At least a few times, he
24  discriminated against me based on my natural
25  characteristics of an African American person.

Page 161

1
2       Q    Again, please, facts.
3           MR. UMOH:  Objection.  Is that
4   a question?
5       Q    You could answer?
6       A    Facts on how he discriminated against
7   me?
8       Q    Tell me precisely, as best you can
9   remember?
10      A    He would --
11          MR. UMOH:  Objection.
12      A    He would single me out on saying that
13  I was not complying to Trump policy.
14          And I never even received the policy,
15  but he would walk by white employees who were
16  blatantly violating policy in black and white,
17  but never said anything to them in my presence,
18  but he would always single me out.
19      Q    He never said anything to them in
20  your presence?
21      A    I questioned each person that was
22  there, and they told me directly they were never
23  questioned whatsoever.
24      Q    My question is, do you allow for the
25  possibility that Mr. MacDonald may have had

Page 162

162

1
2  conversations with other people to which you
3  were not privy? Yes or no?
4       A    No, I don't ascribe to the
5  possibility, because I believe the credibility
6  of the co-workers.
7       Q    Who were the co-workers?
8       A    Ryan, Magaly.
9       Q    Does Ryan have a last name?
10      A    I would have to look at my notes.
11      Q    What notes?
12      A    I mean, I furnished a lot of
13  paperwork in the beginning to the E.E.O.C.
14      Q    That's what you are referring to as
15  notes, what you sent to the E.E.O.C.?
16      A    Yes.
17      Q    Is there anything else you are
18  referring to other than what you sent to the
19  E.E.O.C.?
20      A    It could have been notes that I
21  jotted down for myself.
22      Q    Where are those notes, if they
23  continue to exist?
24      A    Most likely in storage.
25      Q    Since the beginning of this case,

Page 163

163

2  have you made any effort to obtain those notes,
3  or find them in storage?
4       A    Yes, I have made an effort.
5            However, I would find things in
6  piecemeal, and they would be at different
7  locations, because I was moving around, yes.
8       Q    Let me tell you why I am having
9  difficulty with this.
10           You filed the lawsuit. We got it in
11  the mail. You filed the lawsuit, and there are
12  certain obligations that go with that.
13      A    Yes.
14      Q    What I am trying to determine when I
15  start asking about these papers is, what else is
16  in existence that has not been searched or
17  provided to us, which is a problem. That's what
18  I am trying to figure out.
19           I understand about moving, and I
20  understand about storage units and all that
21  stuff. What I am trying to figure out is what
22  is still out there that we don't have. It's an
23  explanation for why I keep asking about this
24  paper, that's all.
25           So my question is, you say you have

Page 164

164

1
2  notes that you made to yourself.
3            What I am asking is, where are they,
4  because I don't have them.
5            MR. UMOH:  Objection.
6       A    I mean, it was not anything like
7  professional or court presentation. It's on a
8  little note pad, like let me write down Ryan's
9  name or something.
10      Q    It's not my job to explain what it is
11  you're supposed to produce. That's your
12  lawyer's job. I will leave that for you two to
13  discuss.
14           We are entitled to all of it, and we
15  are going to need somehow for it to be produced
16  quickly, okay?
17      A    Okay.
18      Q    So there may be some notes?
19      A    Yes.
20      Q    Ryan's last name is?
21      A    I don't remember.
22           I do remember first names, though.
23      Q    Magaly, you don't know?
24      A    I saw it in here. It was in one of
25  these documents.

Page 165

165

1
2       Q    Okay. At this point, I am just
3  concerned about time?
4            MR. UMOH:  Let the record
5            reflect, plaintiff was not allowed to
6            refresh her memory.
7            MS. NORCROSS:  It's up to me
8            whether I show her a document to
9            refresh her memory.
10      Q    Anyone else?
11      A    The question, who was employed there
12  while I was there?
13      Q    No. The question was, who were these
14  other people that you are sure Jamie never spoke
15  to that you described as violations?
16      A    Lisa. No, not Lisa. Sylvia.
17      Q    Anyone else?
18      A    Those are the ones that pop out right
19  now.
20      Q    Before we get to those people, the
21  specifics of those people, I want you to tell
22  me, please, exactly how you claim Jamie singled
23  you out, which is the way you put it.
24      A    Well, he singled me out based on his
25  dislike of my African American traits, my hair,

42 (Pages 162 to 165)

Page 166

166

1
2  because he walked right by the employee who was
3  violating the Trump policy that he showed me
4  afterwards.
5          Even though he could not say how I
6  violated the policy, he continued to say my hair
7  was not normal, it was not appropriate, it was
8  not current, it's not appropriate for this
9  establishment.
10         Then even Chris Ciatto admitted to me
11  Jamie made a mistake in reprimanding me for my
12  hair, and he apologized for Jamie.
13         I was the only one basically sent
14  home, because every time I saw a different
15  person in Plus One, they had a new issue or
16  making up some way why I was not compliant, but
17  could not say why.
18  Q    Again, I am trying to get facts.
19         Jamie said something or things to you
20  about your hair; is that right?
21  A    Yes.
22         MR. UMOH:  For the record, I
23  want to request a copy of Plaintiff's
24  deposition to review.
25         MS. NORCROSS:  Sure.

Page 167

167

2  Q    I want to show you again what we have
3  previously marked as Defendant's Exhibit 18, the
4  third page of that exhibit.
5  A    Yes.
6  Q    It is accurate that you did not
7  function as the receptionist at Trump between
8  2002 and 2006, correct?
9  A    You are saying I did not act as
10  receptionist?
11  Q    You did not?
12  A    I had many hats while an employee at
13  Trump, so receptionist was one of them.
14  Q    Between 2002 and February 2006, you
15  were a massage therapist, right?
16  A    Yes.
17  Q    But this resume reflects that you
18  were assistant to general manager for a
19  four-year period, roughly, does it not?
20  A    I went to the work force.  And you
21  have to go through a series of trainings, and
22  they tell you how to format your resume and what
23  to put on there.
24         I always put the last position I
25  held.  When I go to the interview, how I got to

Page 168

168

1
2  that position at the company.
3  Q    Similarly, a couple of pages back,
4  where you identify your job at Plus One as
5  customer service manager, you similarly have the
6  dates there, 2002 to 2006, correct?
7  A    On the sheet that I am looking at,
8  the date says 2002 to 2006.
9  Q    Okay.  I want you to, as best you
10  can, tell me exactly what Jamie McDonald said to
11  you, the words he used, as best you can
12  remember, that you found problematic or
13  inappropriate.
14  A    He commented that my hair was not
15  normal, it was not current, that my hair was
16  inappropriate.
17  Q    Anything else that you can
18  remember?
19  A    Those are the three things that stood
20  out for me.
21  Q    Did he say those three things on one
22  occasion or were they different occasions?
23  A    Several.  He repeated those on more
24  than one occasion.
25  Q    When you say more than one, how

Page 169

169

1
2  many?
3  A    It could have been like two or
4  three.
5  Q    But I need you to tell me how many it
6  was.  Not what it could have been, but what it
7  was.
8  A    Roughly two to three.
9  Q    Were these on different dates or on
10  the day?
11  A    Then that changes the situation,
12  because he said those words, okay?  He said
13  those words sometimes frequently, like more than
14  once in one meeting.  I know at least three
15  times during that meeting, he had said that.
16  Like the first time he came out of the elevator,
17  he said, it's not normal.  It's not current.
18         Another time, when I had a meeting
19  with him and Tom and I, he said those things
20  again.  I know he called me on the phone one
21  time.  I know at least two different dates.
22  Q    So on two different occasions --
23  A    At least.
24  Q    On two that you remember --
25  A    What stands out right now are two,

Page 170

170

1
2  definitely. Right now, I definitely remember
3  two specific incidents.
4          I don't recall the other times where
5  I encountered Jamie and the topic came up
6  again.
7      Q    There are times you can remember,
8  sitting here right now --
9      A    Yes.
10     Q    -- that you can recall having
11 these -- that Jamie was saying these things,
12 correct?
13     A    Yes.
14     Q    Can you recall more than two?
15     A    I would have to reflect on my memory.
16         If I take time and think, I don't
17 want to be pressured and have it seem I am
18 trying to waste time.
19     Q    I don't think your trying to waste
20 time.
21     A    If I recall correctly, it's at least
22 more than two times. But right now, I can
23 remember specifically two times.
24     Q    And that's what I am trying to get
25 at. I am trying to find out what it is that you

Page 171

171

2  remember.
3          And you remember two specific
4  incidents?
5      A    Yes.
6      Q    When did the first incident occur?
7      A    If I can recall correctly, it was
8  April 5, 2006.
9      Q    And where did this incident occur?
10     A    It occurred at Trump World Towers.
11     Q    Where?
12     A    The health club.
13     Q    Was it at the front desk?
14     A    Yes, it was.
15     Q    And was there anyone else present
16 during this --
17     A    Yes, there was.
18     Q    Who was that?
19     A    It was out in the open. There were
20 residents working out, employees working.
21     Q    Can you give me their names please?
22         MR. UMOH: Objection.
23         MS. NORCROSS: What is the
24     objection?
25         MR. UMOH: Who is "they"?

Page 172

172

1
2          MS. NORCROSS: The clients,
3      residents, employees she just
4      identified.
5      A    Specifically, I think that
6  information can be gotten from Plus One's
7  attendance log, because I had to punch in the
8  information every day of who was in attendance.
9          Plus One should have information,
10 clients who were present at that time in the
11 facility.
12     Q    Do you know the names?
13     A    I don't recall right now.
14     Q    What, if anything, would help you
15 recall, other than what you think Plus One may
16 have?
17     A    It's hard to recall specifically who
18 was working at that time. I really was not in
19 social interaction, like I kept in touch with
20 these people, so I don't remember their names.
21         Sometimes it's like the residents
22 would have their friends come in as guests, as
23 well.
24     Q    Sitting here today, can you identify
25 for me the name of anyone that you claim was an

Page 173

173

1
2  observer or a witness to this interaction you're
3  describing between yourself and Jamie McDonald?
4      A    I know there is a co-worker, Magaly.
5  Her last name is in one of the documents here.
6  She saw Jamie come in.
7      Q    She saw Jamie come in?
8      A    I am sorry. She was present right
9  when Jamie came in. As soon as he came off the
10 elevator, Magaly was present.
11     Q    Then what occurred after he came off
12 the elevator?
13     A    As soon as he came off the elevator,
14 he kind of jolted when he looked at me. And he
15 was walking around the front desk, and he was
16 looking at me askew. And I was a little bit
17 puzzled as to why he was looking at me like
18 that.
19     Q    Had you ever met Jamie before?
20     A    I believe once prior to that.
21     Q    Would you say you knew him well on
22 April 6, 2006?
23     A    2000 --
24     Q    2006?
25     A    I just met him, yes.



174

1
2     Q     You would agree with me, you did not
3  know him well?
4     A     Right.  Yes.
5     Q     So he got off the elevator.  He
6  looked at you, as you described it, askew.
7           And then what occurred?
8           MR. UMOH:  Objection.
9     A     When he was coming off the elevator
10 his facial expression, it did not seem pleasant.
11 It seemed like he had a grimace on his face,
12 looking at me in disgust.  And I could not
13 understand, well, why would he be, you know.
14          Then he came around and said, Did Tom
15 talk to you about your hair?  And I was like,
16 No.  What are you talking about?  He said, You
17 need to change your hair.  I thought he was
18 joking.  I thought it was banter, because I did
19 not know him.
20          He said, No.  I am serious.  I said,
21 You are not joking.  He said, Your hair is not
22 normal.  It's inappropriate.  You have to do
23 something with it.  It's not current.
24          He started reprimanding me.  I felt I
25 was being insulted out in the open.  And even

175

1
2  Bob Welter --
3     Q     Let's stay with what occurred --
4  well, was Bob Welter there during this
5  incident?
6     A     No.
7     Q     Let's stick to this incident.
8           What occurred at this point in time?
9  Did he say anything else?
10    A     Yes, he did say other stuff.
11          I knew something was fishy because he
12 never could tell me what policy I was violating
13 at Trump.
14    Q     Miss Mann, I am only going to
15 interrupt you because are you still describing
16 for me what occurred on this specific incident,
17 on April 5?
18    A     Yes, the interaction and how it was
19 strange, because he was saying that I needed to
20 change my hair.  He could not give me a reason
21 how my hair was violating policy.
22          He said, Did you get the policy,
23 grooming standards?  I said, What grooming
24 standards?
25          While I was employed at Trump, I was

176

1  never given any grooming standards from Trump.
2  I could not understand what he was talking
3  about.
4           The first time I met Jamie, I had a
5  head wrap on.
6     Q     Okay, I need you to focus on my
7  questions.
8     A     Okay.
9     Q     I am talking about the date that you
10 have given me as April 5, 2006, okay?
11    A     Okay.
12    Q     On April 5, 2006, did you have a head
13 wrap on?
14    A     No.
15    Q     Did Jamie say anything else other
16 than what you have already told me?
17    A     Yes.  We continued the conversation.
18          And he was like, Well, Tom did not
19 give you -- something about if Tom did not give
20 you the grooming standards.  He had to find it,
21 and he was not sure whether Tom even had it.
22          He said, You have to change your
23 hair.  I just remember this was a very urgent
24 matter, basically.

177

1
2           Then we had set up a meeting with Tom
3  Nizsczak, my supervisor, to discuss the grooming
4  standards.
5     Q     How long did this discussion between
6  you and Jamie last?
7     A     I can only estimate.
8     Q     Sure.
9     A     Can you repeat the question?
10    Q     I sure can.
11          My question was, how long did this
12 conversation on April 5, 2006 between you and
13 Jamie last?
14    A     It could have been approximately,
15 back and forth, a half hour.  It could be.
16    Q     It could have been less, but probably
17 not more than half an hour, would that be
18 accurate?
19          MR. UMOH:  Objection.
20    A     I don't believe it could have been
21 less, because I think I remember Jamie had to
22 call me back, and we discussed it again --
23    Q     Okay.
24    A     -- when he left the facility that
25 day.

Page 178

178
1
2    Q    You talked to Jamie twice that day;
3  is that true?
4    A    Well, I know I spoke to him -- okay.
5  I don't remember in the time frame of the next
6  time I had to meet with Jamie and Tom.
7       I can definitely say yes, we spoke
8  about the whole hair thing on April 5, about a
9  half hour.
10    Q    Let me make sure I understand.  You
11  had an in-person conversation with Jamie on or
12  about April 5?
13    A    Yes.
14    Q    When he got off the elevator and you
15  talked about your hair, correct?
16    A    Yes.
17    Q    That conversation lasted about a half
18  hour, give or take; is that correct?
19    A    Yes.
20    Q    That conversation alone, is there
21  anyone that you know of that witnessed or
22  observed or heard that conversation?
23       MR. UMOH:  Objection.
24    A    I can't say who was paying attention
25  or what they were able to hear, per se, because

Page 179

179
2  I would be speaking for them.  But I know who
3  was in close proximity and acknowledged the
4  conversation and so forth.
5    Q    Let me make sure I understand your
6  answer.
7       What you are saying is, there were
8  some people around, but you don't know whether
9  they heard the conversation or did not?
10    A    I don't know if they heard the entire
11  conversation.
12    Q    Do you know if anybody did?
13    A    I believe Magaly did.  We had a
14  discussion after Jamie left.
15    Q    What was that discussion?
16    A    The discussion was my job being in
17  jeopardy and me being in trouble for breaking
18  Trump standards that I did not see.
19    Q    And that is something you told
20  Magaly?
21    A    No.  You are talking about common
22  knowledge, that everybody knows already.
23    Q    Did she specifically tell you she had
24  heard the conversation between you and Jamie?
25    A    I know that she -- okay.  I am trying

Page 180

180
1  to think specifically what she said, verbatim.
2       I know she did communicate to me that
3  she knew I was in trouble.  I can definitely say
4  that.  She did communicate that to me.
5    Q    Did she tell you she had heard the
6  conversation between you and Jamie?
7    A    I don't recall.
8    Q    Then you said you had another
9  conversation with Jamie that day; is that
10  correct?
11    A    I am not sure.  But there was another
12  time where we did speak.  I know he called, and
13  there was a point where that's when we made the
14  meeting with Tom.  I know there was contact with
15  either Tom or I to schedule the next meeting
16  about my hair.
17    Q    During that contact to schedule the
18  meeting, did Jamie say anything to you
19  specifically about your hair, or was the
20  conversation just about setting up the
21  meeting?
22    A    About changing my hair.
23    Q    What did he say?
24    A    I don't remember specifically.  Like

Page 181

181
1  I knew something was strange, because he could
2  not give me, okay, well how am I not complying;
3  and he could not answer me.
4    Q    Did you ask him that question?
5    A    Yes, I did.
6    Q    You have to let me finish.
7    A    I am sorry.
8    Q    That's okay.
9    Q    Did you ask him that question in the
10  conversation to set up the meeting?
11       Understand, I am trying to separate
12  out, as much as possible, the different
13  conversations.
14    A    Sure.  Well, he set up the meeting,
15  and it was not my decision.  It was his
16  decision.
17       I am sorry.  The question again?  I
18  am sorry.  I have had so many questions today.
19    Q    That's all right.
20       The question was -- let me try it
21  this way.
22       You had an in-person conversation on
23  April 5, then you had a conversation with
24  somebody about setting up a meeting?

46 (Pages 178 to 181)

182

1
2    A    Yes.
3    Q    Do you remember if that was Jamie or
4  Tom, or you don't know?
5    A    I know Tom, definitely.  We discussed
6  having the meeting, yes.  I know Tom and I, we
7  discussed having a meeting.
8    Q    Then you had the meeting, correct?
9    A    Yes, we did.
10    Q    Where did the meeting take place?
11    A    The meeting took place in Tom
12  Nizsczak's office at Trump World Towers.
13    Q    What date?
14    A    I have it reflected in some of the
15  documents here.
16    Q    Tell me what you remember.
17    A    Of the meeting?
18    Q    My question is, when did the meeting
19  take place?
20    A    Soon after the April 5, 2006
21  incident.
22    Q    And who was present?
23    A    Jamie MacDonald, Tom Nizsczak and I
24  were present.
25    Q    As best you can remember, please tell

183

2  me what was said, and by whom.
3    A    Well, the majority of the
4  conversation was between Jamie and I.  Tom was
5  basically neutral.  He was just being a witness,
6  and I guess taking down information.
7        I know he had interjected -- tom
8  interjected he never saw the Trump grooming
9  standards.  Jamie reiterated how my hair was not
10  normal, it was inappropriate.
11    Q    Was anything resolved at that
12  meeting?
13    A    No, nothing was resolved.
14        Since nothing was resolved, I
15  immediately contacted Human Resources.
16    Q    And you had a conversation with
17  Heather Davis; is that correct?
18    A    Yes.
19    Q    Heather Davis, sitting to my left?
20    A    Yes.
21    Q    So you two know each other?
22    A    Yes.
23    Q    Please tell me, as best you remember,
24  what you said and what she said in that meeting.
25    A    I know I initiated this meeting

184

1  because I was flabbergasted and shocked and
2  could not believe this was happening.
3        And I felt I was being discriminated
4  against, so I went to Heather.  I started
5  telling her what had happened between Jamie and
6  I.  And I believe I mentioned the meeting with
7  Tom, saying how Jamie had discriminated against
8  me, reprimanded me because of my hair.
9        Then I was concerned as to Jamie had
10  veered away from company policy by reprimanding
11  me out in the open instead of in a closed
12  office.  Basically I was discussing what
13  happened and how to take action.
14    Q    You were upset, right?
15    A    I was upset.  A variety of emotions:
16  Upset, in amazement, kind of sad, in 2006,
17  someone would have the gall to say that to
18  another person.
19    Q    You told me what you said.
20        What did Miss Davis say?
21    A    I know I could remember that she got
22  real nervous once I said that I had filed some
23  forms with the E.E.O.C.  So the meeting was
24  adjourned, and I assume she went to go talk to

185

1  her supervisor.
2    Q    Do you know that?
3    A    I just said I assumed.  I don't
4  know.
5    Q    Had you ever met Heather before?
6    A    To be honest with you, I don't know.
7  It could be I had filled out prior paperwork.  I
8  don't remember.
9    Q    Would you agree with me that at the
10  time you had this meeting with her, you did not
11  know her well?
12    A    Correct.  Yes.
13    Q    How was it that you concluded she was
14  nervous?
15    A    Well, I concluded that because she
16  jumped up, and she was sort of jittery, going
17  back to and fro.  Her movements were not slow
18  and deliberate.
19    Q    Would it surprise you to know, her
20  movements are never slow and deliberate?
21    A    I was observing her composure, and it
22  changed.
23    Q    In all of the conversations you had
24  with Jamie, did he ever say the problem with

Page 186

186

1
2  your hair is because you're African American?
3      A    Well, it depends how you interpret
4  it. He said, We can't make allowances for
5  people with hair like you.
6      Q    Did he say because you were African
7  American?
8      A    He did not specifically quote that.
9      Q    Do you know whether Jamie supervised
10  any other African American employees?
11      A    Yes.
12      Q    And did he?
13      A    Yes. I don't know if any African
14  American employees were under his immediate
15  supervision, but I am sure a couple of levels
16  down, sure. There were other African Americans
17  who worked at the Trump world site.
18      Q    Do your knowledge, did he say
19  anything to those other African American
20  employees about their hair?
21      A    Well, the African American guy that I
22  can't remember, he had a shaved head.
23      Q    Do you know if Jamie said anything to
24  that employee about his shaved head?
25      A    I can't say.

Page 187

187

2      Q    After you met with Heather, you
3  scheduled a meeting with her immediate superior,
4  did you not?
5      A    I believe so.
6          I know eventually I set up a meeting
7  with Bob Welter.
8      Q    Bob Welter was the president of Human
9  Resources; is that correct?
10      A    Yes.
11      Q    and you went to his office to have
12  that meeting?
13      A    Yes.
14      Q    You brought a tape recorder?
15      A    Yes, I did.
16      Q    At the time you had the meeting with
17  Bob Welter, were you represented by counsel?
18      A    No.
19      Q    When you walked into Mr. Welter's
20  office, you told him you had a tape recorder and
21  asked for permission to record the conversation;
22  is that right?
23      A    All I know is, we had a conversation.
24      Q    Isn't it true, you did not even tell
25  him you were recording the conversation?

Page 188

188

1
2          MR. UMOH:  Objection.
3      A    I remember me bringing a ruler.
4      Q    And you measuring your own hair?
5      A    No. He actually measured it.
6      Q    Have you listened to the tape
7  recording recently?
8      A    No, I have not.
9      Q    I would suggest that you listen to
10  it.
11      A    Okay.
12      Q    You may want to change that part of
13  your testimony.
14      A    His hands were on my head. I can say
15  we both did it at the same time.
16      Q    Your testimony is whatever it is.
17          I am telling you, I will give you the
18  opportunity to correct it.
19      A    Yes, that is cool.
20      Q    When you went to have the meeting
21  with Mr. Walter, why did you take a tape
22  recorder?
23      A    In the meeting with Heather, I knew
24  something was very fishy because when they said
25  if I did not cut my hair, I had to get a

Page 189

189

1
2  transfer, but the job was not promised. When
3  they said the job was not promised, then that
4  means I won't have a job, and that's like being
5  fired.
6          I said, Can I get this in writing, if
7  I get a transfer, I will definitely have a job?
8          I knew something was fishy when
9  Heather objected to me getting something in
10  writing.
11      Q    What exactly did Heather say in that
12  regard?
13      A    In regard to?
14      Q    Getting something in writing, as you
15  were just testifying.
16      A    From what I recall, she said she
17  could not give me something in writing.
18      Q    Did she say anything else?
19      A    Yes. There was more discussion
20  within the meeting. You can ask me specific
21  questions on issues.
22          I also talked about, like, the focus
23  is like on my hair.
24          She definitely said people should not
25  come off the elevator and be shocked. The word

190

1  
2  shocked was a word used.
3      Jamie was not reprimanded, how he
4  handled the situation, reprimanded me out in the
5  open.
6      Q   Do you know whether or not Jamie was
7  reprimanded?
8      A   No, I don't.
9      Q   I am still trying to figure out, why
10 did you decide to bring a tape recording into
11 your meeting with Mr. Welter?
12     A   So everyone could know what the truth
13 was.
14     Q   Everyone, meaning who?
15     A   Basically, I already filed a charge
16 with the E.E.O.C.
17     Q   Okay.
18     A   So that was on April 5.
19         And I wanted to make sure the truth
20 and everything was out in the open.
21         I know early on, they were trying to
22 say that I was given the Trump grooming
23 standards, which I was not.  And I was hired
24 well before this whole Jamie incident happened.
25         It was strange how Jamie, Jamie was

191

1  
2  never up front as to how I violated the policy.
3  He could not even tell me the first day, and
4  then he made something up.
5      Every time I went to a different
6  person in Plus One management, they had
7  something different to say about my hair.
8      MS. NORCROSS:  Move to
9      strike.
10     Q   My question is, why did you bring a
11 tape recorder into the meeting with
12 Mr. Welter?
13     A   Because I wanted to make sure the
14 truth was known.
15     Q   Known to whom?  That's the question
16 you did not answer.
17     A   Well, for one, people at Plus One.
18         I wanted to see what Bob Welter was
19 going to say.  I wanted to hold people
20 accountable to there word.
21     Q   Why did you hide the fact that you
22 were recording the conversation?
23     A   I did not hide the fact.
24     Q   Did you tell Mr. Welter you were
25 going to record the conversation?

192

1  
2      A   I don't remember if I told him.
3      Q   Did you ask Mr. Welter's permission
4  to record the conversation?
5      A   I don't remember asking.
6      Q   Where was the tape recorder?
7      A   It was in my hand.
8      Q   Where was your hand?
9      A   Like I am sitting in a chair, if I
10 recall, I was sitting like this.  The desk was a
11 little shorter.
12         Yes, I am sitting like this, and it's
13 in my hand.
14     Q   Did you ever provide Mr. Welter a
15 copy of the recording, or the recording
16 itself?
17     A   No, I did not.
18     Q   Did you provide that recording to the
19 E.E.O.C.?
20     A   I don't think so.  I don't remember.
21 I honestly don't know.
22     Q   Did you provide it to anyone else?
23     A   Yes, I did.
24     Q   To whom?
25     A   I provided it to my lawyer.

193

1  
2      Q   Other than your lawyer, did you ever
3  give it to anyone else?
4      A   No.
5      Q   Why not?
6      A   Well, why would anyone need to know?
7      Q   Well, your earlier testimony was, you
8  were recording it so the people at Plus One
9  would know the truth, or words to that effect.
10     A   I think by the time I copied it, Bob
11 was no longer at the company.  He had put in his
12 resignation.
13     Q   Did you provide it to Chris Ciatto?
14     A   No.  I remember Chris had said he was
15 not familiar with human resource policy or
16 whatever.  He actually referred it to Bob
17 Welter.
18     Q   Did you provide it to -- do you know
19 the man who was here before, Dave Milani?
20     A   Yes.
21     Q   In fact, you scheduled a meeting with
22 Mr. Milani, correct?
23         MR. UMOH:  Objection.
24     A   Scheduled a meeting?
25     Q   After Mr. Welter, you scheduled a

Page 194

194

1
2  meeting to talk to Mr. Milani, did you not?
3      A    I believe it was he who initiated it,
4  because he was taking up for Bob Welter.
5      Q    You did, in fact, schedule a meeting
6  with Mr. Milani, or he --
7      A    I know I did meet with Dave. I don't
8  know if that was after June 9. I am not cool on
9  the day. I have to look at my notes again that
10  I wrote down, you know.
11      Q    You recall that you had a meeting
12  scheduled with him. That's all I am trying to
13  get at.
14      A    Well, I know that I asked him to
15  continue where Bob had left off, because I had
16  continued to be singled out.
17      Q    Did you give Mr. Milani a copy of
18  your tape recording?
19      A    No, I did not.
20      Q    Why not?
21      A    I don't think it was transferred by
22  then. I don't think it was transferred to
23  e-mail or CD format.
24          I had a P.C., and I did not have the
25  necessary software to transpose it. I did not

Page 195

195

2  know how to do that yet. It was from a digital
3  recorder.
4      Q    Did you take it to Mr. Milani's
5  office and let him listen to it?
6      A    No.
7          MS. NORCROSS: Mark this as
8  Defendant's Exhibit 23.
9          (Whereupon the above referred
10          to document was marked, Defendant's
11          Exhibit 23, for identification, as of
12          this date, by the reporter)
13      Q    Take a look at what has been marked
14  as Defendant's Exhibit 23, and tell me if you
15  can identify it when you are finished looking it
16  over, okay?
17      A    Okay. I have looked it over.
18      Q    Have you seen these e-mails before?
19          I will tell you this: This document
20  is a collection of e-mails between you and other
21  Plus One employees, correct?
22      A    Yes.
23      Q    Have you seen these e-mails before?
24      A    Yes, I have, yes.
25      Q    I would like you to go to the second

Page 196

196

1  to the last page of the document bearing the
2  little numbers on the right hand corner, JM0125.
3      Q    Do you see where I am?
4      A    Yes.
5      Q    That e-mail says sent Friday,
6  5-5-2006. Do you see that?
7      A    Yes.
8      Q    Is this an e-mail that you received
9  from Michael Matto?
10      A    Yes.
11      Q    Mr. Matto is the president of Plus
12  One; is that correct?
13      A    I don't know what he is right now,
14  but at the time, he was.
15      Q    When you got this e-mail, he was the
16  president of the company?
17      A    Correct.
18      Q    At the time you received this e-mail,
19  did you read it?
20      A    Yes, I did.
21      Q    And did you come to some
22  understanding about what it meant?
23      A    Some understanding, yes.
24      Q    Okay. What was that?

Page 197

197

1
2      A    I was still a little bit puzzled as
3  to why I was still being singled out, but I got
4  this letter.
5      Q    Say it again.
6      A    Like for instance, even though it
7  says my hair was acceptable, they still --
8  within the e-mail, he still wanted me to make
9  changes to my hair.
10          So I could not understand why he
11  singled me out as opposed to any other
12  co-workers who were blatantly violating policy,
13  but he was still asking me to change my hair in
14  some respect.
15      Q    In this e-mail, he tells you your
16  hair --
17      A    Well --
18      Q    Hang on. Let me finish.
19          In this e-mail, he said, and I quote,
20  As to your hairstyle, though it is acceptable in
21  all of our sites, some hairstyles are not. And
22  we have taken action at your current location to
23  ask some of our employees to change their
24  hairstyle when working at that site.
25          I personally regret that there was

Legal Ease Reporting, Inc.
212-481-3500

Page 198

```
1                      198
2   some confusion on our part with respect to your
3   hairstyle, and you have my sincere apology.
4       A    Okay.
5       Q    Did you read that paragraph?
6       A    Yes, I did.
7       Q    Did you have any understanding of
8   what was being said to you in that paragraph?
9       A    Well, in my interpretation, I felt it
10  was basically, I did not get the answer until he
11  consulted his lawyer, and that it was a legal
12  response, and it did not come from the heart.
13         There are women at the site that had
14  hair a foot longer than I. I could not
15  understand why he was focusing on me, with my
16  hair length, but women had hair like a foot
17  longer than me. That kind of made me feel
18  uncomfortable to see how real his response was,
19  sincere.
20      Q    You wrote to him that morning, you
21  wrote Mr. Matto, the president of the company,
22  at 6:52 on May 2, 2006, correct?
23      A    I would have to look at the e-mail.
24      Q    Well, look at it. It's right there
25  in front of you.
```

Page 199

```
1                      199
2       A    Yes, okay.
3       Q    So you wrote Mr. Motto at 6:52 that
4   morning, correct?
5       A    Yes.
6       Q    And he responded to your e-mail at
7   10:48 that same morning, correct?
8       A    Correct.
9       Q    But that did not satisfy you; is that
10  correct?
11      A    Well, I did not feel that my job was
12  still safe because when they hired a new site
13  manager, the first day the site manager started,
14  I was the only one questioned about grooming
15  standards and taken behind closed doors.
16      Q    Are you talking about Christian
17  Garcia?
18      A    Yes. I had a handshake, and he was
19  coming up with new regulations. I was not
20  supposed to where stud earrings.
21      Q    Mr. Garcia came from the Waldorf
22  Astoria to the Trump World Towers, correct?
23      A    I don't know.
24      Q    He was from another facility?
25      A    Correct.
```

Page 200

```
1                      200
2       Q    Different facilities have different
3   standards, correct?
4       A    No facility operates the same.
5       Q    Are you aware of the fact that at the
6   Waldorf Astoria, the fitness employees are not
7   permitted to wear earrings?
8       A    Well, Christian did not make that
9   distinction. He did not say whether or not I
10  could wear earrings. He was -- well, whatever.
11         MS. NORCROSS: Move to strike.
12         Read back the question.
13         (Whereupon, the above referred
14         to question was read back by
15         the reporter.)
16      Q    Let me rephrase it.
17         Are you aware of the fact that in
18  2006, at the Waldorf Astoria, the fitness
19  employees were not permitted to wear earrings?
20      A    I was not familiar with Waldorf
21  policy.
22      Q    On the day that you and Christian had
23  this conversation, are you aware of the fact
24  that you were the only employee there at the
25  time who was wearing earrings?
```

Page 201

```
1                      201
2       A    Repeat the question.
3         MS. NORCROSS: Read it back,
4         please.
5         (Whereupon, the above referred
6         to question was read back by
7         the reporter.)
8       A    Well, if I can recall correctly, if
9   Magaly was present that day, she always wore
10  earrings; and Magaly is a female.
11      Q    You are saying if she was present.
12         Do you know if she was?
13      A    Plus One records would be able to
14  reflect that.
15      Q    That is not my question.
16         My question is, do you know?
17      A    From what I remember, I thought she
18  was there that day.
19         MR. UMOH: Before we go on,
20         it's past 5:00. She has been deposed
21         for seven hours.
22         MS. NORCROSS: You showed up
23         here about a quarter after 10:00, and
24         you took long for lunch.
25         It has not been seven hours.
```

51 (Pages 198 to 201)

Page 202

202

1
2    MR. UMOH:  We showed up at
3    1:00, and we were sitting downstairs
4    for a half hour.
5        MS. NORCROSS:  I came in at
6    1:00, and there was no one there.
7        MR. UMOH:  Off the record.
8        (Discussion off the record)
9        MR. UMOH:  This is Plaintiff's
10   counsel.  And we are in the middle of
11   the deposition, and we would like the
12   judge to resolve it, if possible.
13       THE LAW CLERK: The judge is
14   not available now.
15       MR. UMOH:  The judge allocated
16   10 hours for the deposition today and
17   an unspecified amount tomorrow.
18       MS. NORCROSS:  We have the
19   judge's order.  It has to do with the
20   hour allocation, is the best I
21   understand this.
22       The judge ordered 10 hours of
23   deposition time today and then
24   additional time tomorrow morning,
25   depending upon when Miss Mann needs

Page 203

203

2    to leave for her flight to Singapore.
3        And we resolved earlier this
4    morning, she needs to leave about
5    12:30, which is fine.
6        The issue that has arisen is
7    Plaintiff's counsel believes that --
8    he is concerned about the allocation
9    of deposition time between me, as
10   counsel for two of the Defendants,
11   and Harold, as counsel for the other
12   two.
13       I have taken six hours of
14   deposition.  We have been here for
15   approximately seven  There was a
16   one-hour lunch break.
17       What Mr. Umoh is suggesting is
18   that the one-hour lunch brake counts
19   towards my seven hours, which I have
20   explained to him is contrary even to
21   the comments in the federal rule
22   book.
23       THE LAW CLERK:  Mr. Umoh, is
24   that correct?
25       MR. UMOH:  That is correct.

Page 204

204

1
2    Plaintiff has been produced so far
3    for seven hours of deposition.
4        We feel the deposition with
5    Plus One is concluded.
6        MS. NORCROSS:  We have the
7    court reporter here.  The actual
8    deposition time has been something
9    just under six hours, but call it
10   six.
11       My intent at this point is to
12   finish up one line and then let
13   Mr. Derschowitz start.  We are going
14   to be going until whenever.
15       THE LAW CLERK:  The judge is
16   on the bench.
17       I can't give you a ruling on
18   this.  I am only the law clerk, and
19   not the appointed judge.
20       But my reading of the letter
21   is that the plaintiff is to be
22   questioned for 10 hours, and I am
23   sure the judge would say that does
24   not include a lunch brake.
25       So we can call you back when

Page 205

205

1
2    she is off the bench.
3        MR. UMOH:  One defendant may
4    depose her for 10 hours?
5        THE LAW CLERK:  My reading of
6    the letter, the letter said plaintiff
7    may be questioned for 10 hours on
8    August 12.
9        MS. NORCROSS:  The only thing
10   we don't seem able to agree on, we
11   are in the Lester Schwab offices.
12       THE LAW CLERK:  If I were you
13   guys, I would try to resolve this
14   before the judge calls you back.
15       But give me a call back in a
16   few minutes if you would like to
17   speak to the judge.
18       MS. NORCROSS:  Thank you.
19       Off the record.
20       (Discussion off the record)
21       MS. NORCROSS:  There is an
22   Exhibit that was just marked as 22
23   that should be marked as 23.
24       Mark this as Defendant's
25   Exhibit 24.

Legal Ease Reporting, Inc.
212-481-3500

Page 206

```
 1                        206
 2              (Whereupon the above referred
 3         to document was marked, Defendant's
 4         Exhibit 24, for identification, as of
 5         this date, by the reporter)
 6         Q     Miss Mann, please look at what has
 7    been marked as Exhibit 24 to your deposition,
 8    consisting of four pages, with Bates stamp
 9    numbers 207 through -- excuse me, 297 through
10    300. And I would like you to look over them and
11    then tell me if you can identify those pages.
12         A     Yes, I can identify them.
13         Q     What are they?
14         A     They are a description of my incident
15    report that I filed about the incident that
16    happened on June 8 and June 9 of 2006.
17         Q     And this is the incident involving
18    the exchange between you and Robert Schuller; is
19    that right?
20         A     Yes.
21         Q     What I would like you to do is read
22    through this description of the incidents and
23    tell me if everything you wrote here is
24    accurate.
25         A     Okay.
```

Page 207

```
 2         Q     I have a question pending, but I
 3    think I will withdraw it.
 4              You prepared pages 298 through 300,
 5    correct? You wrote this?
 6         A     Correct.
 7         Q     And is it accurate?
 8         A     It's not inclusive of everything that
 9    happened. I mean, I wrote this under duress. I
10    wrote it to the best of my ability.
11         Q     Is there any statement in here that
12    is not accurate?
13         A     Not to my knowledge. I would have to
14    reread it again.
15         Q     Well, there are ways to do this. I
16    can go through this entire incident, and it will
17    take another hour; or I can ask you to read
18    this, and you tell me if you were truthful when
19    you wrote this.
20         A     Yes, I was truthful when I wrote
21    it.
22         Q     Is what you wrote accurate?
23         A     Yes, this is accurate.
24              But it does not portray, I did not
25    put the -- I don't think I really described in
```

Page 208

```
 1                        208
 2    detail the physical threat that I felt, how
 3    Robert was coming at me during the incident.
 4         Q     In fact, you did not say anything
 5    about physical threat at all in this memo,
 6    correct?
 7         A     Well, it was.
 8         Q     Just answer my question, please.
 9         A     I know I said threatened, and I was
10    scared for my safety.
11         Q     Is there anything in here that is not
12    accurate?
13         A     From what I recall, this is what I
14    put down.
15         Q     Is there anything in there that is
16    not accurate?
17         A     It may not portray the whole story.
18         Q     Is there anything that is not
19    accurate?
20         A     Not in my opinion.
21         Q     And you wrote this on the day of the
22    incident, correct, June 9?
23         A     Yes.
24              MS. NORCROSS:  All right.  I
25         am going to stop at this point and
```

Page 209

```
 1                        209
 2         reserve my right to continue once
 3         counsel has had an opportunity to
 4         question you.
 5    I need to say for the record, there are serious
 6    problems with discovery coming from your end,
 7    which may mean you may have to come back,
 8    according to the judge's letter.
 9    EXAMINATION BY
10    MR. DERSCHOWITZ:
11         Q     Good afternoon, Miss Mann. My name
12    is Harold Derschowitz. I represent Trump and
13    Mr. Henriques in this case. I am going to ask
14    you some questions.
15              I will try my best not to repeat some
16    of the questions that have been asked. If I do,
17    please accept my apology.
18              If you don't understand my question,
19    please tell me, and I will be happy to rephrase
20    it for you.
21         A     All right.
22         Q     You testified earlier, when you were
23    asked about the reason for terminating your
24    employment with P.I.C. in 2006, the first reason
25    you gave would be you had to come to New York to
```

210

1
2  give a deposition in this case.
3     A    Yes.
4     Q    You said there were other reasons.
5         I would like to know what the other
6  reasons were?
7     A    The thing is, I would not have
8  resigned that early with P.I.C.  I would have
9  stayed with them longer.
10        But the reason why I resigned, I gave
11  my resignation on July 5th, was the primary
12  reason to come back to New York so I could be
13  here in person for a deposition.
14        However, I would have continued to
15  work at P.I.C. and then later, in August, I
16  would have resigned to go to school.
17    Q    Right.  You would have intended to
18  leave P.I.C. in either way, whether for the
19  deposition or whether for school?
20    A    In August.
21    Q    When in August would you have to
22  leave there to get ready for school?
23    A    Initially I was planning on getting
24  to Singapore late, like August 21.
25        But then I got an e-mail from the

211

1
2  student services that they recommended that I
3  come much earlier to give me time to find
4  housing there.
5     Q    When did they suggest that you come
6  down, or come up, whatever it may be?
7     A    I know they sent the e-mail in the
8  summertime.  I can check my e-mail and furnish
9  that information.
10    Q    I am going to ask you to check your
11  e-mails and produce any e-mails between you and
12  the school regarding the program that you are in
13  from the time you were accepted in it until the
14  present, I guess.
15    A    Sure.
16    Q    Do you recall what date they told you
17  you have to get there by?
18    A    They suggested I get there August 4.
19  Orientation starts around August 25.  I think
20  that's a Monday.  They told me I should get
21  there August 4.
22    Q    In effect, you would have had to
23  leave basically the same time, whether you were
24  coming up here for the deposition or whether you
25  were starting school, because you --

212

1
2     A    I would assume so.
3         I did not think I had to come back to
4  New York then when I found out my whole schedule
5  changed.
6     Q    We went over earlier a couple of your
7  employers since the time that you left Plus One.
8     A    Yes.
9     Q    I am going to demand, on the record,
10  all of the employers you mentioned during your
11  testimony.
12    A    Okay.
13    Q    Have you received any records from
14  Rita Buck, Ann Boris or Marcy Friedman regarding
15  treatment?
16    A    No.  When I was seeing them, no, they
17  never gave anything to me directly.
18        I was assuming they made notes and
19  sent it to the insurance company.  I assumed the
20  files were there.
21    Q    Did you have an insurance company
22  that was paying their bills at that time?  Was
23  it Medicare, Medicaid or something?
24    A    I believe I started seeing Miss Buck
25  when I was employed at Plus One, and it was

213

1
2  under the Plus One insurance.
3         Then Dr. Boris and Marlene was
4  Medicaid, so it was free health insurance,
5  because I did not have enough income at the time
6  I qualified.
7     Q    Have you paid any medical bills for
8  either of the providers that we have mentioned
9  so far?
10    A    From what I recall, like when I say
11  Miss Buck, I had to pay a co-pay.
12    Q    And what about the others?
13    A    No, I don't recall ever paying them
14  anything directly from my pocket.
15    Q    I want to start and go in
16  chronological order, which of these medical
17  providers you saw first, and then continue from
18  when you first started seeing them, up until the
19  present time, so I can get a full history of all
20  of your medical treatment that's the subject of
21  this lawsuit.
22        Who did you see first, and when was
23  it?
24    A    I first started seeing Rita Buck.
25    Q    Does she have a specialty?  Is she a

Page 214

```
1                    214
2    doctor or social worker, psychiatrist, or
3    something else?
4        A    If I can recall correctly, she was a
5    licensed clinical social worker.
6        Q    Were you referred to her by
7    anybody?
8        A    No.  I looked her up in the health
9    insurance company website.
10       Q    Where was her office?
11       A    I saw her on 11th Street.  It was a
12   street in the Village.
13       Q    In Manhattan?
14       A    Yes, in Manhattan.
15       Q    When you first saw her, what were
16   your complaints?
17       A    My complaints, just the emotional
18   distress I was going through, based on my
19   discrimination at Plus One.
20       Q    When was the first time you saw
21   her?
22       A    From what I recall, late April.  But
23   it should be reflected in the health insurance
24   records.
25       Q    I have no records.  I have to go by
```

Page 215

```
1                    215
2    what you say, at this point.
3        A    Sure.  From what I can recall, it
4    must have been late April, maybe the third
5    week.
6        Q    Was it after the incidents you
7    described earlier with Mr. MacDonald taking
8    place?
9        A    Yes.
10       Q    What, exactly, did you tell her was
11   bothering you?  What were your symptoms or your
12   complaints?
13       A    Well, obviously it was very apparent
14   I showed a lot of anger.  I was depressed,
15   frustrated.  I felt powerless and just basically
16   ill at ease.
17            I had problems sleeping.  I was very
18   anxiety ridden.  I was very jumpy, especially
19   because I felt my job was on the line, getting
20   fired.
21            Yes, I was definitely not in the best
22   of shape.
23            And I had digestive issues, too, just
24   a lot of stomach cramps.  And then I was getting
25   headaches.
```

Page 216

```
1                    216
2        Q    Had you ever felt these symptoms at
3    any time prior to your first visit to Miss
4    Buck?
5        A    You mean -- well, I have experienced
6    those emotions throughout my lifetime.
7        Q    When was the most recent?
8        A    Well, did you ever receive treatment
9    for these symptoms?
10       A    Yes.  That's why I was going to Miss
11   Buck and Marlene.
12            And I was confiding a lot in my
13   pastor at the time.
14       Q    You told me the first time you saw
15   anyone about your situation at work was in late
16   April, when you saw Miss Buck, correct?
17       A    Yes.
18       Q    You just gave me a list of physical
19   complaints you mentioned to Miss Buck on your
20   first visit.
21            Had you ever been treated for those
22   symptoms or complaints before that?
23       A    By a medical doctor?
24       Q    By anybody.
25       A    Yes, I have had headaches before,
```

Page 217

```
1                    217
2    where I have taken Tylenol, throughout my
3    lifetime.
4            Maybe in my early twenties, I went to
5    the doctor and said, I have a stomachache, but I
6    have never taken any medication.  I always try
7    to go the natural route.
8        Q    Is it fair to say you have not seen
9    any medical providers or hospitals or doctors
10   for any of the complaints made to Miss Buck at
11   the end of April '06?
12       A    I was just relying on my peers in
13   terms of telling me what herbal supplements to
14   take.
15            I went to nutritional school, as
16   well.
17            I believe in alternative health so I
18   was doing my own research.
19       Q    What were you taking?
20       A    If I had headaches, I am trying to
21   think what I was taking.  I would take Ginger.
22            I would take this thing like a colon
23   collection.  It would be a mixture of herbal
24   supplements into one.
25            Then also, for the headaches, there
```

Page 218

```
1                    218
2   is peppermint oil, and rub them on my temples.
3       Q    Had you experienced these headaches
4   or stomach problems before April of '06, when
5   you saw Miss Buck?
6       A    I had experienced those problems
7   throughout my lifetime.
8            Well, not consistent throughout my
9   lifetime.  It was not a chronic problem.
10      Q    Periodically?
11      A    Yes.  Once in a blue moon, I would
12  have a headache.
13           I have never been hospitalized.
14      Q    What did Miss Buck do for you?  I
15  don't want to know what she told you.  What did
16  she do for you on your first visit?
17      A    From what I recall, on the first
18  visit, a lot of it was intake.  She was like,
19  okay, why are you here?
20           A lot of times she was asking
21  information for clarification and trying to find
22  out, why did I go and see her.
23      Q    Did she prescribe any medication to
24  you or recommend that you see any other persons
25  or doctors or therapists at that point?
```

Page 219

```
1                    219
2       A    I don't recall if she did.
3            I know if she recommended me to take
4   medication, I would have flatly out denied it.
5       Q    I am just interested in what you
6   recall.
7       A    Sure.  Miss Buck did not; but I know
8   Marlene did suggest, yes.
9       Q    To your knowledge, she did not
10  recommend any medication.
11           She did not refer you to anyone
12  else?
13      A    No, because I had to stop seeing her
14  because my insurance ran out.
15           MR. DERSCHOWITZ: I move to
16           strike the portion that's not
17           responsive.
18      Q    Did she prescribe you any medication
19  or refer you to anybody after your first
20  visit?
21      A    No.
22      Q    How many times did you see Miss
23  Buck?
24      A    An average of once a week.  I think
25  one time I saw her twice a week.
```

Page 220

```
1                    220
2       Q    For how long a time period?
3       A    It had to coincide with when my
4   insurance ended.  I think it was the same week
5   that I was no longer insured, health insurance,
6   by Plus One; so I am thinking I ended seeing her
7   by June 16, 2006.
8       Q    And how many times, in total, did you
9   see her?
10      A    I am taking a guess, about 10.
11      Q    Did she do anything different for you
12  on the other nine times you saw her than the
13  first time you saw her?  Did she just do intake,
14  listen to what you were saying?
15           MR. UMOH:  Objection.
16      Q    You tell me.
17      A    Her strategy seemed consistent.
18           I mean, she would ask me questions,
19  and she would offer questions as to, like post
20  different scenarios and try to get me to look at
21  different things about myself.
22      Q    Do you have any pending appointments
23  with her?
24      A    No, I don't have any.
25      Q    Who is the next person you saw after
```

Page 221

```
1                    221
2   Miss Buck?
3       A    I believe that was Marlene
4   Friedman.
5       Q    And does she have a specialty?
6       A    I don't know her specialty.
7       Q    Is she a doctor?
8       A    I don't know if she is a
9   psychiatrist.  She could be a licensed clinical
10  social worker.
11           I don't know how they do it with the
12  classifications of psychotherapist.
13      Q    Do you know if she has an M.D. after
14  her name?
15      A    That's a good question.  I don't
16  know.
17      Q    Did anyone refer you to her?
18      A    No.
19      Q    How did you find her?
20      A    Through health insurance on the
21  website.
22      Q    When was the first time you saw
23  her?
24      A    I don't recall the first day or time.
25  But I know when I did see her, it was warm
```

Legal Ease Reporting, Inc.
212-481-3500

Page 222

222

1
2    weather.
3        Q    Do you know if it was 2006 or 2007?
4    Do you know what year it was?
5        A    It was like whatever year that I got
6    the free health insurance.
7        I can get back to you on that.  I
8    don't know the day I started getting free health
9    insurance.
10       Q    Was she the next person you saw after
11   you stopped seeing Miss Buck?
12       A    Yes.
13       Q    Do you recall if you saw Marlene a
14   year later or --
15       A    I think it was sometime in 2007.  I
16   am not positive.
17       Q    Do you have any records of Marlene
18   Friedman in your possession?
19       A    No, not currently any records.
20       Q    I mean, did anything go back and
21   forth with you in terms of correspondence or
22   e-mails or anything like that?
23       A    No.
24       Q    When you first saw Marlene Friedman,
25   what were your complaints?

Page 223

223

2        I still had a lot of unresolved anger
3    issues.  I just felt like I had been -- I was
4    frustrated, how I had been terminated from a job
5    which I felt was based on discriminating against
6    me, and retaliation because I brought up
7    discrimination, and the frustration of finding a
8    job, even though I had skills, and not being
9    able to work as a massage therapist.
10       Q    You had not seen anyone for a year,
11   since the last time, right?
12       A    I was confiding in my pastor.
13       Q    On your first visit to Marlene
14   Friedman, what did she do for you?  Not what did
15   she tell you, but what did she do for you?
16       A    You mean --
17       Q    Did she conduct any tests?  Did she
18   examine you?  Did she take X-rays, CAT scan,
19   blood work?
20       A    She just asked questions.
21       Q    Did she prescribe any medication or
22   course of treatment or refer you to anybody else
23   on that first visit?
24       A    The first time, no.
25       Q    Did you see Marlene Friedman more

Page 224

224

1
2    than once?
3        A    Yes, I did.
4        Q    How many times did you see her, in
5    total?
6        A    I am taking a guess, like maybe four.
7    It could be four, five.
8        Q    When was the last visit out of the
9    four?
10       A    I don't remember what day or month
11   that was.
12       Q    Do you remember what year?
13       A    I am taking a guess.  If I had the
14   free health insurance in 2007, then it was in
15   2007.
16       Q    Do you know if it was the beginning,
17   the middle, the end of the year?  Can you narrow
18   it down at all, if possible?
19       A    I am assuming -- I remember that I
20   did not have a coat, so it had to be warm.  I am
21   assuming the summer.
22       Q    Would it be fair to say, all your
23   visits to Marlene Friedman were in the summer of
24   2007?
25       A    I would say so.

Page 225

225

2        Q    What did she do for you on your other
3    visits?  Not what did she tell you, but what did
4    she do for you?
5        A    Ask me questions.  And she would give
6    me an analysis of where I was at.
7        Q    Did she examine you in any way, or
8    run any tests?
9        A    No.
10       Q    Did she prescribe any medication?
11       A    I don't think she was able to
12   prescribe, so the answer is no.
13       But she did recommend -- she posed
14   the possibility.  She said, why don't you
15   consider medication.
16       Q    But she did not mention a particular
17   type, or she was not able to write you out a
18   prescription?
19       A    We never got that far, so I don't
20   know if she is able to write out a prescription.
21       Q    Did she refer you to any other
22   specialists?
23       A    Yes, she did.
24       Q    Who did she refer you to?
25       A    She referred me to St. Luke's

Page 226

```
1                    226
2   Hospital, where Dr. Boris, the third person I
3   saw, was employed.
4       Q    Did she refer you to that particular
5   doctor, or just to the hospital?
6       A    I could say definitely the hospital.
7   I don't recall if it was the specific doctor.
8       Q    Did there come a time when you saw
9   Dr. Boris at St. Luke's Hospital?
10      A    Yes.
11      Q    when was that?
12      A    It could have been weeks after I saw
13  Marlene Friedman, because Marlene Friedman had
14  recommended a couple of people, but everybody
15  else was booked up, and it took me a while to
16  actually -- for an appointment to open up, and I
17  could see Dr. Boris. So I am thinking a couple
18  of weeks after I finished seeing Marlene
19  Friedman.
20      Q    Would that have been late summer or
21  early fall of 2007?
22      A    I would say late summer.
23      Q    Does Dr. Boris have a specialty?
24      A    If she does, I don't remember it.
25      Q    When you first saw Dr. Boris, what
```

Page 227

```
1                    227
2   were your complaints?
3       A    The similar issues that I spoke with
4   Miss Buck and Marlene Friedman, the same
5   issues.
6       Q    There were no changes in your
7   symptoms from the first time you saw Dr. Buck in
8   April of 2006 until the time you were seeing
9   Dr. Boris in 2007?
10      A    It did shift. It became more of a
11  nervous condition and anxiety, because I did not
12  have a job at the time.
13           That was really the forefront, the
14  nerves and my heart murmur and all this other
15  stuff.
16      Q    Did someone tell you you had a heart
17  murmur?
18      A    Yes.
19      Q    Who told you that?
20      A    A doctor at one point -- I don't
21  remember which doctor, but I know I do have a
22  heart murmur. I don't recall which doctor told
23  me this.
24      Q    When were you told this?
25      A    I don't remember.
```

Page 228

```
1                    228
2       Q    Well, was it before you started
3   working at the Trump facility Plus One?
4       A    Yes.
5       Q    What did Dr. Boris do for you on your
6   first visit? I don't want to know what she told
7   you, I just want to know what she did for you.
8       A    Asked questions, and we filled out an
9   intake form.
10      Q    Did she conduct any tests or
11  prescribe any medication or examine you in any
12  way?
13      A    She did not prescribe any medication,
14  but there was some type of test, but I don't
15  know what it was. I know it was more inclusive
16  than what Miss Buck and Marlene had done in the
17  past. I don't remember what she did, though.
18      Q    Do you know if it was a diagnostic
19  test?
20      A    Yes, diagnostic, yes.
21      Q    If I leave a blank in the transcript,
22  do you have any records that would reflect what
23  type of test you underwent with Dr. Boris?
24      A    No. I don't have any records.
25      Q    How many times did you see
```

Page 229

```
1                    229
2   Dr. Boris?
3       A    I don't recall, but I am thinking at
4   least three or more.
5       Q    When was the last time you saw
6   Dr. Boris?
7       A    I am assuming it was around late
8   August of 2007.
9       Q    What did Dr. Boris do for you on all
10  of the other visits that you went to see her?
11  Not what did she tell you, but what did she do
12  for you on those other visits?
13      A    She just asked questions and added
14  commentary.
15           I did not see her individually. It
16  was in a group setting.
17      Q    So these were not individual
18  appointments.
19           Was it part of a therapy group?
20      A    It was part of a therapy group,
21  because she said that was the only thing
22  available. She was booked up with the
23  individual sessions. That was all she could
24  give me.
25      Q    Did the therapy group have a name, or
```

Page 230

230

1  is it referred to as something?
2      A    Not that I recall.  It was her
patients.
5      Q    Do you know what the nature of the
6  therapy was, whether it was anger management, or
7  stress, or anything else in particular?
8      A    I don't know if it was anything in
9  particular.  I know everyone had different
10  issues that were discussed.
11      Q    Everybody basically got up and spoke
12  at these meetings?
13      A    Yes.
14      Q    Now did you also see a Crystal
15  Huggins?
16      A    Yes, I did.
17      Q    When did you first see Crystal
18  Huggins?
19      A    Pertaining to the Trump incident?
20      Q    No, pertaining to your present
21  lawsuit and your claim of personal and mental
22  injuries as a result of this.
23      A    I distinctly remember talking to her
24  right around the time -- yes, it was right
25  around the time I got terminated from Plus

Page 232

232

1
2      A    I met her at a -- I believe it was, I
3  attended one of her work shops.  I took some
4  classes.  She teaches about spiritual issues.
5  She taught holistic healing information and just
6  techniques on how to better your life.
7      Q    After you first spoke to her on the
8  phone in June of 2006, did you actually schedule
9  an appointment to see her?
10      A    After I spoke with her the first
11  time, it was not like an appointment every week.
12  It was basically when I had a breakdown, she
13  would be the first person I would call.
14      Q    You would talk to her if you had any
15  complaints about anything in particular?
16      A    Yes.
17      Q    How often would you call her?
18      A    When I was really stressed, I would
19  call her several times like each week.
20          It would really depend on my
21  emotional state.  If I was feeling stressful and
22  down and out and emotional, I would call her
23  during the week, and then I would get a handle,
24  and then I would just call once a week.
25          Sometimes I can remember calling

Page 231

231

2  One.
3      Q    That would be in June of '06?
4      A    Yes, June of '06.
5      Q    When you say you spoke to her, was
6  this on the phone, or you saw her in person?
7      A    It was on the phone.  I remember it
8  was summer.  I remember it was over the phone.
9      Q    Does Crystal Huggins have a
10  specialty?  Do you know if she is a doctor,
11  something else?
12      A    She is a reverend.
13      Q    Is she the pastor you were talking
14  about previously?
15      A    Yes.
16      Q    What did you tell her the first time
17  you spoke to her on the phone?
18      A    Concerning this matter?
19          If I recall correctly, I think I was
20  crying, just sort of being frustrated.
21      Q    Was she a pastor at the church you
22  went to, or did you know her from somewhere
23  else?
24      A    I knew her from somewhere else.
25      Q    From where did you know her?

Page 233

233

1
2  three times in one week, not being able to
3  necessarily reach her, but placing the calls.
4      Q    For how long a period of time did you
5  call her at least once a week?
6      A    Actually until today.
7      Q    So you are still calling her once a
8  week, at least once a week?
9      A    Actually I have been calling her,
10  trying to reach her more frequently, because I
11  have been nervous about getting here for the
12  deposition, back to New York.
13      Q    It is your testimony you have been
14  calling her from June of '06 until your
15  termination from Plus One.
16          Were there times you called her that
17  involved other issues?
18      A    There were times when I mentioned
19  other things.  Some stemmed from Plus One.
20  Others did not.
21          There were times I called just asking
22  for information, just what do you recommend on
23  relaxation techniques.  I do yoga.
24          Eventually I got to the point, I
25  tried to focus more on healing rather than being

59 (Pages 230 to 233)

Page 234

234

1
2  in a state of frustration and despair and
3  sadness. I think I am getting a handle on it.
4      Q    Other than Miss Buck, Marlene
5  Friedman, Dr. Boris and Crystal Huggins, have
6  you seen any social workers, psychiatrists,
7  medical providers, therapy groups, or anything
8  else relating to this incident?
9      A    No.
10     Q    Miss Mann, I am going to show you a
11 photograph and ask you if you have ever seen
12 this before.
13     A    Yes, I have. I have seen the photo
14 before.
15          MR. UMOH: Can we mark it,
16          please?
17          MR. DERSCHOWITZ: Yes. I
18          wanted to see if she first recognized
19          this.
20          Mark this photo as Defendant's
21          Exhibit 25.
22          (Whereupon the above referred
23          to document was marked, Defendant's
24          Exhibit 25, for identification, as of
25          this date, by the reporter)

Page 235

235

2      Q    Miss Mann, I am going to show you
3  what has been marked as Defendant's Exhibit 25.
4          Can you tell me if you recall when
5  that was taken?
6      A    I know I gave the day -- I know the
7  approximate day it was taken. I e-mailed my
8  lawyer. I know it was taken around my birthday
9  in October, but I have to look in my e-mail to
10 tell you which year.
11          I know it was during my employment at
12 Plus One, but it was before I worked at Trump
13 Tower.
14          MR. DERSCHOWITZ: I am going
15          to leave a blank in the transcript.
16          If you can find a copy of the e-mail,
17          will you provide that information,
18          and so we know when this photo was
19          taken?
20          THE WITNESS: Okay.
21          MR. UMOH: Objection.
22          MR. DERSCHOWITZ: We were not
23          given the exact time --
24          MR. UMOH: I am objecting.
25          She is unsure as to the year.

Page 236

236

1
2          MR. DERSCHOWITZ: She said she
3          definitely sent her attorney it in
4          the month it was taken.
5      Q    Anyway please provide us what year
6  this was.
7      A    Yes.
8      Q    Miss Mann, can you tell me if your
9  appearance in this photograph accurately
10 reflects the appearance of your hairstyle as it
11 existed in April of 2006?
12     A    It's similar, yes.
13     Q    Do you know if your hair was longer
14 or shorter or anything else?
15     A    Well, it's hard to say in this photo,
16 because there is a shadow. I can see on the
17 right side of the photo, there is a shadow
18 behind, so it puts an extra appearance that
19 makes my Afro look bigger. I can't tell whether
20 or not that's the exact height.
21     Q    The same question, but for May of
22 2006. Would your answer be the same? I asked
23 you about April of '06.
24     A    Similar hairstyle. I can't confirm
25 the length, though.

Page 237

237

1
2          In terms of hairstyle, yes, that's
3  how I was wearing my hair.
4      Q    But the length, you can't say whether
5  it was longer or shorter or the same?
6      A    Yes, because how the photo is.
7          Sometimes when I take photos with my
8  hair, the reflection of the flash, it makes it
9  look bigger than what it is.
10     Q    Let me ask you this: From the time
11 the photo was taken, is it fair to say you have
12 had your hair cut until April of 2006, or no?
13     A    I don't know. I don't know if I went
14 to a professional.
15          I have done things to my hair, yes.
16     Q    I am just asking about the length,
17 that's all, whether you shortened it at any time
18 from when the photo was taken through April of
19 '06.
20     A    I don't recall getting an extreme
21 haircut, no.
22     Q    I don't know what extreme is.
23          I am just asking you if you had it
24 cut at any time between the photo and April of
25 '06.

Legal Ease Reporting, Inc.
212-481-3500



Page 238

238

1    A   I don't remember getting it cut.
2    Q   I am going to show you a document
3  that's been marked as Defendant's Exhibit 24. I
4  am going to refer you to page 2 of the document.
5  I am going to ask you to read the fourth
6  paragraph, under June 8, 2006.
7    A   It reads as, later at home --
8    Q   No, you don't have to read it out
9  loud.
10   A   Sorry.
11       Yes, I have read it.
12   Q   Can you tell me what you meant when
13 you said, continued harassment and
14 discrimination from Trump management?
15   A   Like being singled out, where it just
16 puzzled me how my other co-workers would come
17 in, like violating policy.
18       And that had been the case since I
19 was employed at Trump.  And they had never
20 changed their, like wearing the hair gel and
21 wearing overly large earrings.
22       Then also, it was really weird.
23 Independent of Trump, I was talking with another
24 department in Plus One.  They were helping me

Page 239

239

2  with my application for my massage license.
3        A week before, they mysteriously
4  asked me, well, we want to know whether or not
5  you are going to sue Plus One, because they are
6  having reservations about going through with my
7  license.
8        MR. DERSCHOWITZ:  Move to
9        strike the whole answer as not
10       responsive.
11   Q   You're writing in this paragraph,
12 continued harassment and discrimination from
13 Trump management.
14       My question to you is, what is that
15 based upon?
16   A   It's based upon Jamie MacDonald's
17 comments that it was Trump One who said they
18 disapproved of my hair.
19   Q   My question is, that's somebody else
20 telling you something.
21       Did you personally experience any
22 harassment or discrimination from anyone at
23 Trump management while you were at Plus One?
24   A   I should have been more specific and
25 said that Jamie, acting on Trump management's

Page 240

240

1  behalf.
2        MR. DERSCHOWITZ:  I move to
3        strike the portion that's not
4        responsive.
5    Q   Miss Mann, you never experienced any
6  harassment or discrimination from any Trump
7  management employee while you were at Plus One,
8  did you?
9        MR. UMOH:  Objection.
10   A   When I wrote it, it was written with
11 the assumption that whoever was carrying out
12 those duties for Trump.  There were times when
13 Jamie said he is responsible for carrying out
14 Trump management.
15       In semantics, I should have said,
16 instead of management, the policy.
17   Q   When did you start working for Plus
18 One Fitness?
19   A   August of 2002.
20   Q   When you were hired by Plus One
21 Fitness in August of '02, did you have sign any
22 employment contractor agreement?
23   A   I don't recall, but I know I signed
24 the application.  I know you certify.  I know I

Page 241

241

1  signed something.  I don't recall what it was,
2  specifically what it said.
3    Q   Do you know if you were an at-will
4  employee of Plus One Fitness?
5    A   Well, I assume at-will is applicable
6  for employees of New York State.
7    Q   I am just asking if that was your
8  understanding.
9    A   I never really thought about it that
10 way, but I did know in 2006.
11   Q   Miss Mann, I am going to show you
12 what has been marked as Defendant's Exhibit 16.
13   A   Sure.
14   Q   And I draw your attention to page 2
15 and ask you to read the paragraph that begins
16 with, I certify that the facts contained.
17   A   Okay, I see it.
18   Q   Does that refresh your recollection
19 as to whether you were an at-will employee at
20 Plus One Fitness when you were hired by them?
21       MR. UMOH:  Objection.
22   A   Looking at it, definitely, I was
23 informed.
24   Q   And you signed that agreement,

61 (Pages 238 to 241)

242

1
2  correct?
3     A    Yes.
4     Q    And you read it before you signed
5  it?
6     A    I am assuming I did.
7     Q    Okay.
8          Were you given any papers or
9  documents when you were first hired by Plus One,
10  describing the terms of your employment?
11     A    Like specific responsibilities and
12  duties?
13     Q    Maybe guidelines or policies of the
14  company, or any type of manual to welcome you?
15     A    To be honest with you, it's such a
16  long time ago. I don't know if I got like a
17  pamphlet or something.
18          But I know there was an orientation
19  that I went to, like a meeting.
20          MR. DERSCHOWITZ: Mark this as
21  Defendant's Exhibit 26.
22          (Whereupon the above referred
23          to document was marked, Defendant's
24          Exhibit 26, for identification, as of
25          this date, by the reporter)

243

2     Q    Miss Mann, I am going to show you a
3  document that's been labeled Defendant's
4  Exhibit 26, and ask you if you recognize that.
5     A    It looks like it is an employee
6  handbook.
7     Q    Were you ever given this document
8  once you started employment with Plus One?
9     A    There is a possibility I could have
10  gotten it when I started at Trump, but I don't
11  recall getting it when they hired me as a
12  massage therapist.
13     Q    Do you recall having seen this
14  document during your employment at Plus One at
15  any time?
16     A    I can't confirm.
17          I may have seen it in 2006 when I
18  started Trump.
19     Q    That still counts.
20     A    Okay.
21     Q    At some point in time, at the latest,
22  when you started work at the Trump facility, you
23  were shown a copy of this document?
24     A    Page 124 is missing.
25          Usually Plus One has their logo

244

1
2  everywhere. I don't know if I actually saw this
3  particular handbook.
4     Q    When did you start work at Plus One
5  at 845 United Nations Plaza?
6     A    I don't remember the exact date. I
7  don't know whether it was the end of February or
8  March, because I had been interviewing in
9  February, so I don't know when the actual hire
10  date for this position commenced. I don't
11  remember, so it had to have been late February,
12  early March.
13     Q    What was your job title when you
14  started there?
15     A    The title there was receptionist.
16     Q    That was receptionist at the health
17  club, right?
18     A    Yes.
19     Q    Did your job title change during the
20  time you worked at 845 U.N. Plaza, Plus One?
21     A    No.
22     Q    Who was your employer when you worked
23  at 845 U.N. Plaza from the end of March until
24  June?
25          MR. UMOH: Objection.

245

1
2     A    This is where I am a little bit
3  unclear, because I thought that Plus One hired
4  me to work for Trump Towers, and they were just
5  managing the facility.
6     Q    Did someone ever tell you that?
7     A    I remember having a conversation,
8  that Plus One managed the facilities for Trump
9  Towers.
10     Q    Were you under the impression that
11  you were an employee of the Trump World
12  Organization?
13          MS. NORCROSS: I object.
14     A    Well --
15     Q    Did anyone ever tell you you were
16  employed by anybody other than Plus One during
17  the time period of March to June 2006?
18     A    No.
19     Q    Did you receive paychecks during the
20  time period from March to June of 2006?
21     A    Yes, I did receive paychecks.
22     Q    Whose name was on the paychecks?
23     A    Plus One Fitness.
24     Q    Did you receive a W-2 for the time
25  you worked from March to June of 2006, that time

1                          246
2   period?
3        A    Yes, I did.
4        Q    Who was listed as your employer?
5        A    Plus One.
6        Q    Who were your supervisors when you
7   worked for Plus One at 845 U.N. Plaza?
8        A    Immediate supervisors?
9        Q    Anyone who was your supervisor.
10       A    John Henriques, Tom Nizsczak, Mike
11  Murray, Jamie MacDonald, Christian Garcia.
12       Q    Now in what way did the persons you
13  mentioned supervise you?  Did they all give you
14  daily work assignments?
15       A    In certain instances, they would give
16  me directives, and I would have to do stuff and
17  perform duties and give feedback about my
18  accomplished tasks.
19       Q    Did all the persons you mentioned,
20  were they all employed by Plus One Fitness?
21       A    No.
22       Q    Plus One Fitness was your employer,
23  correct?
24            MR. UMOH:  Objection.
25       A    Yes.

2                          247
2        Q    Who was not employed by Plus One
3   Fitness, of the persons you mentioned?
4        A    I believe John Henriques.
5        Q    When you say he was your supervisor,
6   did you meet with him on a daily basis to go
7   over your job assignments?
8        A    No, not on a daily basis.
9        Q    Did you ever meet with him to discuss
10  your job assignments?
11       A    He was not like meeting.  He would
12  come down when --
13            MR. DERSCHOWITZ:  Move to
14            strike the unresponsive portion.
15       Q    Just yes or no, did you ever meet
16  with him to discuss your job assignments?
17       A    It would depend what day I saw him.
18       Q    How often did you meet with John
19  Henriques?
20       A    It was probably a few times when I
21  was there when other supervisors were not
22  present.  He would give me a directive of
23  manning the pool and doing whatever when Tom was
24  not present.
25       Q    How many times would he give you

1                          248
2   directives, from the time you started working
3   there at the Trump facility until the time you
4   were terminated?
5        A    I can remember about two.
6             Basically, we had to listen to
7   everything that he said and take immediate
8   action when there was a problem.
9        Q    He told you that on those two
10  occasions?
11       A    John did not tell me that.
12            Tom Nizsczak directed me to follow
13  his directive.  I guess Tom said he had to meet
14  and report to John.
15       Q    You said earlier, he gave you
16  directives on two occasions during the time you
17  worked at the Trump facility.
18       A    It was a continual problem, about the
19  pool being unmanned.
20       Q    So on those two occasions, was that
21  what he spoke to you about?
22       A    I believe so.
23       Q    Did he call you into his office to
24  meet with you, or did he happen to just be down
25  in that area and say, do something?

1                          249
2        A    He would come down.
3        Q    Other than those two occasions, did
4   you ever meet with Mr. Henriques?
5        A    No.
6        Q    Did you ever meet with anyone from
7   the board of managers of the Trump World Towers
8   condominium?
9        A    If I can recall correctly, they would
10  come to the front desk and vocalize their
11  displeasure on certain things.
12       Q    Did they meet with you to discuss
13  your work assignments?
14       A    No, not work assignments.
15       Q    Did you ever receive any reviews or
16  work evaluations while you worked for Plus One
17  at the Trump facility?
18       A    Not to my knowledge.
19       Q    Did John Henriques ever speak to you
20  about your physical appearance from the time you
21  started working at the Trump facility until the
22  day of your termination?
23       A    He did not speak to me directly.
24       Q    Did anyone ever tell you that John
25  Henriques had commented about your personal

250

1
2  appearance, from the time you first started
3  working at the Trump facility until the day of
4  your termination?
5      A    Yes.
6      Q    Tell me who told you and when they
7  told you.
8      A    It was Jamie MacDonald who told me
9  this.
10     Q    What did he tell you?
11     A    I know he mentioned this in the
12 meeting that I had with Tom regarding the Trump
13 grooming policy.  That's when he he brought it
14 up.
15     Q    That was the meeting in early April
16 '06?
17     A    Correct.
18     Q    And what did he say?  What did Jamie
19 tell you that John said?
20     A    In the meeting, I don't know if he
21 specifically said John Henriques, but I know he
22 said Trump management disapproved of my hair.
23     Q    But he did not attribute it to any
24 particular person.  He just said Trump
25 management disapproves of your hair?

251

2         MR. UMOH:  Objection.
3      Q    You can answer.
4      A    He did not communicate that
5  verbally.
6      Q    So he did not mention anyone
7  specifically by name.  He just said Trump
8  management disapproves of your hair?
9      A    From what I recall from the
10 meeting.
11     Q    Okay.  Did you ever send any written
12 correspondence to, or receive any correspondence
13 from, either John Henriques or the board of
14 managers at Trump World Towers condominium
15 regarding your job performance or appearance?
16     A    No, I did not.
17     Q    Were you ever told by any Plus One
18 employees that you have to conform with any
19 grooming requirements which they told you were
20 promulgated by Trump?
21     A    Yes, I did.
22     Q    When was the first time you were told
23 this?
24     A    I don't know if Jamie said this, like
25 on April 5, with the first incident about him

252

1
2  saying my hair was not normal.
3         But I know definitely, when I met
4  with him and Tom, that's when he told me about
5  the compliance with the Trump hair grooming
6  policy.
7      Q    When was the first time you had ever
8  seen any type of grooming requirements which
9  Plus One attributed to Trump?
10        MR. UMOH:  Objection.
11     A    It was after of the first incidents
12 with Jamie MacDonald, so it was after April 5.
13     Q    Did someone present you with these
14 requirements, in written form or otherwise?
15     A    Yes.
16     Q    And who presented them to you?
17     A    Jamie MacDonald.
18     Q    I am going to show you Defendant's
19 Exhibit 1, and I am going to ask you if these
20 are the documents, the grooming requirements
21 that you just referred to that was presented to
22 you by Jamie MacDonald.
23     A    Yes, it looks like what Jamie
24 MacDonald did give me, yes.
25     Q    Can you tell me if that document has

253

1
2  any particular letterhead or stationery
3  reflecting who it was prepared by?
4         Is the symbol you're pointing to,
5  Plus One?
6      A    Yes, it's Plus One.
7         Even though it has the same -- I
8  don't remember ever seeing the Plus One logo on
9  the initial one that I saw, and it looked like
10 the title was different.
11        I don't remember that being the
12 title.  I don't remember seeing the Plus One
13 logo.  It seems like someone added that on.
14        I thought I submitted this to the
15 E.E.O.C.
16     Q    I am asking you, is this the document
17 that Jamie MacDonald showed to you after your
18 meeting with him and Tom in April of '06?
19     A    I don't believe it's the exact same
20 document.  I don't believe it's the exact same
21 copy.
22     Q    Do you know how that copy that's in
23 front of you would have differed from the one
24 that you were shown?
25     A    No.  I don't know who furnished

254

1  this.
2      Q    Can you read it for content and tell
3  me, apart from the letterhead and title, do you
4  recall if the content is the same?
5      A    For the most part.
6           I am not reading through everything,
7  but when I look at it, yes, the content, no
8  deadlocks -- yes, the content is pretty much
9  across the board.
10          Yes, the content is the same.
11     Q    Can you tell from this document who
12 prepared it?
13     A    No.
14     Q    Is there anything on this document
15 that would lead you to believe that this came
16 directly from Trump, other than the fact that
17 someone wrote Trump's name at the top of it?
18     A    Yes.  I was taking them at face
19 value.
20     Q    If they say that was Trump's grooming
21 requirements, you would assume that --
22     A    It was the grooming requirements,
23 yes.
24     Q    Now did you file a claim with the
25

255

2  Equal Employment Opportunity Commission?
3      A    Yes, I did.
4      Q    I am going to show you what has been
5  marked as Defendant's Exhibit 5 and ask you to
6  read the first paragraph on page 4.
7      A    Yes, I have read it.
8      Q    Was this document prepared by you?
9      A    Yes.
10     Q    And it's your handwriting on it?
11     A    Yes.
12     Q    And do you state on the document, my
13 new regional manager said my hair was
14 inappropriate and it does not comply with Plus
15 One standards?
16     A    That's what I wrote.
17     Q    Did you write on there that it did
18 not comply with anyone else's standards?
19     A    Not on the document.
20     Q    Who was the new regional manager you
21 were talking about, in this document marked
22 Defendant's Exhibit 5?
23     A    Jamie MacDonald.
24     Q    Miss Mann, I am going to show you
25 what has been marked as Exhibit 26 and ask you

256

1  if you could turn to page 15 of that document.
2  It's Bates stamped page 32.  It begins with the
3  letter H at the top.
4      A    Yes.
5      Q    I am going to refer you to section K
6  on that page and ask you if you have ever seen
7  that document or that provision during the time
8  you worked at the Trump facility for Plus One.
9      A    I don't remember ever reading this or
10 seeing it.
11     Q    Did anyone from Plus One ever provide
12 you with this document at any time while you
13 were working at the Trump facility, or prior to
14 that time?
15     A    I am thinking, if I met with Heather
16 Davis, then I guess I would have received it
17 from Heather Davis.
18          I don't remember whether I actually
19 had an orientation.  I think that would have
20 been the only time I would have been given --
21     Q    When would that have been in terms of
22 date and time?  Would that have been April or
23 March of '06?
24     A    Yes, roughly on or about, yes.
25

257

2      Q    Besides what is in the document,
3  section K, did anyone from Plus One ever
4  verbally instruct you as to the provisions that
5  are set forth in section K?
6      A    No, not to my knowledge.
7      Q    Were you familiar with the provisions
8  sets forth in section K during the time you
9  worked at the Trump facility for Plus One?
10     A    No, I was not.
11     Q    Did anyone at Plus One ever instruct
12 you what you should do if you had words with a
13 tenant or a resident at the building?
14     A    No.
15     Q    Did anyone ever tell you that you
16 should seek out another employee or a supervisor
17 from Plus One in the event you were encountering
18 difficulty with a tenant or residents at the
19 Trump facility?
20     A    No one ever told me that specifically
21 in those words.
22     Q    On June 9, 2006, were you involved in
23 an incident with a tenant or resident of the
24 building at 845 U.N. Plaza?
25     A    Yes, I was.

Page 258

258

1
2    Q    When did you first see that tenant or
3  resident on June 9 of '06?
4    A    Early in the morning.
5        I know I wrote it down in one of the
6  statements. I know it was in the morning, like
7  around 6:30 a.m.
8    Q    And did you initiate a conversation
9  with that tenant or resident at that time?
10    A    Did I initiate a conversation? No.
11  I was following what --
12    Q    Ma'am, I am just asking if you
13  initiated a conversation.
14        MR. UMOH: Objection.
15    A    It was not a conversation. I was
16  doing my task that I was told to do every time
17  when someone walks off the elevator.
18    Q    When you saw this particular tenant
19  or resident, you initiated a conversation,
20  correct?
21        MR. UMOH: Objection.
22    Q    Did you talk first? That's all I
23  want to know.
24    A    When you say initiated a
25  conversation --

Page 259

259

2    Q    You're just interpreting what I am
3  saying.
4        Did you talk first to him, or did he
5  talk first to you?
6    A    I spoke first.
7    Q    What do you recall saying?
8    A    Good morning.
9    Q    Did the tenant or resident inform you
10  that he did not want to talk to you?
11    A    Yes. That's when he started to
12  become hostile.
13    Q    But he said to you, I don't want to
14  talk to you, correct?
15        MR. UMOH: Objection.
16    A    Correct.
17    Q    And it was at that time that you
18  called the police?
19    A    No.
20    Q    How much time went by?
21    A    I don't know exactly how much time.
22        But there were a series of incidents
23  where he would be coming back and forth, lunging
24  over the table and pointing in my face.
25        It got to the point where my

Page 260

260

1
2  co-worker said look, go inside the office, don't
3  come out. Call the police.
4    Q    And this is on June 9?
5    A    June 9, on a Friday.
6    Q    I am going to show you the document
7  that's been marked as Defendant's Exhibit 24.
8  And I am going to show you your statement of the
9  incident of June 9, and I am going to ask you
10  why the information you just gave us is not
11  contained in here.
12    A    I am assuming, when I look at this,
13  sometimes like when I write, it's automatically
14  assuming. Sometimes it's when you're repeating
15  stuff and putting it on, you don't say
16  everything that happened. It relatively
17  happened so fast.
18        Basically, I wrote it the same time
19  that I was emotionally distraught. I stayed to
20  type this up.
21        One of my driving factors was to
22  hurry up and sort of be out of Robert's
23  presence.
24    Q    Is it correct to say, the version you
25  just gave now is not the version that's on the

Page 261

261

1
2  June 9 statement that we previously marked as
3  Defendant's Exhibit 24?
4        MR. UMOH: Objection.
5    A    I would say incorrect.
6        What I stated there is the truth. I
7  did not put everything that happened on the
8  piece of paper which is reflected in the Police
9  Report that was filed.
10    Q    Is there anything on this document
11  where you provided a statement of the June 9
12  incident that says that the tenant physically
13  threatened you?
14    A    In here, it does not specifically say
15  that. But to me, it's assumed.
16    Q    Ma'am, I am just asking if it says
17  it.
18    A    It does not say it specifically,
19  yes.
20    Q    Did anyone at Plus One ever tell you
21  that calling the police on a resident was a
22  viable option as part of your job?
23    A    That was never discussed.
24    Q    What is the basis of your claim that
25  John Henriques intentionally or arbitrarily

66 (Pages 258 to 261)

Page 262

```
1                    262
2   procured the breach of your contract of
3   employment with Plus One?
4        MR. UMOH:  Objection.
5        A    According to Jamie MacDonald, Jamie
6   was saying it was John Henriques who said that
7   my hair was not acceptable at Trump.
8        Q    But when did he say that this took
9   place?
10       A    It had to have been after the first
11  incident.  It was like during the meeting.
12       Q    You are talking about in April?
13       A    Yes, the meeting with Tom Nizsczak
14  and Jamie and I.
15       Q    Ma'am, you were terminated in June of
16  2006, correct?
17       A    Correct.
18       Q    Did anyone ever tell you that John
19  Henriques had you terminated from employment
20  arbitrarily?
21       MR. UMOH:  Objection.
22       Q    Because that's your claim in your
23  lawsuit.  You have claimed that, and I want to
24  know what the basis of that claim is.
25       A    Well, the basis is, it all started
```

Page 263

```
1                    263
2   with Jamie MacDonald.  He was saying my job is
3   in jeopardy because of my hair, because of the
4   Trump grooming standards.
5        Q    Ma'am, you did receive an e-mail from
6   the president of the company saying that your
7   hair was acceptable in May of 2006; isn't that
8   correct?
9        MR. UMOH:  Objection.
10       A    It's correct.
11            But they continued to discriminate
12  against me.
13       Q    When you say "they," I am asking you
14  about Mr. Henriques.
15            How did Mr. Henriques discriminate
16  against you?
17       A    I did not have any direct
18  communication with John Henriques about my
19  hair.
20       Q    So as we sit here today, you don't
21  have any basis for claiming that Mr. Henriques
22  discriminated against you because of your hair,
23  do you?
24       MR. UMOH:  Objection.
25       A    Only on the basis Jamie MacDonald's
```

Page 264

```
1                    264
2   statements.
3        Q    What about the board of managers of
4   Trump World Towers condominium?  What is the
5   basis of your claim that they discriminated
6   against you?
7        MR. UMOH:  Objection.
8        A    It's based on the grooming standard
9   that they created, according to Jamie
10  MacDonald.
11       Q    Is it your claim that the grooming
12  standard which was on Plus One's stationery and
13  mentions the name Trump, that that grooming
14  standard discriminated against you?
15       A    It was how they were implying it,
16  jamie saying he was acting on behalf of John's
17  directive
18       Q    Did you ever speak to John about
19  that?
20       A    I never spoke directly to John about
21  my hair.
22       Q    Did you ever receive any written
23  correspondence or memos or e-mails or anything
24  from John about your hair?
25       A    No.
```

Page 265

```
1                    265
2        Q    Or from anyone from the board of
3   managers of Trump World Towers condominium about
4   your hair?
5        A    I don't know if I can answer that
6   question accurately.
7            I was under the assumption that the
8   Trump grooming policy was from them.
9        Q    I am asking if you received any
10  e-mail or correspondence from John Henriques or
11  the board of managers of Trump World Towers
12  concerning your hair or appearance.
13       A    Exclusive of the grooming, no.
14       Q    The grooming was a document you were
15  handed that you don't know who prepared it,
16  correct?
17       A    Correct.
18       Q    Were you ever told the reason you
19  were terminated, by anyone?
20       A    Yes.  I know that I was on the phone
21  with Dave Milani.
22       Q    From Plus One?
23       A    Yes.
24       Q    Was he the person who told you you
25  were being terminated, or was it someone else?
```

266

1
2     A     He was the one who told me I was
3  terminated.
4     Q     Was that on June 16, or somewhere
5  about that?
6     A     I am kind of thinking it was a little
7  built earlier than June 16.
8     Q     Do you recall the date?
9     A     No.  It was in the week period that I
10  was at home.  And he was saying at that point,
11  it might be best you look for another job.
12          June 16, I believe that's when he
13  said, we no longer want you employed at Trump or
14  Plus One.
15     Q     Is this in person, he told you, or by
16  telephone phone, or something else?
17     A     I remember this was over the phone.
18     Q     Did he give you a reason for why you
19  were being terminated?
20     A     I remember him distinctly saying that
21  he was -- Plus One did not like the fact that I
22  exercised my right to protect myself by calling
23  the police.
24          That was one of the reasons, I
25  believe.  I remember him saying, we don't like

267

2  it that you called the police.
3     Q     Were those his words?
4     A     I can almost pretty much say that it
5  was.
6     Q     But he did not mention anything about
7  your appearance or your hair during the time he
8  told you you were being terminated, did he?
9     A     Well, I know --
10     Q     I am just asking whether he mentioned
11  it or not.  I hate to cut you off.
12          MR. UMOH:  Objection.
13     A     I am sorry.  Rephrase the question.
14     Q     When Mr. Milani informed you you were
15  being terminated, did he mention that your hair
16  or your physical appearance was a reason for
17  your being terminated?
18     A     He did not say that.
19     Q     Miss Mann, I am going to show you
20  what has been previously marked as Defendant's
21  Exhibit 19.
22     A     Okay.
23     Q     Have you had a chance to look at that
24  document?
25     A     Yes.

268

1
2     Q     Do you recall whether this document
3  was given to you by Plus One or by anyone else,
4  or where you came to be in possession of this
5  document?
6     A     I am thinking it was Plus One.
7     Q     Do you know when you would have been
8  given this document, or by whom?
9     A     I don't remember about this.
10          I just remember specifically about
11  the one about the Trump regulations.
12          I don't remember whether this was
13  specifically Plus One, like generally for all
14  the employees.
15     Q     Ma'am, I have to know where this
16  document originated.  It does not have a
17  letterhead or anything else on it.
18     A     I am assuming this is Plus One, and
19  not Trump.
20     Q     Besides the fact it has nothing on it
21  that says who it is or what it is, I am just
22  asking you, because you furnished it to us.  I
23  am asking you what this is supposed to
24  represent, since you supplied it.
25     A     If I turned it over, it was turning

269

1  over all the documents I had that I felt were
2  pertinent to the case that was needed.
3     Q     Do you know if you got it off the
4  website, possibly, or from anywhere else,
5  because you seem to have attached it to the
6  other documents that were marked as Defendant's
7  Exhibit 20 that had the pictures of the two
8  general managers on it.
9     A     I don't think it came from the
10  website, because it does not have the thing at
11  the bottom.
12          I don't remember.  I know I did not
13  get this until I started working at Trump.
14     Q     This document?
15     A     Yes.
16     Q     Okay.  Ma'am, can you tell me the
17  basis of your claim that John Henriques and the
18  board of managers of Trump World Towers
19  condominium terminated your employment on the
20  basis of race and national origin?
21     A     How did they terminate me?
22     Q     This is your claim.  I am asking you
23  to tell me the basis of your claim.
24     A     They used the Robert incident as an

Page 270

```
1                        270
2   excuse.
3       Q    Well, did the Robert incident involve
4   any discrimination or any words or statements
5   about your hair or your appearance?
6       A    Not directly from Trump.
7       Q    Can you tell me the basis of your
8   claim that the board of managers of Trump World
9   Towers condominium and John Henriques acted in
10  bad faith in terminating your employment?
11      A    I was not given the same treatment as
12  the other employees when they violated grooming
13  standards, although I did not violate the
14  grooming standards.
15      Q    Well, did Mr. Henriques or anyone on
16  behalf of the Trump organization ever tell you
17  that you had violated any grooming standards?
18      A    No.  I never spoke directly to John
19  Henriques about my hair.
20      Q    Or anyone on the board of managers of
21  Trump World Towers condominium?
22      A    Correct.
23      Q    Can you tell me the basis of your
24  claim that John Henriques or the board of
25  managers of Trump World Towers condominium acted
```

Page 271

```
1                        271
2   in malice regarding your termination from
3   employment?
4       A    Not dealing properly with the
5   harassment I was subject to from the resident,
6   Robert.
7       Q    Can you think of any reason that
8   Mr. Henriques would have any malice towards you,
9   or the board?
10          MR. UMOH:  Objection.
11      A    I would say if they feel I am not
12  conforming to their grooming standards, they
13  want me out.
14      Q    But they never told you that was the
15  case, correct?
16      A    I never spoke to them directly.
17      Q    Can you tell me the basis for your
18  claim that John Henriques and the board of
19  managers of Trump World Towers condominium and
20  John Henriques intentionally interfered with
21  your contract of employment with Plus One?
22      A    It's all based on information that I
23  got from Dave Milani, because I did not speak
24  directly to the Trump board or Trump management
25  about my termination.
```

Page 272

```
1                        272
2       Q    Well, you told me earlier that when
3   Mr. Milani told you you were being terminated,
4   that his comment was that Plus One did not like
5   the fact that you had called the police.
6       A    He said they don't like it and we
7   don't like it, referring to they, Trump.
8           He proceeded to raise his voice and
9   say, you don't call the police on a client.
10      Q    Ma'am, is it your claim that by
11  calling the police on a client, that that was
12  not a valid basis for your termination?
13      A    Can you repeat the question?
14      Q    Yes.
15          MR. DERSCHOWITZ:  Read it
16  back.
17          (Whereupon, the above referred
18          to question was read back by
19          the reporter.)
20      A    Correct.
21      Q    Ma'am, do you have any present
22  physical complaints or mental complaints
23  regarding the incident or regarding your
24  termination from employment at Plus One?
25      A    Present complaints?
```

Page 273

```
1                        273
2       Q    Yes.
3       A    Residual emotional distress.
4       Q    Can you tell me how that manifests
5   itself?
6       A    It has escalated to anxiety, heart
7   palpitations, mostly nervousness and anxiety,
8   and the mere fact that I am rehashing over this
9   right now.
10      Q    Other than seeing the pastor, you
11  have not had any treatment or seen any other
12  doctors or social workers or anyone else since
13  the summer of 2007, right?
14      A    Correct.
15          MR. DERSCHOWITZ:  Off the
16  record.
17          (Discussion off the record)
18  CONTINUING EXAMINATION
19  BY MS. NORCROSS:
20      Q    Miss Mann, you testified before that
21  there are other African American Plus One
22  employees working at the Trump site when you
23  were there, right?
24      A    Yes.
25      Q    who were they?
```

69 (Pages 270 to 273)

Page 274

274

1
2    A    I believe his name was Kenrick, I
3  don't remember his last name.  And Freddy
4  Nicholas.
5    Q    On one of your documents, you
6  identified Freddy Nicholas as a person with
7  information about this case.
8        What information does he have, that
9  you know of?
10    A    He was present during my employment.
11  He was present for the second Robert incident.
12    Q    Okay.
13    A    Basically, he was there at the time
14  of my Plus One employment.
15    Q    Had you spoken to him about your
16  lawsuit or any of the facts underlying your
17  lawsuit?
18    A    I did reach out to him, yes.
19    Q    When did you do that?
20    A    This is Freddy we are talking about
21  now?
22    Q    Yes.
23    A    I don't know specifically what date I
24  contacted him, but I know I did reach out to him
25  to have him give a statement of what happened.

Page 275

275

2    Q    Did he give a statement?
3    A    I don't know if he did an affidavit
4  and submitted to the court.
5        At this point, that's my answer, yes.
6  I don't know if he furnished something directly
7  to the court.
8    Q    Have you ever seen a document
9  prepared by Freddy Nicholas relating to any of
10  your claims in this case?
11    A    He sent me an e-mail that he would be
12  willing to give his account of the situation.
13        MS. NORCROSS:  That e-mail
14        should have been produced, and I ask
15        that it be produced as quickly as
16        possible.
17    Q    Is there anyone else you spoke to
18  regarding the factual claims you may have
19  here?
20    A    I spoke directly to Mike Murray.
21    Q    When was that?
22    A    I don't know, roughly, but I know I
23  did speak to him.
24        It was definitely after my
25  termination at Plus One.

Page 276

276

1
2    Q    Was it before or after you filed this
3  lawsuit?  You filed the lawsuit in June of 2007.
4    A    That's a hard call.  I don't know.  I
5  don't know if I did before or after.  I can't
6  recall the specific dates right now.
7    Q    Did you talk to him before or after
8  you went to Guam?
9    A    It had to have been before Guam.
10    Q    Why?
11    A    Because Guam, I was so busy working,
12  and it was difficult to reach people here.
13    Q    Did you feel better while you were in
14  Guam, while working for P.I.C.
15        MR. UMOH:  Objection.
16    Q    Better in the respect of the symptoms
17  that you described to Mr. Derschowitz?
18    A    They were not as severe as they were
19  closer to my termination.
20    Q    So would it be accurate to say you
21  were less anxious while you were in Guam?
22    A    When I did not hear about the
23  lawsuit.
24        But as soon as I heard now there is
25  deposition issues, yes, it started back up

Page 277

277

1  again.
2    Q    While you were working in Guam, and
3  other than when you had to think about the
4  lawsuit, you felt better than you had before you
5  went to Guam?
6    A    I would say so.
7    Q    What did you say to Mr. Murray, and
8  what did he say to you?
9    A    I don't remember specifically,
10  verbatim.
11        I remember I asked him if he was
12  willing to make a truthful statement about what
13  happened.
14    Q    And did he respond to you?
15    A    He said, I remember what he was like,
16  Jordan.
17        He was very friendly.  He was
18  basically saying, you know what, I would like
19  to, but I think I need to check this out with
20  Plus One first.
21        I was like okay, cool, fine.
22    Q    As far as you know, did he check it
23  out with Plus One?
24    A    Yes, he did check it out.

Legal Ease Reporting, Inc.
212-481-3500

Page 278

278

1
2      He called me back, and he apologized
3  and said he was sorry, he could not make a
4  statement.
5      Q    Did he tell you why?
6      A    I don't think he went into detail as
7  to why.
8          From what I recall, it was basically
9  his supervisor said he was not allowed to.
10     Q    Did he tell you that, or is that
11 something you are concluding from what he did
12 say?
13     A    I don't remember concluding that.
14         It was like, they won't let me.
15     Q    Now do you know whether or not
16 another employee or hire was placed in the
17 receptionist position at the Trump facility?
18     A    When?
19     Q    Anytime after you left?
20         MR. UMOH:  Objection.
21     A    I don't know, because I was not
22 working there anymore.
23     Q    You said you have spoken to some of
24 your former co-workers, correct?
25     A    Yes, I have.

Page 280

280

1  is of color.
2      Former co-worker, Sylvia, who was
3  actually employed at Trump.
4      Q    Employed by Plus One at Trump?
5      A    Contracted at Plus One to work at
6  Trump.  She commented it was discrimination.
7      Freddy Nicolas commented it was
8  discrimination.
9      Tom Nizsczak, my former supervisor,
10 before he left, he commented that Jamie was in
11 the wrong, and that I should hold true to my
12 complaint.
13     Q    Did he say Jamie was in the wrong
14 because of your race, or Jamie was in the wrong,
15 generally?
16         MR. UMOH:  Objection.
17     A    It was a bunch of things.
18         It's sort of like I am answering for
19 him, and I don't know what he was thinking.
20     Q    I want to know what he said to you.
21         I understand you can't tell what
22 somebody else is thinking.
23     A    I remember him saying, hold tight to
24 your complaint.  Jamie was in the wrong.

Page 279

279

2      Q    Did you ever ask them if anybody
3  replaced you?
4      A    No.  That was not my concern.
5      Q    Did you have any reason to determine
6  what the race of the person who replaced you, if
7  anybody, was?
8      A    My focus was on why I was not placed
9  to a different site.  That was my discussion
10 with my former co-workers, because that was
11 policy.
12     Q    Did you ever question why you were
13 not?
14     A    I got some comments that it was not
15 right and it was discriminatory, it was
16 racist.
17     Q    Who said it was racist?
18     A    I remember particular Plus One
19 employees at the Goldman Sachs site who knew me
20 for at least two years while I worked at that
21 site.
22     Q    Please give me their names.
23     A    I believe her name was Debbie.
24     Q    What race is Debbie, if you know?
25     A    I don't know what race.  I know she

Page 281

281

2      And then he went into detail how
3  Jamie did not supply him with all of the
4  information.
5      Q    He had difficulties with Jamie, too,
6  correct?
7      A    I was never privy to any of their
8  discussions.
9      Q    Did Tom ever tell you he was having
10 trouble with Jamie or problems with Jamie?
11     A    Tom told me he was having problems
12 with Trump management.
13     Q    Did he say who at Trump?
14     A    I can't specifically say.
15         I don't think he ever singled out
16 John Henriques, but it was always the
17 environment, whenever John Henriques came down,
18 we really had to be on point, because he was
19 looking at every little thing.
20     Q    Would you agree with me, that's
21 normal, when you have somebody who is overseeing
22 your work --
23         MR. UMOH:  Objection.
24         MS. NORCROSS:  Let me finish
25     the question.

71 (Pages 278 to 281)

Page 282

282
1
2      Q    -- to be on a little bit on guard
when the boss is looking at what you're doing?
4          MR. UMOH:  Objection.
5      A    I disagree.  I would not say it was
6   normal.
7          Under certain circumstances, it was a
8   very tenuous situation.  They had problems with
9   the relationship, and they were nitpicking.
10     Q    Trump was nitpicking?
11     A    Correct.
12     Q    Is it your view that nitpicking was
13   based on race?
14         MR. UMOH:  Objection.
15     A    I thought we were just talking about
16   generally why John Henriques would come down.
17   Now you are going to something --
18     Q    It's a different question.
19         My question is, is it your belief
20   that John Henriques' nitpicking was based on
21   race?
22     A    According to what Jamie MacDonald
23   told me, then yes, it was based on race.
24     Q    Is that because you believe that John
25   Henriques told Jamie that you could not continue

Page 283

283
2   to work at the Trump facility?
3          MR. UMOH:  Objection.
4      A    It was basically how Jamie was
5   presenting the whole entire situation.
6      Q    Let's talk about that.
7      A    Sure.
8      Q    You did not like Jamie very much, did
9   you?
10         MR. UMOH:  Objection.
11     A    I did not know him enough to dislike
12   him.
13     Q    Did you find him abrasive?
14     A    I found his comments disrespectful
15   and harassful, yes.
16     Q    Did you find him to interact with
17   anyone else that way?
18     A    Not to my recollection.
19         I only remember dealing with him
20   primarily about my hair.
21         I did not know him until about a
22   month into my employment at Trump.
23     Q    When you left, Freddy was still
24   employed at Plus One, correct?
25     A    I am not sure if he remained.

Page 284

284
1
2      Q    At the time you left, was he still
3   working there?
4      A    That day, June 9, as far as I know,
5   he was still working that day.
6      Q    And what about Kenrick?  Was he still
7   working there?
8      A    Good question.  I don't know about
9   that.
10     Q    Have you told us everything that you
11   believe supports your claim that you were
12   working in a discriminatory, hostile
13   environment?
14     A    I believe I gave all the major
15   points.
16     Q    Are there any other points.
17     A    Well, because I am not a lawyer, I
18   don't know how to answer it in a legal way.
19     Q    I am only asking, you told us all of
20   the facts that caused you to believe you were
21   subjective to a racially hostile working
22   environment?
23     A    Based on your comment, I don't
24   believe all the questions have been asked.  I am
25   sure there could have been something left out.

Page 285

285
2      Q    Other than what you have already told
3   us, please tell me what additional facts there
4   are that you think support your claim that you
5   were working in a racially discriminatory
6   environment.
7      A    One, the fact that it was quite weird
8   how Jamie could not articulate, the first time
9   he saw my hair, as to how it violated the
10   policy.
11         Number 2, in a meeting with Tom and
12   I, he knew how I violated the policy and said
13   that buns and twists can't be above three
14   inches.  I thought that interpretation was
15   incorrect because my hair is not a bun, it's an
16   Afro.  This is how it naturally grows.
17         He was interpreting incorrectly
18   toward me, where it was subjective on how he was
19   interpreting it.
20         There had been employees who had been
21   violating written policy from a grooming
22   standard continually, and would walk by Jamie,
23   and he never mentioned it at all.
24         Even the same day, he just kept
25   focusing on my hair, while other people, like

72 (Pages 282 to 285)

286

1
2  even after that incident, he would see other
3  employees. Other employees would be violating,
4  showing massive tattoos, hair wet, big hoop
5  earrings, hair in their face, over their eyes.
6      Q    I am going to stop you.
7          I want you to give me the specifics.
8          MR. UMOH:  You can allow her
9  to speak and move to strike.
10         She has to give her responses.
11 You keep interrupting the witness.
12         MS. NORCROSS:  No, I don't
13 keep interrupting the witness.
14         The witness does not answer
15 the questions.
16         MR. UMOH:  Please allow the
17 witness to speak. This is going on
18 all day.
19         MS. NORCROSS: I am not getting
20 into colloquy with you.
21         MR. UMOH:  The attorney is not
22 allowing the witness to answer the
23 question here.
24         MS. NORCROSS:  The record will
25 speak for itself, the entire record

287

2      of this case.
3      Q    Anyway, let's do this. I will
4  withdraw that question.
5          Now here's what I want you to do.
6      A    Sure.
7      Q    For a lot of the day today, you have
8  talked in generalities about this employee was
9  doing, this employees was violating this policy.
10         I would like you to tell me exactly
11 the name of each person you claim was violating
12 the grooming policy, and the portion of the
13 grooming policy you contend he or she was
14 violating.
15         Do you understand what I am asking?
16     A    Yes.
17     Q    I want specifics, not generalities.
18     A    Let's see.
19         All the women that were working at
20 the facility would have hair over their eyes and
21 in their face.
22     Q    Please give me their names.
23     A    Sylvia, I don't know her last name.
24 Magaly, her last name is in the records. There
25 was another receptionist. I don't remember her

288

1
2  name. She was a receptionist on the weekends,
3  so I hardly saw her.
4      Q    Anyone else?
5      A    His name was Ryan. He would
6  consistently have gel in his hair and would
7  groom his hair to stand straight up, which could
8  have been close to three inches, how he was
9  grooming it.
10     Q    Anyone else?
11     A    In terms of the jewelry factor,
12 Magaly was wearing hoop earrings larger than
13 what was allowed on the Trump grooming policy.
14     Q    Anyone else?
15     A    Okay, I talked about Sylvia.
16         I would have to look at the Trump
17 grooming thing and I could let you know. I have
18 to go through it, and it will tell me.
19         MR. DERSCHOWITZ:  Note my
20 objection to the characterization of
21 the Trump grooming thing. Maybe we
22 can refer to it as an exhibit.
23     Q    While I am looking for that, let me
24 ask you, do you have any personal knowledge as
25 to whether or not Jamie or any other Plus One

289

1
2  employee spoke to the people you have named
3  regarding the items you have identified:  Hair,
4  gel and hoops?
5          MR. UMOH:  Objection. Asked
6          and answered.
7      A    Did I answer that already?
8      Q    No, did you not.
9          Go ahead and answer.
10     A    I know I spoke directly with -- I
11 made a point to not assume and do my ground
12 work.
13         No, they had never been called aside
14 on those issues.
15     Q    You spoke to each one of these
16 people?
17     A    Yes, I did.
18     Q    When?
19     A    During my employment at Trump.
20     Q    So sometime between April and June?
21     A    Yes.
22         MR. UMOH:  Objection.
23     A    You mean, were they violating policy
24 between April and June?
25     Q    No. My question was, when did you



Page 290

1                        290
2  speak to them?
3      A    After April 5, 2006.
4      Q    So between April 5 and June 16,
5  that's when you spoke to each one of these
6  people?
7      A    Yes.
8      Q    If any or all of these folks were to
9  testify that your recollection of the
10 conversations you say you had with them was
11 incorrect, would that surprise you?
12     A    No, it would not surprise me, if they
13 were still employed by Plus One.
14     Q    Why is that?
15     A    Because I know, it just makes common
16 sense, if you're employed by a company, your job
17 is at stake, so you are going to follow the
18 instructions of your employer; just like Mike
19 Murray who said he could not, you know, be
20 forthgiving of information.
21     Q    If what you testified to about your
22 conversations with these people is accurate, and
23 they disagree with you, or they say that you're
24 wrong, are you then saying they would be
25 lying?

Page 291

1                        291
2          MR. UMOH:  Objection.
3      A    No, I am not saying they are lying.
4          Some people, they could remember it
5  differently.  The conversation could have been
6  interpreted differently.  There are just so many
7  reasons.
8      Q    Would you agree with me, then, they
9  might have understood the conversation
10 differently than you did?
11         MR. UMOH:  Objection.
12     A    They could not have misunderstood my
13 questions, you know.
14         They could be responding about a
15 particular time period.
16         I would have to see their statement
17 to say otherwise.
18     Q    You were looking at that exhibit to
19 determine whether there was anyone else that you
20 believe was in violation of a grooming standard.
21     A    I can think of those four people I
22 named that I remember.  I definitely made a note
23 of that when I went through.
24         It did not make sense that all this
25 hoopla was about me and my hair, and they

Page 292

1                        292
2  blatantly had things that were not acceptable.
3      Q    So you perceived it as being unfair,
4  then; would that be correct?
5      A    I perceived it as being
6  discriminatory.
7      Q    Explain to me why you concluded that
8  it was because of your race.
9          MR. UMOH:  Objection.  Asked
10         and answered.
11         MS. NORCROSS:  No, she did not
12         answer that.
13         MR. UMOH:  Objection.  Asked
14         and answered.
15     A    How I concluded I was being
16 discriminated based on my race?
17     Q    I want to know why you believe that
18 the dispute about your hair was because of your
19 race and not something entirely unrelated to
20 your race.
21     A    Based on the comments and how I was
22 being treated.
23     Q    Well, this was asked before.
24         But I want to make sure, in this
25 context, no one said to you, we don't like your

Page 293

1                        293
2  hair because it's African American hair, or
3  anything like that; would that be correct?
4          MR. UMOH:  Objection.
5      A    They did not make a specific comment
6  like you just quoted it.
7          They said, We don't make allowances
8  for people with hair like you.
9      Q    First of all, who said that?
10     A    Jamie MacDonald.
11     Q    Did you ask him what he meant by
12 that?
13     A    I don't know if I did or not.
14     Q    Where is Jamie from, do you know?
15     A    No, I do not.
16     Q    Is he American?
17     A    I don't know if he is American or
18 not.
19         To make a comment like, Your hair is
20 not current, you know.  I mean obviously, he was
21 alluding to the fact back in the '60s, like
22 black people had Afros.
23     Q    How do you know that?
24     A    Well, I can't speak for Jamie.
25         Basically how everything went down,

294

1
2  other employees who were nonblack were given
3  certain privileges, and I was not.
4      Q    Tell me who those employees are and
5  what privileges they were given.
6      A    I listed those four employees who
7  were able to consistently break policies, but
8  were never sent home for the day, were never
9  sent to Human Resources for discussion, was
10  never told that their job was in jeopardy based
11  on violating the policies.
12          I don't recall ever seeing anyone
13  being harassed.  It was a continual thing.  They
14  would come to work, and no one would say
15  anything.
16          And I am like, why am I the only one
17  being singled out?
18      Q    Would you agree with me, that
19  conclusion might be incorrect if some of those
20  people have been disciplined, and you just did
21  not know about it?
22      A    I don't think it's incorrect.
23      Q    You don't think you're incorrect
24  when --
25      A    I think if they were still employed,

295

2  see, I don't know whether or not they were
3  disciplined after I got fired.
4          But I know that, like I specifically
5  asked them, have you ever been called out, and
6  they said no.
7          It could be a situation of like which
8  particular month they did get called out.
9          MR. UMOH:  Off the record.
10          (Discussion off the record.)
11          MS. NORCROSS:  Mr. Umoh, do
12      you have a tape recorder on?
13          MR. UMOH:  I don't have a tape
14      recorder.
15      Q    I do have to tell you this.
16          MR. UMOH:  Be careful what you
17      tell my client.
18          MS. NORCROSS:  I am telling
19      her on the record.
20          MR. UMOH:  Don't have a
21      conversation with my client --
22          I am recording you, by the
23      way.
24          MS. NORCROSS:  Then I am not
25      continuing.

296

1
2          Are you recording?
3          MR. UMOH:  It's off.
4          MS. NORCROSS:  Harold, could
5      you look at that and tell me if it's
6      recording?
7      Q    All right, let's do this.
8          Are you okay?
9      A    I am just tired.
10      Q    Let's do this.  You have a claim that
11  Plus One and Jamie MacDonald discriminated
12  against you because of your lawful off-duty
13  activities.
14      A    Which were those?
15      Q    I can show you where I am reading
16  from, and it's right here, that paragraph.
17          MS. NORCROSS:  For the
18      record, I am showing her paragraphs
19      54 and 55 of the Third Amended
20      Complaint.
21      A    After I got off duty, I went to
22  E.E.O.C. to file a complaint.
23      Q    I want to know what the off-duty
24  activity was that you are referring to in that
25  claim.

297

1
2          MR. UMOH:  Objection.
3      A    I am assuming when I got off duty, I
4  went to the E.E.O.C. to file a claim.
5      Q    That paragraph does not refer to your
6  hair, right?  The hair, all that occurred on
7  duty, correct?
8      A    But the hair, that's why why I made
9  the charge to the E.E.O.C.
10      Q    When you called the police, you did
11  that while you were on duty, correct?
12      A    Yes, I was on duty.
13      Q    By the way, have you -- to your
14  knowledge, have you sued Mr. Schuller, Robert
15  Schuller?
16      A    No, I have not sued Robert
17  Schuller.
18      Q    Is there any particular reason why
19  not?
20      A    I can't find him.
21      Q    There were some efforts made, were
22  there not, to attempt to place you in another
23  position within the Plus One system following
24  the Trump, after June 9, 2006, correct?
25          MR. UMOH:  Objection.

298

1
2     A     Repeat the question again.
3     Q     To your knowledge, did Plus One make
4  any efforts to try to find you an alternative
5  position after June 9, 2006?
6           MR. UMOH:  Objection.
7     A     I would be speaking for Dave, and you
8  would have to ask Dave Milani, because he is the
9  resources person.
10    Q     Did Dave tell you they were looking
11 for --
12    A     I remember he said I should start
13 looking for another job.
14    Q     Did Dave tell you they were looking
15 to determine if there was another position for
16 you at Plus One?
17    A     I don't recall him saying that.
18    Q     Did you ever ask him if he was making
19 such an effort?
20    A     I don't recall.
21    I know I was definitely still fixated
22 on, did you do the investigation about the
23 discrimination.
24    Q     Did you receive an answer to that
25 question?

299

1
2     A     After I got terminated.
3     Q     You received the answer on June 16,
4  did you not?  Pardon me, June 19?
5     A     Yes.  It was after I was
6  terminated.
7     Q     Did you receive your termination
8  letter and the letter regarding the
9  investigation on the same day?
10    A     I don't believe so.  I think they
11 came in the mail different dates.
12    Q     You were not qualified to work as a
13 massage therapist in New York in June 2006; is
14 that correct?
15          MR. UMOH:  Objection.
16    A     When you say qualified --
17    Q     I will rephrase it for you.
18    Is it your understanding that you
19 must have a license to be a massage therapist in
20 New York State?
21    A     In order to do full body massage and
22 call yourself a massage therapist, you have to
23 have a license by some New York government
24 organization.
25    Q     And in June of 2006, you did not have

300

1
2  that license; is that correct?
3           MR. UMOH:  Objection.
4     A     In June 2006, no, my application was
5  not completed.
6     Q     Why did you decide to leave the
7  P.I.C. Resort club before your contract
8  expired?
9           MR. UMOH:  Objection.  Asked
10          and answered.
11    A     I did answer that earlier.
12    Q     To go to school, correct?
13    A     I answered earlier, that I had to
14 come to the deposition.
15          MR. UMOH:  Objection.
16    Q     But you applied for school way before
17 this deposition, correct?
18          MR. UMOH:  Objection.
19    A     Before the deposition, yes, I did
20 apply, yes.
21    Q     When did you leave New York to go to
22 Guam to work at the P.I.C. Resort club, what
23 date?
24          MR. UMOH:  Objection.  Asked
25          and answered.

301

1
2           MS. NORCROSS:  No, it has not
3           been asked and answered.
4           MR. UMOH:  Objection.
5     Q     I am just looking for a date.
6     A     Because of the time difference, I
7  don't know whether it was the 21st or the
8  22nd.
9     Q     Of which month?
10    A     February of 2008.
11          MS. NORCROSS:  I am going do
12          stop.  I don't have anything else to
13          ask you tonight.
14          I am not closing the
15          deposition, for the reasons I
16          explained to you before.  There are
17          some serious problems.
18          THE WITNESS:  However, because
19          I am staying with my father, I have
20          to know before I leave today, because
21          it takes me two hours to get here.
22          MS. NORCROSS:  You're talking
23          about tomorrow morning?
24          THE WITNESS:  No, we won't
25          continue tomorrow morning.

76 (Pages 298 to 301)



Page 302

302

1
2          MR. DERSCHOWITZ:  We are
3      talking about rights, about deposing
4      you in the future.
5  EXAMINATION BY
6  MR. UMOH:
7      Q     You testified earlier that the only
8  documents that you turned over were the tax
9  returns; is that correct?
10     A     No, they were not the only documents
11 that I turned over.
12         The only reason why I was focusing on
13 the tax documents is because those were the most
14 challenging, going back and forth with the
15 accountant and trying to get my paperwork in
16 storage.
17         I know over the course of the time of
18 this situation, I have given a copy of my
19 employment contract with P.I.C., I have given an
20 affidavit, e-mails.  A photo of my hair I have
21 given.
22         The only reason I was focusing on the
23 tax records is because that was the most
24 challenging.
25     Q     Now all the documents you just

Page 303

303

2  testified to that you turned over, were those
3  documents that counsel directed you to turn
4  over?
5      A     As far as I know.
6          MS. NORCROSS:  Objection.  My
7      objection is, it appears as though
8      the question calls for Miss Mann to
9      waive the attorney/client privilege,
10     and that is how we are going to take
11     it.
12         MR. DERSCHOWITZ:  I would
13     agree.
14     Q     Let me rephrase the question.
15         Earlier, you were asked whether or
16 not you had turned over certain documents to
17 your attorney.
18         In response to that question, you
19 stated that you turned over solely your tax
20 documents; is that correct?
21         MS. NORCROSS:  Objection.
22     A     No, that's not correct.
23         I turned over more documents than my
24 tax records.
25     Q     On Saturday, August 9, 2008, did you

Page 304

304

1  and I meet to prepare for this deposition?
2      A     Yes, we did meet.
3      Q     Without divulging any of our
4  conversations, how long did we meet on Saturday
5  to discuss this deposition?
6          MS. NORCROSS:  Objection.
7          Asked and answered.
8      A     I know it was not more than two
9  hours, but it could have been an hour and a half
10         MR. UMOH:  That's it.
11 CONTINUING EXAMINATION
12 BY MS. NORCROSS:
13     Q     Did you have any conversation with
14 anybody -- I don't want to hear the substance of
15 it.
16         Did you have any conversation with
17 anybody about the length of your deposition prep
18 between the time I asked you the question this
19 morning and just now?
20     A     Repeat that question.
21     Q     Did you prepare for that particular
22 question at any time between this morning and
23 now?
24     A     I had talked about the deposition,

Page 305

305

1  but I was not staged to say that answer.
2          MS. NORCROSS:  Move to
3      strike.
4      Q     My question was whether you had any
5  conversation about that question.
6      A     And which question was that?
7      Q     The question of how long did you meet
8  with your lawyer to prepare for your deposition.
9      A     I am trying to think.
10         MR. UMOH:  I object to the
11     question.
12     A     I know when I was hesitant to say
13 about my meeting with my lawyer, because I
14 thought it was attorney/client privilege.
15 That's why I was like, I don't know if I should
16 say this.
17         Then I was asking, is it okay to say
18 these things.
19     Q     You don't need to tell me the
20 substance of your conversations with your
21 lawyer.
22         MR. UMOH:  I will direct she
23     not answer that question.
24         MS. NORCROSS:  I am not asking

Legal Ease Reporting, Inc.
212-481-3500

Page 306

```
1                    306
2        substance.
3            MR. UMOH:  I would direct that
         she not answer.
5    Q    I am not going to try to force you to
6  answer it right now.
7            Let me just say, number one, this
8  question does not go to the attorney/client
9  privilege.
10           MS. NORCROSS: I have no
11       further questions.
12           (Whereupon the E.B.T. was
13       concluded at 9:00 p.m.)
14
     _____
              JORDAN MANN
15
16
17
18
19
20  Subscribed and sworn to
21  before me this _____day
22  _____, 2008.
23
24  _____
              NOTARY PUBLIC
25
```

Page 307

```
1                    307
2             JORDAN MANN
3   E R R A T A     S H E E T
4   Page Line
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 308

```
1                    308
2   I N D E X    O F    E X H I B I T S
3
    DEFENDANT'S
4   EXHIBIT #    DESCRIPTION         PAGE
5   1    Court judgment for legal name change  10
6   2    W-4 form                    17
7   3                        17
8   4    Internal posting application for    23
9       Plus One
10  5    E.E.O.C. paperwork          27
11  6    Charge filed with E.E.O.C.   28
12  7    Letter written by deponent to     34
13      E.E.O.C.
14  8    Complaint filed in federal court    41
15  9    Letter from New York University    69
16  10   Employment agreement         71
17  11   Notarized affidavit          76
18  12   Pay stubs from P.I.C. Resort     78
19  13   Plaintiff's Response to       82
20      Interrogatories
21  14   Plaintiff's Responses to Defendant   84
22      Plus One Interrogatories
23  15                       107
24  16   Application to Plus One      115
25  17                       125
```

Page 309

```
1                    309
2   I N D E X     O F     E X H I B I T S
3          (Continued)
4
    DEFENDANT'S
5   EXHIBIT #    DESCRIPTION         PAGE
6   18   Resume                  137
7   19   Grooming standard for Plus One or    148
8       Trump
9   20   Pages from Plus One website     149
10  21   Trump work staff apparel, uniforms   151
11  22   Training materials for Trump Towers  154
12  23   E-mails between deponent and Plus    195
13      One employees
14  24   Incident report, 4 pages      206
15  25   Photograph of deponent        234
16  26   Employee handbook           242
17
18
19
20
21
22
23
24
25
```

Legal Ease Reporting, Inc.
212-481-3500

```
 1                    310
 2            CERTIFICATE
 3        I, SANDY ESKENAZI,
 4   a Shorthand Reporter and Notary Public of the
 5   State of New York, do hereby certify:
 6
 7        That JORDAN MANN,
 8   the witness whose examination is hereinbefore
 9   set forth, was duly sworn, and that such
10   examination is a true record of the testimony
11   given by such witness.
12
13        I further certify that I am not related to
14   any of the parties to this action by blood or
15   marriage; and that I am in no way interested in
16   the outcome of this matter.
17
18
19          Sandy Eskenazi
20        ──────────────────────
              NOTARY PUBLIC
21
22
23
24
25
```